No. 26-2469

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

Americans For Prosperity Foundation, et al.,
*Appellants*,

v.

Anthony Albence, et al.,
*Appellees*.

---

On Appeal from the United States District Court
for the District of Delaware
No. 1:26-cv-00445-JLH
The Honorable Jennifer L. Hall

---

**Opening Brief for Appellants**

---

ERIKA D. PROUTY
ROBERT J. TUCKER
BAKER & HOSTETLER LLP
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com

ALLEN J. DICKERSON
RICHARD B. RAILE
BAKER & HOSTETLER LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1711
adickerson@bakerlaw.com
rraile@bakerlaw.com

*Counsel for Appellants Americans for Prosperity Foundation and Americans for Prosperity*

## <u>Corporate Disclosure Statement</u>

Americans for Prosperity Foundation has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public. Americans for Prosperity likewise has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

## Table of Contents

Introduction ............................................................................................1

Jurisdictional Statement ..........................................................................5

Statement of Issues..................................................................................5

Statement of Related Cases and Proceedings .........................................5

Statement of the Case..............................................................................6

    A.    Factual Background..................................................................6

        1.    Delaware's regulation of electioneering communications and third-party advertisements.....................................................6

        2.    Appellants' First Amendment activity.......................................8

    B.    Procedural History..................................................................12

Summary of Argument ..........................................................................13

Standard of Review................................................................................15

Argument................................................................................................17

    I.    The district court erred in holding that Appellants had not shown a likelihood of success on the merits. ................................................17

        A.    Delaware's donor disclosure requirements cannot survive exacting scrutiny. ................................................18

        B.    Delaware's donor disclosure requirements are overbroad and thus fail on their face.........................................36

        C.    Delaware's donor disclosure requirements are unconstitutional as applied to Appellants. ...............................40

    II.    The remaining factors favor an injunction. .......................................49

Conclusion .............................................................................................51

# Table of Authorities

**Cases**

*Agudath Isr. of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)................................................................................50

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty*,
39 F.4th 95 (3d Cir. 2022) ................................................................................50

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021).................................................................... *passim*

*American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994)................................................................................16

*Ams. for Prosperity Found. v. Harris*,
182 F. Supp. 3d 1049 (C.D. Cal. 2016) ........................................... 10, 11, 47, 49

*Ams. for Prosperity v. Grewal*,
2019 WL 4855853 (D.N.J. Oct. 2, 2019) .................................................... 11, 48

*Apple Computer, Inc. v. Franklin Computer Corp.*,
714 F.2d 1240 (3d Cir. 1983)................................................................................16

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)................................................................................16

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973)................................................................................36

*Brooklyn Legal Servs. Corp v. Legal Servs. Corp.*,
462 F.3d 219 (2d Cir. 2006)................................................................................46

*Buckley v. Valeo*,
424 U.S. 1 (1976).................................................................... *passim*

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ................................................................ *passim*

*Del. Strong Fams. v. Del. Att'y Gen*,
  793 F.3d 304 (3d Cir. 2015) ...................................................... *passim*

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024) ...................................................... 50

*DiFiore v. CSL Behring, LLC*,
  879 F.3d 71 (3d Cir. 2018) ......................................................... 33

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ...................................................... 51

*Duraco Prods., Inc. v. Joy Plastic Enters., Ltd*,
  40 F.3d 1431 (3d Cir. 1994) ....................................................... 16

*Edwards v. District of Columbia*,
  755 F.3d 996 (D.C. Cir. 2014) ............................................. 43, 45, 46

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................. 49

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) ...................................................... 50

*First Choice Women's Res. Centers, Inc. v. Davenport*,
  146 S. Ct. 1114 (2026) ........................................................... *passim*

*Free Speech Coal., Inc. v. Att'y Gen. U.S.*,
  677 F.3d 519 (3d Cir. 2012) ....................................................... 40

*Fusaro v. Howard*,
  19 F.4th 357 (4th Cir. 2021) ...................................................... 45

*Gaspee Project v. Mederos*,
  13 F.4th 79(1st Cir. 2021)........................................................ 27, 28, 31

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006).........................................................................16

*Hassen v. Gov't of V.I.*,
  861 F.3d 108 (3d Cir. 2017).........................................................,,33

*In re Krebs*,
  527 F.3d 82 (3d Cir. 2008)..............................................................33

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*,
  56 F.4th 437 (7th Cir. 2022) ...........................................................50

*K.A. v. Pocono Mt. Sch. Dist.*,
  710 F.3d 99 (3d Cir. 2013)......................................................... 49, 51

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)......................................................... 15, 16

*Legal Aid Servs. Or. v. Legal Servs. Corp.*,
  608 F.3d 1084 (9th Cir. 2010) ........................................................41

*Mazo v. N.J. Sec'y of State*,
  54 F.4th 124 (3d Cir. 2022........................................................ 41, 45

*McConnell v. FEC*,
  540 U.S. 93 (2003).........................................................................35

*McCullen v. Coakley*,
  573 U.S. 464 (2014)................................................................. 20, 24

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995).......................................................................22

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)...................................................................... 39, 40

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958).......................................................................1, 18

*NAACP v. Button*,
   371 U.S. 415, 433 (1963)....................................................................20

*Nat'l Org. for Marriage v. McKee*,
   649 F.3d 34 (1st Cir. 2011)..................................................................33

*N.J. Bankers Ass'n v. Att'y Gen. N.J.*,
   49 F.4th 849 (3d Cir. 2022) ................................................................40

*Nken v. Holder*,
   556 U.S. 418 (2009)............................................................................50

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013)................................................................50

*Pub. Int. Legal Found., Inc. v. Bellows*,
   92 F.4th 36 (1st Cir. 2024)..................................................................33

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) ....................................................... 45, 50

*Regino v. Staley*,
   133 F.4th 951 (9th Cir. 2025) .............................................................46

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017)........................................................ 16, 17, 21

*Rio Grande Found. v. Oliver*,
   154 F.4th 1213 (10th Cir. 2025) .........................................................29

*Roberts v. Neace*,
     958 F.3d 409 (6th Cir. 2020).................................................................49

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
     592 U.S. 14 (2020)...................................................................................50

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
     467 U.S. 947 (1984).......................................................................... 37, 38

*Shelton v. Tucker*,
     364 U.S. 479 (1960)..................................................................................21

*Singer Mgmt. Consultants, Inc. v. Milgram*,
     650 F.3d 223 (3d Cir. 2011)....................................................................17

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*,
     56 F.4th 400 (6th Cir. 2022) ....................................................... 20, 24, 32

*Swartzwelder v. McNeilly*,
     297 F.3d 228 (3d Cir. 2002).....................................................................51

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
     309 F.3d 144, 178 (3d Cir. 2002) ............................................................ 49, 50

*United States v. Hansen*,
     599 U.S. 762 (2023)..................................................................................36

*United States v. Stevens*,
     559 U.S. 460 (2010).......................................................................... 36, 40

*United States v. Williams*,
     553 U.S. 285 (2008).................................................................. 36, 37, 38

*Van Hollen v. Fed. Election Comm'n*,
     811 F.3d 486 (D.C. Cir. 2016)..........................................................3, 34

vii

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ................................................................36

*Wyo. Gun Owners v. Gray*,
   83 F.4th 1224 (10th Cir. 2023) ................................................ *passim*

**Statutes**

15 Del. Admin. Code 100-9.1.5 .......................................................7

15 Del. Admin. Code 100-10.1 .....................................................7, 11

15 Del. Admin. Code 100-10.3 .....................................................8, 11

15 Del. C. § 8002 ......................................................... 6, 7, 20, 42

15 Del. C. § 8021 ........................................................................22

15 Del. C. § 8031 ............................................................... *passim*

15 Del. C. § 8043 ......................................................................8, 11

26 U.S.C. § 501 ...........................................................................35

28 U.S.C. § 1292 ...........................................................................5

28 U.S.C. § 1331 ...........................................................................5

28 U.S.C. § 1343 ...........................................................................5

42 U.S.C. § 1983 ...........................................................................5

**Other Authorities**

DEL. CONST. art. II .......................................................................7
DEL. CONST. art. III ......................................................................7

**Regulations**

Electioneering Communications, 72 Fed. Reg. 72899 (Dec. 26, 2007) .................34

## Introduction

Americans have the right "to pursue their lawful private interests privately and to associate freely with others in so doing." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 466 (1958). Time and again, the Supreme Court has explained that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) ("*AFPF*") (quoting *Patterson*, 357 U.S. at 460). It has repeatedly "noted 'the vital relationship between freedom to associate and privacy in one's associations.'" *Id.* (quoting *Patterson*, 357 U.S. at 462). Even in cases involving donors to candidates and parties, the Court has held that the Constitution protects "privacy of association and belief" and stands against "compelled disclosure." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam).

Against this backdrop, Delaware administers perhaps the most staggeringly overbroad donor disclosure regime in the nation. It reaches any mention of a candidate for office—including an incumbent officeholder—in a public communication made sixty days before a general election. A mere $500.01 in aggregate spending triggers the reporting requirement. Once triggered, any speaker that falls into Delaware's regulatory maw must publish the name and address of

every one of its donors giving more than $100, in aggregate, over a period of up to four years.

Delaware makes no effort to connect the dots between an organization's donor and a reporting organization's often much later speech. There is no requirement that a donor earmark a contribution for a particular advertisement, for activity in Delaware, or even for ostensibly political purposes generally. There is no opportunity to opt out of funding regulated speech and thereby, through an act of unlikely prescience, proactively safeguard one's privacy. There is not even a requirement that a contribution be given with knowledge that an organization *might* engage in a paltry amount of political speech in Delaware at some point in the future. Delaware simply asserts that its voters need to know every donor to an organization that dips a toe into advocacy within its borders—in this case, thousands of individuals, across the nation and across multiple years.

This "dragnet" approach is unconstitutional. *AFPF*, 594 U.S. at 614. As the Supreme Court explained mere months ago, "demands for private donor information" like Delaware's "'inevitably' carry with them a 'deterrent effect on the exercise of First Amendment rights.'" *First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1123 (2026) (alteration marks omitted) (quoting *Buckley*, 424 U.S. at 65). For this reason, donor disclosure regimes are subject to exacting scrutiny requiring "a substantial relation between the disclosure

requirement and a sufficiently important governmental interest," *and* that the demand "be narrowly tailored to the interest it promotes." *AFPF*, 594 U.S. at 611 (citations and quotation marks omitted).

Delaware's scheme cannot meet this standard. Its requirements violate donors' privacy and serve no legitimate purpose. Delaware relies upon a generalized "informational objective[]" in informing its voters, *see* Dist. Ct. Dkt. 21 at 11, but cannot credibly assert that every small donation made everywhere in the country in 2023 provides any useful information about a communication in 2026, much less that each donor intended to support or oppose a specific, named official all those years later. This is especially true where, as here, thousands of donors across the nation have given to large organizations that engage in an enormous range of activity across the entire country. Vanishingly few Delaware voters will ever review that bloated list, and if they do, the identities of an organization's general supporters will say nothing about what those supporters think about the policy positions of a candidate in Delaware.

True, the challenged statute has previously been upheld under an obsolete legal standard. *Del. Strong Fams. v. Del. Att'y Gen.*, 793 F.3d 304 (3d Cir. 2015) ("*DSF*"). But *AFPF* replaced the "fragile arrangement that treats speech, a constitutional right, and transparency, an extra-constitutional value, as equivalents." *Van Hollen v. Fed. Election Comm'n*, 811 F.3d 486, 501 (D.C. Cir. 2016). *DSF* did

not have the benefit of *AFPF* and *First Choice*, did not apply narrow tailoring and is, accordingly, superseded.

Appellants are happy to stand behind their communications. They will register with the state, publicly disclose their spending in Delaware, and take ownership of each communication through a "paid for by" label. If a Delaware voter is anxious to evaluate Appellants' speech, they will have ample resources with which to do so. But Appellants will not speak in Delaware at the cost of subjecting their donors to unconstitutional invasions of privacy and risks of harassment.

Thankfully, the First Amendment does not require them to make that choice. Delaware's disclosure regime is both unconstitutional on its face and as applied to Appellants. It sweeps far too many unrelated bystanders into its regulatory ambit. In particular, it threatens to reach thousands of modest contributors who gave to large organizations with no conception that an infinitesimal share of their donations may be used, years later, to speak in Delaware. The destruction of these individuals' right to "privacy of association and belief," *Buckley*, 424 U.S. at 64, will accomplish nothing to inform any reasonable voter in Delaware. But it will chill those individuals' and Appellants' freedom of speech and association.

Because Appellants are likely to succeed on the merits, and because the remaining equitable factors nearly always favor parties seeking to vindicate First Amendment liberties, the district court erred in denying a preliminary injunction.

**Jurisdictional Statement**

Because Appellants brought their claim under federal law—the First Amendment and 42 U.S.C. § 1983—the district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. The court denied Appellants' motion for a preliminary injunction on June 8, 2026, and Appellants timely appealed two days later on June 10, 2026. JA-001; JA-003. This Court has jurisdiction to review the order denying a preliminary injunction under 28 U.S.C. § 1292(a)(1).

**Statement of Issues**

The questions presented are:

(1) Whether Appellants are likely to show that Delaware violates the First Amendment by requiring that any entity sponsoring any public communication that references a Delaware candidate near a Delaware election disclose all persons everywhere who donated more than $100 to that entity during a period up to four years, JA-006–13; Dist. Ct. Dkt. 5 at 8–18; Dist. Ct. Dkt. 25 at 1–7; and

(2) Whether the equitable factors governing injunction requests favor First Amendment rights over First Amendment deprivations. JA-013–14; Dist. Ct. Dkt. 5 at 18–20; Dist. Ct. Dkt. 25 at 7–10.

**Statement of Related Cases and Proceedings**

This case has not come before this Court previously. This Court has previously considered a challenge to Delaware's disclosure regime in *Del. Strong Fams. v. Del. Att'y Gen.*, 793 F.3d 304 (3d Cir. 2015).

**Statement of the Case**

A.      **Factual Background**

1.      **Delaware's regulation of electioneering communications and third-party advertisements**

The Delaware Elections Disclosure Act (the "Act") requires "[a]ny person" (including an entity) who makes expenditures for "third-party advertisement[s]" over $500 during an election period to "file a third-party advertisement report with the Commissioner." 15 Del. C. § 8031(a); 15 Del. C. § 8002(17). A "[t]hird-party advertisement" includes "an electioneering communication," 15 Del. C. § 8002(27), which is a communication "that: 1. [r]efers to a clearly identified candidate; and 2. [i]s publicly distributed within 30 days before a primary election or special election, or 60 days before a general election to an audience that includes members of the electorate for the office sought by such candidate," 15 Del. C. § 8002(10)a.

Third-party advertisement reports must include "[t]he full name and mailing address of each person who has made contributions to such person during the election period in an aggregate amount or value in excess of $100." 15 Del. C. § 8031(a)(3). The Act provides no exception to this mandate. Donors must be disclosed regardless of whether they earmarked their donations for electioneering communications, intended their donations to be used in Delaware, or intended for their (mostly modest) contributions to be used in support of advertising at all. The Act includes no mechanism for donors to opt out of disclosure by specifying that

6

their donations should not be used in Delaware or for electioneering communications. Any donor who gives more than $100 in the aggregate to an organization during the relevant period must be disclosed—no matter what.

The applicable "election period" depends on the candidate identified in the third-party advertisement. *See* 15 Del. C. § 8002(11)(d). For candidates running for reelection, the election period is "the period beginning on January 1 immediately after the most recent such election [to their current office], and ending on the December 31 immediately after the general election at which the candidate seeks reelection to the office." 15 Del. C. § 8002(11)(a)(1). Because Delaware's state senators and statewide executive officeholders are elected every four years, *see* DEL. CONST. art. II, § 2; *id*. art. III, §§ 5, 19(a), 21, the applicable "election period" for incumbent candidates running for reelection can be as long as four years. Reports must be filed within 48 hours of when the expenditure is made if it is made "more than 30 days before a primary or special election or 60 days before a general election," and within 24 hours if the expenditure is "made 30 days or less before a primary or special election or 60 days or less before an election." 15 Del. Admin. Code 100-9.1.5.

Reports must be made under penalty of perjury. 15 Del. C. § 8031(a). Failure to file a required report is punished by "a fine by the Commissioner of $50 for each day that such report is tardy." 15 Del. Admin. Code 100-10.1. If a tardy report is not

filed or corrected within 30 days following either a determination by the Commissioner that the tardiness is not due to reasonable cause or the expiration of the appeal period, "then the Commissioner shall notify the Office of the Attorney General that the reporting party has failed to file such report." 15 Del. Admin. Code 100-10.3. Failure to file the reports is a class A misdemeanor. 15 Del. C. § 8043(c).

### 2.    Appellants' First Amendment activity

Appellants Americans for Prosperity ("AFP") and Americans for Prosperity Foundation ("AFPF") are nonprofit corporations engaged in public advocacy throughout the United States. Each is organized under a different provision of the Internal Revenue Code—AFP is a 501(c)(4) and AFPF is a 501(c)(3)—and the nature of their advocacy efforts accordingly differs. JA-075. But both groups raise funds from thousands of individual donors across the country, and both groups spend those funds to engage the public on a wide range of policy topics. JA-075–77.

Appellants have not operated in Delaware but intend to do so, including in advance of the 2026 and subsequent primary and general elections. Specifically, Appellants anticipate producing and distributing communications by means of television, radio, mail, and the internet. JA-076. These communications will discuss specific officeholders, who are also candidates for election or reelection, in the context of governmental action and issues of public policy and will cost more than $500. *Id.*; *see also* JA-320–25.

If made within 30 days of a primary election (or 60 days of a general election), these communications will be considered "third-party advertisements" under the Act and require Appellants to file third-party advertisement reports. To comply with the Act, those reports must publicly disclose the names and addresses of AFP's and AFPF's donors: everyone, without limitation, who contributed more than $100 in the aggregate during the applicable "election period." From 2022 to 2025, there were 590 donors who contributed between $100.01 and $199.99 to AFP and/or AFPF. JA-076. Over 1,000 more gave between $200.00 and $999.99 during the same period. JA-077. Only a few donors reside in Delaware; the vast majority reside elsewhere. *Id*. None gave for the purpose of making communications in Delaware or in response to solicitations concerning AFP and AFPF's anticipated activity in Delaware. *Id*. If triggered, the Act would require Appellants to disclose an individual located in Ohio that donated $30 a year ($120 in the aggregate) since 2023.

Appellants will not disclose their donors in this expansive manner. Appellants prioritize donor privacy and have erected safeguards to protect their confidentiality. JA-078–79. Appellants maintain donor information in a highly secure database, and restrict access to individuals within the entities who have a need to know that information. JA-078. If Appellants disclose the names and addresses of their donors, at least some donors will refuse to contribute to Appellants, and current donors will cease contributing, for many reasons. Some will be fearful of reprisal if their names

and addresses are disclosed. JA-077–79. Others will feel betrayed by the violation of agreements they made with Appellants to maintain the confidentiality of donations. *See* JA-078–79. And others will not wish for their names to be misleadingly associated with activities over which they had no control and in which they were not involved. *See* JA-076–77.

Concerns of harassment and reprisal (though unnecessary to Appellants' claims) are justified. Appellants, and their employees and supporters, have been subject to threats and harassment in the past. JA-077. For example, hundreds of protesters gathered outside of AFP's 2011 summit in Washington, D.C. and attempted to storm the building. The protest turned violent, and some attendees were physically accosted and injured.[1] AFP's office in Fargo, North Dakota was vandalized and spray painted because of AFP's support for free speech. JA-077–78. Courts, including the Supreme Court of the United States, have repeatedly recognized the threats, harassment, and intimidation that Appellants and their supporters have experienced. *AFPF*, 594 U.S. at 617 (explaining that AFPF had shown "that they and their supporters have been subject to bomb threats, protests,

---

[1] Clare O'Connor, *Occupy the Koch Brothers: Violence, Injuries, and Arrests at DC Protest*, FORBES (Dec. 10, 2011, at 6:25pm EST), http://www.forbes.com/sites/clareoconnor/2011/11/05/occupy-the-kochs-violent-clashes-injuries-and-arrests-at-protest-against-corporate-greed/; *see also Ams. for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1056 (C.D. Cal. 2016) (describing event) (post-decision procedural history omitted).

10

stalking, and physical violence"); *see also id*. at 636–37 (Sotomayor, J., dissenting) ("Petitioners have unquestionably provided evidence that their donors face a reasonable probability of threats, harassment, and reprisals if their affiliations are made public."); *Harris*, 182 F. Supp. 3d at 1056 (cataloging threats); *see also Ams. for Prosperity v. Grewal*, 2019 WL 4855853, at *6 (D.N.J. Oct. 2, 2019) (describing evidence where "AFP itself and its donors have been subjected to harassment ranging from death threats to cyberattacks to violent protests at AFP events").

Threats and harassment have continued in recent years, including in Vermont, where Appellants were compelled to hire security for their events due to consistent harassment and threats from groups who disagree with Appellants on economic policy. JA-077. Legislators have attempted to stop AFP's operations in Northeastern states by introducing legislation targeting AFP, including in Vermont and Maine, where legislators singled out AFP as the basis for preventing non-profits from advocating in their states. JA-077–78. Appellants and their donors therefore have a reasonable fear that they will be the target of threats, harassment, or other retaliation if such information is disclosed.

But if Appellants engage in covered speech and do not file the required reports disclosing their donors, they face a credible threat of enforcement, including fines and other punitive actions by Delaware state officials, including criminal prosecution. 15 Del. Admin. Code 100-10.1–10.3; 15 Del. C. § 8043(c). Delaware

11

has not disavowed enforcement of its disclosure requirements for Appellants' planned conduct. Rather, Delaware has previously enforced the requirements, *see* JA-062, and rigorously defended the constitutionality of the statute in a prior challenge. *See generally DSF*, 793 F.3d 304; *see infra* § I.A.3.

Caught between its considered policy not to disclose donor identities for weighty reasons and the Act's stiff penalties, Appellants will not publish communications in Delaware that the Act may cover while the challenged requirements are in effect. JA-079. If the Act's disclosure demands are enjoined or withdrawn, Appellants will engage in their desired activity and publish their intended communications. JA-076; JA-079; JA-320–21.

### B. Procedural History

Appellants filed this action on April 17, 2026, and filed a motion for preliminary injunction the same day. JA-026; JA-059. Appellants assert that the Act violates the First Amendment on its face and as applied to Appellants and seek a preliminary injunction to enjoin enforcement of the Act in advance of the 2026 elections. *Id.*; Dist. Ct. Dkt. 5. The State opposed the motion, confirming that it intends to continue enforcing the Act against those who would speak before Delaware elections. Dist. Ct. Dkt. 21. The district court held a hearing on June 8, 2026 and, in a ruling from the bench, denied Appellants' motion the same day. JA-003; JA-004–15. Appellants filed this appeal two days later. JA-001.

**Summary of Argument**

The Court should reverse the district court's order and direct it to issue the requested preliminary injunction.

I.      The Act imposes disclosure obligations that trigger and fail exacting scrutiny on a facial basis and as applied to Appellants.

A.      In *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021), the Supreme Court held that all obligations to disclose donor identities are subject to exacting scrutiny regardless of the severity of the burdens they impose. *Id.* at 608. By consequence, the Act warrants exacting scrutiny because it demands that Appellants disclose nearly all their donors going back years for even *de minimis* spending before Delaware elections. *AFPF* also clarified that exacting scrutiny demands narrow tailoring to an important state interest. *Id.* The Act fails this standard because it furthers, at best, an administrative interest that *AFPF* held is insufficient to justify disclosure burdens. The Act is, besides, insufficiently tailored because its nationwide demand for donors' public exposure sweeps in startling swaths of information with no connection in any supposed interest in revealing who is funding *Delaware* election-related speech. Further, the Act could easily be tailored with an earmarking arrangement or opt-out system or *any* attempt to cabin the requirement to the state of Delaware. The Act is far more burdensome and offensive

13

than the California disclosure regime deemed "far" short of constitutional standards in *AFPF*. *Id.* at 613.

The district court erred by discarding *AFPF*'s directives in favor of this Court's older *DSF* decision, which committed the exact error *AFPF* condemned by failing to apply a narrow-tailoring standard. The Tenth Circuit has expressly stated that *DSF* is abrogated after *AFPF* and that the Act is unconstitutional. This Court should not split with the Tenth Circuit. It can and should declare the same without en banc proceedings, given the plain conflict between *DSF* and *AFPF*.

B.      The Act is facially unconstitutional because of its stunning overbreadth. The Act regulates election spending in *one* state by demanding disclosure of all donors funding *everything* an entity does *everywhere*—in the other 49 states and at the federal level. Indeed, the Act has all of the overbreadth problems of the California disclosure regime struck down in *AFPF* but none of its alleged saving graces. California set a donation threshold 50 times higher than Delaware's, measured that threshold on an annual (not quadrennial) basis, and promised to retain donor confidentiality. Delaware promises internet publication of donors at a nearly non-existent threshold who have no connection at all to the State. Because it is not tailored in any way, this dragnet is unconstitutional in every iteration as to everyone.

C.      The Act is unconstitutional at least as applied to Appellant because they fit within the far extreme of its untailored dragnet. Not a single donor to Appellants

fits within Delaware's supposed interest in disclosure of those who fund Delaware-related election spending. Although future activity could arguably render a small subset of donors within that interest, the Act sweeps far beyond it by demanding disclosure of hundreds of donors who gave at a time when Appellants made no Delaware-related speech and many more who will continue to give without funding Delaware-related speech. The district court did not find otherwise. Instead, it held that Appellants must show a threat of harassment or reprisal to make out a First Amendment claim. But *AFPF* rejected that exact argument, and its holding extends to both facial and as-applied claims. In all events, Appellants *did* establish a reasonable probability of harassment or reprisal, and the district court erred as a matter of law in demanding much more specificity than is required.

II.     The equitable factors governing injunction requests present no contest. Appellants are irreparably harmed as a matter of law by Delaware's First Amendment deprivation, and the remaining factors always favor First Amendment rights over state actors who violate those rights. The Court should direct an immediate provisional injunction.

## **Standard of Review**

This Court "[r]eviews the denial of a preliminary injunction for 'an abuse of discretion, an error of law, or a clear mistake in the consideration of proof.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *American*

*Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). This Court "exercise[s] plenary review over the district court's conclusions of law and its application of law to the facts" and reviews "findings of fact for clear error." *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1438 (3d Cir. 1994) (citations and quotation omitted).

"'Despite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge…a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law.'" *Kos Pharms., Inc.*, 369 F.3d at 708 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1242 (3d Cir. 1983)).

Although "plaintiffs normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits," *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017), *as amended* (June 26, 2017), in First Amendment cases, "plaintiffs must be deemed likely to prevail for the purpose of considering a preliminary injunction unless the government has shown that plaintiffs' proposed less restrictive alternatives are less effective than the statute," *id.* (cleaned up) (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)). "This is because 'the burdens at the preliminary injunction stage track the burdens at trial,' and for First Amendment purposes they rest with the government." *Id.* (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). Moreover, the first factor

only requires a showing that the movant "can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Id.* at 179. This Court does not require "a more-likely-than-not showing of success on the merits." *Id.* at n.3 (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc) (internal punctuation omitted)).

## **Argument**

### I.    **The district court erred in holding that Appellants had not shown a likelihood of success on the merits.**

Appellants' motion for a preliminary injunction should have been granted because Appellants demonstrated they were likely to succeed on the merits of both their facial and as-applied challenges to Delaware's donor disclosure requirements. The Act triggers exacting scrutiny by setting compelled disclosure requirements and cannot survive the standard the Supreme Court announced in *AFPF*. The statute is overbroad and unconstitutional on its face and as applied to Appellants. The district court erred in holding to the contrary, relying almost exclusively on this Court's decision in *DSF*, 793 F.3d 304, a case that predates *AFPF* and has been in effect overruled.

Because the remaining factors also favored Appellants, the district court erred in denying a preliminary injunction.

17

**A. Delaware's donor disclosure requirements cannot survive exacting scrutiny.**

Appellants are likely to prevail on their claims because the Act triggers exacting scrutiny and cannot survive that standard.

**1. Exacting scrutiny requires narrow tailoring.**

"The First Amendment guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice*, 146 S. Ct. at 1122. The Supreme Court has "long understood" that each of these rights "necessarily carries with it a corresponding right to associate with others." *Id*. (cleaned up). And "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Patterson*, 357 U.S. at 462.

As the Supreme Court unanimously reaffirmed just this term, "demands for private donor information" in particular "'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights,'" *First Choice*, 146 S. Ct. at 1123 (quoting *Buckley*, 424 U.S. at 65). "[A]ny demand for donor information . . . must overcome heightened First Amendment scrutiny" because "[d]emands for private donor information . . . 'chill' protected First Amendment associational rights." *Id*. at 1124 (quoting *AFPF*, 594 U.S. at 616). Such demands make injuries to First Amendment rights "'inevitable.'" *Id*. at 1128. That is because of "the 'vital relationship' between 'privacy in one's associations' and the 'freedom to

18

associate.'" *Id*. at 1123 (citation omitted). Accordingly, "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *AFPF*, 594 U.S. at 608 (plurality opinion).

That standard, however, recently changed. Prior to 2021, courts "understood exacting scrutiny to require that the government show 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'" *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1243 (10th Cir. 2023) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366–67 (2010)); *see also DSF*, 793 F.3d at 309 (same). But in *AFPF*, the Supreme Court rejected the argument "that exacting scrutiny demands no additional tailoring beyond the 'substantial relation' requirement." 594 U.S. at 608. The Supreme Court clarified that exacting scrutiny also demands "that disclosure regimes . . . be narrowly tailored to the government's asserted interest." *Id.* Accordingly, the law is now clear that "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored." *Id.* at 609; *see Wyo. Gun Owners*, 83 F.4th at 1243–44 (describing the change in law). In fact, the Ninth Circuit in *AFPF* applied exacting scrutiny without a narrow tailoring inquiry, and the Supreme Court held that this omission "was error." *Id*. at 612. That is because the "'government may regulate in the [First Amendment] area only with narrow specificity,' and compelled disclosure regimes

are no exception." *AFPF*, 594 U.S. at 610 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

A "critical feature" of the narrow tailoring inquiry "turns on whether the [government] 'seriously undertook to address' the problems it faces 'with less intrusive tools readily available to it." *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 404 (6th Cir. 2022) (Sutton, C.J.) (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)). Delaware "is not free to enforce any disclosure regime that furthers its interests," but "must instead demonstrate its need for universal production in light of any less intrusive alternatives." *AFPF*, 594 U.S. at 613.

> **2.      The Act implicates and fails exacting scrutiny because its donor disclosure demands further no important interest and are not narrowly tailored to any cognizable interest.**

The Act's compelled disclosure of organizations' donors is subject to exacting scrutiny and fails that standard for lack of narrow tailoring.

As a threshold matter, there can be no serious doubt that exacting scrutiny applies. That standard reaches "any demand for donor information." *First Choice*, 146 S. Ct. at 1124 (quoting *AFPF*, 594 U.S. at 607); *Buckley*, 424 U.S. at 93–94; *AFPF*, 594 U.S. at 608–12. The Act requires donor information. It demands "[a]ny person" who makes expenditures for "third-party advertisements" over $500 during an election period to "file a third-party advertisement report with the Commissioner." 15 Del. C. § 8031(a); 15 Del. C. § 8002(17). Third-party

advertisement reports must include "[t]he full name and mailing address of each person who has made contributions to such person during the election period in an aggregate amount or value in excess of $100." 15 Del. C. § 8031(a)(3). The Act requires this disclosure of an organization's donors above the $100 threshold during the applicable election period (up to four years) without exception. That is a "compelled disclosure requirement[]" that is unconstitutional unless it withstands "exacting scrutiny." *AFPF*, 594 U.S. at 608.

As explained, exacting scrutiny requires "that the disclosure requirement be narrowly tailored to the interest it promotes." *Id*. at 611 (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). As also explained above, "because 'the burdens at the preliminary injunction stage track the burdens at trial,'" the government bears the burden of establishing narrow tailoring at this stage. *Reilly*, 858 F.3d at 180; *see also Wyo. Gun Owners*, 83 F.4th at 1247. The State failed to meet its burden.

a. **An unbounded informational interest is insufficiently weighty or genuine to justify any compelled disclosure.**

First, the State failed to show that the Act furthers an interest of enough importance to justify a presumptively unconstitutional disclosure mandate. Exacting scrutiny demands, in the first place, "a sufficiently important interest." *AFPF*, 594 U.S. at 607. But the State only advanced an informational interest below. *See* Dist. Ct. Dkt. 21 at 11. That is inadequate. "The simple interest in providing voters with

21

additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995).

Moreover, the State's purported informational interest here does not reach any donor information of conceivable interest to anyone. A cognizable informational interest may support compelled disclosure of material that will "help citizens make informed choices in the political marketplace." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 367 (2010) (internal citation and quotation omitted). Such an interest covers information that "allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches" and can "alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." *Buckley*, 424 U.S. at 66–67. Delaware already advances that interest by its requirement that persons who spend on elections report expenditures to the State for publication and "prominently" reveal in the communications by whom they were "[p]aid for." 15 Del. C. § 8021(b). Such disclosures and disclaimers may advance the state's interest in "knowing who is speaking about a candidate shortly before an election"—here, AFP and AFPF. *Citizens United*, 558 U.S. at 369. But they are not at issue because Appellants do not challenge these requirements and will comply with them in any future covered advocacy.

22

No informational interest supports Delaware's separate demand for the disclosure of innumerable donors from across the nation who give to organizations that (years later) spend money on communications before Delaware elections. Exacting scrutiny requires that courts evaluate state interests "[i]n reality" rather than in theory. *AFPF*, 594 U.S. at 614. In *AFPF*, California claimed it needed identities of donors who furnished over $5,000 in a year to a charity, but that demand was so unrelated to the state's supposed interest—policing charities—that the Supreme Court saw through the claimed interest to the real interest: "ease of administration." *Id.* That true interest, in turn, was insufficiently important to justify any disclosure burden. *Id.* This case is no different. The required disclosure, for example, of a donor in Oregon who donated $100.01 in 2023 to an entity that spent $500.01 in Delaware in 2026 is so far removed from a cognizable informational interest that the only plausible interest could be some type of administrative goal (such as a desire to avoid drawing and enforcing distinctions among donation types) or the conscious object of deterring speech concerning Delaware's election.[2]

---

[2] The State's own evidence suggests that a central motivation among those supporting the Act was a desire to see less political spending in Delaware generally, and less spending by outside residents and national organizations in particular. *See* JA-085 (Delaware Election Commissioner claiming that "people who are not Delaware residents have contributed substantial amounts to Delaware political committees for the purpose of affecting Delaware elections"); JA-254 (news article claiming that "[t]he role of out-of-state money is significant").

Constitutional scrutiny is not bypassed by administrative concerns, and it is meant to weed out invidious purposes as may well be present here.

### b.    The Act is not narrowly tailored.

Even if the State's supposed informational interest were genuine and cognizable, the Act's means of advancing it represent "a dramatic mismatch" that dooms it under the narrow tailoring inquiry. *AFPF*, 594 U.S. at 612. Delaware "is not free to enforce *any* disclosure regime that furthers its interests," but "must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id.* at 613 (emphasis in original). To show proper tailoring, a state that wishes to regulate speech must first "'seriously undert[ake] to address' the problems it faces 'with less intrusive tools readily available to it.'" *Sisters for Life*, 56 F.4th at 404 (quoting *McCullen*, 573 U.S. at 494).

The Act's donor disclosure requirements are not remotely tailored. As an initial matter, no evidence establishes that the Delaware legislature considered less intrusive tools for its supposed informational interest. *See AFPF*, 594 U.S. at 613. That omission is glaring. As noted, a cognizable informational interest gets at "sources of election-related spending." *Citizens United*, 558 U.S. at 367. But the Act stretches far beyond that supposed goal by demanding disclosure of donors who did *not contribute to election-related spending in Delaware* and those who might (or might not) have in the remote past. The Act sets no geographic-limit on donors or

use-limit on donated funds. Thus, a donor whose funds are used entirely for spending in other states' or federal elections must be disclosed in Delaware. Moreover, the Act sets a very low threshold ($100.01) that sweeps in both minor and major donors in one broad category for equal public exposure. And the mandate's time period ensures that funds donated and spent long ago will be associated with present Delaware spending. If Appellants began spending concerning Delaware elections this year, the Act would require disclosure of innumerable donors whose gifts were not (and could not have been) used in Delaware elections as far back ago as 2023, when Appellants did not spend anything in this state.

That is "a dragnet for sensitive donor information," *AFPF*, 594 U.S. at 614, that makes the scheme struck down in *AFPF* look mild by comparison. In *AFPF*, California set a donation threshold 50 times as high as Delaware's ($5,000) measured by "a particular tax year," and it required that the donor information be maintained in confidence and used only within the Office of Attorney General. *See id.* at 602, 615–16, 620. The Supreme Court remarked with disapprobation at "the amount and sensitivity of this information harvested by the State." *Id.* at 613. Here, Delaware set the threshold at a small fraction of California's ($100.01) as measured by a period up to four times the length (four years) and publishes the equally sensitive donor information—names and addresses—to the entire world. *See* JA-086–88. Delaware's burdens exceed those of California's unconstitutional regime

by orders of magnitude. *Cf. AFPF*, 594 U.S. at 611 ("a reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary").

And Delaware's scheme is even less tailored than California's. In *AFPF*, California claimed that it had a strong interest in "preventing wrongdoing by charitable organizations," *id*. at 612, but no record evidence showed that pre-investigation collection of donor identities furthered that interest, given that California had alternative means of investigating and policing charities and rarely used the disclosures to that end. *Id.* at 608–11. Because it "cast[] a dragnet for sensitive donor information" that "will become relevant in only a small number of cases," California fell "far short" of its tailoring burden. *Id*. at 613–614. Delaware falls even further short. Because only a small subset of donors to an organization will likely fund recent, Delaware-related election advocacy, only a small subset of information exposed for public view will be relevant to Delaware's supposed interest. Only in a minority of applications will compelled-disclosure of donor information "help citizens make informed choices in the political marketplace." *Citizens United*, 558 U.S. at 367 (citations omitted).

Delaware also cannot "demonstrate its need" for expansive disclosure requirements in light of "less intrusive alternatives." *AFPF*, 594 U.S. at 613. Neither Delaware nor the district court has explained why it would have been insufficient

for the state to craft a disclosure regime targeted at donations funding *recent Delaware* electioneering. States often erect earmarking regimes that reach donations set apart for electioneering communications within a given state, as well as "opt out" provisions that allow donors to avoid public exposure by directing an organization not to spend their donation in a given state. *See Wyo. Gun Owners*, 83 F.4th at 1248–49; *Gaspee Project v. Mederos*, 13 F.4th 79, 89 (1st Cir. 2021). In fact, the Tenth Circuit deemed a Wyoming regime insufficiently tailored even though it reached only donations "*which relate to* an independent expenditure or electioneering communication." *Wyo. Gun Owners*, 83 F.4th at 1247 (citation omitted). The court found that the burden of complying with that vague test was insufficiently tailored because "the statute could have outlined an earmarking system." *Id.* at 1248.

Delaware's failure here is even more obvious because it did not even attempt to tie covered donors with Delaware-related communications. Whereas Wyoming tried and failed, Delaware did not even try. Notably, in *Wyo. Gun Owners*, Wyoming argued that entities could ease their regulatory burden by rote disclosure of "*all* contributions (over $100) received in the election cycle." *Id.* at 1247. Put differently, entities could voluntarily do what Delaware *requires*. The Tenth Circuit rejected that view because it "resolves the burden of confusion that stems from the burden of the disclosure scheme *with the burden of overdisclosure*." *Id.* (emphasis added). The Tenth Circuit condemned this "proposed overdisclosure solution" because it "would

27

bear no relation to the government's informational interest" and "necessarily sweep in speakers who may have been interested in supporting a different candidate or no candidate at all or perhaps wished to preserve their privacy or anonymity." *Id.* at 1248. The Tenth Circuit was clear that a state would violate the Constitution if it were to require disclosure of all donors who give more than $100 to an entity, without exception. That is what Delaware does. *See also id.* at 1249–50 (explaining that Delaware law "surely forced advocacy groups to bear the burden of overdisclosing donors despite a disconnect with an informational interest").

The Act's lack of tailoring, in purpose, time, or dollar amount, distinguishes it from disclosure regimes that have been upheld post-*AFPF*. For example, Rhode Island's disclosure law is triggered at $1,000 and, according to the First Circuit, provides "ample opportunity for donors to opt out from having their donations used for independent expenditures or electioneering communications, even if the entity to which they contributed has not created a segregated fund." *Gaspee Project*, 13 F.4th at 89. "Taken together," the First Circuit explained in upholding the law, "these limitations on the Act's reach only require disclosure of relatively large donors *who choose* to engage in election-related speech." *Id.* (emphasis added). Similarly, the Tenth Circuit upheld New Mexico's regime that requires disclosure of donors who either (1) donated more than $200 to a fund expressly earmarked for independent expenditures or (2) donated more than $5,000 to a general fund and did not request

28

the contribution not to be used for independent or coordinated expenditures. *Rio Grande Found. v. Oliver*, 154 F.4th 1213, 1218, 1228 (10th Cir. 2025). The court accepted the state's explanation that the law was "focuse[d] on 'large donors who do not opt out of supporting advertisements and who support expenditures designed to influence the relevant electorate, within a short period of time prior to an election.'" *Id*. at 1227.[3]

These cases show that "less intrusive tools . . . [are] readily available" to Delaware, and yet the State "offers no reason why [it] could not have used them." *Wyo. Gun Owners*, 83 F.4th at 1248. The State's briefing below dismissed the value of an earmarking limitation because "the prospect of undisclosed, out-of-state money impacting state elections is precisely what concerns Delawarean voters." Dist. Ct. Dkt. 21 at 13. But that defines away the question of *what* out-of-state money impacts state elections. An Arizona donor who may have been motivated to give a

---

[3] Even the narrower Rhode Island and New Mexico regimes present close cases that may not pass exacting scrutiny. As the dissent in *Rio Grande Found.* aptly noted, even though New Mexico's monetary thresholds and timing requirements "tighten the scope" of its disclosure requirements, there is still a "mismatch" between the regime and the state's informational interest. 154 F.4th at 1234–35 (Eid, J., dissenting). In the dissent's view, the disclosure requirements "do[] not provide voters with quality information about who is commenting on a candidate or ballot question" because it applies "even to general-fund donors" who may not endorse a specific advertisement. *Id*. at 1234. The dissent argued that the "opt-out" provisions could not save the law, and the state failed to explain why an earmarking system— "which not only burdens less speech, but also better serves the state's informational interest"—was insufficient. *Id*. at 1235 (citation omitted). The appellant organization has filed a petition for a writ of certiorari with the Supreme Court.

$110 donation to support speech about a policy relevant in the 2024 Arizona federal senate contest did not impact Delaware elections. Delawarean voters have no interest in knowing who that person is, and the State's demand for information about persons like that creates exactly the "dramatic mismatch" the Supreme Court criticized in *AFPF*. 594 U.S. at 612. Delaware's compelled disclosure of this information would *mislead* its citizens with the very information that it claims serves its interest. Thus the Act's donor disclosure requirement not only fails to advance Delaware's interest but actively undermines it. In any event, Delaware would have more credibility if it at least tried *some* means to link donors whose information it craves with the state of Delaware. Even Wyoming's condemned scheme would be better than Delaware's forced "overdisclosur[e]." *Wyo. Gun Owners*, 83 F.4th at 1249.

> **3. The district court erred in applying this Court's decision in *DSF*, which contravenes *AFPF*.**

Rather than conduct a proper exacting scrutiny analysis, the district court relied solely on this Court's decision in *DSF* to find that Appellants are unlikely to succeed. *See* JA-010. This repeated the same "error" the Supreme Court condemned in *AFPF*. 594 U.S. at 612.

As the Tenth Circuit properly assessed, *DSF* "is a relic of pre-[*AFPF*] exacting scrutiny" that improperly condones "forc[ing] advocacy groups to bear the burden of overdisclosing donors despite a disconnect with an informational interest." *Wyo. Gun Owners*, 83 F.4th at 1249. At the time it issued *DSF*, this Court understood

that exacting scrutiny only required "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *DSF*, 793 F.3d at 309 (internal citations omitted). But the law is clear today "that a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored." *AFPF*, 594 U.S. at 609; *see also id.* ("[a] substantial relation is necessary but not sufficient"). The law "requires narrow tailoring." *Id.* at 611.

This was the holding of *AFPF*, not stray language or dicta. The Ninth Circuit upheld California's disclosure regime (which was less burdensome than Delaware's) because it "found that there was a substantial relation between the" disclosure "demand . . . and a sufficiently strong governmental interest." *Id.* at 611–12. But it "did not apply a narrow tailoring requirement" and thereby committed "error." *Id.* at 612; *see also Wyo. Gun Owners*, 83 F.4th at 1244 (explaining that "[f]or decades [the Tenth Circuit] understood exacting scrutiny to require that the government show 'a substantial relation between the disclosure and a sufficiently important governmental interest'" but *AFPF* "tightened [the court's] review of disclosure laws"); *Gaspee Project*, 13 F.4th at 85 (explaining that prior to *AFPF*, "exacting scrutiny was widely understood to require only a 'substantial relation'" and that *AFPF* "heightened this requirement").

*DSF* committed the same error and stands in the same shoes as the overruled Ninth Circuit *AFPF* decision. *DSF* repeatedly stated that exacting scrutiny is

31

satisfied if a law "bears a substantial relation to [a state's] interest in an informed electorate." *DSF*, 793 F.3d at 311; *see also id.* at 312 (explaining that exacting scrutiny only "necessitates a 'substantial relationship' between the State's interest and the disclosure required"). Indeed, *DSF* explained that its exacting scrutiny analysis "*does not change* simply because" an alternative scheme "would result in a more narrowly tailored statute." *Id.* at 312 (emphasis added). That view is obsolete: "alternatives to the current disclosure requirement" mark the very measure of the governing narrow tailoring standard. *AFPF*, 594 U.S. at 613; *see also Sisters for Life, Inc.*, 56 F.4th at 404.

*DSF*'s error was not semantic. This Court steadfastly refused to consider the Act's burdens "in light of any less intrusive alternatives." *AFPF*, 594 U.S. at 613. The Court *admitted* that "an earmarking limitation would result in a more narrowly tailored statute" but deemed that irrelevant because it believed "'exacting scrutiny'" is always satisfied if it passes the "'substantial relationship'" test. *DSF*, 793 F.3d at 312 (citations omitted). That is wrong. *AFPF*, 594 U.S. at 609. In considering the types of media covered by the Act, the Court mentioned zero alternatives to the scope the Delaware legislature selected. *DSF*, 793 F.3d at 312. And in evaluating the $100 threshold, the Court *rejected* exacting scrutiny and determined it was enough to "ask[]" if the burdens "are 'rationally related' to the State's interest." *Id.* at 310 (citation omitted). For that proposition, the Court cited *Nat'l Org. for Marriage v.*

32

*McKee*, 649 F.3d 34 (1st Cir. 2011), which the First Circuit later admitted was "*abrogated . . . by Ams. for Prosperity Found. v. Bonta*[.]" *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 51 (1st Cir. 2024) (emphasis added). It is hard to imagine a standard more antithetical to narrow tailoring than rational basis review.[4]

"A panel of this Court may reevaluate the holding of a prior panel which conflicts with intervening Supreme Court precedent." *In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008); *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018); *Hassen v. Gov't of V.I.*, 861 F.3d 108, 114 n.5 (3d Cir. 2017). Rarely will a conflict with Supreme Court precedent be so stark as in this case. Narrow tailoring is now the standard, the Supreme Court found error in an appellate ruling that did not apply that standard, and *DSF* did not apply that standard. *DSF* is bad law, and the district court was wrong to rely on it. The Court can and should declare this "without having to resort to an en banc rehearing." *DiFiore*, 879 F.3d at 76.

### 4.    Delaware's additional defenses of the Act lack merit.

Delaware offered several alternative arguments in favor of the Act in the district court, but none are persuasive.

---

[4] It is irrelevant that, in its introduction, *DSF* stated that the Act is "narrowly tailored." *Id.* at 306; *see* JA-010. The Court "seemed to use the word ['tailored'] interchangeably with the 'substantial relation' language." *Wyo. Gun Owners*, 83 F.4th at 1249–50. The Court's analysis, in function, bore none of the features *AFPF* demands of the narrow tailoring inquiry.

33

First, Delaware repeatedly shifted focus from its obligation to tailor donor disclosure burdens to an important interest to its right to regulate electioneering communications. *See* Dist. Ct. Dkt. 21 at 11–14. This simply ignores that Delaware "owes its citizens precision." *Wyo. Gun Owners*, 83 F.4th at 1247. The suggestion that, because *some* regulation of speech deemed by the state as "electioneering" is constitutional, *all* of the state's speech regulations must be constitutional wishes away the exacting scrutiny inquiry itself.

Second, the State inaccurately analogizes the Act with the federal Bipartisan Campaign Reform Act of 2002 ("BCRA") and invokes cases interpreting that law. *See* Dist. Ct. Dkt. 21 at 11–14. This fails because the State itself admits the Act "departs[]" from BCRA with broader provisions in terms of the monetary threshold and covered media. Dist. Ct. Dkt. 21 at 12. That both Delaware and the Federal government chose to name regulated speech an "electioneering communication" does not excuse the State from conducting a proper tailoring analysis on its very different statute. More importantly, BCRA is administered under a 2007 regulation with an earmarking limitation that requires disclosure only of donations above $1,000 (ten times Delaware's threshold) ''made for the purpose of furthering electioneering communications.''' *Van Hollen*, 811 F.3d at 491 (quoting Electioneering Communications, 72 Fed. Reg. 72899, 72911 (Dec. 26, 2007)). The law as administered is tailored in the very respects Delaware rejected. Besides,

34

Delaware cannot hide behind BCRA because the Supreme Court did not decide the permissible scope of the donor disclosure requirement in either *McConnell v. FEC*, 540 U.S. 93 (2003) or *Citizens United*, leaving no *judicial* authority to back Delaware's argument.

Third, rather than prove that less intrusive alternatives are inadequate, Delaware attempted to flip the burden by proposing alternatives *for Appellants' activity*, such as donating via a PAC or unincorporated association. Dist. Ct. Dkt. 21 at 5, 11. This flips exacting scrutiny on its head. It is the *state* that must show *the state's* law is narrowly tailored to an important purpose. *AFPF*, 594 U.S. at 608–09. The argument that persons wishing to engage in constitutionally protected speech should tailor their activities differently wrongly attempts to skirt that obligation.

In any event, 501(c)(3) organizations such as Appellant Americans for Prosperity Foundation cannot form PACs, and would therefore still be forced to disclose their donors. *See* 26 U.S.C. § 501(c)(3). Moreover, the Supreme Court has already rejected this approach. "A PAC is a separate association." *Citizens United*, 558 U.S. at 337. So a "PAC exemption" may provide rights to a completely distinct entity, but it does not lessen the burdens on Appellants. *Id.*

The State's position that organizations can circumvent the donor disclosure requirement by donating through other entities also severely weakens the strength of its claimed informational interest. The State cannot credibly claim the need to know

35

the identities of organization's donors when they issue electioneering communications as a 501(c)(4) while permitting the same organizations engaged in the same activity to shield their donors if they simply form a PAC instead. Indeed, that legislative decision emphasizes the legitimate scope of a state's informational interest: while there is an interest in knowing "who is speaking . . . shortly before an election," *id.* at 369, the "who" is the entity in control of the message and its funding, not contributors with some conceivable connection to the entity.

### B. Delaware's donor disclosure requirements are overbroad and thus fail on their face.

Because the Act is unjustified, woefully overbroad, and untailored, it is facially unconstitutional. In the First Amendment context, a law "is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). This overbreadth doctrine measures the "amount of protected free speech" burdened by a law against its "plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)); *see also AFPF*, 594 U.S. at 615; *United States v. Stevens*, 559 U.S. 460, 473 (2010). "Overbroad laws 'may deter or chill constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas.'" *United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (citations omitted). "To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the

silenced, as well as society's broader interest in hearing them speak." *Id.* (citing *Williams*, 553 U.S. at 292).

In *AFPF*, the Supreme Court applied this doctrine to California's disclosure regime and had "no trouble" finding overbreadth and thus facial invalidity. 594 U.S. at 615. It explained that "[t]he lack of tailoring to the State's investigative goals [was] categorical—present in every case—as [was] the weakness of the State's interest in administrative convenience." *Id.* By consequence, "[e]very demand" for information under the regime was unconstitutional. *Id.*; *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 966 (1984) ("The flaw in the statute" is "that in all its applications it operates on a fundamentally mistaken premise"). The Court was unmoved by California's observations that disclosed information remained confidential, that charities were still collecting donations, and that no material burden was imposed because the IRS already demanded the same information California sought. *AFPF*, 594 U.S. at 615–16. In the Supreme Court's eyes, all those objections were overridden by the "'*possible* deterrent effect'" of the regime and its "indiscriminately sweeping up the information of *every* major donor with reason to remain anonymous." *Id.* at 616–17 (emphasis in original). These failings made the regime unconstitutional even as to donors who "might not mind— or might even prefer—the disclosure of their identities to the State." *Id.* at 616.

37

*AFPF* yet again proves just how brazen Delaware is here. The Act has *all* of the overbreadth problems of California's infirm regime (and more) but *none* of its alleged saving graces. The overbreadth is, to put it charitably, "substantial." *Williams*, 553 U.S. at 292. Appellants, their donors, and everyone else governed by the Act are impaired in their constitutional freedoms at least as to every donation swept up by the Act that lacks a Delaware connection. That includes speech concerning elections in 49 other states and at the federal level, and speech having no connection to elections at all. The tiny fraction of elections in Delaware as to which disclosure could in theory be justified mark a miniscule number of the Act's applications. That is far too little to support the Act's staggering scope. By consequence, the constitutional infirmity goes to the very "premise" of the Act, *Joseph H. Munson Co.*, 467 U.S. at 966, and its failings are "categorical—present in every case," *AFPF*, 594 U.S. at 615.

The burdens go far beyond what California dared impose in *AFPF*. Whereas California made a strict promise of confidentiality, 594 U.S. at 616–17, Delaware proudly enforces a policy of public exposure on the internet. Whereas California tried to minimize burdens by demanding a form already provided to the federal government, *id.*, Delaware imposes a highly unusual regime with small thresholds, no exceptions, and few limitations. And where California could claim its charities did not suffer for lack of funds, *id.*, the chilling effect of the Act is self-evident here

on the facts of *this* case because Appellants have foregone the right to speak in Delaware because of the Act. JA-079. That is the "inevitabl[e]" chill of which precedent warns. *First Choice*, 146 S.Ct. at 1125. One could be forgiven for thinking this was Delaware's very purpose in crafting the Act.

Because the district court read *DSF* as a blank check for Delaware's associational burdens, it found no occasion to address Appellants' overbreadth position. *See* JA-010. This was error not only because *DSF* is bad law, *see supra* § I.A.3, but also because the decision did not even address a facial challenge. It considered the Act only "as applied" to the challenger's "Voter Guide." 793 F.3d at 313. The challenger had raised "overbreadth and vagueness" arguments in the district court, but they went unaddressed there because the lower court accepted the as-applied argument. *Id.* at 306 n.1. For some reason, after reversing on the as-applied contention, this Court did not address the overbreadth or vagueness contentions but instead directed final judgment be entered against the challenger. *See id.* at 313; *but see Citizens United*, 558 U.S. at 329–30 (describing appellate court's obligation to consider broader arguments for a requested outcome after rejecting narrower assertions for that outcome).

Appellants here have asserted a "facial challenge[], and that matters." *See Moody v. NetChoice, LLC*, 603 U.S. 707, 743 (2024). Even if the Act was constitutional as-applied to the challenger in *DSF*, it remains unconstitutional on its

face because "'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *AFPF*, 594 U.S. at 615 (quoting *Stevens*, 559 U.S. at 473). *DSF* does not rule out such a challenge because, "'[u]nder the First Amendment overbreadth doctrine, a party may bring a facial challenge against a statute, even though it is not unconstitutional as applied to that particular party, because the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 859 (3d Cir. 2022) (quoting *Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 677 F.3d 519, 537 (3d Cir. 2012)). By consequence, "neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications." *Moody*, 603 U.S. at 744. By rejecting an overbreadth challenge under a case that addressed only an as-applied challenge, the district court committed that precise error.

### C. Delaware's donor disclosure requirements are unconstitutional as applied to Appellants.

Even if the Act were somehow deemed not to fail in a substantial number of its applications, it violates Appellants' First Amendment rights directly and is therefore, at a minimum, unconstitutional as applied to them.

1. **As applied to Appellants' associational rights, the Act implicates exacting scrutiny and bears no logical connection to Delaware's assumed interest.**

"An as-applied First Amendment challenge contends that a given statute or regulation is unconstitutional as it has been applied to a litigant's particular speech activity." *Legal Aid Servs. Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010). A plaintiff "need only show that a law's 'application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 134 n.7 (3d Cir. 2022).

Because the Act's application to Appellants is especially pernicious, their as-applied claim is straightforward. As a threshold matter, exacting scrutiny governs because the Act burdens Appellants with "compelled disclosure requirements." *AFPF*, 594 U.S. at 608. Appellants intend to "engage in issue advocacy and educational work in Delaware . . . in advance of the 2026 and subsequent primary and general elections," including in the pre-election windows. JA-076. Appellants intend to "produce and distribute communications through various media forms" that "will discuss specific officeholders, including officeholders who are themselves candidates for election or reelection, in the context of governmental action and issues of public policy," though they will not advocate for any candidates' election or defeat. *Id.*; JA-320–21. Appellants provided examples of both past activity in other states and proposed ads they would run in Delaware. JA-080–82; JA-322–25. If

41

Appellants do any of that, they will be compelled to publicly expose all their donors above a *de minimis* threshold as far back as 2023. 15 Del. C. §§ 8031(a), 8002(17). Exacting scrutiny applies to this disclosure obligation regardless of "the severity of any demonstrated burden." *AFPF*, 594 U.S. at 610. For good measure, Appellants have demonstrated severe burdens, *see infra* § I.C.3, not the least of which is the choice to refrain from speech to protect donor identities, JA-079. The Act is presumptively unconstitutional as applied to Appellants.

To satisfy exacting scrutiny, Delaware must show that—"as applied to" Appellants, *Wyo. Gun Owners*, 83 F.4th at 1244–50—the Act is "narrowly tailored to" an important interest, *AFPF*, 594 U.S. at 608. Delaware could never do that because next to none of the disclosures demanded of Appellants would reveal "sources of election-related spending" in Delaware. *Citizens United*, 558 U.S. at 367. As of the district court's order (and the present), no donor to either Appellant has funded any Delaware electioneering communication. From 2022 to 2025, thousands of donors—the overwhelming majority of whom reside outside of Delaware—have contributed more than $100 to Appellants. JA-076–77. But because Appellants funded no covered speech in Delaware since well before 2022, none of that money is election-related spending in Delaware. The State has no interest in knowing about any of it.

To be sure, if Appellants were enabled to sponsor covered communications in Delaware without the Act's threat, some small subset of donors would end up (purposefully or not) contributing to Delaware-related spending. But no one could seriously contend that the Act is narrowly tailored by forcing out that information when the overriding majority of donor identities also forced out would bear no relation at all to the State's supposed interest. The fact remains that thousands of donors within the Act's ambit have nothing to do with Delaware. Recall that "dragnet[s]" are not narrowly tailored. *AFPF*, 594 U.S. at 614. Nor could the State contend that it needs to know—and publicize—all Appellants' donors because of the difficulty in differentiating donations that impact Delaware from those that do not. Recall that "[m]ere administrative convenience does not remotely" supply an important interest. *Id.* at 615.

Of course, as shown (§ I.A), "this lack of narrow tailoring is hardly unique to Appellants" and therefore supports "both . . . facial and as-applied challenges." *Edwards v. District of Columbia*, 755 F.3d 996, 1009 (D.C. Cir. 2014). Whatever justification Delaware might hypothesize for saddling some other speaker with its brazen demands—perhaps because some speakers focus on Delaware politics—that would not support Delaware's insistence on roping in Appellants and similarly situated national organizations. The Act is in all events unconstitutional as to Appellants because they fit within the far extreme of its invidious demands.

### 2. The district court erred in discarding *AFPF* and requiring a showing of threats, harassment, or reprisal.

The district court made no pretense that the Act is narrowly tailored as to Appellants. Instead, it found Appellants unlikely to succeed because the district court felt they did not show "a reasonable probability that disclosure of [Appellants'] donors names pursuant to the Delaware law will subject them to threats, harassments, or reprisals from Government officials and private parties." JA-012.

But this holding also treated *AFPF* as a non-event. The Supreme Court rejected the district court's exact contention by holding that "[s]uch a demanding showing is not required" if "the disclosure law fails to satisfy" the narrow tailoring element of exacting scrutiny. *AFPF*, 594 U.S. at 617. That is because "First Amendment freedoms to refer to the scope of challenged restrictions—their breadth—rather than the severity of any demonstrated burden." *Id.* at 610. Narrow tailoring is *not* "required only for laws that impose severe burdens." *Id.* at 611. Rather, if the government justifies a law as narrowly tailored to an important interest, *then* the challenger may need to meet the "evidentiary burden" of showing possible "harassment and reprisals." *Id.* at 617. As discussed, the Act merits exacting scrutiny for the simple reason that it imposes a disclosure obligation on Appellants. *Id.* at 610. Anyone doubting that *AFPF* held this should read the dissent, which decried that the Supreme Court "discard[ed] its decades-long requirement that . . . plaintiffs must plead and prove that disclosure will likely expose them to objective harms,

such as threats, harassment, or reprisals." *Id.* at 624 (Sotomayor, J., dissenting). As to that assertion, the majority "respectfully disagree[d]." *Id.* at 610. More recently, *First Choice* unanimously confirmed "any demand for donor information . . . must overcome heightened First Amendment scrutiny 'given the deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of the government's conduct.'" 146 S. Ct. at 1124 (quoting *AFPF*, 594 U.S. at 607).

Though it failed to address *AFPF* on this topic, the district court may have mistakenly believed that it is inapplicable to Appellants' as-applied claim. Any such view would be erroneous. "The substantive rule of law is the same for both" facial and as applied "challenges." *Edwards*, 755 F.3d at 1001; *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509 n.5 (D.C. Cir. 2016) ("the substantive rule of law is the same") (cleaned up). "[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint" or otherwise shown on the merits. *Citizens United*, 558 U.S. at 331. The distinction also concerns whether the court considers the interests of "a particular person under particular circumstances" or all possible conduct and persons allegedly burdened. *Mazo*, 54 F.4th at 134 n.7; *see also Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021) ("In order to prevail on an as-applied First Amendment challenge, a plaintiff 'must show that the regulations are unconstitutional as applied to their particular speech activity.'"). "In

45

other words, *how* one must demonstrate the statute's invalidity remains the same for both types of challenges." *Brooklyn Legal Servs. Corp v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211 (2011).

By consequence, Appellants' as-applied claim invokes a narrower remedy and narrower scope of inquiry than their facial challenge. But that makes no difference for *AFPF*'s holding that a showing of possible harassment or reprisals is unnecessary to show a cognizable First Amendment burden.[5] Exacting scrutiny thus applies equally to Appellants' as-applied challenge and their facial challenge. *Regino v. Staley*, 133 F.4th 951, 967–68 (9th Cir. 2025) ("Regardless of the type of challenge, however, the underlying constitutional standard remains the same."); *see also Edwards*, 755 F.3d at 1001–09 (applying exacting scrutiny to as-applied and facial challenge and sustaining both challenges "[b]ecause th[e] lack of narrow tailoring [was] hardly unique to Appellants"). If the State cannot meet its burden of showing the law is narrowly tailored, the inquiry ends there.

---

[5] Indeed, in referencing the standard for "a facial challenge" the Court framed the (rejected) contention in precise terms related to "a substantial number of organizations" that might be shown to be "be subjected to harassment and reprisals." *AFPF*, 594 U.S. at 617. The difference between challenges implicit here goes to the number of entities whose activities are considered, not the underlying substantive requirement.

**3.    Appellants showed a reasonable probability that compelled disclosure of Appellants' donors will subject them to threats, harassments, and reprisals.**

Appellants' as-applied challenge would be likely to succeed even under the district court's erroneous test—or if Delaware somehow showed proper tailoring—because Appellants *did* show a reasonable probability that disclosure of their donors will subject them to threats, harassment, and reprisals. *See Citizens United*, 558 U.S. at 367. The district court imposed an erroneously higher evidentiary burden.

Appellants and their supporters have repeatedly been subjected to threats and harassment in the past because of their views. AFP's founders, their families, and supporters have received death threats due to their affiliation with AFP. *Harris*, 182 F. Supp. 3d at 1056. Protestors stormed an AFP event in Washington DC and physically accosted attendees. *Id*. (describing event).[6] At a Wisconsin event, AFP's CEO was "threatened by a protestor who used multiple slurs and spit in [the CEO's] face," and at a Michigan event, protestors surrounded an AFP tent and "used knives and box-cutters to cut at the ropes of tent, eventually causing the large tent to collapse with AFP supporters still inside." *Id*. The Supreme Court, including the dissent, credited this evidence in *AFPF* showing that Appellants had "been subjected to bomb threats, protests, stalking, and physical violence." 594 U.S. at 617; *see also id*. at 636–37 (Sotomayor, J., dissenting) ("Petitioners have unquestionably provided

---

[6] *See also supra* note 1.

evidence that their donors face a reasonable probability of threats, harassment, and reprisals if their affiliations are made public."); *see also Grewal*, 2019 WL 4855853, at *6 (describing evidence where "AFP itself and its donors have been subjected to harassment ranging from death threats to cyberattacks to violent protests at AFP events").

This history, combined with recent evidence of threats—including in Vermont where security is required at events and where AFP has been targeted by legislators for its beliefs, JA-077–78—has led to justified fear among Appellants' current and potential donors of public exposure, and is why Appellants protect their donors' confidentiality, JA-078–79, and thus are prevented from speaking in Delaware.

The district court dismissed Appellants' evidence as "scant" because it thought the showing "generic, undated, focuses entirely on threats to AFP as an organization as opposed to specific donors, and is not specific to disclosure of donor information." JA-012. That is not the governing standard even in cases where a challenger must make this showing. In *Buckley*, the Supreme Court acknowledged that not every organization would experience the level of harassment and chill present in *Patterson* and declined to impose "unduly strict requirements of proof." 424 U.S. at 74. Instead, the *Buckley* court held that "[t]he proof may include . . . specific evidence of past or present harassment of members due to their associational

ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient." *Id*.

Appellants offered that evidence. They presented specific evidence of past threats and harassment against Appellants as organizations and to their members—including death threats and protests that have turned violent—as well as ongoing threats to Appellants so serious that security is necessary at their events. JA-077–78; *Harris*, 182 F. Supp. 3d at 1056. It was error for the district court to require more.

## II.    The remaining factors favor an injunction.

Because Appellants are exceedingly likely to prevail on the merits, the equitable factors governing injunctive relief present no serious contest. "Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors." *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020); *see Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (finding the equitable factors "easily" satisfied because of likely constitutional injury). Little dwelling is needed here.

Because their First Amendment rights are burdened now, Appellants and their supporters suffer irreparable harm each moment the Act prevents them from speaking in Delaware. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 113 (3d

Cir. 2013). This Court "presume[s] that First Amendment harms are irreparable." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 204 (3d Cir. 2024) (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)). That presumption stands irrefutable here.

The balance of equities and public interest factors "merge when," as here, "the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and they are "easily" resolved in Appellants' favor, *Tenafly*, 309 F.3d at 178. Because "[t]here is a strong public interest in upholding the requirements of the First Amendment," *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 109 (3d Cir. 2022), "it is always in the public interest to prevent the violation of a party's constitutional rights," *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (citation omitted); *Pursuing Am.'s Greatness*, 831 F.3d at 511 ("always"); *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 453 (7th Cir. 2022) ("First Amendment harms . . . are serious injuries that money damages cannot remedy."); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("securing First Amendment rights is in the public interest").

In comparison, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). "[T]he

enforcement of an unconstitutional law vindicates no public interest." *K.A.*, 710 F.3d at 114. An injunction would impose no cognizable harm on the State or anyone else because the legislature remains "free to attempt to draft new [laws] that are better tailored to serve [its] interests." *Swartzwelder v. McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002). The "equities favor[]" the party "whose First Amendment rights are being chilled." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). The equities unequivocally support Appellants, who have suffered a severe First Amendment deprivation that chills them from spending on election related speech in Delaware.

## Conclusion

The Court should reverse the district court's denial of the preliminary injunction and direct it to issue the requested injunction.

| | |
|---|---|
| Dated: July 15, 2026 | */s/ Allen J. Dickerson* |
| ERIKA D. PROUTY | ALLEN J. DICKERSON |
| ROBERT J. TUCKER | RICHARD B. RAILE |
| BAKER & HOSTETLER LLP | BAKER & HOSTETLER LLP |
| 200 Civil Center Dr., Suite 1200 | Washington Square, Ste. 1100 |
| Columbus, OH 43215-4138 | 1050 Connecticut Ave., N.W. |
| (614) 228-1541 | Washington, DC 20036 |
| eprouty@bakerlaw.com | (202) 861-1711 |
| rtucker@bakerlaw.com | adickerson@bakerlaw.com |
| | rraile@bakerlaw.com |

*Counsel for Appellants Americans for Prosperity Foundation and Americans for Prosperity*

51

## <u>Certificate of Compliance</u>

The undersigned counsel for Appellants hereby certifies pursuant to L.A.R. 46.1(e) that he is a member in good standing of the bar of this Court.

The undersigned counsel for Appellants hereby certifies that this motion complies with the requirements of Fed. R. App. P. 32(a)(7)(B) and 32(a)(5)–(6) in that it is prepared in 14-point, proportionately spaced Times New Roman font type utilizing Microsoft Word and contains 12,211 words, including headings, footnotes, and quotations. The text of the electronic document is identical to the paper copies.

The undersigned counsel for Appellants hereby certifies that pursuant to L.A.R. 31.1(c), this electronic document was scanned for viruses using CrowdStrike Falcon Sensor Version 7.38.21003.0 prior to filing and found to be virus free.

Dated: July 15, 2026

*/s/ Allen J. Dickerson*

ALLEN J. DICKERSON
BAKER & HOSTETLER LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1711
adickerson@bakerlaw.com

*Counsel for Appellants*

**Certificate of Service**

The undersigned counsel for Appellants hereby certifies that the foregoing motion was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 15, 2026

/s/ *Allen J. Dickerson*

ALLEN J. DICKERSON
BAKER & HOSTETLER LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1711
adickerson@bakerlaw.com

*Counsel for Appellants*

No. 26-2469
IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Americans For Prosperity Foundation, et al.,
*Appellants*,

v.

Anthony Albence, et al.,
*Appellees*.

On Appeal from the United States District Court
for the District of Delaware
No. 1:26-cv-00445-JLH
The Honorable Jennifer L. Hall

**Joint Appendix, Volume I of II (JA-001 to JA-019)**

ALLEN J. DICKERSON
RICHARD B. RAILE
BAKER & HOSTETLER LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1711
adickerson@bakerlaw.com

ERIKA D. PROUTY
ROBERT J. TUCKER
BAKER & HOSTETLER LLP
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138
(614) 228-1541

*Counsel for Appellants*

EMILY BURTON
JENNIFER-KATE AARONSON
DELAWARE DEPARTMENT OF JUSTICE
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-5374
Emily.Burton@Delaware.gov

*Counsel for Appellees*

## **Table of Contents**

### *Volume One: JA-001 to JA-019*

Appellants' Notice of Appeal (June 10, 2026) (ECF 29)..……………..…….…..JA-001

Order Denying Appellants' Motion (June 8, 2026) (ECF 28)…………..………JA-003

Transcript of Court's Oral Ruling on Appellants' Motion (June 8, 2026)…......JA-004


### *Volume Two: JA-020 to JA-386*

United States District Court for the District of Delaware's Docket Sheet…….JA-020

Appellants' Complaint and Exhibits A and B (ECFs 1, 1-1, 1-2)…………….JA-026

Appellants' Motion for Preliminary Injunction (EFC 4)……………..…….JA-059

Exhibit A to Appellants' Opening Brief in Support of Motion (ECF 5-1), State of Delaware Dep't of Elections Memorandum Re: Request for Ruling on Simpler and Lavelle Campaign Finance Issues ...……………………………………….JA-062

Exhibit B to Appellants' Opening Brief in Support of Motion (ECF 5-2), Declaration of Ross Connolly and Exhibit ……………………………………….…JA-073

Declaration of Anthony J. Albence (ECF 22)…..........................……....…...JA-083

Exhibits 1 to 16 to Declaration of Anthony J. Albence (ECF 22-1)................JA-092

Exhibit C to Appellants' Reply (ECF 25-1)…………………………….…..JA-318

Transcript of June 8, 2026 Hearing……………………………….…….…..JA-326

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

AMERICANS FOR PROSPERITY
FOUNDATION, et al.

      *Plaintiffs,*

   v.

ANTHONY ALBENCE, in his official
capacity as State Election Commissioner
for the State of Delaware, et al.

      *Defendants*.

Case No. 1:26-cv-00445-JLH

## PLAINTIFFS' NOTICE OF APPEAL

Notice is hereby given that Plaintiffs Americans for Prosperity Foundation and Americans

for Prosperity ("Plaintiffs") appeal to the United States Court of Appeals for the Third Circuit from

this Court's Order (D.I. 28) denying Plaintiffs' Motion for Preliminary Injunction (D.I. 4).

DATED: June 10, 2026

BAKER & HOSTETLER LLP

*/s/ Jeremy D. Anderson*
Jeremy D. Anderson (No. 4515)
1201 North Market St., Suite 1407
Wilmington, DE 19801-1147
(302) 407-4224
janderson@bakerlaw.com

Allen J. Dickerson (admitted *pro hac vice*)
1050 Connecticut Ave., N.W., Suite 1110
Washington, DC 20036-5403
(202) 861-1507
adickerson@bakerlaw.com

Erika D. Prouty (admitted *pro hac vice*)
Robert J. Tucker (admitted *pro hac vice*)
Anna E. Croyts (admitted *pro hac vice*)
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138

1

JA - 001

(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com
acroyts@bakerlaw.com

*Attorneys for Plaintiffs*

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AMERICANS FOR PROSPERITY )
FOUNDATION, et al., )
 )
 Plaintiffs, )
 ) C.A. No. 26-445-JLH
 v. )
 )
ANTHONY ALBENCE, in his official )
capacity as State Election Commissioner for )
the State of Delaware, et al., )
 )
 Defendants. )

## ORDER

At Wilmington this 8th day of June, 2026, in accordance with the Court's ruling from the bench at the conclusion of today's hearing, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (D.I. 4) is DENIED.  The parties should consult the transcript for details.

The Honorable Jennifer L. Hall
UNITED STATES DISTRICT JUDGE

JA - 003

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


AMERICANS FOR PROSPERITY)
FOUNDATION, et al.,      )
                         )
        Plaintiffs,      )  C.A. No. 26-445-JLH
                         )
v.                       )
                         )
ALBENCE, et al.,         )
                         )
        Defendants.      )


Monday, June 8, 2026
4:00 p.m.
Teleconference


844 King Street
Wilmington, Delaware


BEFORE:  THE HONORABLE JENNIFER L. HALL
    United States District Court Judge


APPEARANCES:


BAKER & HOSTETLER, LLP
BY:  JEREMY DOUGLAS ANDERSON, ESQ.
BY:  ALLEN DICKERSON, ESQ.

                 Counsel for the Plaintiff

APPEARANCES CONTINUED:

DELAWARE DEPARTMENT OF JUSTICE
BY:  EMILY V. BURTON, ESQ.

-and-

CAMPAIGN LEGAL CENTER
BY:  TARA MALLOY, ESQ.
BY:  MEGAN McALLEN, ESQ.

                    Counsel for the Defendant

----------------------------

THE COURT:  Good afternoon, everyone.  This is Jen Hall.  We're here to reconvene the hearing on the preliminary injunction motion in Americans for Prosperity Foundation v. Albence, civil action number 26-445.

Do we have someone from Plaintiffs' side here?

MR. ANDERSON:  Yes, Your Honor.  Jeremy Anderson and Allen Dickerson are both on the line.

THE COURT:  Very good.

And do we have someone from Defendants here?

MS. BURTON:  Indeed, Your Honor.  Emily Burton, Tara Malloy, and Megan McAllen are all here.

THE COURT:  Great.

Pending before the Court is Plaintiffs' motion for a preliminary injunction.  That's at docket number 4.  The motion has been fully briefed and the parties submitted

declarations and other evidence in support of their papers, all of which has been considered.  That's at D.I. 5, 21, and 25.  The parties were given the opportunity to request an evidentiary hearing, but they assured the Court that neither side wanted an evidentiary hearing.  That's at docket 26.  That said the parties submitted some declarations and exhibits in connection with their papers as D.I. 5, 22, and 25, and both sides agreed during the hearing today that the Court may consider and rely upon those materials.  The record of evidence before the Court, is, however, very slim.

We've heard oral argument from the parties today.  Given that the challenge implicates conduct in the upcoming election, the Court's prepared to render a prompt decision by ruling on the motion from the bench.

Plaintiffs' one-count complaint challenges the constitutionality of certain provisions of the Delaware Elections Disclosure Act.  Specifically, Plaintiff argues that "Delaware's disclosure requirements set forth in 15 Delaware Code §8031" violate the First Amendment because they "are not substantially related to a sufficiently important government interest, nor are they narrowly tailored to any interest they allegedly promote."

As relevant here, §8031(a) provides that

Any person other than a candidate committee or a political party who makes an expenditure for any third-party

advertisement that causes the aggregate amount of expenditures for the third-party advertisements made by such person to exceed $500 during an election period shall file a third-party advertisement report with the Commissioner.

15 Delaware Code §8002 paragraph 21 defines "third-party advertisement" to mean "an independent expenditure or an electioneering communication."

An "electioneering communication" is "a communication by any individual or other person (other than a candidate committee or political party) that:

(1) Refers to a clearly identified candidate; and (2) Is publicly distributed within 30 days before a primary election or special election, or 60 days before a general election to an audience that includes members of the electorate for the office sought by such candidate."

That's §8002 paragraph 10(a).

And the "third-party advertisement report" must include the "full name and mailing address of each person who has made contributions during the election period in an aggregate amount or value in excess of $100. And that's §8031(a)(3). §8032 provides that the report shall be publicly available.

The gist of all this--and the focus of the parties--is that organizations that pay for ads that run shortly before an election that refer to a clearly

identified candidate must file a report with the Delaware

Commission of elections that contains the names of those who

have donated $100 or more during the election period.

Plaintiffs allege that they want to run ads in

the pre-election window that will mention candidates for

election, but that Plaintiffs have refrained from doing so

because essentially they don't want to disclose their donors

and they don't want to violate the Delaware Elections

Disclosure Act.

Plaintiffs contend that the Act is

unconstitutional because it violates the right to private

association and free speech, in violation of the First

Amendment.  Plaintiffs ask the Court to grant a preliminary

injunction to prevent the enforcement of the Act.

"A preliminary injunction is an extraordinary

remedy that should be granted only in limited

circumstances."  And that's a quote from the Third Circuit

in *Delaware State Sportsmen's Association v. Delaware Dep't*

*of Safety.*  It's at 108 F.4th 194, page 200 in 2024.  The

case also explains that district courts have discretion to

grant or deny preliminary injunctions, but "[f]our canonical

guideposts are (1)the likelihood of success on the merits;

(2)the risk of irreparable injury absent preliminary relief;

(3)the balance of the equities; and (4)the public interest."

And "the first two factors are the most critical."

The parties agree that the "exacting scrutiny" standard applies here.  According to the Supreme Court, exacting scrutiny requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest, meaning that the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights. And that's from a case called *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 at page 607 from 2021. That case also explains that exacting scrutiny also requires that the disclosure requirement be narrowly tailored to the interest it promotes.  And that's on pages 608 to 611. However, "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends."

The Third Circuit has previously addressed the constitutionality of the Delaware Elections Disclosure Act. In 2015, the Third Circuit held in a case called *Delaware Strong Families v. Attorney General of Delaware* that application of the act to the Plaintiffs in that case survived exacting scrutiny.  And the case cite for that is 793 F.3d 304 at pages 309 to 312.

Plaintiffs are argue that this Court is not bound by *Delaware Strong Families* because, subsequently, in 2021, the Supreme Court clarified in *Bonta* that exacting

scrutiny requires that the disclosure requirement be narrowly tailored to the interest it promotes. And Plaintiffs say that requirement was not there when *Delaware Strong Families* came out.

But this Court is bound by third circuit precedent unless it is obviously in conflict with subsequent precedent from the Supreme Court. I'm unpersuaded that *Delaware Strong Families* is obviously in conflict with the exacting scrutiny standard set forth in *Bonta*. Indeed, Delaware Strong Families expressly concluded that the Delaware Elections Disclosure Act was "narrowly tailored." That case rejected challenges that the Act's monetary thresholds, the types of media covered, the length of the statutory "election period," and the lack of so-called earmarking provisions. And the Third Circuit's observation that exacting scrutiny does not require use of the least restricted means of advancing the state's interest is entirely consistent with *Bonta*.

Accordingly, I find that Plaintiff has failed to demonstrate any likelihood of success in winning a facial challenge to the constitutionality of the Act.

Plaintiffs spend a lot less time on their as-applied challenge. That said, the parties agree that a plaintiff can succeed with an as-applied challenge in the context of an election communication donor disclosure

requirement if the plaintiff can demonstrate a "reasonable probability that disclosure of its contributors names will subject them to threats, harassment, or reprisals from either government officials or private parties."  And that's from the *Citizens United* case, 558 U.S. at page 367.

Here, Plaintiffs as-applied challenge is based on generic allegations and/or allegations regarding contexts unrelated to disclosure of donors in the election communications context.

Plaintiffs submitted evidence via a declaration that they "understand that both current and potential future donors to our organization are fearful of having their names and addresses disclosed as donors to or supporters of AFP and/or AFPF."  That's document number five at paragraph 17. And that "AFP, AFPF, their employees, supporters, and donors have been subject to threats and harassment in the past." And that's at paragraph 18.

Plaintiffs then provide evidence of generic examples such as that "in Vermont we have experienced consistent harassment and threats from groups that disagreed with us on economic policy initiatives to the point where we had to hire security for our events."  That's paragraph 19. An AFP office in North Dakota was vandalized.  That's paragraph 20.  Legislators in other states have made public comments critical of AFP.  That's paragraph 21.  And in

other litigations AFP has provided other courts with firsthand evidence of threats.  That's at paragraph 22.

The evidence and argument presented by Plaintiffs for their as-applied challenge is scant.  The Court cannot say on this record that Plaintiffs have demonstrated a likelihood of success in showing a reasonable probability that disclosure of Plaintiffs' donors names pursuant to the Delaware law will subject them to threats, harassments, or reprisals from Government officials and private parties.  There are no allegations or evidence of threats from Delaware government officials historically nor is there any suggestion that Delaware will target Plaintiffs in the future.  Plaintiffs' evidence with respect to threats from private parties is generic, undated, focuses entirely on threats to AFP as an organization as opposed to specific donors, and is not specific to disclosure of donor information, nor is it tied to electioneering communications, Delaware, or electioneering communications in Delaware.

And while I'll accept for the purposes of the argument that the proposition that some potential donors would not contribute and current donors would stop contributing if Plaintiffs decided to make electioneering communications and are required to disclose donor information pursuant to the Delaware law, that is not

sufficient to show a likelihood of success that this campaign finance law is unconstitutional as applied to Plaintiffs.  Disclosure in this context is constitutionally permissible even when it places some burden on first amendment rights because the state has a substantial interest in disclosing to the public the identities of the persons funding electioneering communications.

The record before the Court is insufficient to demonstrate a likelihood of success that Plaintiffs' donors will be subjected to threats, harassments, or reprisals due to the Delaware statute.

And I footnote this: While certain remarks in Plaintiffs' briefing and by Plaintiffs' counsel during the oral argument today suggests that Plaintiffs may think it is relevant to their challenge that some or all of the ads they intend to run might not be the functional equivalent of express advocacy, the legal implications of that were not fairly presented to the Court in this motion, so the Court has not considered that issue.

For all the reasons stated, I conclude that the record does not demonstrate a likelihood of success on Plaintiffs facial or as-applied challenge.

I will exercise my discretion to decline to enter the injunction.  The Delaware Act under consideration is not a new law.  It has been on the books for more than a

decade.  The status quo is that the law is enforceable.  Plaintiffs have not shown a likelihood of success.  Even if all of the other factors favored Plaintiffs, the Court is exercised its discretion to deny the injunction.

And that completes the Court's ruling on the motion.

I'm not sure how the parties intend to proceed given the Court's ruling today.  If Plaintiff does file an appeal in denial of the PI to the Third Circuit, it seems to me it would be a good idea to have the parties meet and confer and let us know their positions as to whether the matter should continue forward in the District Court while that appeal is pending.

So that's my thinking.  Can I hear anybody's comments on that?

MR. DICKERSON:  Your Honor, this is Allen Dickerson for the Plaintiffs.  That seems reasonable to us.  We'll plan to meet and confer with opposing counsel in the event that an appeal is taken.

THE COURT:  All right.  Thank you.

Can I hear from Defendants?

MS. BURTON:  From Defendants, Your Honor, we'll meet and confer with Plaintiffs once they have determined whether or not to appeal.

THE COURT:  All right.  Thank you very much.

Thanks, everyone.  Have a good night.  We'll be adjourned.

MS. BURTON:  Thank you, Your Honor.

MR. DICKERSON:  Thank you.

(Court adjourned at 4:19 p.m.)

-----------------------------------

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceedings.

/s/ Stacy M. Ingram, RPR
Official Court Reporter
U.S. District Court

JA - 015

**$**

$100 [2] - 4:20, 5:3
$500 [1] - 4:3

**/**

/s [1] - 12:11

**1**

1)Refers [1] - 4:11
1)the [1] - 5:22
10(a) [1] - 4:16
108 [1] - 5:19
15 [2] - 3:18, 4:5
17 [1] - 8:14
18 [1] - 8:17
19 [1] - 8:22
194 [1] - 5:19

**2**

2)ls [1] - 4:12
2)the [1] - 5:23
20 [1] - 8:24
200 [1] - 5:19
2015 [1] - 6:18
2021 [2] - 6:9, 6:25
2024 [1] - 5:19
2026 [1] - 1:10
21 [3] - 3:2, 4:5, 8:25
22 [2] - 3:7, 9:2
25 [2] - 3:3, 3:8
26 [1] - 3:5
26-445 [1] - 2:14
26-445-JLH [1] - 1:5

**3**

3)the [1] - 5:24
30 [1] - 4:12
304 [1] - 6:22
309 [1] - 6:22
312 [1] - 6:22
367 [1] - 8:5

**4**

4 [1] - 2:24
4)the [1] - 5:24
4:00 [1] - 1:11
4:19 [1] - 12:4

**5**

5 [2] - 3:2, 3:7
558 [1] - 8:5
594 [1] - 6:9
595 [1] - 6:9

**6**

60 [1] - 4:13
607 [1] - 6:9
608 [1] - 6:12
611 [1] - 6:12

**7**

793 [1] - 6:22

**8**

8 [1] - 1:10
844 [1] - 1:13

**A**

absent [1] - 5:23
accept [1] - 9:20
according [1] - 6:2
accordingly [1] - 7:19
accurate [1] - 12:9
achieving [1] - 6:14
Act [8] - 3:17, 5:9, 5:10, 5:14, 6:17, 7:11, 7:21, 10:24
act [1] - 6:20
Act's [1] - 7:12
action [1] - 2:14
actual [1] - 6:7
address [1] - 4:18
addressed [1] - 6:16
addresses [1] - 8:13
adjourned [2] - 12:1, 12:4
ads [3] - 4:24, 5:4, 10:15
advancing [1] - 7:17
advertisement [4] - 4:1, 4:4, 4:6, 4:17
advertisements [1] - 4:2
advocacy [1] - 10:17
AFP [6] - 8:13, 8:15, 8:23, 8:25, 9:1, 9:15
AFPF [2] - 8:14, 8:15
afternoon [1] - 2:11

aggregate [2] - 4:1, 4:20
agree [2] - 6:1, 7:23
agreed [1] - 3:8
al [2] - 1:4, 1:7
Albence [1] - 2:14
ALBENCE [1] - 1:7
allegations [3] - 8:7, 9:10
allege [1] - 5:4
allegedly [1] - 3:22
Allen [2] - 2:17, 11:16
ALLEN [1] - 1:23
Amendment [3] - 3:19, 5:13, 6:7
amendment [1] - 10:5
Americans [2] - 2:13, 6:8
AMERICANS [1] - 1:3
amount [2] - 4:1, 4:20
Anderson [1] - 2:16
ANDERSON [2] - 1:22, 2:16
appeal [4] - 11:9, 11:13, 11:19, 11:24
APPEARANCES [2] - 1:19, 2:1
application [1] - 6:20
applied [6] - 7:23, 7:24, 8:6, 9:4, 10:2, 10:22
applies [1] - 6:2
argue [1] - 6:23
argues [1] - 3:17
argument [4] - 3:11, 9:3, 9:21, 10:14
as-applied [5] - 7:23, 7:24, 8:6, 9:4, 10:22
association [1] - 5:12
Association [1] - 5:18
assured [1] - 3:4
attorney [1] - 6:19
audience [1] - 4:14
available [1] - 4:22

**B**

BAKER [1] - 1:22
balance [1] - 5:24
based [1] - 8:6
BEFORE [1] - 1:16
bench [1] - 3:14
between [1] - 6:4
Bonta [4] - 6:9, 6:25, 7:9, 7:18
books [1] - 10:25
bound [2] - 6:24, 7:5

briefed [1] - 2:25
briefing [1] - 10:13
burden [2] - 6:7, 10:4
Burton [1] - 2:20
BURTON [4] - 2:3, 2:20, 11:22, 12:2
BY [5] - 1:22, 1:23, 2:3, 2:5, 2:6

**C**

C.A [1] - 1:5
campaign [1] - 10:2
CAMPAIGN [1] - 2:5
candidate [5] - 3:24, 4:10, 4:11, 4:15, 5:1
candidates [1] - 5:5
cannot [1] - 9:5
canonical [1] - 5:21
case [8] - 5:20, 6:8, 6:10, 6:18, 6:20, 6:21, 7:12, 8:5
causes [1] - 4:1
CENTER [1] - 2:5
certain [2] - 3:16, 10:12
certify [1] - 12:8
challenge [8] - 3:12, 7:21, 7:23, 7:24, 8:6, 9:4, 10:15, 10:22
challenges [2] - 3:15, 7:12
Circuit [4] - 5:17, 6:16, 6:18, 11:9
circuit [1] - 7:5
Circuit's [1] - 7:15
circumstances [1] - 5:17
cite [1] - 6:21
Citizens [1] - 8:5
civil [1] - 2:14
clarified [1] - 6:25
clearly [2] - 4:11, 4:25
Code [2] - 3:19, 4:5
comments [2] - 8:25, 11:15
Commission [1] - 5:2
Commissioner [1] - 4:4
committee [2] - 3:24, 4:10
communication [4] - 4:7, 4:8, 4:9, 7:25
communications [5] - 8:9, 9:18, 9:24, 10:7
complaint [1] - 3:15
completes [1] - 11:5

conclude [1] - 10:20
concluded [1] - 7:10
conduct [1] - 3:12
confer [3] - 11:11, 11:18, 11:23
conflict [2] - 7:6, 7:8
connection [1] - 3:7
consider [1] - 3:9
consideration [1] - 10:24
considered [2] - 3:2, 10:19
consistent [2] - 7:18, 8:20
constitutionality [3] - 3:16, 6:17, 7:21
constitutionally [1] - 10:3
contains [1] - 5:2
contend [1] - 5:10
context [3] - 7:25, 8:9, 10:3
contexts [1] - 8:7
continue [1] - 11:12
CONTINUED [1] - 2:1
contribute [1] - 9:22
contributing [1] - 9:23
contributions [1] - 4:19
contributors [1] - 8:2
Counsel [2] - 1:24, 2:7
counsel [2] - 10:13, 11:18
count [1] - 3:15
COURT [6] - 1:1, 2:11, 2:18, 2:22, 11:20, 11:25
Court [20] - 1:17, 2:23, 3:4, 3:9, 3:10, 5:13, 6:2, 6:23, 6:25, 7:5, 7:7, 9:5, 10:8, 10:18, 11:3, 11:12, 12:4, 12:11, 12:12
Court's [3] - 3:13, 11:5, 11:8
courts [2] - 5:20, 9:1
covered [1] - 7:13
critical [2] - 5:25, 8:25
current [1] - 8:11, 9:22

**D**

D.I [2] - 3:2, 3:7
Dakota [1] - 8:23
days [2] - 4:12, 4:13
decade [1] - 11:1

**decided** [1] - 9:23
**decision** [1] - 3:14
**declaration** [1] - 8:10
**declarations** [2] - 3:1, 3:6
**decline** [1] - 10:23
**Defendant** [1] - 2:7
**Defendants** [4] - 1:8, 2:19, 11:21, 11:22
**defines** [1] - 4:5
**DELAWARE** [2] - 1:1, 2:2
**Delaware** [24] - 1:14, 3:16, 3:19, 4:5, 5:1, 5:8, 5:18, 6:17, 6:18, 6:19, 6:24, 7:3, 7:8, 7:10, 7:11, 9:8, 9:11, 9:12, 9:18, 9:19, 9:25, 10:11, 10:24
**Delaware's** [1] - 3:18
**demonstrate** [4] - 7:20, 8:1, 10:9, 10:21
**demonstrated** [1] - 9:6
**denial** [1] - 11:9
**deny** [2] - 5:21, 11:4
**Dep't** [1] - 5:18
**DEPARTMENT** [1] - 2:2
**determined** [1] - 11:23
**Dickerson** [2] - 2:17, 11:17
**DICKERSON** [3] - 1:23, 11:16, 12:3
**disagreed** [1] - 8:20
**disclose** [2] - 5:7, 9:24
**disclosed** [1] - 8:13
**disclosing** [1] - 10:6
**Disclosure** [4] - 3:17, 5:9, 6:17, 7:11
**disclosure** [11] - 3:18, 6:4, 6:11, 6:13, 7:1, 7:25, 8:2, 8:8, 9:7, 9:16, 10:3
**discretion** [3] - 5:20, 10:23, 11:4
**distributed** [1] - 4:12
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 5:20
**District** [3] - 1:17, 11:12, 12:12
**docket** [2] - 2:24, 3:5
**document** [1] - 8:14

**donated** [1] - 5:3
**donor** [3] - 7:25, 9:16, 9:24
**donors** [10] - 5:7, 8:8, 8:12, 8:13, 8:15, 9:7, 9:16, 9:21, 9:22, 10:9
**DOUGLAS** [1] - 1:22
**due** [1] - 10:10
**during** [5] - 3:8, 4:3, 4:19, 5:3, 10:13

**E**

**earmarking** [1] - 7:15
**economic** [1] - 8:21
**either** [1] - 8:4
**election** [13] - 3:13, 4:3, 4:13, 4:14, 4:19, 4:25, 5:3, 5:5, 5:6, 7:14, 7:25, 8:8
**electioneering** [6] - 4:7, 4:8, 9:17, 9:18, 9:23, 10:7
**elections** [1] - 5:2
**Elections** [4] - 3:17, 5:8, 6:17, 7:11
**electorate** [1] - 4:15
**Emily** [1] - 2:20
**EMILY** [1] - 2:3
**employees** [1] - 8:15
**ends** [1] - 6:15
**enforceable** [1] - 11:1
**enforcement** [1] - 5:14
**enter** [1] - 10:24
**entirely** [2] - 7:18, 9:14
**equities** [1] - 5:24
**equivalent** [1] - 10:16
**ESQ** [5] - 1:22, 1:23, 2:3, 2:5, 2:6
**essentially** [1] - 5:7
**et** [2] - 1:4, 1:7
**event** [1] - 11:19
**events** [1] - 8:22
**evidence** [8] - 3:1, 3:10, 8:10, 8:18, 9:2, 9:3, 9:10, 9:13
**evidentiary** [2] - 3:4, 3:5
**exacting** [8] - 6:1, 6:3, 6:10, 6:13, 6:21, 6:25, 7:9, 7:16
**examples** [1] - 8:19
**exceed** [1] - 4:3
**excess** [1] - 4:20
**exercise** [1] - 10:23

**exercised** [1] - 11:4
**exhibits** [1] - 3:7
**expenditure** [2] - 3:25, 4:7
**expenditures** [1] - 4:2
**experienced** [1] - 8:19
**explains** [2] - 5:20, 6:10
**express** [1] - 10:17
**expressly** [1] - 7:10
**extraordinary** [1] - 5:15

**F**

**F.3d** [1] - 6:22
**F.4th** [1] - 5:19
**f]our** [1] - 5:21
**facial** [2] - 7:20, 10:22
**factors** [2] - 5:25, 11:3
**failed** [1] - 7:19
**fairly** [1] - 10:18
**Families** [5] - 6:19, 6:24, 7:4, 7:8, 7:10
**favored** [1] - 11:3
**fearful** [1] - 8:12
**file** [3] - 4:3, 5:1, 11:8
**finance** [1] - 10:2
**First** [3] - 3:19, 5:12, 6:7
**first** [2] - 5:25, 10:4
**firsthand** [1] - 9:2
**five** [1] - 8:14
**focus** [1] - 4:23
**focuses** [1] - 9:14
**footnote** [1] - 10:12
**FOR** [2] - 1:1, 1:3
**foregoing** [1] - 12:8
**forth** [2] - 3:18, 7:9
**forward** [1] - 11:12
**Foundation** [2] - 2:14, 6:9
**FOUNDATION** [1] - 1:4
**free** [1] - 5:12
**full** [1] - 4:18
**fully** [1] - 2:25
**functional** [1] - 10:16
**funding** [1] - 10:7
**future** [2] - 8:11, 9:13

**G**

**general** [1] - 4:13
**General** [1] - 6:19
**generic** [3] - 8:7, 8:18, 9:14

**gist** [1] - 4:23
**given** [3] - 3:3, 3:12, 11:8
**Government** [1] - 9:9
**government** [3] - 3:21, 8:4, 9:11
**governmental** [2] - 6:5, 6:6
**grant** [2] - 5:13, 5:21
**granted** [1] - 5:16
**great** [1] - 2:22
**groups** [1] - 8:20
**guideposts** [1] - 5:22

**H**

**HALL** [1] - 1:16
**Hall** [1] - 2:12
**harassment** [3] - 8:3, 8:16, 8:20
**harassments** [2] - 9:9, 10:10
**hear** [2] - 11:14, 11:21
**heard** [1] - 3:11
**hearing** [4] - 2:12, 3:4, 3:5, 3:8
**held** [1] - 6:18
**hereby** [1] - 12:8
**hire** [1] - 8:22
**historically** [1] - 9:11
**Honor** [5] - 2:16, 2:20, 11:16, 11:22, 12:2
**HONORABLE** [1] - 1:16
**HOSTETLER** [1] - 1:22

**I**

**idea** [1] - 11:10
**identified** [2] - 4:11, 5:1
**identities** [1] - 10:6
**implicates** [1] - 3:12
**implications** [1] - 10:17
**important** [2] - 3:21, 6:5
**IN** [1] - 1:1
**include** [1] - 4:18
**includes** [1] - 4:14
**indeed** [2] - 2:20, 7:9
**independent** [1] - 4:6
**individual** [1] - 4:9
**information** [2] - 9:17, 9:25
**Ingram** [1] - 12:11

**initiatives** [1] - 8:21
**injunction** [6] - 2:13, 2:24, 5:14, 5:15, 10:24, 11:4
**injunctions** [1] - 5:21
**injury** [1] - 5:23
**insufficient** [1] - 10:8
**intend** [2] - 10:16, 11:7
**interest** [9] - 3:21, 3:22, 5:24, 6:5, 6:6, 6:12, 7:2, 7:17, 10:6
**irreparable** [1] - 5:23
**issue** [1] - 10:19

**J**

**Jen** [1] - 2:12
**JENNIFER** [1] - 1:16
**Jeremy** [1] - 2:16
**JEREMY** [1] - 1:22
**Judge** [1] - 1:17
**June** [1] - 1:10
**JUSTICE** [1] - 2:2

**K**

**King** [1] - 1:13

**L**

**lack** [1] - 7:14
**law** [5] - 9:8, 9:25, 10:2, 10:25, 11:1
**least** [2] - 6:14, 7:16
**legal** [1] - 10:17
**LEGAL** [1] - 2:5
**legislators** [1] - 8:24
**length** [1] - 7:13
**less** [1] - 7:22
**likelihood** [7] - 5:22, 7:20, 9:6, 10:1, 10:9, 10:21, 11:2
**limited** [1] - 5:16
**line** [1] - 2:17
**litigations** [1] - 9:1
**LLP** [1] - 1:22

**M**

**mailing** [1] - 4:18
**MALLOY** [1] - 2:5
**Malloy** [1] - 2:21
**materials** [1] - 3:9
**matter** [1] - 11:12
**McAllen** [2] - 2:6, 2:21

mean [1] - 4:6
meaning [1] - 6:5
means [2] - 6:14, 7:17
media [1] - 7:13
meet [3] - 11:10, 11:18, 11:23
Megan [1] - 2:21
MEGAN [1] - 2:6
members [1] - 4:14
mention [1] - 5:5
merits [1] - 5:22
might [1] - 10:16
Monday [1] - 1:10
monetary [1] - 7:12
most [1] - 5:25
motion [6] - 2:13, 2:23, 2:25, 3:14, 10:18, 11:6
MR [3] - 2:16, 11:16, 12:3
MS [3] - 2:20, 11:22, 12:2
must [3] - 4:17, 5:1, 6:6

**N**

name [1] - 4:18
names [4] - 5:2, 8:2, 8:12, 9:7
narrowly [4] - 3:21, 6:11, 7:2, 7:11
new [1] - 10:25
night [1] - 12:1
North [1] - 8:23
notes [1] - 12:9
number [3] - 2:14, 2:24, 8:14

**O**

observation [1] - 7:15
obviously [2] - 7:6, 7:8
OF [2] - 1:1, 2:2
office [2] - 4:15, 8:23
Official [1] - 12:11
officials [3] - 8:4, 9:9, 9:11
once [1] - 11:23
one [1] - 3:15
one-count [1] - 3:15
opportunity [1] - 3:3
opposed [1] - 9:15
opposing [1] - 11:18
oral [2] - 3:11, 10:14
organization [2] -

8:12, 9:15
organizations [1] - 4:24

**P**

p.m [2] - 1:11, 12:4
page [3] - 5:19, 6:9, 8:5
pages [2] - 6:12, 6:22
papers [2] - 3:1, 3:7
paragraph [8] - 4:5, 4:16, 8:14, 8:17, 8:22, 8:24, 8:25, 9:2
parties [12] - 2:25, 3:3, 3:6, 3:11, 4:24, 6:1, 7:23, 8:4, 9:10, 9:14, 11:7, 11:10
party [7] - 3:25, 4:2, 4:4, 4:6, 4:10, 4:17
past [1] - 8:16
pay [1] - 4:24
pending [2] - 2:23, 11:13
period [4] - 4:3, 4:19, 5:3, 7:14
permissible [1] - 10:4
person [4] - 3:24, 4:3, 4:9, 4:18
persons [1] - 10:7
PI [1] - 11:9
places [1] - 10:4
Plaintiff [4] - 1:24, 3:17, 7:19, 11:8
plaintiff [2] - 7:24, 8:1
Plaintiffs [23] - 1:5, 5:4, 5:6, 5:10, 5:13, 6:20, 6:23, 7:3, 7:22, 8:6, 8:10, 8:18, 9:4, 9:5, 9:12, 9:23, 10:3, 10:14, 10:22, 11:2, 11:3, 11:17, 11:23
plaintiffs' [1] - 9:13
Plaintiffs' [7] - 2:15, 2:23, 3:15, 9:7, 10:9, 10:13
plan [1] - 11:18
point [1] - 8:21
policy [1] - 8:21
political [2] - 3:25, 4:10
positions [1] - 11:11
potential [2] - 8:11, 9:21
pre [1] - 5:5
pre-election [1] - 5:5
precedent [2] - 7:6,

7:7
preliminary [6] - 2:13, 2:24, 5:13, 5:15, 5:21, 5:23
prepared [1] - 3:13
presented [2] - 9:3, 10:18
prevent [1] - 5:14
previously [1] - 6:16
primary [1] - 4:12
private [4] - 5:11, 8:4, 9:10, 9:14
probability [2] - 8:2, 9:7
proceed [1] - 11:7
proceedings [1] - 12:9
promote [1] - 3:22
promotes [2] - 6:12, 7:2
prompt [1] - 3:13
proposition [1] - 9:21
Prosperity [2] - 2:13, 6:8
PROSPERITY [1] - 1:3
provide [1] - 8:18
provided [1] - 9:1
provides [2] - 3:23, 4:21
provisions [2] - 3:16, 7:15
public [3] - 5:24, 8:24, 10:6
publicly [2] - 4:12, 4:22
purposes [1] - 9:20
pursuant [2] - 9:8, 9:25

**Q**

quo [1] - 11:1
quote [1] - 5:17

**R**

reasonable [3] - 8:1, 9:6, 11:17
reasons [1] - 10:20
reconvene [1] - 2:12
record [4] - 3:10, 9:5, 10:8, 10:21
refer [1] - 4:25
reflect [1] - 6:6
refrained [1] - 5:6
regarding [1] - 8:7
regimes [1] - 6:14

rejected [1] - 7:12
related [1] - 3:20
relation [1] - 6:4
relevant [2] - 3:23, 10:15
relief [1] - 5:23
rely [1] - 3:9
remarks [1] - 10:12
remedy [1] - 5:16
render [1] - 3:13
report [4] - 4:4, 4:17, 4:21, 5:1
Reporter [1] - 12:11
reprisals [3] - 8:3, 9:9, 10:10
request [1] - 3:3
require [2] - 6:13, 7:16
required [1] - 9:24
requirement [5] - 6:4, 6:11, 7:1, 7:3, 8:1
requirements [1] - 3:18
requires [3] - 6:3, 6:10, 7:1
respect [1] - 9:13
restricted [1] - 7:17
restrictive [1] - 6:14
rights [2] - 6:7, 10:5
risk [1] - 5:23
RPR [1] - 12:11
ruling [3] - 3:14, 11:5, 11:8
run [3] - 4:24, 5:4, 10:16

**S**

Safety [1] - 5:19
scant [1] - 9:4
scrutiny [8] - 6:1, 6:3, 6:10, 6:13, 6:21, 7:1, 7:9, 7:16
security [1] - 8:22
seriousness [1] - 6:7
set [2] - 3:18, 7:9
shall [2] - 4:3, 4:21
shortly [1] - 4:25
show [1] - 10:1
showing [1] - 9:6
shown [1] - 11:2
side [2] - 2:15, 3:5
sides [1] - 3:8
slim [1] - 3:10
so-called [1] - 7:14
someone [2] - 2:15, 2:19

sought [1] - 4:15
special [1] - 4:13
specific [2] - 9:15, 9:16
specifically [1] - 3:17
speech [1] - 5:12
spend [1] - 7:22
Sportsmen's [1] - 5:18
Stacy [1] - 12:11
standard [2] - 6:2, 7:9
state [1] - 10:5
State [1] - 5:18
state's [1] - 7:17
states [1] - 8:24
STATES [1] - 1:1
States [1] - 1:17
status [1] - 11:1
statute [1] - 10:11
statutory [1] - 7:14
stenographic [1] - 12:9
stop [1] - 9:22
Street [1] - 1:13
strength [1] - 6:6
Strong [5] - 6:19, 6:24, 7:4, 7:8, 7:10
subject [3] - 8:3, 8:16, 9:8
subjected [1] - 10:10
submitted [3] - 2:25, 3:6, 8:10
subsequent [1] - 7:6
subsequently [1] - 6:24
substantial [2] - 6:3, 10:5
substantially [1] - 3:20
succeed [1] - 7:24
success [7] - 5:22, 7:20, 9:6, 10:1, 10:9, 10:21, 11:2
sufficient [1] - 10:1
sufficiently [2] - 3:20, 6:5
suggestion [1] - 9:12
suggests [1] - 10:14
support [1] - 3:1
supporters [2] - 8:13, 8:15
Supreme [3] - 6:2, 6:25, 7:7
survived [1] - 6:21

4

| T | W |
|---|---|
| **tailored** [4] - 3:22, 6:11, 7:2, 7:11<br>**TARA** [1] - 2:5<br>**Tara** [1] - 2:21<br>**target** [1] - 9:12<br>**Teleconference** [1] - 1:11<br>**THE** [8] - 1:1, 1:1, 1:16, 2:11, 2:18, 2:22, 11:20, 11:25<br>**thinking** [1] - 11:14<br>**third** [6] - 3:25, 4:2, 4:4, 4:6, 4:17, 7:5<br>**Third** [5] - 5:17, 6:16, 6:18, 7:15, 11:9<br>**third-party** [5] - 3:25, 4:2, 4:4, 4:6, 4:17<br>**threats** [9] - 8:3, 8:16, 8:20, 9:2, 9:8, 9:11, 9:13, 9:15, 10:10<br>**thresholds** [1] - 7:13<br>**tied** [1] - 9:17<br>**today** [4] - 3:8, 3:12, 10:14, 11:8<br>**transcript** [1] - 12:9<br>**true** [1] - 12:8<br>**two** [1] - 5:25<br>**types** [1] - 7:13 | **Wilmington** [1] - 1:14<br>**window** [1] - 5:5<br>**winning** [1] - 7:20 |

| W (cont.) | § |
|---|---|
| | **§8002** [2] - 4:5, 4:16<br>**§8031** [1] - 3:19<br>**§8031(a** [1] - 3:23<br>**§8031(a)(3)** [1] - 4:21<br>**§8032** [1] - 4:21 |

| U |
|---|
| **U.S** [3] - 6:9, 8:5, 12:12<br>**unconstitutional** [2] - 5:11, 10:2<br>**undated** [1] - 9:14<br>**under** [1] - 10:24<br>**UNITED** [1] - 1:1<br>**United** [2] - 1:17, 8:5<br>**unless** [1] - 7:6<br>**unpersuaded** [1] - 7:7<br>**unrelated** [1] - 8:8<br>**upcoming** [1] - 3:13 |

| V |
|---|
| **value** [1] - 4:20<br>**vandalized** [1] - 8:23<br>**Vermont** [1] - 8:19<br>**via** [1] - 8:10<br>**violate** [2] - 3:19, 5:8<br>**violates** [1] - 5:11<br>**violation** [1] - 5:12 |