No. 26-2469
IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

Americans For Prosperity Foundation, et al.,
*Appellants*,

v.

Anthony Albence, et al.,
*Appellees*.

---

On Appeal from the United States District Court
for the District of Delaware
No. 1:26-cv-00445-JLH
The Honorable Jennifer L. Hall

---

**Joint Appendix, Volume II of II (JA-020 to JA-386)**

---

ALLEN J. DICKERSON
RICHARD B. RAILE
BAKER & HOSTETLER LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1711
adickerson@bakerlaw.com

ERIKA D. PROUTY
ROBERT J. TUCKER
BAKER & HOSTETLER LLP
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138
(614) 228-1541

*Counsel for Appellants*

EMILY BURTON
JENNIFER-KATE AARONSON
DELAWARE DEPARTMENT OF JUSTICE
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-5374
Emily.Burton@Delaware.gov

*Counsel for Appellees*

# Table of Contents

***Volume One: JA-001 to JA-019***

Appellants' Notice of Appeal (June 10, 2026) (ECF 29)..……………….……..JA-001

Order Denying Appellants' Motion (June 8, 2026) (ECF 28)………….……..JA-003

Transcript of Court's Oral Ruling on Appellants' Motion (June 8, 2026)…....JA-004

***Volume Two: JA-020 to JA-386***

United States District Court for the District of Delaware's Docket Sheet…….JA-020

Appellants' Complaint and Exhibits A and B (ECFs 1, 1-1, 1-2)…………….JA-026

Appellants' Motion for Preliminary Injunction (EFC 4)……………….…….JA-059

Exhibit A to Appellants' Opening Brief in Support of Motion (ECF 5-1), State of Delaware Dep't of Elections Memorandum Re: Request for Ruling on Simpler and Lavelle Campaign Finance Issues ...……………………………………….…JA-062

Exhibit B to Appellants' Opening Brief in Support of Motion (ECF 5-2), Declaration of Ross Connolly and Exhibit ……………………………………………..…JA-073

Declaration of Anthony J. Albence (ECF 22).........................………..…..JA-083

Exhibits 1 to 16 to Declaration of Anthony J. Albence (ECF 22-1)................JA-092

Exhibit C to Appellants' Reply (ECF 25-1)…………………………………..JA-318

Transcript of June 8, 2026 Hearing……………………………………...….JA-326

APPEAL

# U.S. District Court
# District of Delaware (Wilmington)
# CIVIL DOCKET FOR CASE #: 1:26-cv-00445-JLH

Americans for Prosperity Foundation et al v. Albence et al
Assigned to: Judge Jennifer L. Hall
Case in other court: Third Circuit, 26-02469
Cause: 28:1391 Personal Injury

Date Filed: 04/17/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Americans for Prosperity Foundation** represented by **Jeremy Douglas Anderson**
Baker & Hostetler LLP
1201 N. Market Street
Ste #1407
Wilmington, DE 19801
302-319-2799
Email: jdanderson@bakerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allen J. Dickerson**
Email: adickerson@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anna E. Croyts**
Email: acroyts@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erika D. Prouty**
Email: eprouty@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert J. Tucker**
Email: rtucker@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Americans for Prosperity** represented by **Jeremy Douglas Anderson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allen J. Dickerson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anna E. Croyts**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erika D. Prouty**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert J. Tucker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Anthony Albence**
*in his official capacity as State Election Commissioner for the State of Delaware*

represented by

**Emily V. Burton**
Delaware Department of Justice
820 N. French Street, 6th Floor
19801
Wilmington, DE 19801
302-577-5374
Email: Emily.Burton@Delaware.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer-Kate M. Aaronson**
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8803
Email: kate.aaronson@delaware.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Kolker**
Email: dkolker@campaignlegalcenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Shimek**
Email: eshimek@campaignlegalcenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan McAllen**
Email: mmcallen@campaignlegalcenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tara Malloy**
Email: tmalloy@campaignlegalcenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathy Jennings**
*in her official capacity as Attorney General of the State of Delaware*

represented by

**Emily V. Burton**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Jennifer-Kate M. Aaronson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Kolker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Shimek**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Megan McAllen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tara Malloy**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/17/2026 | 1 | COMPLAINT against Anthony Albence and Kathy Jennings (Filing fee $ 405, receipt number ADEDC-4951205) - filed by Americans for Prosperity Foundation and Americans for Prosperity. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet)(slk) (Entered: 04/20/2026) |
| 04/17/2026 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (slk) (Entered: 04/20/2026) |
| 04/17/2026 | 3 | Disclosure Statement pursuant to Rule 7.1: No Parents or Affiliates Listed filed by Americans for Prosperity, Americans for Prosperity Foundation. (slk) (Entered: 04/20/2026) |
| 04/17/2026 | 4 | MOTION for Preliminary Injunction - filed by Americans for Prosperity, Americans for Prosperity Foundation. (Attachments: # 1 Text of Proposed Order)(slk) (Entered: 04/20/2026) |
| 04/17/2026 | 5 | OPENING BRIEF in Support of 4 MOTION for Preliminary Injunction filed by Americans for Prosperity, Americans for Prosperity Foundation. Answering Brief/Response due date per Local Rules is 5/1/2026. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(slk) (Entered: 04/20/2026) |
| 04/20/2026 | 6 | Summons Issued as to Anthony Albence on 4/20/2026. (slk) (Entered: 04/20/2026) |
| 04/20/2026 | 7 | SUMMONS Returned Executed by Americans for Prosperity Foundation, Americans for Prosperity.Anthony Albence served on 4/20/2026, answer due 5/11/2026. (Anderson, Jeremy) (Entered: 04/20/2026) |
| 04/22/2026 | | Case Assigned to Judge Jennifer L. Hall. Please include the initials of the Judge (JLH) after the case number on all documents filed. (alb) (Entered: 04/22/2026) |
| 04/23/2026 | 8 | MOTION for Pro Hac Vice Appearance of Attorney Allen J. Dickerson, Erika D. Prouty, Robert J. Tucker and Anna E. Croyts - filed by Americans for Prosperity, Americans for Prosperity Foundation. (Attachments: # 1 Text of Proposed Order, # 2 Certification of Allen J. Dickerson, # 3 Certification of Erika D. Prouty, # 4 Certification of Robert J. Tucker, # 5 Certification of Anna E. Croyts)(Anderson, Jeremy) (Entered: 04/23/2026) |
| 04/23/2026 | 9 | Pro Hac Vice Fee - Credit Card Payment received for Allen J. Dickerson, Erika D. Prouty, Robert J. Tucker, and Anna E. Croyts. ( re 8 MOTION for Pro Hac Vice Appearance of Attorney Allen J. |

| | | |
|---|---|---|
| | | Dickerson, Erika D. Prouty, Robert J. Tucker and Anna E. Croyts )( Payment of $ 200, receipt number ADEDC-4955300).(Anderson, Jeremy) (Entered: 04/23/2026) |
| 04/24/2026 | | SO ORDERED, re 8 Motion for Pro Hac Vice Appearance of Attorney Allen J. Dickerson, Erika D. Prouty, Robert J. Tucker and Anna E. Croyts filed by Americans for Prosperity Foundation, Americans for Prosperity. Ordered by Judge Jennifer L. Hall on 4/24/2026. (ceg) (Entered: 04/24/2026) |
| 04/24/2026 | | Pro Hac Vice Attorney Allen J. Dickerson, Erika D. Prouty, Robert J. Tucker & Anna E. Croyts for Americans for Prosperity & Americans for Prosperity Foundation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (slk) (Entered: 04/24/2026) |
| 04/29/2026 | 10 | SUMMONS Returned Executed by Americans for Prosperity Foundation, Americans for Prosperity.Kathy Jennings served on 4/20/2026, answer due 5/11/2026. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Anderson, Jeremy) (Entered: 04/29/2026) |
| 05/01/2026 | 11 | NOTICE of Appearance by Jennifer-Kate M. Aaronson on behalf of Anthony Albence, Kathy Jennings (Aaronson, Jennifer-Kate) (Entered: 05/01/2026) |
| 05/08/2026 | 12 | STIPULATION TO EXTEND TIME to Answer, Move, or Otherwise Respond to the Complaint until all briefing is Completed and Considered for the Motion for Preliminary Injunction to - filed by Anthony Albence, Kathy Jennings. (Burton, Emily) (Entered: 05/08/2026) |
| 05/12/2026 | 13 | SO ORDERED, re 12 Stipulation and Order to Extend Time to Answer, Move, or Otherwise Respond to the Complaint until after the Court's resolution of Plaintiffs' Motion for Preliminary Injunction. (*Reset Briefing Schedule re 4 MOTION for Preliminary Injunction: Answering Brief due 5/25/2026; Reply Brief due 5/29/2026). Signed by Judge Jennifer L. Hall on 5/12/2026. (ceg) (Entered: 05/12/2026) |
| 05/12/2026 | 14 | ORAL ORDER Setting Hearing on Motion: IT IS HEREBY ORDERED that a hearing on the Motion for Preliminary Injunction (D.I. 4 ) is scheduled for June 8, 2026 at 10:00 A.M. in Courtroom 6D. IT IS FURTHER ORDERED that on or before June 2, 2026, the parties shall file a joint letter setting forth whether either side requests an evidentiary hearing and if so, a list of the witnesses and a description of the documents each side intends to introduce. Ordered by Judge Jennifer L. Hall on 5/12/2026. (ceg) (Entered: 05/12/2026) |
| 05/13/2026 | 15 | ORAL ORDER: The Court has ordered the parties' stipulation regarding the briefing schedule for the pending motion for preliminary injunction. (D.I. 12 , 13 .) The parties have contacted chambers seeking to alter those agreed-upon dates. To the extent the parties seek to change the briefing schedule, the parties should submit a proposed stipulation. Ordered by Judge Jennifer L. Hall on 5/13/2026. (twk) (Entered: 05/13/2026) |
| 05/13/2026 | 16 | STIPULATION TO EXTEND TIME Deadlines and set Briefing Schedule to Defendant's Responsive Brief May 26,2026 and Plaintiffs Reply Brief on or before June 1, 2026 - filed by Anthony Albence, Kathy Jennings. (Burton, Emily) (Entered: 05/13/2026) |
| 05/14/2026 | | SO ORDERED, re 16 Stipulation and Order to Extend Time to Answer, Move, or Otherwise Respond to the Complaint until after the Court's resolution of Plaintiffs' Motion for Preliminary Injunction and Briefing Schedule. (*Reset Briefing Schedule re 4 MOTION for Preliminary Injunction: Answering Brief due 5/26/2026; Reply Brief due 6/1/2026). Ordered by Judge Jennifer L. Hall on 5/14/2026. (ceg) (Entered: 05/14/2026) |
| 05/26/2026 | 17 | MOTION for Pro Hac Vice Appearance of Attorney David Kolker - filed by Anthony Albence, Kathy Jennings. (Burton, Emily) (Main Document 17 replaced on 6/1/2026) (ceg). (Entered: 05/26/2026) |
| 05/26/2026 | 18 | MOTION for Pro Hac Vice Appearance of Attorney Elizabeth Shimek - filed by Anthony Albence, Kathy Jennings. (Burton, Emily) (Main Document 18 replaced on 6/1/2026) (ceg). (Entered: 05/26/2026) |
| 05/26/2026 | 19 | MOTION for Pro Hac Vice Appearance of Attorney Megan McAllen - filed by Anthony Albence, Kathy Jennings. (Burton, Emily) (Main Document 19 replaced on 6/1/2026) (ceg). (Entered: 05/26/2026) |
| 05/26/2026 | 20 | MOTION for Pro Hac Vice Appearance of Attorney Tara Malloy - filed by Anthony Albence, Kathy Jennings. (Burton, Emily) (Main Document 20 replaced on 6/1/2026) (ceg). (Entered: 05/26/2026) |

| | | |
|---|---|---|
| 05/26/2026 | 21 | ANSWERING BRIEF in Opposition re 4 MOTION for Preliminary Injunction, filed by Anthony Albence, Kathy Jennings. Reply Brief due date per 16 Stipulation is 6/1/2026. (Burton, Emily) Modified on 5/27/2026 (ceg). (Entered: 05/26/2026) |
| 05/27/2026 | | CORRECTING ENTRY: The declaration and exhibits filed as attachments to D.I. 21 has been removed. Counsel is advised to refile the declaration with exhibits at a new transaction number and link to the appropriate docket item. (ceg) (Entered: 05/27/2026) |
| 05/27/2026 | | DEFICIENCY NOTICE by the Court issued to Defendants re 20 Motion for Leave to Appear Pro Hac Vice, 18 Motion for Leave to Appear Pro Hac Vice, 19 Motion for Leave to Appear Pro Hac Vice, 17 Motion for Leave to Appear Pro Hac Vice. Per the December 21, 2023 Standing Order, the fee shall be paid upon the filing of a motion. For Pro Hac Vice payments via CM/ECF, local counsel can pay by credit card using the appropriate event code from the Pro Hac Vice Fee Menu in the case the motion is being filed in. (ceg) (Entered: 05/27/2026) |
| 05/27/2026 | 22 | DECLARATION of Anthony J. Albence re 21 Answering Brief in Oppositin, by Anthony Albence, Kathy Jennings. (Attachments: # 1 Exhibit 1-16)(Burton, Emily) Modified on 5/27/2026 (ceg). (Entered: 05/27/2026) |
| 05/27/2026 | 23 | Pro Hac Vice Fee - Credit Card Payment received for David Kolker. ( re 17 MOTION for Pro Hac Vice Appearance of Attorney David Kolker )( Payment of $ 50, receipt number ADEDC-4977799). (Burton, Emily) (Entered: 05/27/2026) |
| 05/27/2026 | 24 | Pro Hac Vice Fee - Credit Card Payment received for Elizabeth Shimek, Megan McAllen, and Tara Malloy. ( re 20 MOTION for Pro Hac Vice Appearance of Attorney Tara Malloy, 18 MOTION for Pro Hac Vice Appearance of Attorney Elizabeth Shimek, 19 MOTION for Pro Hac Vice Appearance of Attorney Megan McAllen )( Payment of $ 150, receipt number ADEDC-4977815).(Burton, Emily) (Entered: 05/27/2026) |
| 06/01/2026 | | CORRECTING ENTRY: The pdf for the motions for pro hac vice (D.I. 17 , 18 , 19 , 20 ) have been replaced with corrected versions to include additional contact information per the discussion between chambers and filer. (ceg) (Entered: 06/01/2026) |
| 06/01/2026 | | SO ORDERED, re 20 Motion for Pro Hac Vice Appearance of Attorney Tara Malloy, 17 Motion for Pro Hac Vice Appearance of Attorney David Kolker, 19 Motion for Pro Hac Vice Appearance of Attorney Megan McAllen, 18 Motion for Pro Hac Vice Appearance of Attorney Elizabeth Shimek filed by Kathy Jennings, Anthony Albence. Ordered by Judge Jennifer L. Hall on 6/1/2026. (ceg) (Entered: 06/01/2026) |
| 06/01/2026 | 25 | REPLY BRIEF re 4 MOTION for Preliminary Injunction filed by Americans for Prosperity, Americans for Prosperity Foundation. (Attachments: # 1 Exhibit C)(Anderson, Jeremy) (Entered: 06/01/2026) |
| 06/02/2026 | 26 | Joint Letter to The Honorable Jennifer L. Hall regarding the Preliminary Injunction Hearing scheduled for June 8, 2026. (Anderson, Jeremy) Modified on 6/3/2026 (ceg). (Entered: 06/02/2026) |
| 06/08/2026 | | Minute Entry for proceedings held before Judge Jennifer L. Hall - Preliminary Injunction Hearing held on 6/8/2026. (Court Reporter: H. Triozzi). (twk) (Entered: 06/08/2026) |
| 06/08/2026 | 27 | ORAL ORDER Setting Teleconference: The Preliminary Injunction Hearing will resume on June 8, 2026, at 4:00 PM. The parties shall dial the Court's conference line at (855)-244-8681, access code: 2305 225 5565. Ordered by Judge Jennifer L. Hall on 6/8/2026. (twk) (Entered: 06/08/2026) |
| 06/08/2026 | | Minute Entry for proceedings held before Judge Jennifer L. Hall - Preliminary Injunction Hearing completed on 6/8/2026. (Court Reporter: S. Ingram). (twk) (Entered: 06/08/2026) |
| 06/08/2026 | 28 | ORDER: IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (D.I. 4 ) is DENIED. (*See Order for details). Signed by Judge Jennifer L. Hall on 6/8/2026. (twk) (Entered: 06/08/2026) |
| 06/10/2026 | | Pro Hac Vice Attorney David Kolker for Anthony Albence,and Kathy Jennings added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (oam) (Entered: 06/10/2026) |

| | | |
|---|---|---|
| 06/10/2026 | | Pro Hac Vice Attorney Megan McAllen for Anthony Albence and Kathy Jennings added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (oam) (Entered: 06/10/2026) |
| 06/10/2026 | | Pro Hac Vice Attorney Elizabeth Shimek for Anthony Albence, and for Kathy Jennings added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (oam) (Entered: 06/10/2026) |
| 06/10/2026 | | Pro Hac Vice Attorney Tara Malloy for Anthony Albence, and Kathy Jennings added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (oam) (Entered: 06/10/2026) |
| 06/10/2026 | 29 | NOTICE OF APPEAL of 28 Order . Appeal filed by Americans for Prosperity, Americans for Prosperity Foundation. (Anderson, Jeremy) (Entered: 06/10/2026) |
| 06/10/2026 | | APPEAL - Credit Card Payment received re 29 Notice of Appeal (Third Circuit) filed by Americans for Prosperity Foundation, Americans for Prosperity. ( Filing fee $605, receipt number ADEDC-4990020.) (Anderson, Jeremy) (Entered: 06/10/2026) |
| 06/17/2026 | 30 | NOTICE of Docketing Record on Appeal from USCA for the Third Circuit re 29 Notice of Appeal (Third Circuit) filed by Americans for Prosperity, Americans for Prosperity Foundation. USCA Case Number 26-2469. USCA Case Manager: James (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF) (jk) (Entered: 06/17/2026) |
| 07/07/2026 | 31 | ORAL ORDER: On or before July 15, 2026, the parties shall file a joint letter setting forth their positions as to how (if at all) this case should proceed at the district court during the pendency of Plaintiffs' interlocutory appeal. Ordered by Judge Jennifer L. Hall on 7/7/2026. (ceg) (Entered: 07/07/2026) |
| 07/15/2026 | 32 | Joint Letter to The Honorable Jennifer L. Hall regarding Status of Action - re 31 Status Report Order,. (Anderson, Jeremy) (Entered: 07/15/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/15/2026 13:04:21 | | | |
| **PACER Login:** | anna_croyts | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cv-00445-JLH Start date: 1/1/1975 End date: 7/15/2026 |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

AMERICANS FOR PROSPERITY FOUNDATION; AMERICANS FOR PROSPERITY

*Plaintiffs*,

v.

ANTHONY ALBENCE, in his official capacity as State Election Commissioner for the State of Delaware,

KATHY JENNINGS, in her official capacity as Attorney General of the State of Delaware,

*Defendants*.

Case No.

**COMPLAINT**

**NATURE OF THE CASE**

1. The First Amendment prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

2. Included in the First Amendment's protection is the right of individuals to freely associate with others. The Supreme Court of the United States has long held that compelled disclosure of an advocacy organization's members violates that right. *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958).

3. In 2021, the Supreme Court confirmed that state laws requiring the disclosure of an organization's donors are subject to "exacting scrutiny" under the First Amendment. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021).

Case: 26-2469 Document: 16 Page: 10 Date Filed: 07/15/2026

4. Plaintiff Americans for Prosperity Foundation ("AFPF") is a nonprofit organization with donors across the country, including in Delaware. AFPF regularly engages in advocacy and education concerning issues of public policy, including communications in various forms that may refer to incumbent officials who may also be candidates for office.

5. Plaintiff Americans for Prosperity ("AFP") is a nonprofit organization with donors across the country, including in Delaware. Although AFP sometimes engages in express advocacy, it most regularly engages in issue advocacy, including communications in various forms that may refer to incumbent officials who may also be candidates for office.

6. Plaintiffs intend to publish non-express advocacy, issue-based communications that will refer to specific officeholders who are also candidates for election in Delaware in advance of the 2026 and subsequent primary and general elections. Upon information and belief, however, if Plaintiffs published such communications, the Delaware Elections Disclosure Act, codified at 15 Del. C. § 8001, et seq., and specifically, 15 Del. C. § 8031(a)(3) ("Delaware's disclosure requirements"), would require them to file reports disclosing the names and addresses of their donors who have donated more than $100 dating back several years.

7. Plaintiffs reasonably fear that if they fail to file these reports disclosing the names and addresses of their donors, they will be subject to enforcement actions, investigations, and penalties initiated or imposed by Defendants and their agents.

8. Delaware's disclosure requirements violate the right to private association, chill free speech and association, and overstep the government's legitimate disclosure interests, all in violation of the First Amendment.

9. Plaintiffs therefore bring this action to obtain a declaration that Delaware's disclosure requirements are unlawful on their face and as applied to Plaintiffs, and to enjoin enforcement of those requirements.

**PARTIES**

10. Plaintiff Americans for Prosperity Foundation is a Delaware nonprofit corporation headquartered in Virginia. It is exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code. AFPF funds its activities by raising charitable contributions from donors across the country, including in Delaware.

11. Plaintiff Americans for Prosperity is a Washington, D.C. nonprofit corporation headquartered in Virginia. It is exempt from taxation pursuant to Section 501(c)(4) of the Internal Revenue Code. AFP funds its activities by raising contributions from donors across the country, including in Delaware.

12. Defendant Anthony Albence is the State Election Commissioner ("Commissioner") for the State of Delaware and is empowered to issue regulations with the force of law regarding Delaware election laws pursuant to 15 Del. C. § 302. As Commissioner, Defendant Albence also has the power to levy fines when "a report [] is not filed, not filed on time, or is filed on time but incomplete." 15 Del. C. § 8044(a).

13. Defendant Kathy Jennings is the Attorney General of Delaware and is empowered to "investigate matters involving the public peace, safety and justice" in the State of Delaware. 29 Del. C. § 2504(4). Under 15 Del. C. § 8044(g), "the [Reports Appeals Subcommittee of the State Board of Elections] shall notify the Office of the Attorney General" of parties which fail to file required reports. Failure to file such reports constitutes a class A misdemeanor. 15 Del. C. § 8043(c).

## JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343.

15. Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) and (b)(2).

## FACTS

### Delaware's Regulation of Electioneering Communications and Third-Party Advertisements

16. The Delaware Elections Disclosure Act states that "[a]ny person . . . who makes an expenditure for any third-party advertisement that causes the aggregate amount of expenditures for third-party advertisements made by such person to exceed $500 during an election period shall file a third-party advertisement report with the Commissioner." 15 Del. C. § 8031(a). A "person" includes "any individual, corporation, company, incorporated or unincorporated association, general or limited partnership, society, joint stock company, and any other organization or institution of any nature." 15 Del. C. § 8002(17).

17. A "third-party advertisement" includes "an electioneering communication," 15 Del. C. § 8002(27), which is defined as any communication "by any individual or other person (other than a candidate committee or a political party) that: 1. [r]efers to a clearly identified candidate; and 2. [i]s publicly distributed within 30 days before a primary election or special election, or 60 days before a general election to an audience that includes members of the electorate for the office sought by such candidate." 15 Del. C. § 8002(10)(a).

18. The "third-party advertisement report" must be "filed under penalty of perjury" and include "[t]he full name and mailing address of each person who has made contributions to such person during the election period in an aggregate amount or value in excess of $100; the total of all contributions from such person during the election period, and the amount and date of all contributions from such person during the reporting period." 15 Del. C. § 8031(a)(3). If the

contributor is not an individual, the report must include "the full name and mailing address of . . . [a]ny person who, directly or otherwise, owns a legal or equitable interest of 50 percent or greater in such entity; and . . . [o]ne responsible party, if the aggregate amount of contributions made by such entity during the election period exceeds $1,200." 15 Del. C. § 803l(a)(4).

19. "Election period" has various definitions under Delaware law. 15 Del. C. § 8002(11).

20. "For a person who makes an expenditure for a third-party advertisement, the election period shall begin and end at the same time as that of the candidate identified in such advertisement." 15 Del. C. § 8002(1l)(d). For candidates running for reelection for the office to which they were elected in the most recent election, the election period is "the period beginning on January 1 immediately after the most recent such election, and ending on the December 31 immediately after the general election at which the candidate seeks reelection to the office." 15 Del. C. § 8002(1l)(a)(1). And for candidates running for an office which they do not hold, the election period is "the period beginning on the day on which the candidate first receives any contribution from any person (other than from the candidate or from the candidate's spouse) in support of that candidate's candidacy for the office, and ending on the December 31 immediately after the general election at which the candidate seeks election to the office." 15 Del. C. § 8002(11)(a)(3).

21. Delaware's state senators and statewide executive officeholders are elected every four years. *See* DEL. CONST. art. II. § 2; *id*. art. III, §§ 5, 19(a), 21. Therefore, under Delaware law, the applicable "election period" for incumbent candidates for these offices may be up to four years.

22. Delaware regulations require third-party advertisement reports to be filed within "48 hours" after a qualifying expenditure is made if the expenditure is made "more than 30 days

before a primary or special election or 60 days before a general election," and within "24 hours" after the expenditure is made if the expenditure is made "30 days or less before a primary or special election or 60 days or less before an election." 15 Del. Admin. Code 100-9.1.5.

23. Failure to file the required reports results in assessment of "a fine by the Commissioner of $50 for each day that such report is tardy." 15 Del. Admin. Code 100-10.1. If a tardy report is not filed or corrected within 30 days following either a determination by the Commissioner that the tardiness is not due to reasonable cause or the expiration of the appeal period, "then the Commissioner shall notify the Office of the Attorney General that the reporting party has failed to file such report." 15 Del. Admin. Code 100-10.3.

**Plaintiffs' Past and Future Activities**

24. AFPF is a 501(c)(3) nonprofit organization committed to educating and training Americans to be advocates for the ideas, principles, and policies of a free and open society.

25. AFPF engages in educational and advocacy work in many states across the country in pursuit of this mission. This education and advocacy includes communications through mechanisms that Delaware defines as "communications media." For example, a true and correct audio copy of a recent radio advertisement from Arizona is available on AFPF's website.[1] The production and distribution of this communication cost AFPF more than $500.

26. AFPF intends to engage in similar work in Delaware on an ongoing basis, including within 30 days before the upcoming 2026 primary election and within 60 days of the upcoming 2026 general election. Specifically, AFPF intends to produce and distribute communications through mechanisms that Delaware defines as "communications media." Upon information and

---

[1] *AZ Proposition 211 Radio Advertisement*, AMS. FOR PROSPERITY FOUND. (Feb. 2026), https://americansforprosperityfoundation.org/wp-content/uploads/2026/02/AZProp211_60_Radio.mp3.

Case: 26-2469 Document: 16 Page: 15 Date Filed: 07/15/2026

belief, the production and distribution of these communications will cost AFPF more than $500. Consistent with its federal tax status, AFPF's communications will discuss specific officeholders, including officeholders who are themselves candidates for election or reelection, in the context of governmental action and issues of public policy but will not advocate their election or defeat.

27. AFP is a 501(c)(4) is a nonprofit organization that engages in broad-based grassroots outreach to advocate for long-term solutions to the country's biggest problems that prevent people from realizing their incredible potential. Its areas of focus include unsustainable government spending and debt, reforms to immigration and economic policy, and a host of other issues.

28. AFP engages in issue advocacy work in many states across the country in pursuit of this mission. This advocacy includes communications through mechanisms that Delaware defines as "communications media." A true and correct copy of a recent example from Maine is attached hereto as Exhibit A. The production and distribution of this communication cost AFP more than $500.

29. AFP intends to engage in similar work in Delaware on an ongoing basis, including within 30 days before the upcoming 2026 primary election and within 60 days of the upcoming 2026 general election, and subsequent elections. Specifically, AFP intends to produce and distribute communications through mechanisms that Delaware defines as "communications media." Upon information and belief, the production and distribution of these communications will cost AFP more than $500. Consistent with its federal tax status, these communications will discuss specific officeholders, including officeholders who are themselves candidates for election or reelection, in the context of governmental action and issues of public policy.

30. Plaintiffs' communications are protected speech under the First and Fourteenth Amendments.

31. However, upon information and belief, Plaintiffs' communications would fall within Delaware's definition of "electioneering communications," and therefore would be "third-party advertisements" subject to Delaware's disclosure requirements.

32. Therefore, Plaintiffs would be required to file third-party advertisement reports, under penalty of perjury, that disclose the names and addresses of their donors who have contributed more than $100 in the aggregate during the applicable "election period."

33. Between 2022 and 2025, thousands of donors contributed more than $100 to AFP and/or AFPF. The vast majority of these donors reside outside of Delaware, and none gave for the purpose of regulated communications in Delaware or in response to solicitations concerning AFP and AFPF's anticipated activity in Delaware. Yet, under Delaware law, Plaintiffs would be required to disclose the names and addresses of these donors in a third-party advertisement report.

34. This compelled disclosure violates the First Amendment freedom of association and belief enjoyed by Plaintiffs and their supporters.

35. Furthermore, Delaware's disclosure requirements will chill, or at the very least, create an unnecessary risk of chilling, the First Amendment activity of Plaintiffs and their donors.

36. Plaintiffs and their donors have a reasonable fear that they will be the target of threats, harassment, or other retaliation if Plaintiffs are forced to disclose the names and addresses of their donors.

37. Plaintiffs and their supporters have been subject to threats and harassment in the past, as the Supreme Court has recognized. *Bonta*, 594 U.S. at 617 (explaining that AFPF had

shown "that they and their supporters have been subjected to bomb threats, protests, stalking, and physical violence."); *see also id.* at 604.

38. For example, at AFP's 2011 summit in Washington, D.C., hundreds of protesters gathered outside the event space and attempted to storm the building. The protest became violent, with some attendees physically accosted and injured. *See* Clare O'Connor, *Occupy the Koch Brothers: Violence, Injuries, and Arrests at DC Protest*, FORBES (Dec. 10, 2011 at 6:25 EST), http://www.forbes.com/sites/clareoconnor/2011/11/05/occupy-the-kochs-violent-clashes-injuries-and-arrests-at-protest-against-corporate-greed/. Additionally, in 2019, an AFP office in Fargo, North Dakota was vandalized because of AFP's support for free speech. *See* Rob Port, *This conservative group's Fargo office has been vandalized repeatedly since it was opened*, INFORUM (Nov. 29, 2019 at 3:15 CT), https://www.inforum.com/opinion/columns/port-this-conservative-groups-fargo-office-has-been-vandalized-repeatedly-since-it-was-opened.

39. Two of Plaintiffs' founders are brothers Charles Koch and the late David Koch. Charles has faced extensive threats and attacks for his advocacy work, including his work and ties to AFPF. *See Ams. for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1056 (C.D. Cal. 2016) (recounting threats to Charles and David) (post-decision procedural history omitted).

40. Donors whose associations with Plaintiffs are known to the public have received threats of physical harm and/or public harassment. For example, reporters have published a list of potential donors to Plaintiffs, resulting in individuals on the list being immediately harassed and their businesses boycotted.

41. Other donors, supporters, and employees of AFP and AFPF have repeatedly faced public threats, harassment, and intimidation based on their support and affiliation for the organizations. *See Ams. for Prosperity Found.*, 182 F. Supp. 3d at 1055-56 (cataloging threats);

*see also Ams. for Prosperity v. Grewal*, 2019 WL 4855853, at *6 (D.N.J. Oct. 2, 2019) (describing Plaintiffs' evidence where "AFP itself and its donors have been subjected to harassment ranging from death threats to cyberattacks to violent protests at AFP events.").

42. These threats and harassment have continued in recent years. For example, Plaintiffs and their employees have experienced consistent harassment and threats in Vermont from groups that disagree with Plaintiffs on economic policy initiatives, requiring Plaintiffs to hire security for their events. Legislators and their supporters have attempted many ways to stop Plaintiffs' operations in Northeastern states by introducing legislation targeting AFP. Both Vermont and Maine legislators singled out AFP as the reason they attempted to stop non-profits from advocating in their states.

43. Plaintiffs therefore believe that both current and potential donors are fearful of having their names and addresses disclosed as supporters or donors to Plaintiffs.

44. Accordingly, Plaintiffs vigorously protect the confidentiality of their donors. For example, Plaintiffs maintain donor information in a highly secure database, and access is restricted to individuals who have a need to know that information. The vast majority of donors require confidentiality as a condition of their giving to Plaintiffs.

45. If, however, Plaintiffs are required to disclose the names and addresses of their donors, it is likely that potential donors will refuse to contribute, and current donors will cease to contribute, because they are too fearful of the reprisal they will face if their names and addresses are disclosed.

46. Consequently, Delaware's disclosure requirements will chill, or at the very least create an unnecessary risk of chilling, Plaintiffs' and their donors' associational activity by discouraging individuals from associating with Plaintiffs, who are themselves engaged in protected

First Amendment activity. The disclosure requirements will also chill, or at the very least create an unnecessary risk of chilling, the protected speech of donors who forgo making contributions out of fear of reprisal.

47. If, however, Plaintiffs do not file the required reports disclosing their donors, they will be subject to daily fines. Additionally, the Election Commissioner is required to notify the Attorney General of any failure to file required reports, which is a class A misdemeanor. *See* 15 Del. C. § 8043(c).

48. Upon information and belief, Plaintiffs and other organizations face a credible threat that Delaware will enforce the disclosure requirements against them. For example, the state Election Commissioner has previously concluded that a political action committee was required to file a third-party advertisement report for an advertisement that referred to a candidate for State Treasurer aired during the 2018 election, but had failed to do so by the applicable deadline. *See* Exhibit B, "*Re: Request for Ruling on Simpler and Lavelle Campaign Finance Issues*," STATE OF DEL. DEP'T OF ELECTIONS, (Oct. 26, 2018), https://elections.delaware.gov/public/com_opinions/pdfs/AO2018-01%20LavelleSimpler.pdf. While the State Election Commissioner agreed "on a one-time basis . . . to waive the fines associated with the Foundation's tardy third-party reports" so long as they were accurate and complete, the Commissioner also warned that she would "not waive any fines for the Foundation for third-party advertisement reports that must be filed in the future." *Id*. at 4.

49. Upon information and belief, Delaware has never disavowed enforcement of Delaware's disclosure requirements for Plaintiffs' planned conduct. To the contrary, Delaware has previously enforced the requirements, *see* Exhibit B, and rigorously defended the constitutionality of the statute, *see generally Del. Strong Fams. v. Att'y Gen. of Del.*, 793 F.3d 304 (3d Cir. 2015).

50. Absent a court order enjoining enforcement of the law and declaring it unconstitutional, Plaintiffs will not publish communications in Delaware in the regulated periods predating the 2026 or subsequent elections for fear that Delaware will enforce its unconstitutional disclosure requirements.

51. Consequently, Plaintiffs' speech is chilled because they fear a future enforcement action and punishment by Defendants for publishing covered communications without filing the required reports that disclose the names and addresses of their donors.

**COUNT I – FIRST AMENDMENT**

52. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 to 51 as if set forth fully herein.

53. The First Amendment to the United States Constitution applies to Delaware by virtue of the Fourteenth Amendment. *See Gitlow v. New York*, 268 U.S. 652 (1925).

54. The First Amendment prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *Bonta*, 594 U.S. at 605-606. The Supreme Court has recognized that "the right to engage in activities protected by the First Amendment" includes "a corresponding right to associate with others." *Id.* at 606 (citation omitted).

55. The Supreme Court has "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity" because "they ma[k]e group membership less attractive, raising the same First Amendment concerns about affecting the group's ability to express its message." *Rumsfeld v. FAIR*, 547 U.S. 47, 69 (2006). This protection applies with equal force to an organization's financial supporters. *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976).

56. "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of government action." *Patterson*, 357 U.S. at 462.

57. The Supreme Court has thus held that compelled disclosure requirements are subject to "exacting scrutiny." *Buckley*, 424 U.S. at 93-94; *Bonta*, 594 U.S. at 608.

58. That standard requires "that there be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,'" *Bonta*, 594 U.S. at 611 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)), "and that the disclosure requirement be narrowly tailored to the interest it promotes," *id*. (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). The narrow tailoring inquiry requires analysis of "the extent to which the burdens are unnecessary." *Id*.

59. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Id*. at 609 (alternation in original) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

60. "A critical feature of [the narrow tailoring] inquiry turns on whether the [government] 'seriously undertook to address' the problems it faces 'with less intrusive tools readily available to it.'" *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 404 (6th Cir. 2022) (Sutton, C.J.) (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)). "This means that, beyond proving a balanced relationship between the disclosure scheme's burdens and the government's interests, the government must 'demonstrate its need' for the disclosure regime 'in light of any less intrusive alternatives.'" *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1247 (10th Cir. 2023) (quoting *Bonta*, 594 U.S. at 613).

61. Delaware's disclosure requirements require Plaintiffs to disclose the names and addresses of their donors who have contributed more than $100 in the aggregate during the

applicable "election period." The compelled disclosure of Plaintiffs' donors, as required by Delaware's disclosure requirements, burdens Plaintiffs' First Amendment right to association, triggering exacting scrutiny.

62. Delaware's disclosure requirements set forth in 15 Del. C. § 8031 are not substantially related to a sufficiently important government interest, nor are they narrowly tailored to any interest they allegedly promote.

63. The Supreme Court has identified the governmental interests that could survive exacting scrutiny as: "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek . . . office," "deter[ring] actual corruption and avoid[ing] the appearance of corruption by exposing large contributions and expenditures to the light of publicity," and "detect[ing] violations of the contribution limitations." *Buckley*, 424 U.S. at 66-68 (citations omitted).

64. Delaware's disclosure requirements lack a substantial relation to any of these interests, and are not narrowly tailored to any of these interests.

65. The only interest that could even potentially justify the disclosure requirements here is the informational interest, but that "simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995).

66. Delaware cannot demonstrate that disclosing the names and addresses of Plaintiffs' donors across the country for an extended period of time actually provides voters with information that is relevant to their evaluation of candidates or "help[s] citizens make informed choices in the

political marketplace," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 367 (2010) (citations omitted), or that it is narrowly tailored to that interest.[2]

67. Under Delaware's disclosure requirements, Plaintiffs must disclose the names and addresses of all of their donors who have contributed more than $100 within the applicable "election period," regardless of whether these donors earmarked their donations for a specific candidate or purpose. Circuit courts around the country have identified a state's institution of "earmarking systems" and "opt out" provisions as methods of tailoring disclosure requirements to a state's informational interest. *See Wyo. Gun Owners*, 83 F.4th at 1248-49; *Gaspee Project v. Mederos*, 13 F.4th 79, 89 (1st Cir. 2021). Delaware lacks either option and cannot "demonstrate its need" for the burden of disclosing all of Plaintiffs' donors above $100 in light of these other "less intrusive alternatives." *Bonta*, 594 U.S. at 613.

68. Delaware also cannot demonstrate that the applicable "election period[s]" are narrowly tailored to any informational interest. Those periods are defined by the election periods for "the candidate identified in such [third-party] advertisement[s]," 15 Del. C. § 8002(11)(d), which equates to a four-year election period for incumbent statewide executive officeholders and state senators, *see* 15 Del. C. § 8002(11)(a)(1). Compelling the disclosure of Plaintiffs' donors as far back as four years prior to an election provides little information of value to voters, as those donors may no longer support Plaintiffs or their mission, and are unlikely to have given for the

---

[2] The bill synopsis for the legislation enacting Delaware's disclosure requirements claimed that it was intended to "close a major loophole under existing law" "by requiring reports for electioneering communications—i.e., third party advertisements that refer to a clearly identified candidate and are publicly distributed within 30 days before a primary or special election, or 60 days before a general election," and that "[t]his requirement will provide crucial information to voters in the days before an election and 'help citizens make informed choices in the political marketplace.' *Citizens United v. FEC*, 130 S. Ct. 876 (2010)." H.B. 300, 146th Gen. Assemb. (Del. 2012), available at https://legis.delaware.gov/BillDetail/21575 (last visited Apr. 7, 2026).

purpose of any specific public communication or advocacy concerning any specific candidate, in Delaware or elsewhere.

69. Delaware's interest here, whatever it may be, is weak, and it is apparent "[t]here is a dramatic mismatch" between those interests "and the disclosure regime . . . implemented in service of that end." *Id.* at 612. Delaware's disclosure requirement is therefore not narrowly tailored to any government interest.

70. The government's interests also do not "reflect the seriousness of the actual burden" that Delaware's disclosure requirements impose on the First Amendment rights of Plaintiffs and their supporters. *Bonta*, 594 U.S. at 615 (quoting *Reed*, 561 U.S. at 196). Plaintiffs and their supporters have suffered from threats and harassment in the past, and donors will likely face similar retaliation in the future if their affiliation with Plaintiffs is disclosed. Delaware's disclosure requirements therefore will also chill, or at the very least create an unnecessary risk of chilling, the protected associational and speech activity of Plaintiffs' and their supporters.

71. Delaware's disclosure requirements are overbroad and facially unconstitutional because they "fail[] exacting scrutiny in 'a substantial number of [their] applications . . . judged in relation to [their] plainly legitimate sweep.'" *Id.* at 618 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

72. The "lack of tailoring to" Delaware's goals is "categorical—present in every case—as is the weakness of the State's interest . . ." *Id.* at 615. It is true in "every case" that Delaware's interests in the disclosure requirement is weak, that Delaware has not imposed "less intrusive alternatives," and that the disclosure requirements are not narrowly tailored to the state's interests. *See id.* at 613, 615.

73. Delaware's disclosure requirements are triggered by relatively low expenditures on third-party advertisements ($500), and require the disclosure of donors who gave even less (more than $100 in the aggregate) as far back as four years and regardless of whether they were earmarked or specified for a specific candidate, communication, or any other purpose. Delaware's disclosure requirements do not create a mechanism for donors to "opt-out" of having their donations used for third-party advertisements and thereby avoid disclosure.

74. Delaware's disclosure requirements create an "unnecessary risk of chilling" by "indiscriminately sweeping up the information of *every* major donor with reason to remain anonymous." *Bonta*, 594 U.S. at 616-17. This risk of chilling is even more serious here where the requirement does not just apply to "major" donors but "sweep[s] up" donors who have given more than $100 in the aggregate over a four-year period, and when ever-evolving technology permits "'anyone with access to a computer'" to "'compile a wealth of information about' anyone else" using their name and home address. *Id*.

75. Moreover, Delaware's disclosure requirements are not narrowly tailored as applied to Plaintiffs, and therefore violate the First Amendment rights of Plaintiffs and their supporters.

76. Plaintiffs intend to publish and distribute communications that will be considered "electioneering communications" in the regulated periods predating the 2026 and subsequent elections, communication that would require Plaintiffs to file "third-party advertisement reports" disclosing the names and addresses of their donors.

77. However, unless and until a court enjoins the enforcement of the Delaware disclosure requirements, or they are otherwise repealed, Plaintiffs will not publish such communications in Delaware. Plaintiffs' speech will be chilled, as well as the activity of their donors, who fear they will face harassment and reprisals if their names and addresses are disclosed.

78. Delaware's disclosure requirements infringe the First and Fourteenth Amendment rights to freedom of speech and freedom of association of Plaintiffs and their supporters, and are unconstitutional on their face and as applied to Plaintiffs.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully requests that judgment be entered in their favor and against the Defendants as follows:

A. An order preliminarily enjoining the enforcement of the disclosure requirements for third-party advertisements at 15 Del. C. § 8031;

B. An order permanently enjoining the enforcement of the disclosure requirements for third-party advertisements at 15 Del. C. § 8031;

C. A declaration that the disclosure requirements for third-party advertisements at 15 Del. C. § 8031 violate the First and Fourteenth Amendments both on their face and as applied to Plaintiffs, and are therefore null and void in their entirety;

D. An award to Plaintiffs of their reasonable attorneys' fees and costs;

E. A grant to Plaintiffs of such additional or different relief as the Court deems just and proper.

DATED: April 17, 2026

Allen J. Dickerson*
1050 Connecticut Ave., N.W., Suite 1110
Washington, DC 20036-5403
(202) 861-1507
adickerson@bakerlaw.com

Erika D. Prouty*
Robert J. Tucker*
Anna E. Croyts*
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138
(614) 228-1541
eprouty@bakerlaw.com

BAKER & HOSTETLER LLP

_/s/ Jeremy D. Anderson_
Jeremy D. Anderson (No. 4515)
1201 North Market St., Suite 1407
Wilmington, DE 19801-1147
(302) 407-4224
janderson@bakerlaw.com

*Attorneys for Plaintiffs*

rtucker@bakerlaw.com
acroyts@bakerlaw.com

**Pro hac vice motions forthcoming*

# EXHIBIT A


AFP
MAINE
FREE SPEECH IS UNDER ATTACK IN MAINE
THANKS TO SENATOR RICK BENNETT

1st Amendment

# SENATOR RICK BENNETT IS ATTACKING FREE SPEECH IN MAINE

**Protect** Privacy Rights.

Stop them from **taking your rights.**

Censorship is **never the answer.**

Tell your legislator to

## Protect the First Amendment

JA-047

AFP MAINE
Address
City, State, Zip

Non-Profit Org.
US Postage
PAID
AMERICANS FOR
PROSPERITY

# EXHIBIT B

**State of Delaware**
**Department of Elections**

[redacted]

October 26, 2018

Re: Request for Ruling on Simpler and Lavelle Campaign Finance Issues

Dear

By letter dated October 15, 2018, the Delaware Democratic Party requests a ruling on certain conduct in connection with the campaigns of Ken Simpler (for State Treasurer) and Greg Lavelle (for State Senator, 4th District). Specifically, your letter alleges and complains that each of these campaigns has violated campaign finance laws under Chapter 80 of Title 15 of the Delaware Code.

My jurisdiction under 15 *Del. C.* Ch. 80 does not extend to rulings on individual complaints; my jurisdiction to act upon the Democratic Party's complaint is limited to the issuance of rulings based on a specified set of facts pursuant to 15 *Del. C.* § 8041(2). Accordingly, I respond to the Democratic Party's request for a ruling using the allegations in its letter as a specified set of facts. Those allegations are set out below.

**The Foundation for Delaware's Future, LLC**

As of the date of the Democratic Party complaint, the Foundation for Delaware's Future, LLC (the "Foundation"), which is a duly registered political action committee, had not filed any third-party advertising reports the Democratic Party alleges are required by 15 *Del. C.* § 8031. The Democratic Party requests an opinion from me on whether the Foundation must file such report(s) to disclose the costs of its digital advertisement currently running on digital and cable platforms. The Democratic Party provided a copy of a screenshot of that advertisement (see Exhibit 1). Thus, the first issue on which the Democratic Party seeks a ruling is whether the advertisement constitutes a third-party advertisement.

"Third-party advertisement" is defined as an independent expenditure or an electioneering communication. 15 *Del. C.* § 8002(27). If the advertisement constitutes either an

independent expenditure or an electioneering communication, both of which are defined terms under Chapter 80, the person who makes the expenditure for the advertisement must file a "special" report of a third-party advertisement under 15 *Del. C.* § 8031.

Analysis of whether the advertisement is an independent expenditure is straightforward. An independent expenditure is defined as "any expenditure made by any individual or other person (other than a candidate committee or a political party) *expressly advocating the election or defeat of a clearly identified candidate*, which is made without cooperation or consultation with any candidate, or any committee or agent of such candidate, and which is not made in concert with, or at the request or suggestion of, any candidate or any committee or agent of such candidate." 15 *Del. C.* § 8002(13) (emphasis added).[1]

I conclude that the advertisement at issue does not constitute an independent expenditure because nowhere does it advocate for the election of Ken Simpler. It simply asks the reader to call Ken Simpler. Thus, I need not address the coordination issue and advise that the Foundation is not required to file a report of a third-party advertisement on the ground that the advertisement the Democratic Party describes is an independent expenditure. That finding, however, does not end the analysis.

The next issue is whether the advertisement constitutes an electioneering communication. An electioneering communication is defined in relevant part as a communication that refers to a clearly identified candidate that is publicly distributed within 60 days of a general election. 15 *Del. C.* § 8002(10)a. Unlike an independent expenditure, an electioneering communication need not expressly advocate for the election or defeat of a candidate to be reportable, and coordination is not part of the analysis; the timing of the communication is the central inquiry. The Democratic Party alleges that the Foundation is publicly airing the advertisement within 60 days of the general election and I accept this as a fact for the purposes of this ruling. Thus, the sole issue raised under the facts that the Democratic Party alleges is whether the advertisement refers to Ken Simpler as a clearly identified candidate.

"Clearly identified candidate" is defined to mean "that the name, a photograph or a drawing of the candidate appears or the identity of the candidate is otherwise apparent by unambiguous reference." 15 *Del. C.* § 8002(5). The advertisement indeed contains the name and photograph of Ken Simpler and the identity of Ken Simpler is also apparent by unambiguous

---

[1] The United States Supreme Court has ruled that the First Amendment would allow the regulation of express advocacy defined to include not only the *Buckley v. Valeo* "magic words" but also their functional equivalent. *McConnell v. FEC*, 540 U.S. 193, 206 (2003); *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 474 n.7 (2007). *See* 11 C.F.R. § 100.22(b). Delaware's statute and regulations are not written to reach the functional equivalent of express advocacy. 15 *Del. C.* § 8002 (13); 15 DE Admin Code 100 Campaign Finance Regulations, Section 2.

reference.[2] Moreover, settled case law from the United States Supreme Court establishes that states may regulate **disclosure** of speech that is not express advocacy without violation of the First Amendment of the United States Constitution.[3]

Under the facts the Democratic Party alleges, the Foundation's advertisement was publicly aired within 60 days of the November 6, 2018 general election and so it constitutes an electioneering communication under 15 *Del. C.* § 8002(10)a. Additionally, under the facts the Democratic Party alleges, the cost of the advertisement exceeded $500.00 and therefore the Foundation was required to file a special report within 24 hours after the expenditure was made.[4] 15 *Del. C.* § 8031.

The Delaware Campaign Finance Reporting System reflects that the Foundation filed two third-party advertisement reports on October 19, 2018 and one third-party advertisement report on October 22, 2018. The remaining issues, therefore, are whether the Foundation reports were timely and accurate.

The Foundation has responded to both of these allegations.[5] As to timeliness, while denying that the Foundation was legally required to file third-party advertisement reports at all, the Foundation concedes that it did file the reports well after the 24-hour filing deadline imposed by 15 *Del. C.* § 8031(d). The Foundation contends, however, that it supplied the information required by Section 8031 when it filed its 30-day report under 15 *Del. C.* § 8030 on October 8 and that, therefore, the October 8 report is the functional equivalent of a 30-day report. Moreover, the Foundation requests that I waive the fines imposed under 15 *Del. C.* § 8044. I respond to the Foundation's request and contention separately.

---

[2] Case law from other jurisdictions applying language that is identical to the language of Section 8002(5) have concluded that an advertisement clearly identifies a candidate if the subject of the advertisement is publicly identified as a candidate by the target audience for the advertisement. *Comm. for Justice & Fairness v. Arizona Sec'y of State's Office*, 332 P.3d 94 (Ct. App. 2014); *Hispanic Leadership Fund, Inc. v. Fed. Election Comm'n*, 897 F. Supp. 2d 407 (E.D. Va. 2012)

[3] *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007); *Citizens United v. FEC*, 558 U.S. 310 (2010); *See also Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304, 308 (3rd Cir. 2015)(*cert. denied* 136 S. Ct. 2376 (2016)) ("Any possibility that the Constitution limits the reach of disclosure to express advocacy or its functional equivalent is surely repudiated by *Citizens United v. FEC… ")*

[4] 15 *Del. C.* § 8031(d) and 15 Del. Admin. Code § 100.9.1.5 read in pertinent part: "For purposes of this section, an expenditure shall be deemed to be made on the date it is paid or obligated, whichever is earlier." 16 DE Reg. 771 (01/01/13).

[5] The Foundation and First State First requested, and I granted, permission to respond to the Democratic Party's complaint. These entities responded on October 23, 2018.

By not legislating a "grace" period that excuses the filing of special reports under Section 8031 within a certain timeframe (e.g. five days) of the filing deadlines for the 8 and 30 day reports under Section 8030, the General Assembly has clearly spoken with respect to the 24-hour filing deadline for special reports. Therefore, I do not agree that a 30-day report serves as the functional equivalent of a third-party advertisement report. I do agree, however, on a one-time basis, to waive the fines associated with the Foundation's tardy third-party reports, provided that the filed reports are accurate and complete. Please be advised that I will not waive any fines for the Foundation for third-party advertisement reports that must be filed in the future.

Since the Foundation did not file the reports until after the Democratic Party made its October 15, 2018 complaint, I have no set of facts on which to opine whether the reports were accurate. The Foundation alleges in response to the complaint by the Democratic Party that its 30-day report accurately reported the costs of its advertisement incurred to date. I am authorized to issue a ruling only upon a specified set of facts; I cannot resolve factual differences in this procedural posture. I direct the attention of the Democratic Party to 15 *Del. C.* § 8031(d) ("For purposes of this section, an expenditure shall be deemed to be made on the date it is paid or obligated, whichever is earlier.") to confirm that the three filed reports are filed in response to the Simpler ads at issue.

**Ken Simpler**

The Democratic Party's complaint against Ken Simpler is twofold. First, the Democratic Party alleges that Ken Simpler acted improperly when he linked the Foundation advertisement to his social media account on Facebook because that linkage necessarily required state employees of the Treasurer's Office to engage in electioneering on state time. A copy of the Facebook entry with a screenshot of the Foundation advertisement is attached as Exhibit 2. Second, the Democratic Party alleges that Ken Simpler's use of the advertisement changed the nature of the advertisement to something other than issue advocacy. I do not agree with either contention.

The concern about pressing state employees into the service of the Simpler campaign is speculative, especially given the Foundation's representation that no one has called the State Treasurer's office in response to the advertisement. The propriety of the practice of instructing voters to call government employees during their work hours is beyond the scope of this ruling.

The charge that linkage of the Foundation advertisement to the Simpler campaign converts the advertisement into something other than unregulated issue advocacy mischaracterizes the advertisement. The Foundation advertisement is an electioneering communication and must be reported as such. Thereafter, if the candidate clearly identified in

the electioneering communication, which has been properly reported, or anyone else for that matter, uses the advertisement, the advertisement remains a disclosed electioneering communication and the purpose of the campaign finance laws – public disclosure – has been furthered.

**First State First and Senator Greg Lavelle**

The Democratic Party alleges, and I accept as true for the purposes of this ruling, that Greg Lavelle coordinated with First State First, a political action committee of which Senator Lavelle is the treasurer, to produce and publicly distribute mailings about Senator Lavelle. Copies of the mailings are attached as Exhibit 3. The mailings each tout Senator Lavelle's accomplishments as state senator and invite the reader to contact the Senator via his Senate-assigned phone number at his office in Legislative Hall to thank him. The Democratic Party contends that these mailings constitute third-party expenditures subject to 15 *Del. C.* § 8031. I disagree.

The discussion above regarding State Treasurer Ken Simpler is fully applicable here. An expenditure qualifies as an "independent expenditure," and is reportable, if it "expressly advocate[s] the election or defeat of a clearly identified candidate. . ." 15 *Del. C.* § 8002(13). Like the Foundation advertisement, the First State First mailings do not expressly advocate for the election or defeat of any candidate. The Delaware statute does not require disclosure of the speech contained in the First State First mailings on the ground that the speech is an independent expenditure. The remaining analysis regarding the Foundation's advertisement, however, is directly applicable to the First State First mailings as well.

Just as the Foundation's advertisement constitutes an electioneering communication as defined by 15 *Del. C.* § 8002(10)a, so too do the First State First mailings. The mailings refer to a clearly identified candidate because they contain the name, photograph and the identity of a candidate made apparent by unambiguous reference. *Id.* Accordingly, if the mailings otherwise qualify as third-party advertisements, including the cost provisions contained in 15 *Del. C.* § 8031,[6] the cost of the mailings is an expenditure for a third-party advertisement, and must be reported as such.

---

[6] Section 8031 provides that expenditures that cause the aggregate amount of expenditures for third-party advertisements made by the advertiser to exceed $500 must be reported as third-party advertisement. The Democratic Party makes no factual allegation as to the cost of the mailings.

The records of the State Election Commissioner reflect that First State First filed third-party advertisement reports on September 19, 2018, September 25, 2018, and October 4, 2018. The Democratic Party's complaint does not allege that First State First did not timely file accurate third-party advertisement reports. I conclude, therefore, that on the facts that the Democratic Party alleges, First State First did not violate Delaware law.

**The Response of the Foundation for Delaware's Future and First State First**

Many of the points that the Foundation and First State First raised in their response are addressed above. There are, however, several additional points in the response that warrant comment.

First, the Foundation and First State First rely on a Delaware Attorney General's Opinion from 2000 to support their contention that the advertisement and mailings at issue cannot be regulated because they constitute issue advocacy. While the Attorney General's Opinion they cite largely remains good law, it must be read in conjunction with changes to the Delaware statutes and regulations. As the Foundation and First State First acknowledge, the General Assembly rewrote Delaware's campaign finance laws in 2012. The changes include defining electioneering communications and required that such communications be disclosed in special reports. 15 *Del. C.* §§ 8002(10)a and 8031. The Attorney General's Opinion simply did not opine upon the constitutionality of regulating the disclosure of electioneering communications.[7]

Second, the Foundation and First State First rely upon *FEC v. Wisconsin Right to Life, Inc.,* 127 S. Ct. 2652 (2007) ("*WRTL*"), to support their view that the advertisement and mailings at issue cannot be regulated because they constitute issue advocacy. (Response at Page 1, note 1). That reliance is misplaced. *WRTL* addressed the constitutionality of criminalizing **payment** for electioneering communications and therefore does not apply to the **disclosure** provisions at issue here. The United States Supreme Court has uniformly drawn a clear distinction between **banning** electioneering communications and **requiring disclosure** of communications beginning with *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) and most recently in *Citizens United v. FEC*, 558 U.S. 310, 366-371 (2010). Very recently, the Third Circuit recognized this distinction in *Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304, 308 (3rd Cir. 2015)(*cert. denied* 136 S. Ct. 2376 (2016), writing, "Any possibility that the Constitution limits the reach of disclosure to express advocacy or its functional equivalent is surely repudiated by *Citizens United v. FEC…"*

[7] In footnote 2 of the Foundation and First State First's response, they write that the Democratic Party's complaint's use of the term "electioneering materials" appeared to mean the Democratic Party was alleging that the advertisement and mailings constituted "express advocacy." I understand the Democratic Party to be complaining that the advertisement and mailings constitute electioneering communications.

Case: 26-2409 Document: 16 Page: 38 Date Filed: 07/15/2026



**Conclusion**

I trust that the analysis above addresses all issues raised in the complaint of the Democratic Party and the response by the Foundation and First State First, to the extent possible in a ruling pursuant to 15 Del. C. 8041(2). That said, I wish to add a comment on the practices at issue.

Senator Lavelle attempts, through the action of a PAC he controls, to finely parse the legal difference between "issue" advocacy" and "express advocacy". By carefully never saying "vote for" but substituting his picture, name and title, most voters would never understand the difference.

While I believe that his use of the mailings at issue steps right up to the legal line and the distinction in the statute, I reluctantly conclude his use of electioneering communications to support his own campaign does not step over the line and is technically permitted 15 *Del. C.* Ch. 80. In my view, however, though legal, the practice is not consistent with the spirit of the law intended to promote transparency, fairness and clarity for voters and the election process.

Very truly yours,

Elaine Manlove

Elaine Manlove
State Election Commissioner

Cc Pursuant to 15 *Del. C.* § 8041(2):
- Governor John C. Carney
- Attorney General Matt Denn
- Erik Raser-Schramm, Chairman, Delaware Democratic Party
- Michael Harrington, Sr., Chairman, Delaware Republicans Party
- David McCorquodale, Green Party
- Sean Goward, Libertarian Party

EXHIBIT 1-2

**Ken Simpler for Delaware**

Sponsored · Paid for by The Simpler Campaign, LLC ·

To learn more about Ken's accomplishments, finance background and vision for his home state visit KenSimpler.com

Support State Treasurer Ken Simpler on November 6th!
#LetsMakeItSimpler



Case 1:26-cv-00465-JLH Document 1-2 Filed 04/17/26 Page 10 of 10 PageID #: 32

EXHIBIT 3

PAID FOR BY FIRSTSTATEFIRST PAC
500 WHITBY DRIVE | WILMINGTON, DE 19803
18-LAV-003

PRESORT STANDARD US POSTAGE PAID ASSOCIATES INTERNATIONAL INC

T18 B25 P1 S 5102 ECRLOT C 019

[redacted]




STOPPING AN INCOME TAX INCREASE | STANDING UP TO THE CAREER POLITICIANS
OPPOSING LEGISLATIVE PAY RAISES




State Senator

# GREG LAVELLE

## STANDS UP FOR TAXPAYERS

GREG LAVELLE is a businessman with real-world skills he uses every day to make sure taxpayers can keep more of what they earn.

He's also Delaware's leading voice for government reform – to help stop Dover from wasting our money.

- **Helped stop an income tax increase** on working families.
- **Protected homeowners** by preserving tax deductions for mortgage interest.
- **Led the fight against unethical pay raises for legislators** and has returned over $43,000 in raises to local charities.
- **Passed a Constitutional Amendment to stop politicians from raiding the Transportation Trust Fund** and ensure money is spent on infrastructure, as promised.

**Call Greg Lavelle** at 302-744-4135 and thank him for protecting your money!

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION and AMERICANS FOR PROSPERITY,<br><br>*Plaintiffs*,<br><br>v.<br><br>ANTHONY ALBENCE, in his official capacity as State Election Commissioner for the State of Delaware, et al.<br><br>*Defendants*. | Case No. |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, Americans for Prosperity Foundation and Americans for Prosperity, (collectively "Plaintiffs"), by and through the undersigned counsel, submit this Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 (the "Motion"), seeking an order preliminarily enjoining Defendants from enforcing the disclosure requirements for third-party advertisements at 15 Del. C. § 8031. The bases for this Motion are set forth more fully in the accompanying Opening Brief and supporting materials.

WHEREFORE, Plaintiffs respectfully request that their Motion be granted, and that the Court enter an Order in the form submitted herewith.

DATED: April 17, 2026

BAKER & HOSTETLER LLP

*/s/ Jeremy D. Anderson*
Jeremy D. Anderson (No. 4515)
1201 North Market St., Suite 1407
Wilmington, DE 19801-1147
(302) 407-4224
janderson@bakerlaw.com

Allen J. Dickerson*
1050 Connecticut Ave., N.W., Suite 1110
Washington, DC 20036-5403
(202) 861-1507
adickerson@bakerlaw.com

Erika D. Prouty*
Robert J. Tucker*
Anna E. Croyts*
200 Civil Center Dr., Suite 1200
Columbus, OH 43215-4138
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com
acroyts@bakerlaw.com
**Pro hac vice motions forthcoming*

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION and AMERICANS FOR PROSPERITY,<br><br>*Plaintiffs*,<br><br>v.<br><br>ANTHONY ALBENCE, in his official capacity as State Election Commissioner for the State of Delaware, et al.<br><br>*Defendants*. | Case No. |

**PROPOSED ORDER**

The Court, having considered Plaintiff's Motion for a Preliminary Injunction, as well as all submissions related thereto, and good cause having been found therefore:

IT IS HEREBY ORDERED this _____ day of ____________, 2026, that:

1. The Plaintiffs' motion is GRANTED;
2. The enforcement of the disclosure requirements for third-party advertisements at 15 Del. C. § 8031 is preliminarily enjoined.

____________________________________

United States District Court Judge

# EXHIBIT A

State of Delaware
Department of Elections

[redacted]

October 26, 2018

Re: Request for Ruling on Simpler and Lavelle Campaign Finance Issues

Dear

By letter dated October 15, 2018, the Delaware Democratic Party requests a ruling on certain conduct in connection with the campaigns of Ken Simpler (for State Treasurer) and Greg Lavelle (for State Senator, 4th District). Specifically, your letter alleges and complains that each of these campaigns has violated campaign finance laws under Chapter 80 of Title 15 of the Delaware Code.

My jurisdiction under 15 *Del. C.* Ch. 80 does not extend to rulings on individual complaints; my jurisdiction to act upon the Democratic Party's complaint is limited to the issuance of rulings based on a specified set of facts pursuant to 15 *Del. C.* § 8041(2). Accordingly, I respond to the Democratic Party's request for a ruling using the allegations in its letter as a specified set of facts. Those allegations are set out below.

**The Foundation for Delaware's Future, LLC**

As of the date of the Democratic Party complaint, the Foundation for Delaware's Future, LLC (the "Foundation"), which is a duly registered political action committee, had not filed any third-party advertising reports the Democratic Party alleges are required by 15 *Del. C.* § 8031. The Democratic Party requests an opinion from me on whether the Foundation must file such report(s) to disclose the costs of its digital advertisement currently running on digital and cable platforms. The Democratic Party provided a copy of a screenshot of that advertisement (see Exhibit 1). Thus, the first issue on which the Democratic Party seeks a ruling is whether the advertisement constitutes a third-party advertisement.

"Third-party advertisement" is defined as an independent expenditure or an electioneering communication. 15 *Del. C.* § 8002(27). If the advertisement constitutes either an

Case: 26-2469 Document: 5 Page: 37 Date Filed: 07/15/2026



independent expenditure or an electioneering communication, both of which are defined terms under Chapter 80, the person who makes the expenditure for the advertisement must file a "special" report of a third-party advertisement under 15 *Del. C.* § 8031.

Analysis of whether the advertisement is an independent expenditure is straightforward. An independent expenditure is defined as "any expenditure made by any individual or other person (other than a candidate committee or a political party) *expressly advocating the election or defeat of a clearly identified candidate*, which is made without cooperation or consultation with any candidate, or any committee or agent of such candidate, and which is not made in concert with, or at the request or suggestion of, any candidate or any committee or agent of such candidate." 15 *Del. C.* § 8002(13) (emphasis added).[1]

I conclude that the advertisement at issue does not constitute an independent expenditure because nowhere does it advocate for the election of Ken Simpler. It simply asks the reader to call Ken Simpler. Thus, I need not address the coordination issue and advise that the Foundation is not required to file a report of a third-party advertisement on the ground that the advertisement the Democratic Party describes is an independent expenditure. That finding, however, does not end the analysis.

The next issue is whether the advertisement constitutes an electioneering communication. An electioneering communication is defined in relevant part as a communication that refers to a clearly identified candidate that is publicly distributed within 60 days of a general election. 15 *Del. C.* § 8002(10)a. Unlike an independent expenditure, an electioneering communication need not expressly advocate for the election or defeat of a candidate to be reportable, and coordination is not part of the analysis; the timing of the communication is the central inquiry. The Democratic Party alleges that the Foundation is publicly airing the advertisement within 60 days of the general election and I accept this as a fact for the purposes of this ruling. Thus, the sole issue raised under the facts that the Democratic Party alleges is whether the advertisement refers to Ken Simpler as a clearly identified candidate.

"Clearly identified candidate" is defined to mean "that the name, a photograph or a drawing of the candidate appears or the identity of the candidate is otherwise apparent by unambiguous reference." 15 *Del. C.* § 8002(5). The advertisement indeed contains the name and photograph of Ken Simpler and the identity of Ken Simpler is also apparent by unambiguous

---

[1] The United States Supreme Court has ruled that the First Amendment would allow the regulation of express advocacy defined to include not only the *Buckley v. Valeo* "magic words" but also their functional equivalent. *McConnell v. FEC*, 540 U.S. 193, 206 (2003); *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 474 n.7 (2007). *See* 11 C.F.R. § 100.22(b). Delaware's statute and regulations are not written to reach the functional equivalent of express advocacy. 15 *Del. C.* § 8002 (13); 15 DE Admin Code 100 Campaign Finance Regulations, Section 2.

reference.[2] Moreover, settled case law from the United States Supreme Court establishes that states may regulate **disclosure** of speech that is not express advocacy without violation of the First Amendment of the United States Constitution.[3]

Under the facts the Democratic Party alleges, the Foundation's advertisement was publicly aired within 60 days of the November 6, 2018 general election and so it constitutes an electioneering communication under 15 *Del. C.* § 8002(10)a. Additionally, under the facts the Democratic Party alleges, the cost of the advertisement exceeded $500.00 and therefore the Foundation was required to file a special report within 24 hours after the expenditure was made.[4] 15 *Del. C.* § 8031.

The Delaware Campaign Finance Reporting System reflects that the Foundation filed two third-party advertisement reports on October 19, 2018 and one third-party advertisement report on October 22, 2018. The remaining issues, therefore, are whether the Foundation reports were timely and accurate.

The Foundation has responded to both of these allegations.[5] As to timeliness, while denying that the Foundation was legally required to file third-party advertisement reports at all, the Foundation concedes that it did file the reports well after the 24-hour filing deadline imposed by 15 *Del. C.* § 8031(d). The Foundation contends, however, that it supplied the information required by Section 8031 when it filed its 30-day report under 15 *Del. C.* § 8030 on October 8 and that, therefore, the October 8 report is the functional equivalent of a 30-day report. Moreover, the Foundation requests that I waive the fines imposed under 15 *Del. C.* § 8044. I respond to the Foundation's request and contention separately.

---

[2] Case law from other jurisdictions applying language that is identical to the language of Section 8002(5) have concluded that an advertisement clearly identifies a candidate if the subject of the advertisement is publicly identified as a candidate by the target audience for the advertisement. *Comm. for Justice & Fairness v. Arizona Sec'y of State's Office*, 332 P.3d 94 (Ct. App. 2014); *Hispanic Leadership Fund, Inc. v. Fed. Election Comm'n*, 897 F. Supp. 2d 407 (E.D. Va. 2012)

[3] *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007); *Citizens United v. FEC*, 558 U.S. 310 (2010); *See also Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304, 308 (3rd Cir. 2015)(*cert. denied* 136 S. Ct. 2376 (2016)) ("Any possibility that the Constitution limits the reach of disclosure to express advocacy or its functional equivalent is surely repudiated by *Citizens United v. FEC… ")*

[4] 15 *Del. C.* § 8031(d) and 15 Del. Admin. Code § 100.9.1.5 read in pertinent part: "For purposes of this section, an expenditure shall be deemed to be made on the date it is paid or obligated, whichever is earlier." 16 DE Reg. 771 (01/01/13).

[5] The Foundation and First State First requested, and I granted, permission to respond to the Democratic Party's complaint. These entities responded on October 23, 2018.

By not legislating a "grace" period that excuses the filing of special reports under Section 8031 within a certain timeframe (e.g. five days) of the filing deadlines for the 8 and 30 day reports under Section 8030, the General Assembly has clearly spoken with respect to the 24-hour filing deadline for special reports. Therefore, I do not agree that a 30-day report serves as the functional equivalent of a third-party advertisement report. I do agree, however, on a one-time basis, to waive the fines associated with the Foundation's tardy third-party reports, provided that the filed reports are accurate and complete. Please be advised that I will not waive any fines for the Foundation for third-party advertisement reports that must be filed in the future.

Since the Foundation did not file the reports until after the Democratic Party made its October 15, 2018 complaint, I have no set of facts on which to opine whether the reports were accurate. The Foundation alleges in response to the complaint by the Democratic Party that its 30-day report accurately reported the costs of its advertisement incurred to date. I am authorized to issue a ruling only upon a specified set of facts; I cannot resolve factual differences in this procedural posture. I direct the attention of the Democratic Party to 15 *Del. C.* § 8031(d) ("For purposes of this section, an expenditure shall be deemed to be made on the date it is paid or obligated, whichever is earlier.") to confirm that the three filed reports are filed in response to the Simpler ads at issue.

**Ken Simpler**

The Democratic Party's complaint against Ken Simpler is twofold. First, the Democratic Party alleges that Ken Simpler acted improperly when he linked the Foundation advertisement to his social media account on Facebook because that linkage necessarily required state employees of the Treasurer's Office to engage in electioneering on state time. A copy of the Facebook entry with a screenshot of the Foundation advertisement is attached as Exhibit 2. Second, the Democratic Party alleges that Ken Simpler's use of the advertisement changed the nature of the advertisement to something other than issue advocacy. I do not agree with either contention.

The concern about pressing state employees into the service of the Simpler campaign is speculative, especially given the Foundation's representation that no one has called the State Treasurer's office in response to the advertisement. The propriety of the practice of instructing voters to call government employees during their work hours is beyond the scope of this ruling.

The charge that linkage of the Foundation advertisement to the Simpler campaign converts the advertisement into something other than unregulated issue advocacy mischaracterizes the advertisement. The Foundation advertisement is an electioneering communication and must be reported as such. Thereafter, if the candidate clearly identified in

the electioneering communication, which has been properly reported, or anyone else for that matter, uses the advertisement, the advertisement remains a disclosed electioneering communication and the purpose of the campaign finance laws – public disclosure – has been furthered.

**First State First and Senator Greg Lavelle**

The Democratic Party alleges, and I accept as true for the purposes of this ruling, that Greg Lavelle coordinated with First State First, a political action committee of which Senator Lavelle is the treasurer, to produce and publicly distribute mailings about Senator Lavelle. Copies of the mailings are attached as Exhibit 3. The mailings each tout Senator Lavelle's accomplishments as state senator and invite the reader to contact the Senator via his Senate-assigned phone number at his office in Legislative Hall to thank him. The Democratic Party contends that these mailings constitute third-party expenditures subject to 15 *Del. C.* § 8031. I disagree.

The discussion above regarding State Treasurer Ken Simpler is fully applicable here. An expenditure qualifies as an "independent expenditure," and is reportable, if it "expressly advocate[s] the election or defeat of a clearly identified candidate. . ." 15 *Del. C.* § 8002(13). Like the Foundation advertisement, the First State First mailings do not expressly advocate for the election or defeat of any candidate. The Delaware statute does not require disclosure of the speech contained in the First State First mailings on the ground that the speech is an independent expenditure. The remaining analysis regarding the Foundation's advertisement, however, is directly applicable to the First State First mailings as well.

Just as the Foundation's advertisement constitutes an electioneering communication as defined by 15 *Del. C.* § 8002(10)a, so too do the First State First mailings. The mailings refer to a clearly identified candidate because they contain the name, photograph and the identity of a candidate made apparent by unambiguous reference. *Id.* Accordingly, if the mailings otherwise qualify as third-party advertisements, including the cost provisions contained in 15 *Del. C.* § 8031,[6] the cost of the mailings is an expenditure for a third-party advertisement, and must be reported as such.

---

[6] Section 8031 provides that expenditures that cause the aggregate amount of expenditures for third-party advertisements made by the advertiser to exceed $500 must be reported as third-party advertisement. The Democratic Party makes no factual allegation as to the cost of the mailings.

The records of the State Election Commissioner reflect that First State First filed third-party advertisement reports on September 19, 2018, September 25, 2018, and October 4, 2018. The Democratic Party's complaint does not allege that First State First did not timely file accurate third-party advertisement reports. I conclude, therefore, that on the facts that the Democratic Party alleges, First State First did not violate Delaware law.

**The Response of the Foundation for Delaware's Future and First State First**

Many of the points that the Foundation and First State First raised in their response are addressed above. There are, however, several additional points in the response that warrant comment.

First, the Foundation and First State First rely on a Delaware Attorney General's Opinion from 2000 to support their contention that the advertisement and mailings at issue cannot be regulated because they constitute issue advocacy. While the Attorney General's Opinion they cite largely remains good law, it must be read in conjunction with changes to the Delaware statutes and regulations. As the Foundation and First State First acknowledge, the General Assembly rewrote Delaware's campaign finance laws in 2012. The changes include defining electioneering communications and required that such communications be disclosed in special reports. 15 *Del. C.* §§ 8002(10)a and 8031. The Attorney General's Opinion simply did not opine upon the constitutionality of regulating the disclosure of electioneering communications.[7]

Second, the Foundation and First State First rely upon *FEC v. Wisconsin Right to Life, Inc.,* 127 S. Ct. 2652 (2007) ("*WRTL*"), to support their view that the advertisement and mailings at issue cannot be regulated because they constitute issue advocacy. (Response at Page 1, note 1). That reliance is misplaced. *WRTL* addressed the constitutionality of criminalizing **payment** for electioneering communications and therefore does not apply to the **disclosure** provisions at issue here. The United States Supreme Court has uniformly drawn a clear distinction between **banning** electioneering communications and **requiring disclosure** of communications beginning with *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) and most recently in *Citizens United v. FEC*, 558 U.S. 310, 366-371 (2010). Very recently, the Third Circuit recognized this distinction in *Delaware Strong Families v. Attorney General of Delaware*, 793 F.3d 304, 308 (3rd Cir. 2015)(*cert. denied* 136 S. Ct. 2376 (2016), writing, "Any possibility that the Constitution limits the reach of disclosure to express advocacy or its functional equivalent is surely repudiated by *Citizens United v. FEC…"*

[7] In footnote 2 of the Foundation and First State First's response, they write that the Democratic Party's complaint's use of the term "electioneering materials" appeared to mean the Democratic Party was alleging that the advertisement and mailings constituted "express advocacy." I understand the Democratic Party to be complaining that the advertisement and mailings constitute electioneering communications.

**Conclusion**

I trust that the analysis above addresses all issues raised in the complaint of the Democratic Party and the response by the Foundation and First State First, to the extent possible in a ruling pursuant to 15 Del. C. 8041(2). That said, I wish to add a comment on the practices at issue.

Senator Lavelle attempts, through the action of a PAC he controls, to finely parse the legal difference between "issue" advocacy" and "express advocacy". By carefully never saying "vote for" but substituting his picture, name and title, most voters would never understand the difference.

While I believe that his use of the mailings at issue steps right up to the legal line and the distinction in the statute, I reluctantly conclude his use of electioneering communications to support his own campaign does not step over the line and is technically permitted 15 *Del. C.* Ch. 80. In my view, however, though legal, the practice is not consistent with the spirit of the law intended to promote transparency, fairness and clarity for voters and the election process.

Very truly yours,

Elaine Manlove
State Election Commissioner

Cc Pursuant to 15 *Del. C.* § 8041(2):
Governor John C. Carney
Attorney General Matt Denn
Erik Raser-Schramm, Chairman, Delaware Democratic Party
Michael Harrington, Sr., Chairman, Delaware Republicans Party
David McCorquodale, Green Party
Sean Goward, Libertarian Party

EXHIBIT 1-2

**Ken Simpler for Delaware**
Sponsored · Paid for by The Simpler Campaign, LLC ·

To learn more about Ken's accomplishments, finance background and vision for his home state visit KenSimpler.com

Support State Treasurer Ken Simpler on November 6th!
#LetsMakeItSimpler



EXHIBIT 3

PAID FOR BY FIRSTSTATEFIRST PAC
500 WHITBY DRIVE | WILMINGTON, DE 19803
18-LAV-003

T18 B25 P1 S 5102 ECRLOT C 019

[redacted]

PRESORT STANDARD US POSTAGE PAID ASSOCIATES INTERNATIONAL INC



State Senator

# GREG LAVELLE

## IS LEADING THE FIGHT TO PROTECT TAXPAYERS & REFORM DOVER.

STOPPING AN INCOME TAX INCREASE | STANDING UP TO THE CAREER POLITICIANS

OPPOSING LEGISLATIVE PAY RAISES




State Senator

# GREG LAVELLE

## STANDS UP FOR TAXPAYERS

GREG LAVELLE is a businessman with real-world skills he uses every day to make sure taxpayers can keep more of what they earn.

He's also Delaware's leading voice for government reform – to help stop Dover from wasting our money.

- **Helped stop an income tax increase** on working families.
- **Protected homeowners** by preserving tax deductions for mortgage interest.
- **Led the fight against unethical pay raises for legislators** and has returned over $43,000 in raises to local charities.
- **Passed a Constitutional Amendment to stop politicians from raiding the Transportation Trust Fund** and ensure money is spent on infrastructure, as promised.

**Call Greg Lavelle** at 302-744-4135 and thank him for protecting your money!

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION; AMERICANS FOR PROSPERITY<br>*Plaintiffs*,<br>v.<br>ANTHONY ALBENCE, in his official capacity as State Election Commissioner for the State of Delaware,<br>KATHY JENNINGS, in her official capacity as Attorney General of the State of Delaware,<br>*Defendants*. | Case No. |

**DECLARATION OF ROSS CONNOLLY**

I, Ross Connolly, declare as follows:

1. I am over the age of 18 and competent to make this declaration.

2. I am the Northeast Regional Director for Americans for Prosperity ("AFP") and for Americans for Prosperity Foundation ("AFPF"). I have been in these roles for three years and with the organizations in other roles for 13 years.

3. I am authorized to speak for AFP and AFPF regarding the information set forth in this declaration.

4. The statements in this declaration are based upon knowledge I have acquired in the performance of my official duties, through information provided to me in my official capacity by AFP and AFPF personnel, and by reviewing records maintained by AFP and AFPF during the ordinary course of business.

5. AFP is a 501(c)(4) nonprofit organization that engages in broad-based grassroots outreach to advocate for long-term solutions to the country's biggest problems that prevent people from realizing their incredible potential, including in the areas of unsustainable government spending and debt, reforms to immigration and economic policy, and a host of other issues.

6. AFPF is a 501(c)(3) nonprofit organization that is committed to educating and training Americans to be advocates for the ideas, principles, and policies of a free and open society.

7. AFP and AFPF fund their activities through donations from donors across the country.

8. Consistent with their federal tax-exempt statuses, AFP engages in issue advocacy work, and AFPF engages in educational and advocacy work, in many states across the country in pursuit of their missions. This activity includes communications through various media forms, including but not limited to television, radio, mail, and the internet.

9. A true and correct copy of a recent example of AFP's advocacy work in Maine is attached hereto as Exhibit A. The production and distribution of this communication cost AFP more than $500.

10. A recent example of an AFPF radio communication that aired in Arizona can be found on AFPF's website. *See AZ Proposition 211 Radio Advertisement,* AMS. FOR PROSPERITY FOUND. (Feb. 2026), *https://americansforprosperityfoundation.org/wp-content/uploads/2026/02/AZProp211_60_Radio.mp3*. AFPF wishes to, and intends to, engage in similar discussions of issues of public policy in Delaware, including non-electoral reference to incumbent officeholders. The production and distribution of this communication cost AFPF more than $500.

11. As Northeast Regional Director, I am familiar with AFP and AFPF's past, present, and planned future advocacy efforts in Delaware, Maine, New Hampshire, and other states in the Northeast, as well as states in other regions of the country.

12. AFP and AFPF intend to engage in issue advocacy and educational work in Delaware. Because this work will be ongoing, it will necessarily occur in advance of the 2026 and subsequent primary and general elections, including within 30 days before the upcoming 2026 primary election and within 60 days of the upcoming 2026 general election. Specifically, AFP and AFPF intend to produce and distribute communications through various media forms, including but not limited to television, radio, mail, and the internet.

13. Based on my professional experience in these roles with AFP and AFPF, the production and distribution of these communications will cost AFP and AFPF more than $500.

14. These communications will discuss specific officeholders, including officeholders who are themselves candidates for election or reelection, in the context of governmental action and issues of public policy.

15. It is my understanding, however, that if AFP and AFPF were to produce and distribute these communications in Delaware, they would be required to file third-party advertisement reports that disclose the names and addresses of all their donors across the country who have contributed more than $100 in the aggregate during the applicable "election period," which could be several years long.

16. I have reviewed AFP and AFPF's donor records from 2022 to the present and confirmed that there are donors who have contributed more than $100 to AFP and AFPF whose names and addresses would be required to be disclosed in a third-party advertisement report. For example, there were 590 donors who contributed between $100.01 and $199.99 from 2022 to 2025.

There were over 1,000 more who gave between $200.00 and $999.99 during the same time periods. At least four of the  donors who gave to AFP and/or AFPF from 2022 to 2025 reside in the state of Delaware, and at least two of them gave over $100. But, to my knowledge, none of them gave for the purpose of regulated communications in Delaware or in response to solicitations concerning AFP and AFPF's anticipated activity in Delaware.

17. It is my understanding that both current and potential future donors to our organizations are fearful of having their names and addresses disclosed as donors to or supporters of AFP and/or AFPF.

18. AFP, AFPF, their employees, supporters, and donors have been subject to threats and harassment in the past.

19. For example, in Vermont we have experienced consistent harassment and threats from groups that disagreed with us on economic policy initiatives to the point where we had to hire security for our events.

20. In Fargo, North Dakota, an AFP office was vandalized and spray painted because of AFP's support for free speech. *See* Rob Port, *This conservative group's Fargo office has been vandalized repeatedly since it was opened*, InForum.com (Nov. 29, 2019), https://www.inforum.com/opinion/columns/port-this-conservative-groups-fargo-office-has-been-vandalized-repeatedly-since-it-was-opened.

21. Legislators and their supporters have attempted many ways to impede our operations in Northeastern states by introducing legislation targeting AFP. Both Vermont and Maine legislators singled out AFP as the reason they attempted to impede non-profits from advocating in their states. *See* Rep. Laura Sibilia, *Updated: Addressing the Inconsistencies in AFP and VTGOP's Stance on Climate and Energy Policies*, VT. STATE REPRESENTATIVE LAURA

SIBILIA (Mar. 5, 2025), https://laurasibiliavt.com/2025/03/05/sibilia-addressing-the-inconsistencies-in-afp-and-vtgops-stance-on-energy-policies/; Calvin Cutler, *Vermont lawmakers seek transparency for outside political spending*, WCAZ3 (Dec. 4, 2025, at 04:43 EST) https://www.wcax.com/2025/12/04/vermont-lawmakers-seek-transparency-outside-political-spending/.

22. AFP and AFPF staff have repeatedly provided federal courts with firsthand evidence of threats to their business locations, business operations, staff, grassroots activists, and donors. *See, e.g.*, *Americans for Prosperity v. Grewal*, 2019 WL 4855853, at *6 (D.N.J. Oct. 2, 2019) (recognizing "AFP itself and its donors have been subjected to harassment ranging from death threats to cyberattacks to violent protests at AFP events") (citing Decl. of Erica Jedynak (ECF No. 3-5)); Decl. of Emily Seidel at ¶¶ 9-20 (ECF No. 3-4), *Americans for Prosperity v. Grewal*, No. 19-14228 (D.N.J. filed June 25, 2019) (outlining threats and confidentiality measures taken in response); *Ams. for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1055–56 (C.D. Cal. 2016) (cataloging threats, including to "death threats," "slit his throat," "taking pictures of employees' license pla[t]es," "multiple slurs and spit in Mr. Hilgemann's face," "several hundred protestors surrounded the tent and used knives and box-cutters to cut at the ropes of tent, eventually causing the large tent to collapse with AFP supporters still inside.").

23. Due to these threats and harassment, AFP and AFPF take donor privacy very seriously and have instituted a number of measures to protect the confidentiality of their donors. For example, AFP and AFPF maintain donor information in a highly-secure database, and access is restricted to individuals who have a need to know that information. It is my understanding that the vast majority of donors require confidentiality as part of their giving.

24. I believe that if AFP and AFPF are required to disclose the names and addresses of our donors, it is likely that potential donors will refuse to contribute, and current donors will cease to contribute, to Plaintiffs because they are too fearful of the reprisal they will face if their names and addresses are disclosed.

25. If AFP and AFPF do not file the required reports disclosing their donors, it is my understanding that they will be subject to fines and other enforcement actions by Delaware state officials.

26. Therefore, because of the onerous nature of these laws, AFP and AFPF will not publish communications in Delaware while the disclosure requirements are in effect.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed by:
Ross Connolly
06498F323D604DF...

Executed on: April 17, 2026

Ross Connolly

# EXHIBIT A


AFP MAINE
FREE SPEECH IS UNDER ATTACK IN MAINE
THANKS TO SENATOR RICK BENNETT

1st Amendment

# SENATOR RICK BENNETT IS ATTACKING FREE SPEECH IN MAINE

**Protect** Privacy Rights.

Stop them from **taking your rights.**

Censorship is **never the answer.**

Tell your legislator to

**Protect the First Amendment**

AFP MAINE
Address
City, State, Zip

Non-Profit Org.
US Postage
PAID
AMERICANS FOR
PROSPERITY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AMERICANS FOR PROSPERITY FOUNDATION, et al.,

Plaintiffs,

v.

ANTHONY ALBENCE, in his official capacity as State Election Commissioner of the State of Delaware, et al.,

Defendants.

Case No. 1:26-cv-00445-JLH

**DECLARATION OF ANTHONY J. ALBENCE**

I, Anthony J. Albence, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration to accompany Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.

## I. Background

2. I am currently the State Election Commissioner for the State of Delaware. In my official capacity, I am one of the Defendants in this case.

3. In my capacity as State Election Commissioner, I lead Delaware's Department of Elections and I am responsible for promulgating rules, regulations, and forms necessary to implement and enforce the Delaware Elections Disclosure

Act. *See* 15 Del. C. § 8041(1). I am also responsible for adopting procedures for the electronic filing of reports under the Disclosure Act. *See id.* § 8041(1)(d).

4. I am a lifelong Delaware resident.

## II. Records Attached

5. Attached as exhibits hereto are true and correct copies of the declarations filed on behalf of Defendants in *Delaware Strong Families v. Biden*, C.A. no. 1:13-cv-1746-SLR, together with accompanying exhibits.

| Exhibit | Description |
|---|---|
| **1** | Declaration of Weili J. Shaw |
| **2** | Declaration of Mimi Murray Digby Marziani |
| **3** | Declaration of Liane Sorenson |
| **4** | Declaration of Erik Raser-Schramm |
| **5** | Declaration of Elaine Manlove |
| **6** | Declaration of Jonathan D. Moll, CPA |

## III. Political Campaigns in Delaware

6. In my experience political advertising in Delaware generally takes the following forms: print mail sent to people's homes; signs posted in residents' yards, public rights of way, or the medians of roads; text messages; radio ads; or advertisements on websites for Delaware's limited selection of Delaware-specific news media.

7. Delaware does not have dedicated television broadcast media. For most purposes, Delaware is grouped with the media markets for Philadelphia or Baltimore. As such, TV advertising is not widely used in connection with Delaware-

specific elections; TV advertising in Delaware-specific elections is generally limited to the largest state-wide elections, such as the election for governor.

8. While some campaigns spend hundreds of thousands of dollars to communicate with the electorate, I am also aware of many campaigns for elected office in Delaware that are conducted for less than $5,000 total. I understand that it is possible to communicate with all of the likely voters in an election district in Delaware for less than $500 in many instances, such as by mass-text message.

9. I am aware that people who are not Delaware residents have contributed substantial amounts to Delaware political committees for the purpose of affecting Delaware elections. The sources of these contributions are the subject of many news articles. Attached as exhibits hereto are true and correct copies of four such news articles:

| **Exhibit** | **Article Title** |
|---|---|
| **7** | Karl Baker, *Longtime court critic quietly funds PAC controlled by House Speaker*, Spotlight Delaware, March 5, 2026<br><br>Available at: https://spotlightdelaware.org/2026/03/05/longtime-court-critic-quietly-funds-pac-controlled-by-house-speaker/ |
| **8** | Karl Baker and Amanda Fries, *Millions fueling Delaware governor's race make it one of most expensive in history,* Spotlight Delaware, August 20, 2024<br><br>Available at: https://spotlightdelaware.org/2024/08/20/governors-race-funding-august/ |

| Exhibit | Article Title |
|---|---|
| **9** | Melissa Steele, *Influence of PACs increasing in Delaware*, Cape Gazette, September 5, 2024<br><br>Available at: https://www.capegazette.com/article/influence-pacs-increasing-delaware/280537 |

10. People who are not Delaware residents have also affected Delaware elections through third-party advertising. The purpose of the Disclosure Act is to inform Delaware voters of the funding sources for these third-party advertisements.

11. I know that disclosures around who paid for political communications matter to Delaware voters because the Department of Elections is and I am contacted by Delaware residents asking about funding sources for advertisements when required disclosures are not made.

12. On multiple occasions, I have been contacted by Delawareans expressing dismay about campaign mailings by ambiguously named groups; the Delawareans wanted to know who was behind the communications.

## IV. Delaware Campaign Finance Reporting for Third-Party Advertisers

13. The Department of Elections operates the Delaware Campaign Finance Reporting System ("CFRS"), the website through which campaign finance reports required by the Disclosure Act are submitted. The CFRS website is located at https://cfrs.elections.delaware.gov/. Filings made on the CFRS website are accessible to the public upon submission.

14. I am aware that members of the public and the press access the CFRS system to gain information about the sources of funding for political advertisements.

15. CFRS's website contains an online form for a person to register as a third-party advertiser. This form is referred to as a Third-Party Advertiser Statement of Organization. Completion of this form is sufficient under Delaware law to document the creation of a new unincorporated association to act as a third-party advertiser, if a person chooses to proceed in that fashion.

16. CFRS's website contains an online form for a person to register as or to form a Delaware PAC. This form is referred to as a Political Action Committee Statement of Organization. Filing a Political Action Committee Statement of Organization with Delaware's Department of Elections through the CFRA website is sufficient to form a PAC. Delaware law does not require a PAC to maintain a separate bank account. A Delaware PAC can be dissolved by choosing the final report button when filing a financial report for the PAC that reflects the distribution of all funds held by the PAC and repayment of all debts owed by the PAC. A final report reflecting a PAC's closure is attached as Exhibit 10 hereto.

17. CFRS's website contains an online form for submitting the third-party advertisement reports described in 15 Del. C. § 8031. This form is referred to as a Third-Party Advertisement Report.

18. Attached as exhibits hereto are true and correct copies of the following forms, which are available on the CFRS website at the internet addresses listed:

| Exhibit | Forms Available on CFRS Website: https://cfrs.elections.delaware.gov/ |
|---|---|
| **11** | **Statement of Organization for Third-Party Advertiser** https://cfrs.elections.delaware.gov/Public/ThirdPartyAdvertisersRegistration?isInitial=true# |
| **12** | **Statement of Organization for Political Action Committee** https://cfrs.elections.delaware.gov/Public/PoliticalActionRegistration?isInitial=true |
| **13** | **Third-Party Advertisement Report** https://cfrs.elections.delaware.gov/Public/ThirdPartyAdvertisersRegistration?isInitial =true |

19. In my experience, third-parties that intend to issue election related communications in Delaware often form a political action committee, an unincorporated association, or both specifically for that purpose. By forming these entities and issuing third-party advertising through the new entity, groups can lawfully designate a subset of their funding as the source of funding for political advertisements.

20. It is my understanding that Delaware corporate and alternative entity laws require agencies, such as the Department of Elections, to respect entities' corporate form, absent specific circumstances or direction in code.

21. Delaware's campaign finance laws do not currently contain any provisions permitting the Department of Elections to disregard special purpose entities or unincorporated associations through which people engage in third-party

advertising. Thus, Delaware's current Disclosure Act permits third-party advertisers to limit disclosure of their underlying donors by forming PACs and unincorporated associations for the purposes of making third-party advertisements.

22. Delaware's campaign finance laws do not currently contain any limitations on the amount that may be contributed to a PAC or to an unincorporated association during a reporting period.

23. An example of a Third-Party Advertisement Report where the reporting party did not create special purpose entities for purposes of third-party advertising is attached as Exhibit 14 hereto. An example of a Third-Party Advertisement Report reflecting the creation of special purpose entities for purposes of third-party advertising is attached as Exhibit 15 hereto.

24. The Department enforces the Disclosure Act's requirement that a third-party advertiser file a statement describing their organization and a report reflecting the expenditures related to third-party advertising. When doing so, the Department does not, however, take enforcement actions against people who engage in third-party advertising through unincorporated entities created for that purpose, provided that the use of such unincorporated entities is properly reported. This is because that conduct is not prohibited by current law.

25. On June 30, 2025, legislation was introduced in Delaware's General Assembly to change the use of PACs and other associations to limit disclosure under

Act. A copy of that legislation is attached hereto as Exhibit 16. The current state of this legislation is reflected on the Delaware General Assembly's website at: https://legis.delaware.gov/BillDetail?LegislationId=143188. If this legislation is passed, the Department of Elections will implement this legislation as soon as it becomes effective.

26. If enacted, this amendment would require third-party advertisers to disclose their actual funding sources. The legislation, as currently amended, would be implemented on July 1, 2028. *See* Exhibit 16, at line 268.

**V. Plaintiffs' Campaign Finance Reporting**

27. I am familiar with the steps necessary to search Delaware's CFRS system. I have searched CFRS and to the best of my knowledge neither plaintiff has ever reported any campaign contribution or third-party advertisement in Delaware.

28. I have reviewed the Federal Campaign Finance Reporting System. Based upon my review of that system, I understand that Plaintiffs have a federally organized PAC that operates under the same name and control as Plaintiffs do.

29. Current Delaware law would permit Plaintiffs to fund third-party advertising in Delaware through their associated federal PAC or through a newly-created Delaware PAC or unincorporated association. If Plaintiffs did this, they would be required to file a disclosure report in Delaware's CFRS that identified

Plaintiffs' federal or Delaware PAC or unincorporated association as the third-party advertiser and Plaintiffs as the source of donations to the PAC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 26, 2026.

Anthony J. Albence

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STRONG FAMILIES,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH R. BIDEN III, in his official capacity as Attorney General of the State of Delaware; and<br><br>ELAINE MANLOVE, in her official capacity as Commissioner of Elections for the State of Delaware,<br><br>Defendants. | Civil Action No. 1:13-cv-1746-SLR |

**DECLARATION OF WEILI J. SHAW**

I, Weili J. Shaw, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration to accompany Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.

2. I am currently a senior associate at Wilmer Cutler Pickering Hale and Dorr LLP, counsel to Defendants in this action.

3. Attached as exhibits are true and correct copies of the following documents:

| **Exhibit** | **Description** |
|---|---|
| A | Minutes from the House Administration Committee hearing on H.B. 300 on May 2, 2012, and accompanying certification from the Chief Clerk of the Delaware House of Representatives, both received from the Chief Clerk of the Delaware House of Representatives |

| | |
|---|---|
| B | 2011 Tax Return for Delaware Strong Families Inc. that Plaintiff admitted to be a true and accurate copy of the original in Plaintiff's Responses and Objections to Defendants' Discovery Requests, *see* D.I. 21-1, at 6 |
| C | 2011 Tax Return for Delaware Family Policy Council, Inc. ("DFPC") that Plaintiff admitted to be a true and accurate copy of the original in Plaintiff's Responses and Objections to Defendants' Discovery Requests, *see* D.I. 21-1, at 6 |
| D | DFPC 2012 General Election Values Scorecard, downloaded from the Internet Archive at https://web.archive.org/web/20130301152700/http://www.delawarefamilies.org/pdfs/2012_C4_General_Election_Voter_Scorecard_Final2.pdf |
| E | Andrew Staub, *Mailers Promote Mayoral Hopeful Through Loophole*, Wilmington News Journal, Aug. 31, 2012. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 7, 2014

/s/ Weili J. Shaw
Weili J. Shaw

# EXHIBIT A

RICHARD PUFFER
CHIEF CLERK

HOUSE OF REPRESENTATIVES
STATE OF DELAWARE
411 LEGISLATIVE AVENUE
DOVER, DELAWARE 19901

ROOM H129
Phone: (302) 744-4087
Fax: (302) 739-7854
Richard.Puffer@state.de.us

February 20, 2014

Adam Klein, Esq.
WilmerHale
1875 Pennsylvania Ave. NW
Washington, DC 20006

Dear Mr. Klein,

This letter will confirm the Office of the Chief Clerk of the Delaware House of Representatives has provided a true and correct copy of the May 2, 2012 Delaware House Administration Committee minutes in which House Bill 300 was discussed. The committee meeting took place in the Chambers of the Delaware House of Representatives and was chaired by then-Majority Leader Peter C. Schwartzkopf. The meeting minutes were submitted by Legislative Fellow Abigail N. Stollar and approved by the committee for distribution and publication.

Thank you for your request to provide the minutes. Please do not hesitate to contact me should you need further assistance.

Sincerely,

Richard L. Puffer
Chief Clerk of the House
Delaware House of Representatives

STATE OF DELAWARE
HOUSE
147th
CHIEF CLERK

**PETER C. SCHWARTZKOPF**
MAJORITY LEADER
Fourteenth District

HOUSE OF REPRESENTATIVES
STATE OF DELAWARE
LEGISLATIVE HALL
DOVER, DELAWARE 19901

COMMITTEES
Ethics, Chair
House Administration, Chair
House Rules, Chair
Gaming & Pari-mutuels
Veterans Affairs

**House Administration Committee**
Meeting Minutes
May 2, 2012

Chairman Schwartzkopf called the meeting to order at 2:45 p.m. Members present included Speaker of the House Robert F. Gilligan and Representatives Hocker, Lavelle, and Longhurst. Rep. Mulrooney was also present. For a list of guests, please see attached.

Chairman Schwartzkopf first introduced **HB 307: AN ACT TO REINCORPORATE THE CHARTER OF THE CITY OF NEW CASTLE, CHAPTER 216, VOLUME 27, LAWS OF DELAWARE, AS AMENDED, ENTITLED "AN ACT AMENDING, REVISING, AND CONSOLIDATING THE CHARTER OF THE CITY OF NEW CASTLE"** and asked Rep. Mulrooney, the prime sponsor, to speak on the bill. He indicated that the city has been talking about a potential charter change for a few years and established a committee last year to update the charter. Rep. Mulrooney, as well as co-sponsors Rep. J. Johnson, Sen. Connor, and Sen. Henry, have all met with the City Council and agree with these proposed changes.

Rep. Mulrooney then introduced Daniel Losco, the City Solicitor for the City of New Castle, who noted that it's been over ninety years since this charter has been modernized. Losco stated that there were eight public hearings, all which were advertised via public notice, and three workshops held by the City's charter commission to receive input from citizens regarding the changes. The City also sent out postcards to every citizen inviting them to these workshops. Finally, the City Council voted unanimously for these changes.

Losco summarized the changes within the bill, many of which were housekeeping in nature. Since it hasn't been modernized in over years, the original charter contained various provisions that were out of compliance with federal or state law, and the revised charter fixes those provisions. They also made the charter gender neutral and attempted to omit some of the archaic language.

There were two substantial changes, Losco said. The first major change was changing their current City Council terms from non-staggered two year terms to staggered four year terms. With this change, an election would still occur every two years. In one year, three councilpersons would be up for reelection, and in the next election year, two councilpersons and the Mayor would be up for reelection. Losco noted that this change is a result of studying many other town charters and laws.

24 Coventry Road, Rehoboth Beach, DE 19971
Home: 302-227-6252 House Office: 302-744-4351 Fax: 302-739-2313
peter.schwartzkopf@state.de.us

The second substantial change regards borrowing money for the City. Currently, their charter dictates that the City cannot borrow any money without a City-wide referendum. They examined various charters to find a different borrowing system and adopted a three-tiered system found in the Middletown charter. First, they established a new short-term borrowing system, with various checks and balances built in. Therefore, the maximum aggregate that they can borrow is $150,000 with the super majority vote of Council (four of five councilpersons in favor). The second tier is long-term borrowing with a maximum aggregate of 1.2 percent of their real estate taxes base, which is currently about $3 million. This also requires a public hearing and a super majority vote from the Council. Finally, the third level of borrowing remains the same, so any other amount must be approved by a City-wide referendum.

Chairman Schwartzkopf then allowed the committee members to ask any questions. Speaker Gilligan, who had heard objections about the bill, asked if there had been public hearings and how many people attended them. Losco responded that they did hold public hearings which were all properly noticed under FOIA and had a turnout of about fifty or sixty individuals. Cathryn Thomas, City Administrator for the City of New Castle, noted that they also included details about the meeting in the town newsletter, which piqued citizen interest. Therefore, they moved the hearing from their regular chambers to the local senior center to accommodate more individuals.

William Barthel, President of the City of New Castle, noted the reasons for these changes in the borrowing provisions. In May 2005, the City needed a loan to meet payroll but wasn't able to do so under the current City-wide referendum. Therefore, they had a choice to violate the charter and take out a $250,000 line of credit or bankrupt the city. Last year, they ran into another issue when they needed to fix the dikes around the City from flooding. They were up for a matching grant, but they were not able to perform a City-wide referendum in time to get approved for the funds, so they lost out on that opportunity. Therefore, this new tiered borrowing system allows the government to function more efficiently in these types of situations.

Barthel concluded that this change was necessary because of the expense of City-wide referendum. He stated that if the City needed a police car that cost around $20,000, they would have to have a city referendum that could cost almost $5,000 to advertise and conduct, which is nearly 25 percent of the actual cost of a police care. He stated that this is impractical and therefore a new borrowing system is necessary.

Rep. Lavelle then clarified that there is a $150,000 cap on short-term borrowing and then a $3 million cap on long-term borrowing. He asked how the City chose these numbers. Losco responded that they borrowed these numbers from existing charters. He stated that these short-term borrowing provisions allow the City to take out credit for short-term operational expenses, such as salaries, but are not applicable to capital expenditures. He noted that the second tier applies to capital expenditures to allow a more efficient process, but would remain capped at $3 million so that the City could not enter crippling debt.

Rep. Lavelle then asked what the City's total budget is. Losco responded that it is around $5-$6 million total, and Thomas noted that their capital budget is about $500,000 per year.

Chairman Schwartzkopf then opened up the meeting for public comment. Jack Klingmeyer, former member of City Council and Mayor of the City of New Castle, stated that he asked for minutes from these charter committee hearings and was told that minutes had never been filed, which is a violation of FOIA.

Klingmeyer stated that a charter acts like a state or federal constitution to set boundaries between people and government, and these changes are very unnecessary. He noted that voters should have the right to referendum. In addition, the City is not in dire financial need, so these borrowing provisions are also unnecessary. He stated that the issue is that the Mayor and other Councilpersons refuse to raise taxes and therefore are looking for other ways to provide funds, which is a political move. He concluded that the City needs to get their financial house in order and get a City Council that will raise taxes rather than try to convince the General Assembly to give them borrowing power.

Next, Carol Hickman, a New Castle citizen, brought up two main issues with this legislation – the term limits and the borrowing power. She noted that many citizens of New Castle were unable to attend the workshops because of work or other commitments and although they were somewhat advertised, they were not public enough. Hickman said that she opposes the changes in term limits because two years should be sufficient, as state representatives serve those two-year terms. Finally, she stated that any major funding decisions should go to the people via referendum, as they always have.

John Cochran, New Castle City Council member, stated that four year terms are necessary because you can gain more experience and run government more efficiently.

Rep. Longhurst then asked if any other towns or cities in Delaware have four-year terms. Losco noted that the City of Wilmington, City of Dover, Delmar, Laurel, and Newark all have four-year terms, while others have three- or two- year terms. Rep. Mulrooney noted that four-year terms help save money for the city while still allowing citizens to be actively involved in the process. He stated that a diverse committee helped make the decision in the best interest of the citizens.

John Houben, former mayor of the City of New Castle, noted that he was elected with no prior political experience and spent the first two years figuring out the job. Therefore, he supports the staggered four-year terms because the learning process takes time. He concluded by sharing the results of a survey which found that the majority of citizens favored four-year terms for councilpersons.

Arlene Harris, New Castle citizen, stated that she has issues with borrowing for operational and capital needs because the City should learn to stay within its means. Harris noted that she attended a workshop but didn't believe her opinion was considered in the Council's decisions. She said that she's been getting a lot of conflicting information and therefore believes the charter needs to be reexamined. Because the citizens pay for whatever the City borrows, she believes they reserve the right to vote on projects.

Rep. Johnson, a co-sponsor of the bill, stated that he represents Buttonwood, which is a largely minority section of the City. He noted that when City flooded and new dikes were needed, there

was very little done because of the referendum issue. Therefore, he supports the legislation because of the changes necessary to correct such issues.

Mark Lally, representing the Delaware League of Local Governments, stated that they support this legislation and asked the committee to release it.

Next, Teel Petty, a New Castle Councilwoman, stated that with the current charter, there is a possibility to have a brand new Council every two years. She noted that term length makes a difference because you understand the job better the longer you're in office. She concluded by saying that anything ninety years old needs updating.

Rep. Hocker stated that he represents seven different cities, and they all have limited borrowing powers. In addition, all of them have some type of borrowing power beyond referendum.

Chairman Schwartzkopf stated that the towns he represents also have staggered terms, which he believes is important. He noted that he's never heard of a City having so many public hearings for a charter change, and they went above and beyond the necessary hearings. Chairman Schwartzkopf said that those hearings were the time for public comment, and the City Council has decided to approve this charter. Finally, he stated that their borrowing system satisfies their short, medium, and long-term needs, and although they shouldn't get into continual debt, it's often necessary to borrow for necessary long-term decisions and projects.

Finally, Klingmeyer read from Title 22 of the Delaware Code and stated that this charter violates the public's right to be part of the democratic process. Chairman Schwartzkopf concluded that these term limits begin in 2013, and if citizens are unhappy with the decisions of the current Council, they can vote them out of office.

After hearing no more questions or comments, Chairman Schwartzkopf then asked for a motion on HB 307. Rep. Longhurst motioned to release the bill from committee and Rep. Hocker seconded the motion. The bill was released from committee on a vote of 5-0.

Next, Chairman Schwartzkopf introduced **HB 300: AN ACT TO AMEND TITLE 15 OF THE DELAWARE CODE RELATING TO ENHANCED DISCLOSURE REPORTING AND DISCLAIMER REQUIREMENTS IN DELAWARE'S CAMPAIGN FINANCE LAWS.** Andrew Lippstone, Deputy Legal Counsel for Governor Markell, spoke on behalf of the legislation.

Lippstone stated that Delaware's election disclosure laws were adopted over twenty years ago, and there has been a rapid increase in spending since then. Therefore, it's necessary to update these laws. He noted that federal laws and Supreme Court decisions have allowed more money to flow into the elections, but courts have consistently upheld disclosure laws.

Lippstone continued that this legislation closes loopholes about the transparency of third-party ads. This bill requires that any person or entity who spends $500 or more on electioneering communications within 30 days of a primary election or 60 days of a general election submit a

report disclosing this information. This report provides voters with timely information about who's responsible for ads and where the money came from.

Lippstone also noted that this legislation includes "stand-by-your-ad provisions," requiring these third parties to state in the ad how it was paid for. He said it also clarifies the law about political action committees and provides definitions for certain things that were not previously defined. He concluded that the influx of anonymous outside spending could violate Delaware's tradition of direct and honest political dialogue, which is why this legislation is necessary,

Speaker Gilligan then asked if school board elections are covered under this legislation. Lippstone responded that they are covered under this legislation. Speaker Gilligan responded that he hopes they are because there is an issue with undisclosed electioneering communications in Red Clay and other schools districts. The committee discussed adding an amendment if necessary to clarify that school boards are included.

Mimi Marziani, an attorney at the Brennan School for Justice at the New York University School of Law, shared two main reasons for this legislation. First, it's essential for voters to know who's influencing their votes, and with partisan outside groups playing more of a role in electioneering communications, it's more important than ever for disclosure laws. Marziani noted that the Supreme Court has upheld disclosure laws consistently over the last 35 years, both in the Citizens United decision and other decisions.

Secondly, Marziani noted that Delaware's current disclosure law hasn't been updated to reflect the Citizens United decision and it lags behind many other states. Therefore, this legislation modernizes Delaware law in three main ways. First, it better regulates electioneering communications by third-parties. Second, the act enhances reporting requirements to make reports more prompt and accessible to the citizens online. Third, it requires spenders to stand by their advertisements through disclaimers on their ads. Finally, the proposed law provides a link to the Elections website where voters can go to find out more information about these third parties and who's influencing their vote.

Rep. Lavelle asked what information will be on the website that these ads link to. Lippstone responded that the information online will include how the third party receives funding and where that money goes. It also will include short statement about its purpose and goals. Rep. Lavelle then asked if this law also includes state political committees. Lippstone responded that a political committee will abide by the same rules as these third parties, and they will be required to provide that information once they hit that $500 mark.

Rep. Lavelle then responded that not all of these political committees hit that $500 mark through advertising but still spend significant money to fund candidates. He noted that it's very difficult to navigate the Department of Elections website because you must know the exact name of the PAC to actually look it up and find these reports. He concluded by asking how they came up with the amount of $500 to trigger the disclosure of this information.

Lippstone then stated that if you're a PAC, you are required to file regular reports. These reports are also found online. Marziana noted that the disclosure is triggered by an event rather than

periodic reporting because when citizens see or hear an advertisement, they have an immediate interest and therefore deserve immediate information about who's behind that advertisement.

Rep. Lavelle then asked if candidate committees are covered under this law, and Lippstone responded that they are not. Rep. Schwartzkopf stated that candidates are required to file periodic reports, regardless of if or how they advertise.

Rep. Lavelle conveyed his support for disclosure and asked if other parts of speech should also be covered. He stated that you must be careful how you use speech and how you regulate it. He noted that founders like Thomas Payne hid beyond anonymous speech to achieve life and liberty, and that anonymous speech has held an important place in our society.

Rep. Schwartzkopf said that he doesn't view this as regulating speech. Instead, this gives citizens the opportunity to know who sponsored the advertisement and who's trying to influence elections in a district.

Marziana stated that our nation has a long tradition of anonymous speech but not necessary anonymous spending. She also clarified that the legislation regulates all outside groups besides the actual candidate committee, so that all outside spending is subject to disclosure requirements.

Ron Smith, a house attorney, noted that there is a heavy burden on the legislative branch to apply law that isn't too broad or overreaching. Smith expressed concerns about this legislation, as it allows the Election Commissioner to make an exemption without any stipulations or guidelines as to how they can make exemptions. As a result, the state is delegating broad authority to a single person, and this could result in potential long-term problems.

Lippstone responded that the Commissioner could not require any additional information not listed in the bill and must go through a process listed in the Administrative Procedures Act. Smith responded that his concerns deal with delegating such broad power to an executive branch nominee. He asked if there are any avenues for the General Assembly to take to put some guidelines in place here around this exemption. Marziana responded that there is nothing unusual about this type of exemption.

Smith stated that the goal here is equality and a fair and open process, and this exemption process doesn't promote that fairness. He also referenced the case of *McIntyre v. Ohio Elections Commission,* which dealt with a woman who passed out flyers without her name and therefore faced criminal penalties since they were anonymous. Smith said that under this legislation, there are exemptions for any advertisements less than ninety square feet, which could led to many exemptions.

Lippstone responded that the legislation attempts to exempt any less noticeable types of communication, such as yard signs or pamphlets. Marziana also stated that *McIntyre* demonstrates the history of anonymous speech in the United States, but that the Supreme Court has continuously made it clear that *McIntyre* does not apply to spending money in elections.

Rep. Lavelle then asked how they could track down mail that goes out without any type of identification. Marziana replied that they have criminal penalties built into the legislation to try to deter this. Rep. Schwartzkopf also noted that in most cases, people will abide by a law if there are penalties.

Rep. Lavelle asked if out-of-state communications are also regulated. For example, if someone in Ohio sponsors advertisements in Delaware and they do not abide by the disclosure requirements, could the state prosecute whoever sponsored the anonymous communication? Marziana replied that yes, the offender could be prosecuted even if he or she resides outside of Delaware.

Rep. Schwartzkopf then opened the floor for public comment. Kathleen MacRae, representing the ACLU of Delaware and Common Cause, stated Common Cause's support for this legislation because of its ability to disclose "sham issue ads," which mention candidates by name. Because this legislation keeps voters aware of who is trying to influence their elections, these two organizations support the bill.

Charlotte King, League of Women Voters, stated that increased elections disclosure is a priority for their national organization. She said that this legislation is a good step towards campaign finance reform.

Nancy Willing, representing the Civic league, noted her concerns about anonymous spending in school board elections both in Red Clay and Christiana school districts. She asked that school board elections be included under this legislation to help curb the vicious, anonymous spending.

Speaker Gilligan than asked why the legislation is set to take effect on June 30, 2013, versus earlier next year. Lippstone stated that they chose that date to give the Elections Department more time to prepare for these regulatory changes. Speaker Gilligan stated that June 30 would exclude the next school board elections. The committee then discussed a possible amendment to change this date.

Jack Polidori of the Delaware School Board Association stated that his organization supports this disclosure legislation and would like to be sure that school board elections are included in under this bill. He handed out sample literature that has been sent out in certain school districts from a PAC. He demonstrated that this anonymous speech and spending is difficult to track and almost impossible for voters to understands where money comes from and who's trying to influence their votes.

After hearing no more questions of the committee, Chairman Schwartzkopf asked for a motion. Speaker Gilligan motioned to release the bill, and Rep. Longhurst seconded the motion. HB 300 was released from committee on a 4-1 vote.

Rep. Lavelle noted that he voted against the release of this bill because of the concerns Smith brought up. Chairman Schwartzkopf agreed that they need to resolve these issues about the exemptions and signage before bringing the legislation to the floor. The committee and interested parties agreed to review concerns and propose amendments, if necessary.

Chairman Schwartzkopf then introduced the final bill on the agenda, **HB 310: AN ACT TO AMEND CHAPTER 80, TITLE 15 OF THE DELAWARE CODE RELATIN GTO VIOLATIONS OF CAMPAIGN FINANCE LAWS** and asked Rep. Longhurst, the prime sponsor of the bill, to introduce the legislation. Rep. Longhurst stated that this bill enhances the penalties regarding filing election disclosure reports.

Rep. Longhurst stated that the bill has four main parts. First, it increases the penalties of late filing from $50 per month to $50 per day. Second, it makes the penalties the same for late or incomplete reports. Third, it imposes a fine of $500 or 25 percent of the cost of the ad to whatever ad fails to include the "paid by for…" disclaimer. Finally, it requires the Commissioner to send a written notice and allows the party 30 days to appeal.

Rep. Lavelle asks how the Elections Department determines if reports are late or incomplete. He stated that he supports the increase of transparency, but there are issues with enforcement. He stated that they need better enforcement before legislation like this could actually work. Rep. Longhurst responded that because the Governor supports this legislation, she suspects more attention will be paid to enforcement.

Rep. Lavelle then inquired whether or not this bill needs to have a fiscal note. Lippstone replied that, based on their discussions with the Elections Commissioner, there is no additional cost involved.

Rep. Hocker then asked how many individuals have actually paid this fine. Lippstone stated that this legislation seeks to put due process around this filing process. If there is a late filing, the Elections Commissioner must notify the party and allow for a 30-day appeal period.

Smith asked what organizations should do if they absolutely cannot comply with the law, due to illness or any other issues. Lippstone replied that there are standards in existing law to address these concerns.

Chairman Schwartzkopf then asked for a motion. Speaker Gilligan motioned to release HB 310 from committee, and Rep. Longhurst seconded the motion. The bill was released on a 5-0 vote.

Chairman Schwartzkopf adjourned the meeting at 4:37 p.m.

Respectfully submitted by,

Abigail N. Stollar

**House Administration Committee**
Attendance
May 2, 2012

1. William Barthel, President of City of New Castle
2. Daniel Losco, City of New Castle
3. Cathryn Thomas, City of New Castle
4. Theodore Megginon, City of New Castle
5. John Cochran, City of New Castle
6. Donald Reese, City of New Caslte
7. Marellira Petty, City of New Castle
8. Janet Wurtzel, City of New Castle citizen
9. Linda Ratchford, City of New Castle resident
10. Nancy Willing, Civic League of New Castle County
11. Ron Smith, House Attorney
12. Seth Thompson, House Attorney
13. James Stewurt, City of New Castle Property Owner
14. John L. Houben
15. George Lovett
16. William Boyle, New Castle resident
17. Holly Denton, Resident of New Castle
18. Jack Polidori, DSEA
19. Mark Lally, Delaware League of Local Governments
20. Kathleen MacRae, ACLU-DE; Common Cause
21. Arleen Harris, City of New Castle citizen
22. John Klingmeyer
23. Carol Hickman, City of New Castle
24. Charlotte King, League of Women Voters

# EXHIBIT B

Form **990-EZ**

Department of the Treasury
Internal Revenue Service

# Short Form
# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code
(except black lung benefit trust or private foundation)

▶ Sponsoring organizations of donor advised funds, organizations that operate one or more hospital facilities, and certain controlling organizations as defined in section 512(b)(13) must file Form 990 (see instructions) All other organizations with gross receipts less than $200,000 and total assets less than $500,000 at the end of the year may use this form

▶ The organization may have to use a copy of this return to satisfy state reporting requirements

OMB No 1545-1150

**2011**

**Open to Public Inspection**

**A For the 2011 calendar year, or tax year beginning , 2011, and ending , 20**

B Check if applicable
☐ Address change
☒ Name change
☐ Initial return
☐ Terminated
☐ Amended return
☐ Application pending

C Name of organization
DELAWARE STRONG FAMILIES INC

Number and street (or P O box, if mail is not delivered to street address) | Room/suite
50 FALLON DRIVE

City or town, state or country, and ZIP + 4
SEAFORD, DE 19973

D Employer identification number
26-1294144

E Telephone number

F Group Exemption Number ▶

G Accounting Method ☐ Cash ☐ Accrual Other (specify) ▶ INCOME TAX BASIS

I Website: ▶ NA

J **Tax-exempt status** (check only one) - ☒ 501(c) (3) ☐ 501(c)( ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527

H Check ▶ ☐ if the organization is not required to attach Schedule B (Form 990, 990-EZ, or 990-PF)

K Check ▶ ☐ if the organization is not a section 509(a)(3) supporting organization or section 527 organization **and** its gross receipts are normally **not** more than $50,000 A Form 990-EZ or Form 990 return is not required though Form 990-N (e-postcard) may be required (see instructions) But if the organization chooses to file a return, be sure to file a complete return

L Add lines 5b, 6c, and 7b, to line 9 to determine gross receipts If gross receipts are $200,000 or more, or if total assets (Part II, line 25, column (B) below) are $500,000 or more, file Form 990 instead of Form 990-EZ ▶ $ 63,212

**Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances** (see the instructions for Part I )

Check if the organization used Schedule O to respond to any question in this Part I ☒

| | | | | | | |
|---|---|---|---|---|---|---|
| Revenue | 1 | Contributions, gifts, grants, and similar amounts received | | | 1 | 63,212 |
| | 2 | Program service revenue including government fees and contracts | | | 2 | |
| | 3 | Membership dues and assessments | | | 3 | |
| | 4 | Investment income | | | 4 | |
| | 5a | Gross amount from sale of assets other than inventory | 5a | | | |
| | b | Less cost or other basis and sales expenses | 5b | | | |
| | c | Gain or (loss) from sale of assets other than inventory (Subtract line 5b from line 5a) | | | 5c | |
| | 6 | Gaming and fundraising events | | | | |
| | a | Gross income from gaming (attach Schedule G if greater than $15,000) | 6a | | | |
| | b | Gross income from fundraising events (not including $ ______ of contributions from fundraising events reported on line 1) (attach Schedule G if the sum of such gross income and contributions exceeds $15,000) | 6b | | | |
| | c | Less direct expenses from gaming and fundraising events | 6c | | | |
| | d | Net income or (loss) from gaming and fundraising events (add lines 6a and 6b and subtract line 6c) | | | 6d | |
| | 7a | Gross sales of inventory, less returns and allowances | 7a | | | |
| | b | Less cost of goods sold | 7b | | | |
| | c | Gross profit or (loss) from sales of inventory (Subtract line 7b from line 7a) | | | 7c | |
| | 8 | Other revenue (describe in Schedule O) | | | 8 | |
| | 9 | **Total revenue.** Add lines 1, 2, 3, 4, 5c, 6d, 7c, and 8 ▶ | | | 9 | 63,212 |
| Expenses | 10 | Grants and similar amounts paid (list in Schedule O) | | | 10 | |
| | 11 | Benefits paid to or for members | | | 11 | |
| | 12 | Salaries, other compensation, and employee benefits | | | 12 | |
| | 13 | Professional fees and other payments to independent contractors | | | 13 | |
| | 14 | Occupancy, rent, utilities, and maintenance | | | 14 | |
| | 15 | Printing, publications, postage, and shipping | | | 15 | |
| | 16 | Other expenses (describe in Schedule O) | | | 16 | 59,469 |
| | 17 | **Total expenses.** Add lines 10 through 16 ▶ | | | 17 | 59,469 |
| Net Assets | 18 | Excess or (deficit) for the year (Subtract line 17 from line 9) | | | 18 | 3,743 |
| | 19 | Net assets or fund balances at beginning of year (from line 27, column (A)) (must agree with end-of-year figure reported on prior year's return) | | | 19 | 15,007 |
| | 20 | Other changes in net assets or fund balances (explain in Schedule O) | | | 20 | |
| | 21 | Net assets or fund balances at end of year Combine lines 18 through 20 ▶ | | | 21 | 18,750 |

RECEIVED NOV 19 2012 OGDEN, UT 883 IRS-OSC

SCANNED DEC 12 2012

**For Paperwork Reduction Act Notice, see the separate instructions.** EEA Form 990-EZ (2011)

98-10 21

## Part II Balance Sheets. (see the instructions for Part II )

Check if the organization used Schedule O to respond to any question in this Part II . . . . . . [X]

| | (A) Beginning of year | | (B) End of year |
|---|---|---|---|
| 22 Cash, savings, and investments | 37,777 | 22 | 26,307 |
| 23 Land and buildings | 1,762 | 23 | 1,762 |
| 24 Other assets (describe in Schedule O) | 0 | 24 | 1,470 |
| 25 **Total assets** | 39,539 | 25 | 29,539 |
| 26 **Total liabilities** (describe in Schedule O) | 24,532 | 26 | 10,789 |
| 27 **Net assets or fund balances** (line 27 of column (B) **must** agree with line 21) | 15,007 | 27 | 18,750 |

## Part III Statement of Program Service Accomplishments (see the instructions for Part III )

Check if the organization used Schedule O to respond to any question in this Part III . . . . [ ]

What is the organization's primary exempt purpose? TO EDUCATE ON ISSUES IMPACTING FAMLIES

Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses In a clear and concise manner, describe the services provided, the number of persons benefited, and other relevant information for each program title

**Expenses** (Required for section 501(c)(3) and 501(c)(4) organizations and section 4947(a)(1) trusts, optional for others )

| | | | |
|---|---|---|---|
| 28 | EDUCATED 200 PEOPLE ON THEIR CONSTITUTIONAL RIGHTS. WORKED TO BRING COMMUNITY LEADERS TOGETHER IMPACTING 600 LEADERS. | | |
| | (Grants $ ) If this amount includes foreign grants, check here . . . ▶ [ ] | 28a | 59,469 |
| 29 | | | |
| | (Grants $ ) If this amount includes foreign grants, check here . . . ▶ [ ] | 29a | |
| 30 | | | |
| | (Grants $ ) If this amount includes foreign grants, check here . . . ▶ [ ] | 30a | |
| 31 | Other program services (describe in Schedule O) | | |
| | (Grants $ ) If this amount includes foreign grants, check here . . . ▶ [ ] | 31a | |
| 32 | **Total program service expenses** (add lines 28a through 31a) ▶ | 32 | 59,469 |

## Part IV List of Officers, Directors, Trustees, and Key Employees. List each one even if not compensated (see the instructions for Part IV )

Check if the organization used Schedule O to respond to any question in this Part IV . . . . [ ]

| (a) Name and address | (b) Title and average hours per week devoted to position | (c) Reportable compensation (Form W-2/1099-MISC) (if not paid, enter -0-) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| NICOLE THEIS<br>50 FALLON DRIVE, SEAFORD DE 19973 | PRESIDENT<br>10 | 0 | 0 | 0 |
| TOM BIROWSKI<br>50 FALLON DRIVE, SEAFORD DE 19973 | BOARD CHAIR<br>1 | 0 | 0 | 0 |
| CHRIS THEIS<br>50 FALLON DRIVE, SEAFORD DE 19973 | SECRETARY<br>1 | 0 | 0 | 0 |
| ALAN COLE<br>50 FALLON DRIVE, SEAFORD DE 19973 | TREASURER<br>1 | 0 | 0 | 0 |
| ANN SMITH<br>50 FALLON DRIVE, SEAFORD DE 19973 | DIRECTOR<br>1 | 0 | 0 | 0 |
| DAVID BOOTHE<br>50 FALLON DRIVE, SEAFORD DE 19973 | DIRECTOR<br>1 | 0 | 0 | 0 |
| TIM WAMPLER<br>50 FALLON DRIVE, SEAFORD DE 19973 | DIRECTOR<br>1 | 0 | 0 | 0 |
| JOHN GOOSS<br>50 FALLON DRIVE, SEAFORD DE 19973 | DIRECTOR<br>1 | 0 | 0 | 0 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

JA-108

**Part V** **Other Information** (Note the Schedule A and personal benefit contract statement requirements in the instructions for Part V ) Check if the organization used Schedule O to respond to any question in this Part V ☐

| | | | Yes | No |
|---|---|---|---|---|
| 33 | Did the organization engage in any significant activity not previously reported to the IRS? If "Yes," provide a detailed description of each activity in Schedule O | 33 | | X |
| 34 | Were any significant changes made to the organizing or governing documents? If "Yes," attach a conformed copy of the amended documents if they reflect a change to the organization's name Otherwise, explain the change on Schedule O (see instructions) | 34 | X | |
| 35 a | Did the organization have unrelated business gross income of $1,000 or more during the year from business activities (such as those reported on lines 2, 6a, and 7a, among others)? | 35a | | X |
| b | If "Yes," to line 35a, has the organization filed a Form 990-T for the year? If "No," provide an explanation in Schedule O | 35b | | |
| c | Was the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization subject to section 6033(e) notice, reporting, and proxy tax requirements during the year? If "Yes," complete Schedule C, Part III | 35c | | X |
| 36 | Did the organization undergo a liquidation, dissolution, termination, or significant disposition of net assets during the year? If "Yes," complete applicable parts of Schedule N | 36 | | X |
| 37 a | Enter amount of political expenditures, direct or indirect, as described in the instructions ▶ 37a 5,117 | | | |
| b | Did the organization file **Form 1120-POL** for this year? | 37b | | X |
| 38 a | Did the organization borrow from, or make any loans to, any officer, director, trustee, or key employee or were any such loans made in a prior year and still outstanding at the end of the tax year covered by this return? | 38a | | X |
| b | If "Yes," complete Schedule L, Part II and enter the total amount involved 38b | | | |
| 39 | Section 501(c)(7) organizations Enter | | | |
| a | Initiation fees and capital contributions included on line 9 39a | | | |
| b | Gross receipts, included on line 9, for public use of club facilities 39b | | | |
| 40 a | Section 501(c)(3) organizations Enter amount of tax imposed on the organization during the year under section 4911 ▶ ______ , section 4912 ▶ ______ , section 4955 ▶ ______ | | | |
| b | Section 501(c)(3) and 501(c)(4) organizations Did the organization engage in any section 4958 excess benefit transaction during the year, or did it engage in an excess benefit transaction in a prior year that has not been reported on any of its prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I | 40b | | X |
| c | Section 501(c)(3) and 501(c)(4) organizations Enter amount of tax imposed on organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 ▶ ______ | | | |
| d | Section 501(c)(3) and 501(c)(4) organizations Enter amount of tax on line 40c reimbursed by the organization ▶ ______ | | | |
| e | All organizations At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? If "Yes," complete Form 8886-T | 40e | | X |

41 List the states with which a copy of this return is filed ▶ ______

42 a The organization's books are in care of ▶ NICOLE THEIS Telephone no ▶ 302-548-5106
Located at ▶ 50 FALLON DRIVE SEAFORD, DE ZIP + 4 ▶ 19973

| | | | Yes | No |
|---|---|---|---|---|
| b | At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | 42b | | X |
| | If "Yes," enter the name of the foreign country ▶ ______ See the instructions for exceptions and filing requirements for **Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts.** | | | |
| c | At any time during the calendar year, did the organization maintain an office outside of the U S ? | 42c | | |
| | If "Yes," enter the name of the foreign country ▶ ______ | | | |

43 Section 4947(a)(1) nonexempt charitable trusts filing Form 990-EZ in lieu of **Form 1041**-Check here ▶ ☐
and enter the amount of tax-exempt interest received or accrued during the tax year ▶ 43

| | | | Yes | No |
|---|---|---|---|---|
| 44 a | Did the organization maintain any donor advised funds during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ | 44a | | X |
| b | Did the organization operate one or more hospital facilities during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ | 44b | | X |
| c | Did the organization receive any payments for indoor tanning services during the year? | 44c | | X |
| d | If "Yes," to line 44c, has the organization filed a Form 720 to report these payments? If "No," provide an explanation in Schedule O | 44d | | |
| 45 a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 45a | | X |
| 45 b | Did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? If "Yes," Form 990 and Schedule R may need to be completed instead of Form 990-EZ (see instructions) | 45b | | X |

| | | | Yes | No |
|---|---|---|---|---|
| 46 | Did the organization engage, directly or indirectly, in political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I | 46 | | X |

**Part VI** **Section 501(c)(3) organizations and section 4947(a)(1) nonexempt charitable trusts only.** All section 501(c)(3) organizations and section 4947(a)(1) nonexempt charitable trusts must answer questions 47-49b and 52, and complete the tables for lines 50 and 51.

Check if the organization used Schedule O to respond to any question in this Part VI ☐

| | | | Yes | No |
|---|---|---|---|---|
| 47 | Did the organization engage in lobbying activities or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II | 47 | X | |
| 48 | Is the organization a school as described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | 48 | | X |
| 49a | Did the organization make any transfers to an exempt non-charitable related organization? | 49a | X | |
| b | If "Yes," was the related organization a section 527 organization? | 49b | | X |

50 Complete this table for the organization's five highest compensated employees (other than officers, directors, trustees and key employees) who each received more than $100,000 of compensation from the organization If there is none, enter "None "

| (a) Name and address of each employee paid more than $100,000 | (b) Title and average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

f Total number of other employees paid over $100,000 ▶

51 Complete this table for the organization's five highest compensated independent contractors who each received more than $100,000 of compensation from the organization If there is none, enter "None "

| (a) Name and address of each independent contractor paid more than $100,000 | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | [redacted] | |
| | | |

d Total number of other independent contractors each receiving over $100 [redacted]

52 Did the organization complete Schedule A? **Note:** All section 501(c)(3) [redacted]

nonexempt charitable trusts must attach a completed Schedule A . . . [redacted]

Under penalties of perjury, I declare that I have examined this return, including accompanying schedule [redacted]

true, correct, and complete Declaration of preparer (other than officer) is based on all information of w [redacted]

**Sign Here**

▶ Signature of officer [redacted]

▶ NICOLE THEIS, PRESIDENT

Type or print name and title

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature |
|---|---|
| Jeff Premo CPA | [redacted] |

Firm's name ▶ Jeffrey L Premo PA

Firm's address ▶ 214 E Front Street

LAUREL DE 19956

May the IRS discuss this return with the preparer shown above? See Instruct [redacted]

**SCHEDULE A** (Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

**Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.**

▶ Attach to Form 990 or Form 990-EZ. ▶ See separate instructions.

OMB No 1545-0047

**2011**

**Open to Public Inspection**

Name of the organization: DELAWARE STRONG FAMILIES INC

Employer identification number: 26-1294144

## Part I Reason for Public Charity Status (All organizations must complete this part ) See instructions

The organization is not a private foundation because it is (For lines 1 through 11, check only one box )

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E )

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II )

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II )

9 ☐ An organization that normally receives (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions - subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975 See **section 509(a)(2).** (Complete Part III )

10 ☐ An organization organized and operated exclusively to test for public safety See **section 509(a)(4).**

11 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2) See **section 509(a)(3).** Check the box that describes the type of supporting organization and complete lines 11e through 11h

a ☐ Type I  b ☐ Type II  c ☐ Type III-Functionally integrated  d ☐ Type III-Other

e ☐ By checking this box, I certify that the organization is not controlled directly or indirectly by one or more disqualified persons other than foundation managers and other than one or more publicly supported organizations described in section 509(a)(1) or section 509(a)(2)

f If the organization received a written determination from the IRS that it is a Type I, Type II, or Type III supporting organization, check this box . . . . . . ☐

g Since August 17, 2006, has the organization accepted any gift or contribution from any of the following persons?

| | | Yes | No |
|---|---|---|---|
| (i) A person who directly or indirectly controls, either alone or together with persons described in (ii) and (iii) below, the governing body of the supported organization? | 11g(i) | | |
| (ii) A family member of a person described in (i) above? | 11g(ii) | | |
| (iii) A 35% controlled entity of a person described in (i) or (ii) above? | 11g(iii) | | |

h Provide the following information about the supported organization(s)

| | (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-9 above or IRC section (see instructions) ) | (iv) Is the organization in col (i) listed in your governing document? Yes | No | (v) Did you notify the organization in col (i) of your support? Yes | No | (vi) Is the organization in col (i) organized in the U S ? Yes | No | (vii) Amount of support |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | | | | | | | | | | |
| (B) | | | | | | | | | | |
| (C) | | | | | | | | | | |
| (D) | | | | | | | | | | |
| (E) | | | | | | | | | | |
| Total | | | | | | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**  EEA  Schedule A (Form 990 or 990-EZ) 2011

**Part II** **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**

(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III If the organization fails to qualify under the tests listed below, please complete Part III )

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2007 | (b) 2008 | (c) 2009 | (d) 2010 | (e) 2011 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") | | 44,068 | 54,496 | 71,154 | 63,212 | 232,930 |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 4 **Total.** Add lines 1 through 3 | | 44,068 | 54,496 | 71,154 | 63,212 | 232,930 |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | 16,129 |
| 6 **Public support.** Subtract line 5 from ln 4 | | | | | | 216,801 |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2007 | (b) 2008 | (c) 2009 | (d) 2010 | (e) 2011 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4 | | 44,068 | 54,496 | 71,154 | 63,212 | 232,930 |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| 10 Other income Do not include gain or loss from the sale of capital assets (Explain in Part IV ) | | | | | | |
| 11 **Total support.** Add lines 7 through 10 | | | | | | 232,930 |

12 Gross receipts from related activities, etc (see instructions) . . . 12 1,771

13 **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . ▶ ☐

## Section C. Computation of Public Support Percentage

14 Public support percentage for 2011 (line 6, column (f) divided by line 11, column (f)) . . . 14 93.08 %

15 Public support percentage from 2010 Schedule A, Part II, line 14 . . . 15 97.41 %

16a **33 1/3% support test - 2011.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . ▶ ☒

b **33 1/3% support test - 2010.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . ▶ ☐

17a **10%-facts-and-circumstances test - 2011.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part IV how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization . . . ▶ ☐

b **10%-facts-and-circumstances test - 2010.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part IV how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization . . . ▶ ☐

18 **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . ▶ ☐

Schedule A (Form 990 or 990-EZ) 2011 DELAWARE STRONG FAMILIES INC 26-1294144 Page 3

## Part III Support Schedule for Organizations Described in Section 509(a)(2)

(Complete only if you checked the box on line 9 of Part I or if the organization failed to qualify under Part II
If the organization fails to qualify under the tests listed below, please complete Part II )

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2007 | (b) 2008 | (c) 2009 | (d) 2010 | (e) 2011 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") | | | | | | |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| 3 Gross receipts from activities that are not an unrelated trade or bus under sec 513 | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6 **Total.** Add lines 1 through 5 | | | | | | |
| 7a Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| c Add lines 7a and 7b | | | | | | |
| 8 **Public support** (Subtract line 7c from line 6 ) | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2007 | (b) 2008 | (c) 2009 | (d) 2010 | (e) 2011 | (f) Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6 | | | | | | |
| 10a Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| c Add lines 10a and 10b | | | | | | |
| 11 Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| 12 Other income Do not include gain or loss from the sale of capital assets (Explain in Part IV ) | | | | | | |
| 13 **Total support.** (Add lines 9, 10c, 11, and 12 ) | | | | | | |

14 **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** ▶ ☐

### Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| 15 | Public support percentage for 2011 (line 8, column (f) divided by line 13, column (f)) | 15 | % |
| 16 | Public support percentage from 2010 Schedule A, Part III, line 15 | 16 | % |

### Section D. Computation of Investment Income Percentage

| | | | |
|---|---|---|---|
| 17 | Investment income percentage for **2011** (line 10c, column (f) divided by line 13, column (f)) | 17 | % |
| 18 | Investment income percentage from **2010** Schedule A, Part III, line 17 | 18 | % |

19a **33 1/3% support tests - 2011.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☐

b **33 1/3% support tests - 2010.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3%, and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ▶ ☐

**SCHEDULE C (Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Political Campaign and Lobbying Activities

For Organizations Exempt From Income Tax Under section 501(c) and section 527

▶ Complete if the organization is described below. ▶ Attach to Form 990 or Form 990-EZ.
▶ See separate instructions.

OMB No 1545-0047

**2011**

**Open to Public Inspection**

**If the organization answered "Yes," to Form 990, Part IV, line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**

- Section 501(c)(3) organizations Complete Parts I-A and B Do not complete Part I-C
- Section 501(c) (other than section 501(c)(3)) organizations Complete Parts I-A and C below Do not complete Part I-B
- Section 527 organizations Complete Part I-A only

**If the organization answered "Yes," to Form 990, Part IV, line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**

- Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)) Complete Part II-A Do not complete Part II-B
- Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)) Complete Part II-B Do not complete Part II-A

**If the organization answered "Yes," to Form 990, Part IV, line 5 (Proxy Tax) or Form 990-EZ, Part V, line 35c (Proxy Tax), then**

- Section 501(c)(4), (5), or (6) organizations Complete Part III

| Name of organization | Employer identification number |
|---|---|
| DELAWARE STRONG FAMILIES INC | 26-1294144 |

**Part I-A Complete if the organization is exempt under section 501(c) or is a section 527 organization.**

1 Provide a description of the organization's direct and indirect political campaign activities in Part IV.

2 Political expenditures . . . . ▶ $

3 Volunteer hours . . . .

**Part I-B Complete if the organization is exempt under section 501(c)(3).**

1 Enter the amount of any excise tax incurred by the organization under section 4955 . . . . ▶ $

2 Enter the amount of any excise tax incurred by organization managers under section 4955 . . . . ▶ $

3 If the organization incurred a section 4955 tax, did it file Form 4720 for this year? . . . . ☐ Yes ☐ No

4a Was a correction made? . . . . ☐ Yes ☐ No

b If "Yes," describe in Part IV

**Part I-C Complete if the organization is exempt under section 501(c), except section 501(c)(3).**

1 Enter the amount directly expended by the filing organization for section 527 exempt function activities . . . . ▶ $

2 Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities . . . . ▶ $

3 Total exempt function expenditures Add lines 1 and 2 Enter here and on Form 1120-POL, line 17b . . . . ▶ $

4 Did the filing organization file **Form 1120-POL** for this year? . . . . ☐ Yes ☐ No

5 Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments For each organization listed, enter the amount paid from the filing organization's funds Also enter the amount of political contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC) If additional space is needed, provide information in Part IV

| | (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds If none, enter -0- | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization If none, enter -0- |
|---|---|---|---|---|---|
| (1) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |

**Part II-A** **Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)).**

A Check ▶ ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures)

B Check ▶ ☐ if the filing organization checked box A and "limited control" provisions apply

| Limits on Lobbying Expenditures (The term "expenditures" means amounts paid or incurred.) | (a) Filing organization's totals | (b) Affiliated group totals |
|---|---|---|
| 1a Total lobbying expenditures to influence public opinion (grass roots lobbying) | | |
| b Total lobbying expenditures to influence a legislative body (direct lobbying) | | |
| c Total lobbying expenditures (add lines 1a and 1b) | | |
| d Other exempt purpose expenditures | | |
| e Total exempt purpose expenditures (add lines 1c and 1d) | | |
| f Lobbying nontaxable amount Enter the amount from the following table in both columns | | |

| If the amount on line 1e, column (a) or (b) is: | The lobbying nontaxable amount is : |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000 |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000 |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000 |
| Over $17,000,000 | $1,000,000 |

| | (a) Filing organization's totals | (b) Affiliated group totals |
|---|---|---|
| g Grassroots nontaxable amount (enter 25% of line 1f) | | |
| h Subtract line 1g from line 1a If zero or less, enter -0- | | |
| i Subtract line 1f from line 1c If zero or less, enter -0- | | |

j If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? ☐ Yes ☐ No

**4-Year Averaging Period Under Section 501(h)**
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 2a through 2f on page 4.)**

**Lobbying Expenditures During 4-Year Averaging Period**

| Calendar year (or fiscal year beginning in) | (a) 2008 | (b) 2009 | (c) 2010 | (d) 2011 | (e) Total |
|---|---|---|---|---|---|
| 2a Lobbying nontaxable amount | | | | | |
| b Lobbying ceiling amount (150% of line 2a, column (e)) | | | | | |
| c Total lobbying expenditures | | | | | |
| d Grassroots nontaxable amount | | | | | |
| e Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| f Grassroots lobbying expenditures | | | | | |

**Part II-B Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).**

| For each "Yes" response to lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity | (a) Yes | (a) No | (b) Amount |
|---|---|---|---|
| 1 During the year, did the filing organization attempt to influence foreign, national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of | | | |
| a Volunteers? | X | | |
| b Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? | X | | |
| c Media advertisements? | | X | |
| d Mailings to members, legislators, or the public? | | X | |
| e Publications, or published or broadcast statements? | | X | |
| f Grants to other organizations for lobbying purposes? | | X | |
| g Direct contact with legislators, their staffs, government officials, or a legislative body? | | X | |
| h Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? | | X | |
| i Other activities? | X | | 5,117 |
| j Total Add lines 1c through 1i | | | 5,117 |
| 2a Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? | | X | |
| b If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| c If "Yes," enter the amount of any tax incurred by organization managers under section 4912 | | | |
| d If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? | | | |

**Part III-A Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6).**

| | | Yes | No |
|---|---|---|---|
| 1 Were substantially all (90% or more) dues received nondeductible by members? | 1 | | |
| 2 Did the organization make only in-house lobbying expenditures of $2,000 or less? | 2 | | |
| 3 Did the organization agree to carry over lobbying and political expenditures from the prior year? | 3 | | |

**Part III-B Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No" OR (b) Part III-A, line 3, is answered "Yes."**

| | | |
|---|---|---|
| 1 Dues, assessments and similar amounts from members | 1 | |
| 2 Section 162(e) nondeductible lobbying and political expenditures **(do not include amounts of political expenses for which the section 527(f) tax was paid).** | | |
| a Current year | 2a | |
| b Carryover from last year | 2b | |
| c Total | 2c | |
| 3 Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues | 3 | |
| 4 If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? | 4 | |
| 5 Taxable amount of lobbying and political expenditures (see instructions) | 5 | |

**Part IV Supplemental Information**

Complete this part to provide the descriptions required for Part I-A, line 1, Part I-B, line 4, Part I-C, line 5, Part II-A, and Part II-B, line 1 Also, complete this part for any additional information

**SCHEDULE O (Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information.

▶ Attach to Form 990 or 990-EZ.

OMB No 1545-0047

**2011**

**Open to Public Inspection**

Name of the organization: DELAWARE STRONG FAMILIES INC

Employer identification number: 26-1294144

01. General explanation attachment

PART 1 LINE 16 OTHER EXPENSES

DE FAMILY POLICY COUNCIL INC A C4 27-0375433 PERFORMS C-3 ACTIVITIES FOR DE STRONG FAMILY FAMILIES A C3. THESE EXPENSES ARE TRACTED AND REIMBURSED. SCHEDULE C; PART IIB LINE LI OTHER ACTIVITIES

THIS AMOUNT INCLUDES $2893 OF STAFF TIME AND $2224 OF OVERHEAD ATTRIBUTED TO DIRECT AND INDIRECT LOBBYING.

02. Description of other expenses (Part I, line 16)

| DESCRIPTION | AMOUNT |
|---|---|
| CORPORATE TAXES | 164 |
| BANKING AND PROCESSING FEES | 52 |
| INFORMATION TECHNOLOGY | 186 |
| PY EXP CHARGED BACK TO C4 | 24,660 |
| DIRECT EXP CHARGED BACK TO C4 | 34,407 |

03. Description of other assets (Part II, line 24)

| CATEGORY | BEGINNING OF YEAR | END OF YEAR |
|---|---|---|
| UNDEPOSITED FUNDS | 0 | 1,470 |

04. Description of total liabilities (Part II, line 26)

BEGINNING

Name of the organization: DELAWARE STRONG FAMILIES INC

Employer identification number: 26-1294144

| CATEGORY | OF YEAR | END OF YEAR |
|---|---|---|
| ACCOUNTS PAYABLE | 24,532 | 10,789 |

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:30 AM 10/20/2011
FILED 11:30 AM 10/20/2011
SRV 111123190 - 4477569 FILE

Acer
2 9080 5301

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT
# (A CORPORATION WITHOUT CAPITAL STOCK)

The corporation, Delaware Family Policy Council Education Fund, organized and existing under the laws of the State of Delaware, hereby certifies as follows:

(1) That at a meeting a vote of the members of the governing body was taken for and against the amendment to the Certificate of Incorporation, said Amendment being as follows:

The name of the Corporation shall be Delaware Strong Families Inc.

(2) That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

**IN WITNESS WHEREOF**, said corporation has caused this certificate to be signed this 13th day of October, A.D. 2011.

By: [signature]
Authorized Officer

Name: Tom Birowski, Chairman of the Board
Print or Type

# EXHIBIT C

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93492320031532

Form **990-EZ**

Department of the Treasury
Internal Revenue Service

# Short Form
# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code**
**(except black lung benefit trust or private foundation)**

▶ Sponsoring organizations of donor advised funds, organizations that operate one or more hospital facilities, and certain controlling organizations as defined in section 512(b)(13) must file Form 990 (see instructions) All other organizations with gross receipts less than $200,000 and total assets less than $500,000 at the end of the year may use this form

▶ *The organization may have to use a copy of this return to satisfy state reporting requirements*

OMB No 1545-1150

**2011**

**Open to Public Inspection**

**A For the 2011 calendar year, or tax year beginning 01-01-2011 , and ending 12-31-2011**

**B** Check if applicable
☐ Address change
☐ Name change
☐ Initial return
☐ Terminated
☐ Amended return
☐ Application pending

**C** Name of organization
DE FAMILY POLICY COUNCIL INC

Number and street (or P O box, if mail is not delivered to street address) Room/suite
50 FALLON AVENUE

City or town, state or country, and ZIP + 4
SEAFORD, DE 19973

**D Employer identification number**
27-0375433

**E** Telephone number

**F** Group Exemption Number ▶

**G** Accounting method ☐ Cash ☐ Accrual Other (specify) ▶ INCOME TAX BAS

**H** Check ▶ ☐ if the organization is **not** required to attach Schedule B (Form 990, 990-EZ, or 990-PF)

**I Website:**▶ DELAWAREFAMILIESORG

**J Tax-Exempt status** (check only one)— ☐ 501(c)(3) ☑ 501(c)( 4) ◀(insert no ) ☐ 4947(a)(1) or ☐ 527

**K** Check ▶☐ if the organization is not a section 509(a)(3) supporting organization or a section 527 organization **and** its gross receipts are normally **not** more than $50,000 A Form 990-EZ or Form 990 return is not required though Form 990-N (e-postcard) may be required (see instructions) But if the organization chooses to file a return, be sure to file a complete return

**L** Add lines 5b, 6c, and 7b, to line 9 to determine gross receipts, If gross receipts are $200,000 or more, or if total assets (Part II, line 25, column (B) below) are $500,000 or more, file Form 990 instead of Form 990-EZ ▶ $ 128,349

## Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances (See the instructions for Part I )

Check if the organization used Schedule O to respond to any question in this Part I . . . . . . . . . . ☑

| Section | Line | Description | | | Line | Amount |
|---|---|---|---|---|---|---|
| Revenue | 1 | Contributions, gifts, grants, and similar amounts received | | | 1 | 53,259 |
| | 2 | Program service revenue including government fees and contracts | | | 2 | |
| | 3 | Membership dues and assessments | | | 3 | 14,300 |
| | 4 | Investment income | | | 4 | |
| | 5a | Gross amount from sale of assets other than inventory | 5a | | | |
| | b | Less cost or other basis and sales expenses | 5b | | | |
| | c | Gain or (loss) from sale of assets other than inventory (Subtract line 5b from line 5a) | | | 5c | |
| | 6 | Gaming and fundraising events | | | | |
| | a | Gross income from gaming (attach Schedule G if greater than $15,000) | 6a | | | |
| | b | Gross income from fundraising events (not including $ _of contributions from fundraising events reported on line 1) (attach Schedule G if the sum of such gross income and contributions exceeds $15,000) | 6b | | | |
| | c | Less direct expenses from gaming and fundraising events | 6c | | | |
| | d | Net income or (loss) from gaming and fundraising events (Add lines 6a and 6b and subtract line 6c) | | | 6d | |
| | 7a | Gross sales of inventory, less returns and allowances | 7a | 1,723 | | |
| | b | Less cost of goods sold | 7b | 2,650 | | |
| | c | Gross profit or (loss) from sales of inventory (Subtract line 7b from line 7a) | | | 7c | -927 |
| | 8 | Other revenue (describe in Schedule O) | | | 8 | 59,067 |
| | 9 | **Total revenue.** Add lines 1, 2, 3, 4, 5c, 6d, 7c, and 8 | | | 9 | 125,699 |
| Expenses | 10 | Grants and similar amounts paid (list in Schedule O) | | | 10 | |
| | 11 | Benefits paid to or for members | | | 11 | |
| | 12 | Salaries, other compensation, and employee benefits | | | 12 | 58,858 |
| | 13 | Professional fees and other payments to independent contractors | | | 13 | 12,352 |
| | 14 | Occupancy, rent, utilities, and maintenance | | | 14 | 2,717 |
| | 15 | Printing, publications, postage, and shipping | | | 15 | |
| | 16 | Other expenses (describe in Schedule O) | | | 16 | 91,579 |
| | 17 | **Total expenses.** Add lines 10 through 16 | | | 17 | 165,506 |
| Net Assets | 18 | Excess or (deficit) for the year (Subtract line 17 from line 9) | | | 18 | -39,807 |
| | 19 | Net assets or fund balances at beginning of year (from line 27, column (A)) (must agree with end-of-year figure reported on prior year's return) | | | 19 | 73,817 |
| | 20 | Other changes in net assets or fund balances (explain in Schedule O) | | | 20 | |
| | 21 | Net assets or fund balances at end of year Combine lines 18 through 20 ▶ | | | 21 | 34,010 |

**For Privacy Act and Paperwork Reduction Act Notice, see the separate instructions.** Cat No 10642I Form **990-EZ** (2010)

**Part II Balance Sheets**

Check if the organization used Schedule O to respond to any question in this Part II . . . . . . . . . ☑

| (See the instructions for Part II ) | (A) Beginning of year | | (B) End of year |
|---|---|---|---|
| 22 Cash, savings, and investments | 48,715 | 22 | 25,534 |
| 23 Land and buildings | 570 | 23 | 570 |
| 24 Other assets (describe in Schedule O ) | 24,532 | 24 | 11,089 |
| 25 **Total assets** | 73,817 | 25 | 37,193 |
| 26 **Total liabilities** (describe in Schedule O ) | 0 | 26 | 3,183 |
| 27 **Net assets or fund balances** (line 27 of column (B) **must** agree with line 21) | 73,817 | 27 | 34,010 |

**Part III Statement of Program Service Accomplishments**

Check if the organization used Schedule O to respond to any question in this Part III . ☐

**Expenses** (Required for section 501(c)(3) and 501(c)(4) organizations and section 4947(a)(1) trusts, optional for others )

What is the organization's primary exempt purpose?
TO INFORM FAMILIES ABOUT PUBLIC POLICES

Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses In a clear and concise manner, describe the services provided, the number of persons benefited, and other relevant information for each program title

| | | |
|---|---|---|
| **28** ADVOCATE AND ENCOURAGE PEOPLE TO ACTION ON SPECIFIC ISSUES<br>(Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | **28a** | 168,156 |
| **29**<br>(Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | **29a** | |
| **30**<br>(Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | **30a** | |
| **31** Other program services (describe in Schedule O )<br>(Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | **31a** | |
| **32 Total program service expenses** (add lines 28a through 31a) . ▶ | **32** | 168,156 |

**Part IV List of Officers, Directors, Trustees, and Key Employees.** List each one even if not compensated (See the instructions for Part IV )

Check if the organization used Schedule O to respond to any question in this Part IV . . . . . . . . . ☐

| **(a)** Name and address | **(b)** Title and average hours per week devoted to position | **(c)** Compensation **(If not paid, enter -0-.)** | **(d)** Contributions to employee benefit plans & deferred compensation | **(e)** Expense account and other allowances |
|---|---|---|---|---|
| See Additional Data Table | | | | |
| | | | | |
| | | | | |
| | | | | |

Case 1:23-cv-02648-SEB Document 18-1 Page 106 of 370 Filed 03/15/2024 PageID #: 228

**Part V** **Other Information** (Note the statement requirements in the instructions for Part V.)

Check if the organization used Schedule O to respond to any question in this Part V . . . . . ☐

| | | Line | Yes | No |
|---|---|---|---|---|
| 33 | Did the organization engage in any significant activity not previously reported to the IRS? If "Yes," provide a detailed description of each activity in Schedule O | 33 | | No |
| 34 | Were any significant changes made to the organizing or governing documents? If "Yes," attach a conformed copy of the amended documents if they reflect a change to the organization's name Otherwise, explain the change on Schedule O (see instructions) | 34 | | No |
| 35 | If the organization had income from business activities, such as those reported on lines 2, 6a, and 7a (among others), but **not** reported on Form 990-T, explain in Schedule O why the organization did not report the income on Form 990-T | | | |
| a | Did the organization have unrelated business gross income of $1,000 or more during the year from business activities (such as those reported on lines 2, 6a, and 7a, among others)? | 35a | | No |
| b | If 'Yes' to line 35a, has the organization filed a **Form 990-T** for the year? If 'No,' provide an explanation in Schedule O | 35b | | |
| c | Was the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization subject to section 6033(e) notice, reporting, and proxy tax requirements during the year? If 'Yes,' complete Schedule C, Part III | 35c | | No |
| 36 | Did the organization undergo a liquidation, dissolution, termination, or significant disposition of net assets during the year? If "Yes," complete applicable parts of Schedule N | 36 | | No |
| 37a | Enter amount of political expenditures, direct or indirect, as described in the instructions ▶ 37a 19,524 | | | |
| b | Did the organization file **Form 1120-POL** for this year? | 37b | | No |
| 38a | Did the organization borrow from, or make any loans to, any officer, director, trustee, or key employee **or** were any such loans made in a prior year and still outstanding at the end of the tax year covered by this return? | 38a | | No |
| b | If "Yes," complete Schedule L, Part II and enter the total amount involved 38b | | | |
| 39 | *Section 501(c)(7) organizations.* Enter | | | |
| a | Initiation fees and capital contributions included on line 9 39a | | | |
| b | Gross receipts, included on line 9, for public use of club facilities 39b | | | |
| 40a | *Section 501(c)(3) organizations.* Enter amount of tax imposed on the organization during the year under section 4911 ▶ ______, section 4912 ▶ ______, section 4955 ▶ ______ | | | |
| b | *Section 501(c)(3) and 501(c)(4) organizations.* Did the organization engage in any section 4958 excess benefit transaction during the year or did it engage in an excess benefit transaction in a prior year that has not been reported on any of its prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I | 40b | | No |
| c | Section 501(c)(3) and 501(c)(4) organizations Enter amount of tax imposed on organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 ▶ ______ | | | |
| d | Section 501(c)(3) and 501(c)(4) organizations Enter amount of tax on line 40c reimbursed by the organization ▶ ______ | | | |
| e | *All organizations.* At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? If "Yes," complete Form 8886-T | 40e | | No |

41 List the states with which a copy of this return is filed ▶

42a The organization's books are in care of ▶ NICOLE THEIS Telephone no ▶ (302) 542-5106

Located at ▶ 50 FALLON AVENUE SEAFORD, DE ZIP + 4 ▶ 19973

| | | Line | Yes | No |
|---|---|---|---|---|
| b | At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | 42b | | No |
| | If "Yes," enter the name of the foreign country ▶ ______ | | | |
| | See the instructions for exceptions and filing requirements for **Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts.** | | | |
| c | At any time during the calendar year, did the organization maintain an office outside of the U S ? | 42c | | No |
| | If "Yes," enter the name of the foreign country ▶ ______ | | | |

43 Section 4947(a)(1) nonexempt charitable trusts filing Form 990-EZ in lieu of **Form 1041—**Check here ▶ ☐ and enter the amount of tax-exempt interest received or accrued during the tax year ▶ 43

| | | Line | Yes | No |
|---|---|---|---|---|
| 44a | Did the organization maintain any donor advised funds? *If "Yes", Form 990 must be completed instead of Form 990-EZ.* | 44a | | No |
| b | Did the organization operate one or more hospital facilities during the year? *If 'Yes,' Form 990 must be completed instead of Form990-EZ* | 44b | | No |
| c | Did the organization receive any payments for indoor tanning services during the year? | 44c | | No |
| d | If 'Yes' to line 44c, has the organization filed a Form 720 to report these payments? *If 'No,' provide an explanation in Schedule O* | 44d | | |
| 45a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 45a | | No |
| 45b | Did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? If 'Yes,' Form 990 and Schedule R may need to be completed instead of Form990-EZ (see instructions) | 45b | | No |

| | | | Yes | No |
|---|---|---|---|---|
| 46 | Did the organization engage, directly or indirectly, in political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I | 46 | Yes | |

**Part VI** **Section 501(c)(3) organizations and section 4947(a)(1) nonexempt charitable trusts only.**
All section 501(c)(3) organizations and section 4947(a)(1) nonexempt charitable trusts must answer questions 47-49b and 52.
Check if the organization used Schedule O to respond to any question in this Part VI . . . . . . . . . ☐

| | | | Yes | No |
|---|---|---|---|---|
| 47 | Did the organization engage in lobbying activities or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II | 47 | | |
| 48 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | 48 | | |
| 49a | Did the organization make any transfers to an exempt non-charitable related organization? | 49a | | |
| b | If "Yes," was the related organization a section 527 organization? | 49b | | |

**50** Complete this table for the organization's five highest compensated employees (other than officers, directors, trustees and key employees) who each received more than $100,000 of compensation from the organization If there is none, enter "None "

| **(a)** Name and address of each employee paid more than $100,000 | **(b)** Title and average hours per week devoted to position | **(c)** Compensation | **(d)** Contributions to employee benefit plans & deferred compensation | **(e)** Expense account and other allowances |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**f** Total number of other employees paid over $100,000 . . . . . . . . . . . . . ▶

**51** Complete this table for the organization's five highest compensated independent contractors who each received more than $100,000 of compensation from the organization If there is none, enter "None "

| **(a)** Name and address of each independent contractor paid more than $100,000 | **(b)** Type of service | **(c)** Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | [redacted] | [redacted] |
| | [redacted] | [redacted] |

**d** Total number of other independent contractors each receiving over $10[redacted]

**52** Did the organization complete Schedule A? **NOTE:** All Section 501(c)(3[redacted]
must attach a completed Schedule A . . . . . . . . . [redacted]

**Under penalties of perjury, I declare that I have examined this return, including acco[redacted]**
**knowledge and belief, it is true, correct, and complete. Declaration of preparer (othe[redacted]**
**knowledge.**

**Sign Here**
▶ ****** [redacted]
Signature of officer
▶ NICOLE THEIS PRES [redacted]
Type or print name and title

**Paid Preparer's Use Only**
Preparer's signature ▶ Jeff Premo CPA
Date 2012-11-15 [redacted]
Firm's name (or yours if self-employed), address, and ZIP + 4 ▶ Jeffrey L Premo PA
214 E Front Street
LAUREL, DE 19956 [redacted]

May the IRS discuss this return with the preparer shown above? See instructio[redacted]

**SCHEDULE C** (Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Political Campaign and Lobbying Activities

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

▶ Complete if the organization is described below.
▶ Attach to Form 990 or Form 990-EZ. ▶ See separate instructions.

OMB No 1545-0047

**2011**

**Open to Public Inspection**

**If the organization answered "Yes," to Form 990, Part IV, Line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**

- Section 501(c)(3) organizations Complete Parts I-A and B Do not complete Part I-C
- Section 501(c) (other than section 501(c)(3)) organizations Complete Parts I-A and C below Do not complete Part I-B
- Section 527 organizations Complete Part I-A only

**If the organization answered "Yes," to Form 990, Part IV, Line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**

- Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)) Complete Part II-A Do not complete Part II-B
- Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)) Complete Part II-B Do not complete Part II-A

**If the organization answered "Yes," to Form 990, Part IV, Line 5 (Proxy Tax) or Form 990-EZ, line 35c (Proxy Tax), then**

- Section 501(c)(4), (5), or (6) organizations Complete Part III

| Name of the organization | Employer identification number |
|---|---|
| DE FAMILY POLICY COUNCIL INC | 27-0375433 |

**Part I-A Complete if the organization is exempt under section 501(c) or is a section 527 organization.**

1 Provide a description of the organization's direct and indirect political campaign activities on behalf of or in opposition to candidates for public office in Part IV

2 Political expenditures ▶ $ 19,524

3 Volunteer hours 92

**Part I-B Complete if the organization is exempt under section 501(c)(3).**

1 Enter the amount of any excise tax incurred by the organization under section 4955 ▶ $

2 Enter the amount of any excise tax incurred by organization managers under section 4955 ▶ $

3 If the organization incurred a section 4955 tax, did it file Form 4720 for this year? ☐ Yes ☐ No

4a Was a correction made? ☐ Yes ☐ No

b If "Yes," describe in Part IV

**Part I-C Complete if the organization is exempt under section 501(c) except section 501(c)(3).**

1 Enter the amount directly expended by the filing organization for section 527 exempt function activities ▶ $

2 Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt funtion activities ▶ $

3 Total exempt function expenditures Add lines 1 and 2 Enter here and on Form 1120-POL, line 17b ▶ $

4 Did the filing organization file **Form 1120-POL** for this year? ☐ Yes ☑ No

5 Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments For each organization listed, enter the amount paid from the filing organization's funds Also enter the amount of political contributions received that were promptly and directly delivered to a separate political organization, such as a separate segregated fund or a political action committee (PAC) If additional space is needed, provide information in Part IV

| **(a)** Name | **(b)** Address | **(c)** EIN | **(d)** Amount paid from filing organization's funds If none, enter -0- | **(e)** Amount of political contributions received and promptly and directly delivered to a separate political organization If none, enter -0- |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

JA-125

**Part II-A** **Complete if the organization is exempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)).**

**A** Check ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures)

**B** Check ☐ if the filing organization checked box A and "limited control" provisions apply

| **Limits on Lobbying Expenditures** (The term "expenditures" means amounts paid or incurred.) | **(a)** Filing Organization's Totals | **(b)** Affiliated Group Totals |
|---|---|---|
| **1a** Total lobbying expenditures to influence public opinion (grass roots lobbying) | | |
| **b** Total lobbying expenditures to influence a legislative body (direct lobbying) | | |
| **c** Total lobbying expenditures (add lines 1a and 1b) | | |
| **d** Other exempt purpose expenditures | | |
| **e** Total exempt purpose expenditures (add lines 1c and 1d) | | |
| **f** Lobbying nontaxable amount Enter the amount from the following table in both columns | | |

| **If the amount on line 1e, column (a) or (b) is:** | **The lobbying nontaxable amount is:** |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000 |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000 |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000 |
| Over $17,000,000 | $1,000,000 |

| | (a) | (b) |
|---|---|---|
| **g** Grassroots nontaxable amount (enter 25% of line 1f) | | |
| **h** Subtract line 1g from line 1a If zero or less, enter -0- | | |
| **i** Subtract line 1f from line 1c If zero or less, enter -0- | | |

**j** If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year? ☐ **Yes** ☐ **No**

**4-Year Averaging Period Under Section 501(h)**
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the instructions for lines 2a through 2f on page 4.)**

**Lobbying Expenditures During 4-Year Averaging Period**

| **Calendar year (or fiscal year beginning in)** | **(a)** 2008 | **(b)** 2009 | **(c)** 2010 | **(d)** 2011 | **(e)** Total |
|---|---|---|---|---|---|
| **2a** Lobbying non-taxable amount | | | | | |
| **b** Lobbying ceiling amount (150% of line 2a, column(e)) | | | | | |
| **c** Total lobbying expenditures | | | | | |
| **d** Grassroots non-taxable amount | | | | | |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f** Grassroots lobbying expenditures | | | | | |

JA-126

**Part II-B Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).**

| | | (a) Yes | (a) No | (b) Amount |
|---|---|---|---|---|
| 1 | During the year, did the filing organization attempt to influence foreign, national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of | | | |
| a | Volunteers? | | | |
| b | Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? | | | |
| c | Media advertisements? | | | |
| d | Mailings to members, legislators, or the public? | | | |
| e | Publications, or published or broadcast statements? | | | |
| f | Grants to other organizations for lobbying purposes? | | | |
| g | Direct contact with legislators, their staffs, government officials, or a legislative body? | | | |
| h | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? | | | |
| i | Other activities? If "Yes," describe in Part IV | | | |
| j | Total lines 1c through 1i | | | |
| 2a | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? | | | |
| b | If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| c | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 | | | |
| d | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? | | | |

**Part III-A Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6).**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were substantially all (90% or more) dues received nondeductible by members? | 1 | Yes | |
| 2 | Did the organization make only in-house lobbying expenditures of $2,000 or less? | 2 | | No |
| 3 | Did the organization agree to carryover lobbying and political expenditures from the prior year? | 3 | | No |

**Part III-B Complete if the organization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)(6) if BOTH Part III-A, lines 1 and 2 are answered "No" OR if Part III-A, line 3 is answered "Yes".**

| | | | |
|---|---|---|---|
| 1 | Dues, assessments and similar amounts from members | 1 | |
| 2 | Section 162(e) non-deductible lobbying and political expenditures **(do not include amounts of political expenses for which the section 527(f) tax was paid).** | | |
| a | Current year | 2a | |
| b | Carryover from last year | 2b | |
| c | Total | 2c | |
| 3 | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues | 3 | |
| 4 | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? | 4 | |
| 5 | Taxable amount of lobbying and political expenditures (see instructions) | 5 | |

**Part IV Supplemental Information**

Complete this part to provide the descriptions required for Part I-A, line 1, Part I-B, line 4, Part I-C, line 5, and Part II-B, line 1i Also, complete this part for any additional information

| Identifier | Return Reference | Explanation |
|---|---|---|

# SCHEDULE O (Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

## Supplemental Information to Form 990 or 990-EZ

**Complete to provide information for responses to specific questions on Form 990 or to provide any additional information.**
**▶ Attach to Form 990 or 990-EZ.**

OMB No 1545-0047

**2011**

**Open to Public Inspection**

Name of the organization
DE FAMILY POLICY COUNCIL INC

**Employer identification number**
27-0375433

| Identifier | Return Reference | Explanation |
|---|---|---|
| 01 General explanation attachment | | 990EZ PART I LINE 8 OTHER REVENUE THIS REVENUE IS A CHARGEBACK OF EXPENSES FOR WORK PERFORMED FOR DE STRONG FAMILIES 26-1294144 SCHEDULE C PART IV SUPPLEMENTAL INFORMATION THIS WAS FOR POLLING AND ENCOURAGE PEOPLE TO ACT ON SPECIFIC POLITICAL ISSUES |
| 02 Description of other revenue (Part I, line 8) | | DESCRIPTION AMOUNT CHARGEBACK FROM C3 59067 |
| 03 Description of other expenses (Part I, line 16) | | DESCRIPTION AMOUNT SPECIAL APPEAL 228 LEGISLATIVE ADVOCACY 25979 BANK AND PROCESSING FEES 1291 WEBSITE 41 CRM AND DATABASE SERVICES 11960 TRAILING AND DEVELOPMENT 870 BOOKS AND SUBSCRIPTIONS 411 POSTAGE AND MAILING 971 SUPPLIES 1873 TELEPHONE 2932 TRAVEL AND MEETINGS 11377 MARKETING AND PROMOTION 11135 EVENTS EXPENSE 22511 |
| 04 Description of other assets (Part II, line 24) | | BEGINNING CATEGORY OF YEAR END OF YEAR ACCOUNTS RECEIVABLE 24532 10699 UNDEPOSITED FUNDS 0 390 |
| 05 Description of total liabilities (Part II, line 26) | | BEGINNING CATEGORY OF YEAR END OF YEAR ACCOUNTS PAYABLE 0 3183 |

**Additional Data**

**Software ID:**
**Software Version:**
**EIN:** 27-0375433
**Name:** DE FAMILY POLICY COUNCIL INC

**Form 990-EZ, Special Condition Description:**

| Special Condition Description |
|---|

**Form 990EZ, Part IV - List of Officers, Directors, Trustees, and Key Employees**

| (A) Name and address | (B) Title and average hours per week devoted to position | (C) Compensation (If not paid, enter -0-.) | (D) Contributions to employee benefit plans & deferred compensation | (E) Expense account and other allowances |
|---|---|---|---|---|
| NICOLE THEIS<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | PRESIDENT 30 | 30,000 | 0 | 0 |
| TOM BIROWSKI<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | BOARD CHAIR 1 | 0 | 0 | 0 |
| CHRIS THEIS<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | SECRETARY 1 | 0 | 0 | 0 |
| ALAN COLE<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | TREASURER 1 | 0 | 0 | 0 |
| ANN SMITH<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | DIRECTOR 1 | 0 | 0 | 0 |
| DAVID BOOTHE<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | DIRECTOR 1 | 0 | 0 | 0 |
| TIM WAMPLER<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | DIRECTOR 1 | 0 | 0 | 0 |
| JOHN GOOSS<br>50 FALLON AVENUE<br>SEAFORD, DE 19973 | DIRECTOR 1 | 0 | 0 | 0 |

# EXHIBIT D

2012 General Election

# Values Scorecard

*A Service of Delaware Family Policy Council*

Delaware Family Policy Council (DFPC) is pleased to present the 2012 Values Scorecard. DFPC is a 501c4 member-driven organization committed to standing for values that strengthen Delaware families.

All candidates were provided a questionnaire and given an equal opportunity to respond and to provide explanations or comments concerning each question. Any additional explanations or comments that were made by candidates are noted with an asterisk (*) next to the answer and can be found our website.

For your convenience, the Voter Scorecard includes phone numbers for all candidates if you wish to call those who failed to respond. Positions for non-responding candidates are based on voting records, public statements, and/or campaign literature.

A printable version of the Voter Scorecard is available on our website **www.delawarefamilies.org**. Please Facebook and share the Voter Scorecard and encourage your friends and family to vote on November 6th.

*Remember, this Voter Scorecard does not address a candidate's character, only their position on issues. It should not take the place of your effort to personally evaluate a candidate.*

The stakes couldn't be higher this election. Our hope is that on November 6th, this Voter Scorecard will help you choose candidates who best represent your values.

*Nicole Theis*
President
Delaware Family Policy Council



## FEDERAL QUESTIONS:

1. Do you oppose taxpayer funding of abortions?
2. Do you oppose giving tax dollars to Planned Parenthood?
3. Do you oppose the federal funding of embryonic stem cell research?
4. Do you support federal legislation prohibiting human cloning of all kinds, both "therapeutic" and "reproductive"?
5. Do you support repealing federal estate tax?
6. Do you support parental rights in education (educational choice)?
7. Do you support the state constitutional amendments preserving natural marriage?
8. Do you support enforcement of the Defense of Marriage Act (DOMA)?
9. Do you support a marriage protection amendment to the U.S. Constitution that defines marriage as the union of one man and one woman?
10. Do you oppose the Federal Employment Non-Discrimination Act?
11. Do you support strict constructionist judges?
12. Do you oppose open homosexuality in the military?
13. Do you support repealing the healthcare law known as "Obamacare"?
14. Do you support protection for institutions, organizations, and individuals from having the government force them to violate their moral or religious beliefs?

| Federal Candidates | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Senate | (202) 905-6706 | Alexander Pires (I) **X** | - | - | - | - | - | - | N | N | N | - | - | N | - | - | D |
| Senate | (202) 224-2441 | Thomas Carper (D) **X** | N | N | N | - | - | - | - | N | N | - | N | N | N | N | F |
| Senate | (302) 339-1763 | Kevin Wade (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| US Congress | (302) 536-9495 | Tom Kovach (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| US Congress | (302) 654-1718 | John Carney (D) **X** | N | N | - | - | - | N | - | N | - | - | - | - | N | - | F |

**Color Key**

- Family Advocate (green)
- Needs Improvement (yellow)
- Hostile (red)

**Answer Key**

- **Y** = Yes, **Pro-Family Position**
- **N** = No, **Anti- Family Position**
- **U** = **Undecided**
- **X** = **Candidate failed to respond**, information compiled from other sources listed online at www.delawarefamilies.org
- * = **Additional Comments** or voting record online at www.delawerefamilies.org
- **–** = **Failed to respond/Position Unknown**

**Party Key**

- **D**= Democrat
- **R**= Republican
- **L**= Libertarian
- **I** = Independent

**Endorsements/Ranking Key**

- **L** = Delaware Liberty Fund LGBT
- **S** = Stonewall Democrats
- **V** = Gay and Lesbian Victory fund
- **P** = Scored more than 60% Pro- Choice on Planned Parenthood's Survey

**Explanation of Information**

To find your voting district and contact information on the candidates, go to www.delawarefamilies.org.
This Values Scorecard is for personal distribution. For a 501c3 or church-friendly Voter Guide, please go to www.delawarestrong.org.
To help you make an informed decision, we have included endorsements of organizations that have a mission and agenda opposite of the family values promoted by DFPC. The mission of those organizations can be viewed in the endnotes online.
***The A+ grade is only awarded to incumbents who are proven champions of pro-family legislation. Those who earned an A+ grade are considered Outstanding Family Advocates.***



Paid for by Delaware Family Policy Council | P.O. Box 925 | Seaford, DE 19973

## STATE QUESTIONS:

1. Do you support the right of parents to choose what services their children may receive at school-based wellness centers?
2. Do you support tax incentives to encourage natural marriage and incent married couples to stay together as a solution to reducing poverty and dependency on government services?
3. Do you oppose same-sex civil union legislation?
4. Do you support parental consent of abortion for minors under the age of 18? (HB80)
5. Do you support strengthening and maintaining marriage as the union of one man and one woman?
6. Do you oppose adding “gender identity or gender expression” to the protected classes in Delaware’s anti-discrimination laws for housing, employment, and public accommodation?
7. Do you oppose legislation that includes legalizing internet gambling as a means to increase state revenue and provide jobs?
8. Do you support prohibiting coverage for abortion in the state insurance exchanges mandated by the new federal healthcare law?
9. Do you support an annual inspection of abortion clinics for unsafe and unsanitary conditions?
10. Do you oppose using taxpayer money to fund Planned Parenthood and other organizations that provide abortion services?
11. Do you support a policy that ensures parental guardian notification prior to the introduction or instructional use of classroom curriculum or materials, whether brought or introduced by school educators, administrators, and officials, or by guests invited at their request, which involve human sexual education, human sexuality issues, sexual acts, family planning, profanity, drugs, or alcohol?
12. Do you support a Delaware Marriage Protection Amendment defining marriage between a man and a woman in the state constitution? (It does not ban civil unions. SS1 for SB27 2009)

| **Statewide Races** | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Governor | 322-8800 | L,P,S | | Jack Markell (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| Governor | 521-3761 | | | Jeffrey Cragg (R) | Y | Y | U | Y | Y | Y | Y | Y | Y | Y | Y | Y | A- |
| Lt. Governor | 328-9036 | L,P,S | | Matthew Denn (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| Lt. Governor | 563-2665 | | | Cheryl Valenzuela (R) | Y | Y | U | Y | Y | Y | Y | Y | Y | Y | Y | Y | A- |
| Insurance Co. | 559-1434 | P | | Karen Stewart (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| Insurance Co. | 690-2403 | | | Benjamin Mobley (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| **Sussex County:** Clerk of the Peace | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 604-4925 | | | | Brooks Witzke (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 542-5189 | | | | John Brady (D) **X** | - | - | - | N | - | - | - | - | - | Y | - | N | C |
| **Sussex County:** State Senate | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 703-9090 | | L,S,V,P | 6 | Andrew Staton (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 703-2243 | | | 6 | Ernesto Lopez (R) | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | N | B- |
| 422-3460 No Opponent | | | 18 | Gary Simpson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 856-6534 | | | 19 | Jane Hovington (D) | Y | Y* | U | Y | Y | Y | Y | U | Y | Y | Y | Y | B+ |
| 858-0694 | | | 19 | Brian Pettyjohn (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 436-4633 | | | 20 | Richard Eakle (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 539-4140 | | | 20 | Gerald Hocker (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 744-4298 | | | 21 | Robert Venables (D) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 629-9788 | | | 21 | Bryant Richardson (R) | Y | Y | Y | Y | Y | U | Y | Y | Y | Y | Y | Y | A |
| **Sussex County:** State Representatives | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 227-6252 | | L,S,P | 14 | Peter Schwartzkopf (D)**X** | N | - | N | - | N | N | Y | - | N | - | - | N | F |
| 231-2202 | | | 14 | Margaret Melson (L) | Y | Y | N | Y | N | Y* | N | Y | Y | Y | Y | N* | C+ |
| 684-1602 | | S,V | 20 | Marie Mayor (D) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 684-4577 | | | 20 | Stephen Smyk (R) | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | A |
| 422-3454 | | | 35 | David Wilson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 349-5122 | | L | 35 | Ronnie Fitzgerald (L) | Y | N | N | Y | N | N | N | U | Y | Y | Y | N | C- |
| 422-6155 No Opponent | | | 36 | Harvey Kenton (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y* | A+ |
| 947-2984 | | | 37 | Elizabeth McGinn (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 856-2772 | | | 37 | Ruth Briggs King (R) | Y | Y | Y | Y | Y | U* | Y | Y | Y | U* | Y | Y* | A- |
| 539-6738 | | | 38 | Shirley Price (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 436-7024 | | | 38 | Ronald Gray (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 628-5222 No Opponent | | | 39 | Daniel Short (R) | Y | Y | Y | Y | Y | Y | N* | Y | Y | Y | Y | Y | A- |
| 875-5736 | | | 40 | Benjamin Lowe (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 235-9806 | | | 40 | Timothy Dukes (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 745-1587 | | | 41 | John Atkins (D) | Y | Y | Y* | Y* | Y | Y | Y* | Y | Y | Y | Y | Y | A |
| 381-1610 | | | 41 | Richard Collins (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |

| New Castle: State Senate | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 656-2921 | L,P | | Harris McDowell (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 764-2309 | | 1 | Robert Clark (I) | Y | Y | U | Y | Y | U | Y | Y | Y | Y | Y | Y | B+ |
| Not Listed | P | | Brian Lintz (L) | Y | N | N | U | N | Y* | N | U* | U* | Y | - | N | D |
| 425-4148 No Opponent | L,S,P | 2 | Margaret Henry (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 656-7261 No Opponent | L | 3 | Robert Marshall (D) **X** | - | - | N | - | Y | N | Y | - | - | - | Y | Y | C+ |
| 598-3194 | L,S,P | 4 | Michael Katz (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 478-6128 | | | Gregory Lavelle (R) **X** | Y | - | Y | Y | - | - | Y | - | Y | - | - | - | B |
| 439-0992 | L,S,P | 5 | Christopher Counihan (D)**X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 478-9616 | P | | Catherine Cloutier (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 994-4843 | L,S,P | 7 | Patricia Blevins (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| Not Listed | | | James Christina (L) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 239-2193 | L,S,P | 8 | David Sokola (D) **X** | - | - | N | - | N | N | N | - | - | - | N | N | F |
| 894-4591 | | | William Stritzinger (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 999-7522 No Opponent | L,S | 9 | Karen Peterson (D) **X** | - | - | N | - | N | N | Y | - | - | - | - | N | D |
| 378-8386 No Opponent | L,P | 10 | Bethany Hall-Long (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 709-1516 | L | 11 | Bryan Townsend (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 754-1787 | | | Evan Queitsch (R) | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 562-2106 | L,S,P | 12 | Nicole Poore (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 328-8944 | P | | Dorinda Connor (R) **X** | - | - | Y | - | - | - | N | - | - | - | - | N | C- |
| 322-6100 No Opponent | L | 13 | David McBride (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 653-7566 | P | 14 | Bruce Ennis (D) | Y | Y | Y | U | Y | U | N | U | Y | U | Y | Y | B |
| 378-6036 | | | Scott Unruh (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| **New Castle:** State Representatives | | | | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **Grade** |
| 762-8322 No Opponent | | 1 | Charles Potter (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 428-1269 No Opponent | L,S | 2 | Stephanie Bolden (D) **X** | N | - | N | N | - | N | N | - | Y | - | - | - | C |
| 655-7071 No Opponent | L,S,P | 3 | Helene Keeley (D) **X** | N | - | N | - | N | N | Y | - | N | - | - | N | D |
| 655-1373 No Opponent | L | 4 | Gerald Brady (D) **X** | N | - | N | Y | N | N | N | - | N | - | Y | N | C- |
| 832-1956 No Opponent | L,S | 5 | Melanie Smith (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| Not Listed | L,S,P | 6 | Debra Heffernan (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 478-4754 | | | Eric Taylor (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 475-2252 | L,S | 7 | Bryon Short (D) **X** | N | - | N | - | N | N | Y | - | N | - | - | N | D |
| 798-0960 | | | Daniel Lepre (R) | Y | N* | N | Y | N* | N | Y | Y | Y | Y | Y | U* | C |
| 378-2681 | L | 8 | Quinton Johnson (D) **X** | Y | - | N | N | N | N | N | - | N | - | - | N | D |
| 919-900-0401 | | | Matthew Brown (R) | Y* | U* | U* | Y* | Y* | Y | N* | Y | Y | Y | Y* | Y | B+ |
| 293-2356 No Opponent | L,P | 9 | Rebecca Walker (D) **X** | Y | - | N | N | N | N | N | - | N | - | - | N | D |
| 373-0115 | L,S | 10 | Dennis Williams (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 478-4763 | | | Robert Rhodunda (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 653-8247 | | 11 | Lynne Newlin (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 526-2267 | | | Jeffrey Spiegelman (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 651-9571 No Opponent | P | 12 | Deborah Hudson (R) **X** | Y | - | Y | Y | Y | N | Y | - | Y | - | Y | Y | B+ |
| 995-1803 No Opponent | L | 13 | John Mitchell (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 562-6640 | L,S,P | 15 | Valerie Longhurst (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| Not Listed | | | Amy Merlino (L) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 322-3521 | L,P | 16 | James Johnson (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 985-7025 | P | | John Machurek (L) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 322-1249 | L,P | 17 | Michael Mulrooney (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 395-1998 | | | Laura Brown (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 368-7257 No Opponent | L,S,P | 18 | Michael Barbieri (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 633-1289 | L,S | 19 | Kimberly Williams (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 999-8191 | | | Dennis Cini (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 584-8601 No Opponent | L | 21 | Michael Ramone (R) **X** | Y | - | N | Y | - | - | N | - | Y | - | Y | - | C+ |
| 983-2622 | L,S,P | 22 | David Ellis (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 454-1840 | | | Joseph Miro (R) | Y | U* | Y* | Y* | Y | N* | N* | Y | Y | Y | Y* | Y | B |
| 562-4546 | L,S,P | 23 | Paul Baumbach (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 731-9766 | | | Mark Doughty (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 292-8903 No Opponent | L,S,P | 24 | Edward Osienski (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 547-9351 No Opponent | L,S,P | 25 | John Kowalko (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 832-2209 No Opponent | L,P | 26 | John Viola (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 834-9231 No Opponent | L,S | 27 | Earl Jaques (D) **X** | Y | - | N | Y | N | N | Y | - | N | - | - | N | C |

## STATE QUESTIONS:

1. Do you support the right of parents to choose what services their children may receive at school-based wellness centers?
2. Do you support tax incentives to encourage natural marriage and incent married couples to stay together as a solution to reducing poverty and dependency on government services?
3. Do you oppose same-sex civil union legislation?
4. Do you support parental consent of abortion for minors under the age of 18? (HB80)
5. Do you support strengthening and maintaining marriage as the union of one man and one woman?
6. Do you oppose adding "gender identity or gender expression" to the protected classes in Delaware's anti-discrimination laws for housing, employment, and public accommodation?
7. Do you oppose legislation that includes legalizing internet gambling as a means to increase state revenue and provide jobs?
8. Do you oppose prohibiting coverage for abortion in the state insurance exchanges mandated by the new federal healthcare law?
9. Do you support an annual inspection of abortion clinics for unsafe and unsanitary conditions?
10. Do you oppose using taxpayer money to fund Planned Parenthood and other organizations that provide abortion services?
11. Do you support a policy that ensures parental guardian notification prior to the introduction or instructional use of classroom curriculum or materials, whether brought or introduced by school educators, administrators, and officials, or by guests invited at their request, which involve human sexual education, human sexuality issues, sexual acts, family planning, profanity, drugs, or alcohol?
12. Do you support a Delaware Marriage Protection Amendment defining marriage between a man and a woman in the state constitution? (It does not ban civil unions. SS1 for SB27 2009)

| **Kent County: Clerk of the Peace** | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 335-3392 | | | Loretta Wootten (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 730-0454 | | | Mary McVay (L) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |

| **Kent County:** State Senate | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 653-7566 | | 14 | Bruce Ennis (D) | Y | Y | Y | U | Y | U | N | U | Y | U | Y | Y | B |
| 378-6036 | | | Scott Unruh (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 270-2012 | | 15 | Kathleen Cooke (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 492-1155 | | | Dave Lawson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 698-0960 | | 16 | Colin Bonini (R) | Y | Y | Y | Y | Y | Y | N* | Y | Y | Y | Y | Y | A- |
| 697-1740 | | | Michael Tedesco (I) **X** | - | - | - | - | - | - | - | - | - | - | Y | Y | B- |
| 674-5442 No Opponent | L,S | 17 | Brian Bushweller (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 422-3460 No Opponent | | 18 | Gary Simpson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |

| **Kent County:** State Representatives | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 653-8247 | | 11 | Lynne Newlin (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 526-2267 | | | Jeffrey Spiegelman (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 653-8642 | | 28 | William Carson (D) **X** | Y | - | Y | - | Y | - | N | - | N | - | Y | Y | B |
| 242-4253 | | | Christopher Sylvester (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 659-5850 | L,P | 29 | Charles Paradee (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 659-3436 | | | Lincoln Willis (R) | Y | U* | Y | Y | Y | Y* | N | Y* | Y | Y | Y | Y | A- |
| Not Listed | | 30 | William Outten (R) | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | A+ |
| 272-1373 | | | Gordon Smith (L) | Y | Y | N | Y | Y | N | U | Y | Y | Y | Y | U | C+ |
| 735-1781 | L,S,P | 31 | Darryl Scott (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 222-2577 | | | Samuel Chick (R) | Y | U* | Y* | Y | N* | Y | Y* | Y | Y* | Y | Y* | N* | B |
| 545-0198 | | 32 | Andria Bennett (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 697-8271 | | | Ellis Parrott (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | A |
| 335-5633 | | 33 | John Robbins (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 335-4261 | | | Harold Peterman (R) | Y | Y | Y | Y | Y | Y | N | U | Y | U | U | Y | B+ |
| 697-2554 | S | 34 | Theodore Yacucci (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 697-6723 | | | Donald Blakey (R) | Y | Y | Y | Y | Y | N | N | U | U | Y | Y | Y | B |

**Color Key**
- Family Advocate (green)
- Needs Improvement (yellow)
- Hostile (red)

**Answer Key**
- **Y** = Yes, **Pro-Family Position**
- **N** = No, **Anti- Family Position**
- **U** = **Undecided**
- **X** = **Candidate failed to respond**, information compiled from other sources listed online at www.delawarefamilies.org
- * = **Additional Comments** or voting record online at www.delawerefamilies.org
- **–** = **Failed to respond/Position Unknown**

**Party Key**
- **D**= Democrat
- **R**= Republican
- **L**= Libertarian
- **I** = Independent

**Endorsements/Ranking Key**
- **L** = Delaware Liberty Fund LGBT
- **S** = Stonewall Democrats
- **V** = Gay and Lesbian Victory fund
- **P** = Scored more than 60% Pro- Choice on Planned Parenthood's Survey

# EXHIBIT E

# Mailers promote mayoral hopeful through loophole

The News Journal - Wilmington, Del.
Author: Staub, Andrew
Date: Aug 31, 2012
Start Page: n/a
Section: Government & Politics

**Document Text**

The News Journal

A mystery group led by out-of-state political operatives is spending money in the Wilmington mayoral race, paying for three glossy mailers that pump up Bill Montgomery's public safety proposals and attack state Rep. Dennis P. Williams.

Montgomery appears to benefit most from the group's efforts, promoting his favored Safe Communities program, although he said he has no idea who is behind it.

"They stress a program that's near and dear to me," he said. "Do they upset me? No. Somebody obviously has an interest in Safe Communities and in stopping violence. I was surprised to see them. I can't say I'm upset by them."

Montgomery said he doesn't support anonymous donors spending money on campaigns, but he has no plans to investigate whose money is behind the brochures mailed to voters two weeks before the Sept. 11 primary.

The tactic, far more common in federal and state elections, has caught some off guard. It's clear the practice has filtered down to the local level, and that raises accountability issues, said Theo Gregory, a former city councilman with nearly three decades of political experience.

"It's contagious. It's like a cancer," said Gregory, who is running unopposed for City Council president.

The materials identify Citizens for a Secure Community as the group behind the mailings. The group uses a Wilmington address identified by The News Journal as a rented mail space at The Neighborhood Mailbox. The mailings include few details other than a phone number, email address and a website that offers little information.

Messages left at the phone number and email address were not returned.

Voters may never know who is paying for the mailings because the group is using a loophole in Delaware's election laws.

Because Citizens for a Secure Community did not endorse Montgomery or coordinate with him on the mailings and only promotes issues in the mailings, the advertisements are not considered campaign literature under state law, said Elaine Manlove, the state elections commissioner. The group does not qualify as a political action committee and does not have to file a campaign finance report, she said.

As currently constructed, Delaware law has a "weird loophole" in which third-party groups can avoid disclosure requirements if they do not expressly advocate for a candidate's election or defeat with "magic words" such as "vote for" or "don't vote for," said Andrew Lippstone, the deputy legal counsel for Gov. Jack Markell.

That will change next year, when a new law goes into effect. Signed by Markell earlier this month, it will close the loophole by requiring the reporting of "electioneering communications," defined as campaign advertisements that "refer to a clearly identified candidate" and are distributed within 30 days before a primary and 60 days before a general election.

While the name Citizens for a Secure Community connotes a grass-roots organization of concerned Wilmington residents, The News Journal discovered that the group is incorporated in Texas and led by conservative-leaning political operatives based in Nevada, Ohio and Texas.

Jeffrey S. Bensing is listed as president and treasurer of Citizens for a Secure Community on one of the mailers. He previously served as chief of staff to former U.S. Sen. John Ensign, a Nevada Republican, and now runs a consulting

firm with offices in Reno, Nev., and Washington, D.C. He did not return phone messages seeking comment.

Another director of Citizens for a Secure Community, James Nathanson, answered the phone number listed for JSN Associates, a political and advocacy consulting firm in Dayton, Ohio. He first said he was "never involved" with the group but later acknowledged his association when told that Texas Department of State records showed him as a director.

In explaining his confusion, Nathanson said that the group recently changed its name and that he believed it previously operated as Freedom Vote. Nathanson said he was unaware of any political activity in Delaware.

"I have not been informed of involvement, but that doesn't mean that the involvement has not happened," he said.

Freedom Vote is a nonprofit advocacy group that worked to register voters in Ohio and promoted economic policy, fiscal responsibility and job growth. It took in more than $1.3 million from July to September 2010 and spent more than $1.2 million in the same period, mostly on "issues education" and voter registration, according to IRS documents.

Citizens for a Secure Community was incorporated as a Texas nonprofit in April 2011. The group's Wilmington mailers distributed in the mayor's race clearly benefit Montgomery but at no cost to his campaign. Ed Osborne, a Williams supporter who has helped with the candidate's publicity efforts, said a similar mailing cost his candidate's campaign about $6,000.

One of the group's mailers declares "there's no time to wait" for the Safe Communities program, noting the city's rising number of homicides. One includes a photo of Montgomery that identifies him only as a "Wilmington resident" and the other mailer thanks him for supporting the strategy that targets the worst criminals and offers social services to lower-level offenders.

The advertisements neither identify Montgomery as a candidate for mayor nor expressly urge his election.

Montgomery, the former chief of staff to Mayor James M. Baker, noted the photos used in the mailings were from his campaign website and his Facebook page.

A third mailer takes a more direct approach in attacking Williams for past tax delinquencies. "In tough economic times, does Wilmington really need a mayor who can't pay his taxes?" the ad asks, displaying Williams as a caricature of a politician surrounded by cash.

Williams, who has said he fell behind while paying his mother's medical bills, called the brochures attacking him "cowardly" in a message on his Facebook page. On Thursday, he called them an act of "desperation."

"We're just going to take the high road, and we're going to keep moving," he said.

Sam Hoff, a political science professor at Delaware State University, wonders if they'll play well with state residents who have embraced a culture of increased transparency while often bristling at outside involvement.

"That's not something that Delawareans normally like to see," he said.

The mayoral mailers aren't the only example of third-party advertising playing a role this election cycle.

Last week, Manlove ruled Ernesto Lopez, one of two Republican candidates for the 6th Senate District in Sussex County, had to list about $28,000 in television advertising from a third-party group, The Project to Restore America, on his campaign finance report as an in-kind receipt and expenditure.

Lopez helped plan the content and appeared in the commercials, which advocated his candidacy, not issues, Manlove wrote in an Aug. 24 letter.

She decided that Lopez would have to reimburse Restore American for the ads - minus the maximum allowed contribution of 600 - and that he could not buy further advertising until satisfying the debt.

Contact Andrew Staub at 324-2837, on Twitter @AndrewStaubTNJ or at astaub@delawareonline.com.

ID_Code: BL-308310030

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

**Abstract** (Document Summary)

The News Journal A mystery group led by out-of-state political operatives is spending money in the Wilmington mayoral race, paying for three glossy mailers that pump up Bill Montgomery's public safety proposals and attack state Rep. Dennis P. Williams. Voters may never know who is paying for the mailings because the group is using a loophole in Delaware's election laws. Because Citizens for a Secure Community did not endorse Montgomery or coordinate with him on the mailings and only promotes issues in the mailings, the advertisements are not considered campaign literature under state law, said Elaine Manlove, the state elections commissioner.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STRONG FAMILIES,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH R. BIDEN III, in his official capacity as Attorney General of the State of Delaware; and<br><br>ELAINE MANLOVE, in her official capacity as Commissioner of Elections for the State of Delaware,<br><br>Defendants. | Civil Action No. 1:13-cv-1746-SLR |

**DECLARATION OF MIMI MURRAY DIGBY MARZIANI**

I, Mimi Murray Digby Marziani, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration to accompany Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.
2. I am currently an associate at Sullivan & Cromwell LLP in New York.
3. From September 2009 until December 2012, I was a counsel at the Brennan Center for Justice at New York University School of Law.
4. In that capacity, I testified before the Delaware House Administration Committee on May 2, 2012, in support of the Delaware Elections Disclosure Act.

5. Attached to this declaration as Exhibit A is a true and correct copy of the written statement I submitted to the Committee for that hearing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 5, 2014

/s/ Mimi Murray Digby Marziani
Mimi Murray Digby Marziani

# EXHIBIT A

BRENNAN CENTER FOR JUSTICE

Brennan Center for Justice
*at New York University School of Law*

161 Avenue of the Americas
12th Floor
New York, New York 10013
212.998.6730 Fax 212.995.4550
www.brennancenter.org

**Testimony of**
**MIMI MURRAY DIGBY MARZIANI[1]**

**Submitted to the**
**HOUSE ADMINISTRATION COMMITTEE**

**For the hearing on**
**HB 300: DELAWARE ELECTIONS DISCLOSURE ACT**
**May 2, 2012**

I appreciate the opportunity to testify today and express my strong support for the Delaware Elections Disclosure Act, which would enhance transparency in Delaware's elections.

Robust disclosure of money in politics is an essential component of a healthy democracy. Voters have a right to know the identities of those seeking to influence their vote. Moreover, disclosure deters corrupt, back-room dealings and enables regulators to detect violations of other campaign finance laws, like contribution limits.

Delaware's current campaign finance disclosure regime has not been updated to meet the challenges of modern elections, and it lags behind the laws of many other states. The Delaware Elections Disclosure Act (the "Act") is necessary to bring Delaware elections into the twenty-first century.

## The Act Would Modernize Delaware Elections

Since *Citizens United v. FEC*[2] lifted restrictions on independent spending in US elections, outside parties, including business corporations, unions, and Super PACs, have spent astronomical sums on campaign advertisements in both federal and state elections. In the 2010 federal elections, for example, outside groups spent a total of $294 million on political advertising—an increase of more than 400 percent compared with the previous midterm cycle.[3] Similarly, an analysis of just 20 states showed that at least $193 million was spent independent of campaigns during their 2009 and 2010

[1] Mimi Marziani serves as counsel for the Brennan Center's Democracy Program where her work focuses on money in politics and voting rights.
[2] 130 S. Ct. 876 (2010).
[3] *See* PUBLIC CITIZEN, 12 MONTHS AFTER: THE EFFECTS OF *CITIZENS UNITED* ON ELECTIONS AND THE INTEGRITY OF THE LEGISLATIVE PROCESS 9 (2011).

state elections—a 14% increase from the comparable 2005-2006 cycle.[4] Delaware has not been immune to this influx of new money. In 2010, for instance, outside groups—many funded by out-of-state interests—spent over $1.7 million dollars to influence the results of the state's US Senate race.[5]

As third parties play an increasingly central role in American elections, it becomes even more important that strong disclosure laws promote accountability and deter corruption. To be effective, such laws must be broad enough to capture a significant amount of political spending and rigorous enough to provide useful information to the public. The Act would further these goals in three main ways.

*Regulating Electioneering Communications*

First, the Act would mend a gaping hole in existing state law by regulating "electioneering communications"—campaign advertisements that target candidates right before an election, but escape disclosure by avoiding the "magic words" of express advocacy like "vote for" or "vote against" that have traditionally triggered disclosure requirements. Over the years, sophisticated players have had little trouble avoiding these magic words and thereby shielding their campaign spending from public scrutiny. Recognizing the problem of so-called sham issues ads in federal elections, the Supreme Court wryly noted that one cannot "satisfactorily answer the question of how 'uninhibited, robust, and wide-open' speech can occur when organizations hide themselves from the scrutiny of the voting public."[6]

State elections nationwide have experienced similar issues, and Delaware is no exception. In 2010, for instance, many Delawareans received colorful mailings about several state legislative candidates, largely attacking them for their stance on taxes. The mailings listed a P.O. Box in Newark, but no other identifying information. And, because the cards carefully never told recipients to "vote against" any candidate, state law did not require those responsible for funding this effort to publically report their spending.[7]

Accordingly, over the last decade, federal law and the laws of twenty-one states have been extended to regulate electioneering communications. Delaware should follow suit, and likewise expand the scope of its disclosure regime to capture these ubiquitous campaign ads.

*Enhancing Reporting Requirements*

Second, the Act would require prompt disclosure from third parties spending significant amounts on independent expenditures and/or electioneering communications. Specifically, within twenty-four

---

[4] *See* National Institute of Money in State Politics, *Independent Spending's Role in State Elections: 2005-2010*, FOLLOWTHEMONEY.ORG (March 15, 2012), http://www.followthemoney.org/press/PrintReportView.phtml?r=481.
[5] Center for Responsive Politics, *2010 Race: Delaware Senate, Outside Spending*, OPENSECRETS.ORG (last visited April 30, 2012), http://www.opensecrets.org/races/indexp.php?cycle=2010&id=DES2.
[6] *McConnell v. FEC*, 540 U.S. 93, 197 (2003) (citation omitted).
[7] *See* Celia Cohen, *None of Your Business Who Paid for This Ad*, DELAWAREGRAPEVINE.COM (Oct. 27, 2010), http://www.delawaregrapevine.com/10-10PObox.asp.

hours of spending $500 or more on campaign advertisements right before an election,[8] outside spenders would have to file a report with information about their political spending and a list of everyone who has recently donated more than $100 to them. If more than $1,200 of the underlying funds came from a non-human entity, a representative from that entity must also be identified. Thereafter, the Elections Commission will post the spending report online.

Disclosing information about the spender, the target of their spending, and the people or entities providing the underlying funding is necessary to paint a full and accurate picture of election spending in Delaware. Otherwise, corporate or other political actors seeking to veil their involvement in partisan politics may seek to funnel their funds through another organization, evading meaningful disclosure and thus any public accountability. This, too, has been a substantial problem nationwide.[9]

Delaware thus has a strong interest in joining with the numerous other states that require robust disclosure of outside spending, including information about underlying donors.[10]

*Requiring Spenders to Stand by their Advertisements*

Finally, the Act would require outside spenders to stand by their advertisements, just like candidates must do. As the *Citizens United* Court explained, stand-by-your-ad requirements are necessary to "insure that . . . voters are fully informed about the person or group who is speaking," and "avoid confusion by making clear that the ads are not funded by a candidate or political party."[11] And so, federal law and the laws of thirty-eight states include disclaimer requirements as part of their campaign finance regimes.

In addition to mandating that groups include their name on the face of campaign ads, the Act would require a link to the Election Commission's website, where a voter can easily learn more about the spender and its funders. This is of vital importance; too often the name on the face of an ad is that of a benign-sounding group that obscures who is running, the organization and how it obtains its funding. Examples of this problem abound in state elections nationwide:

---

[8] If the $500 threshold is reached more than 30 days before a primary or special election, or 60 days before a general election, spenders have forty-eight hours to file their report.

[9] Indeed, in the 2010 federal elections, an estimated $135 million was spent by groups that did not provide any information about their sources of money. 12 MONTHS AFTER, *supra* note 3, at 10. And, of the ten highest spending outside groups that year, seven disclosed nothing about their contributors—even though they collectively accounted for nearly half of all outside spending. *Id.*

[10] Many states that are close to Delaware in population and geographic distance have similar requirements. For states with similar total population, *see, e.g.*, Haw. Rev. Stat. § 11-341(c) (requiring disclosure of *all* underlying donors funding electioneering communications); Alaska Stat. § 15.13.040(d)-(e) (requiring requiring disclosure of *all* underlying donors funding campaign advertisements). For states that are geographically close to Delaware, *see, e.g.*, MD Code Ann., Elec. Law §§ 13-306(e)(5); 13-307(e)(5) (requiring disclosure of underlying donors contributing over $51 to fund campaign advertisements); Mass. Gen. Laws ch. 55, § 18F (requiring disclosure of underlying donors contributing over $250 for electioneering communications). *See also* 2 U.S.C. § 434(f)(2) (mandating disclosure of underlying donors contributing over $1,000 to fund electioneering communications); *Van Hollen v. FEC*, ___ F.Supp.2d ___ , 2012 WL 1066717 (March 30, 2012) (striking down FEC interpretations narrowing scope of underlying disclosure required by § 434(f)(2)).

[11] *Citizens United*, 130 S. Ct. at 915.

- During the 2011 Wisconsin Supreme Court race, a group named "Citizens for a Strong America" funded an advertising blitz against candidate JoAnne Kloppenburg, but provided no public information about its organization, leadership, or funders. The address listed for the group led to a mailbox at a local UPS store and its phone number led to a full voicemail box. Eventually, the Center for Media and Democracy discovered that "Citizens for a Strong America" was controlled by a leader of Americans for Prosperity, a national organization largely funded by billionaire David Koch.[12]

- In a 2010 Colorado ballot measure election, a group called "Littleton Neighbors Voting No," spent $170,000 to defeat a restriction that would have prevented Wal-Mart from coming to town. When the disclosure reports for these groups were filed, however, it was revealed that "Littleton Neighbors" was exclusively funded by Wal-Mart; it was not a grassroots campaign at all.[13]

The Act would prevent this mischief by giving curious voters a link where they can quickly and easily access the outside spender's campaign finance report, with full information about a spender's identity, their spending decisions, and the source of their funds.

**The Act Stands on Firm Constitutional Ground**

For more than three decades—from *Buckley v. Valeo*,[14] upholding the post-Watergate regulation of money and politics in 1976, through *McConnell v. FEC*,[15] upholding the Bipartisan Campaign Reform Act's ("BCRA") disclosure requirements in 2003, to *Citizens United* [16]and beyond—the US Supreme Court has consistently and repeatedly held laws requiring the robust disclosure of money in politics. Moreover, the Court has twice upheld the specific reforms that are central to HB 300—mandating robust disclosure of electioneering communications and disclaimers on the face of campaign advertisements.[17] This unbroken chain of precedent leaves no doubt that the Act is constitutional.

In *Buckley v. Valeo*, the Court explained that campaign finance disclosure serves three vital governmental interests:

---

[12] Lisa Graves, *Group Called "Citizens for a Strong America" Operates out of a UPS Mail Drop but Runs Expensive Ads in Supreme Court Race?*, PRWATCH.ORG (Apr. 2, 2011, 6:37 PM), http://www.prwatch.org/news/2011/04/10534/group-called-citizens-strong-america-operates-out-ups-mail-drop-runs-expensive-ad.

[13] *See* Def.'s Response Br. to Pls.' Motion for Summary Judgment, Sampson v. Coffman, 06-cv-01858 at 43-44 (D. Co. 2007) (Dkt. #34).

[14] 424 U.S. 1 (1976).

[15] 540 U.S. at 194-96.

[16] 130 S. Ct. at 914-16.

[17] *See Citizens United*, 130 S. Ct. at 914-16; *McConnell*, 540 U.S. at 194-96. Under federal law, an electioneering communication is "any broadcast, cable, or satellite communication that (1) Refers to a clearly identified candidate for Federal office; (2) Is publicly distributed within 60 days before a general election for the office sought by the candidate; or within 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate, and the candidate referenced is seeking the nomination of that political party; and (3) Is targeted to the relevant electorate . . . ." Electioneering Communication, 11 C.F.R. § 100.29(a) (2011). *See also* 2 U.S.C. § 434(f)(3).

> (1) "disclosure provides the electorate with information as to where political campaign money comes from and how it is spent;" (2) "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity;" and (3) "disclosure requirements are an essential means of gathering the data necessary to detect violations" of other campaign finance regulations.[18]

The *Buckley* court went on to find these interests important enough to justify any incidental burdens on political speech that disclosure requirements could cause. In 2003, the *McConnell* Court reaffirmed this triumvirate of governmental interests by upholding the reporting and disclaimer requirements for electioneering communications in BCRA.

More recently, in *Citizens United*, eight justices voted to uphold BCRA's disclosure requirements as applied to a politically-active nonprofit, Citizens United. In doing so, the Court explained that even if "[d]isclaimer and disclosure requirements may burden the ability to speak, . . . they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking." [19] And, the Court made clear that laws of this nature further important First Amendment values, and are necessary components of our electoral process:

> The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.[20]

Since *Citizens United*, lower federal courts—from Washington to Florida and from Maine to Hawaii—have consistently and repeatedly upheld state campaign finance disclosure laws that target outside spending.[21] Over and over, these courts have stressed the importance of robust

---

18 424 U.S. at 66-68 (citations and internal quotation marks omitted).

19 130 S. Ct. at 914 (citations and internal quotation marks omitted).

20 *Id.* at 916.

21 *See, e.g.*, *Family PAC v. McKenna*, Nos. 10–35832, 10–35893, 2012 WL 266111, at *6 (9th Cir. Jan. 31, 2012) (upholding Washington's $25 and $100 disclosure thresholds for reporting information about contributors to political committees that support ballot measures); *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 118 (1st Cir. 2011) (finding that Rhode Island's "relatively small imposition" for disclosing information about independent expenditures is related to government interest in providing electorate with key information); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 41 (1st Cir. 2011) (upholding Maine's political committee financial disclosure requirements and finding that provisions "neither erect a barrier to political speech nor limit its quantity"), *aff'd* No. 11-1196, 40 (1st Cir. Jan. 31, 2012) (finding that "ballot question committee" law, like PAC laws, are constitutional and that "transparency is a compelling objective"), *cert. denied*, No. 11-559 (U.S. Feb. 27, 2012); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1013 (9th Cir. 2010) (upholding Washington's political committee financial disclosure requirements and noting, "indeed, it is the Supreme Court's decision in *Citizens United* . . . that provides the best guidance regarding the constitutionality of the Disclosure Law's requirements."); *Justice v. Hosemann*, No. 3:11-CV-138-SA-SAA, 2011 WL 5326057, at *14 (N.D. Miss. Nov. 3, 2011) (holding that Mississippi's disclosure forms are not "overly intrusive" and that $200 threshold amount is rational and substantially related to government's important informational interest); *ProtectMarriage.com v. Bowen*, No. 2:09-CV-00058-MCE-DAD, 2011 WL 5507204, at *18 (E.D. Cal. Nov. 4, 2011) (finding that alleged harassment related to financial support of Proposition 8 did not warrant exception from California's general disclosure laws); *Nat'l Org. for Marriage, Inc. v. Roberts*, 753 F.Supp.2d 1217, 1222 (N.D. Fla. 2010)

transparency of money in state politics. For instance, as the Ninth Circuit Court of Appeals explained, upholding Washington state disclosure laws:

> Campaign finance disclosure requirements . . . advance the important and well-recognized governmental interest of providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas. An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another.[22]

********

For the reasons set forth above, the reforms contained in HB 300 should be embraced by the House Administration Committee and recommended to the General Assembly for prompt passage.

---

(finding that Florida disclosure requirements connected to "electioneering communications organizations" "would not prohibit [plaintiff] from engaging in its proposed speech"); *Yamada v. Kuramoto*, No. 10-00497 JMS/LEK, 2010 WL 4603936, at *1 (D. Haw. Oct. 29, 2010) (finding that "*Citizens United* also endorsed disclosure" and upholding Hawaii's disclosure regime); *Iowa Right to Life Comm., Inc. v. Smithson*, 750 F.Supp.2d 1020, 1026 (S.D. Iowa 2010) (finding "under *Citizens United*, '[t]he Government may regulate corporate political speech through disclaimer and disclosure requirements'" and upholding Iowa disclosure regime (alteration in original)); *Wis. Club for Growth, Inc. v. Myse*, No. 10-cv-427-wmc, 2010 WL 4024932, at *5 (W.D. Wis. Oct. 13, 2010) (refusing to enjoin Wisconsin's disclosure regulations; noting "[P]laintiffs' reliance on *FEC v. WRTL* ignores the Supreme Court's later treatment of disclosure and disclaimer regulations in *Citizens United*"); *Ctr. for Individual Freedom v. Madigan*, 735 F. Supp. 2d 994, 1000 (N.D. Ill. 2010) (upholding Illinois' registration, disclosure, and reporting provisions; noting "in *Citizens United*, the Supreme Court expressly rejected the contention that election-law disclosure requirements are limited to express advocacy or its functional equivalent"). *See also SpeechNow.org v. FEC*, 599 F.3d 686, 696–97 (D.C. Cir. 2010) (upholding federal disclosure requirements for organizations making independent expenditures; finding "*Citizens United* upheld disclaimer and disclosure requirements for electioneering communications as applied to Citizens United, again citing the government's interest in providing the electorate with information").

[22] *Brumsickle*, 624 F.3d at 1008.

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STRONG FAMILIES,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH R. BIDEN III, in his official capacity as Attorney General of the State of Delaware; and<br><br>ELAINE MANLOVE, in her official capacity as Commissioner of Elections for the State of Delaware,<br><br>Defendants. | Civil Action No. 1:13-cv-1746-SLR |

**DECLARATION OF LIANE SORENSON**

I, Liane Sorenson, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration to accompany Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.

2. I recently retired from public life but remain active as a volunteer for several community organizations.

3. I served for twenty years as an elected official in the Delaware General Assembly, including eighteen years as a member of the State Senate.

4. I was elected to the Delaware House of Representatives in 1992.

5. I was elected to the Delaware Senate in 1994.

6. My Senate district, the Sixth District, covered primarily North Wilmington until the redistricting preceding the 2002 election cycle. In 2002, my district shifted southwest to cover most of municipal Newark.

7. I was re-elected to the Senate in 1998, 2002, 2004, and 2008.

8. I chose not to run for re-election in 2012.

9. During my last ten years in the Senate, I served in the Republican leadership as Minority Whip.

10. In that capacity, I was frequently involved in other Republican Senators' re-election campaigns.

11. Delaware Senators run for re-election in staggered classes, so three or four incumbent Republican senators came up for re-election in any given election year. I had some degree of involvement in each of these campaigns.

12. I voted in favor of the Delaware Elections Disclosure Act on June 6, 2012, when the Act passed the Senate by a unanimous 21-0 vote.

13. Disclosure enables voters to evaluate the credibility of political messages in light of the track record and interests of those behind them.

14. In my experience, if voters know who is funding political advertisements, that information affects their evaluation of the message.

15. It is important that this disclosure cover all ads that refer to a candidate by name during the run-up to an election.

16. I have seen many electioneering "issue ads"—that is, communications that refer to a candidate or candidates but do not include an express voting appeal—disseminated during the closing days of elections in which I have been involved.

17. I have also seen many such communications aired by campaigns in neighboring states.

18. In my experience, communications that mention candidates during the run-up to an election affect voting behavior. That is why groups put out these communications.

19. Referring to a candidate by name ties the advertisement to the upcoming election and creates a positive or negative association in voters' minds. Those impressions often carry over into the voting booth.

20. Voters are smart enough to understand the subtext of these communications. When a communication criticizes or supports a position taken by a candidate in an impending election, voters understand that they are being urged to vote, respectively, against or for the candidate.

21. In my experience, disclosure of who is funding election-related communications allows voters to evaluate political messages in light of the interests and credibility of those who are funding them.

22. Voters may give more weight to a message about Delaware legislation if it is funded by a grassroots group of fellow citizens; they may give the same message less weight if it is funded by out-of-state activists or a corporation with a financial interest in the issue.

23. For example, voters would likely give less weight to an anti-gun-control message if they knew that it was funded by the firearm industry. They might give the same message more weight if it was funded by a local hunting club.

24. Unlike bans on speech, disclosure laws increase the quantity of information available to voters.

25. By helping voters evaluate the messages they receive during an election campaign, disclosure improves the functioning of the marketplace of ideas, and reduces the likelihood that voters will be misled about the information they receive.

26. Disclosure also informs the public as to what interests are spending money to affect the outcome of elections.

27. This information improves the electoral process and increases accountability for elected officials. Full disclosure of who is supporting a candidate during the campaign allows voters to monitor elected officials' post-election behavior and see if they are responding to those funders with favorable legislation.

28. Without the disclosure required by the Act, groups could hide behind anodyne or misleading names to conceal the true source of their funds. Even when a group does not use a misleading name, the identities of those who fund the group's activities provide valuable information to voters.

29. The public's interest in disclosure applies equally to voter guides.

30. During my career, I have been involved in the planning of some voter guides.

31. Voter guides are typically intended to influence voter behavior, and they, in fact, generally do so. Otherwise, organizations would not go to the expense of producing them.

32. In my experience, the public has the same interest in knowing who is funding voter guides as it has in knowing who is funding other kinds of communications intended to influence voter behavior.

33. Many voter guides portray candidates' positions in a positive or negative light depending on whether a candidate agrees with the organization's views. Moreover,

as the term “voter guide” conveys, they all provide information to inform the decisions that voters make when they cast their ballots.

34. Disclosure enables voters to evaluate a voter guide’s portrayal of a candidate’s positions in light of the reputations and motives of those funding the guide.

35. I have reviewed the copy of the voter guide put out by Delaware Strong Families in 2012 that was attached to the complaint as Exhibit A.

36. This voter guide illustrates how election-related communications of this kind, though lacking words of express advocacy, may well influence voters’ choices. The considerations that lead me to that conclusion include (i) the selection and phrasing of the issues or questions, (ii) the document’s self-description as a “Values Voter Guide,” (iii) its statement near the top of the first page that “The stakes couldn’t be higher this election. Our hope is that on November 6th, this Voter Guide will help you choose candidates who represent your values,” and (iv) its identification of Delaware Strong Families as an affiliate of the Delaware Family Policy Council, an organization that expressly supports and opposes candidates.

37. With reference to the first consideration, for example, federal question 7 refers to “The state constitutional amendments preserving natural marriage,” and state question 6 refers to “Strengthening and maintaining marriage as the union of one man and one woman, and not redefining or adding to man/woman marriage.”

38. With reference to the fourth consideration, the Delaware Family Policy Council, for example, put out a “Values Scorecard” in the 2012 election that is similar to Delware Strong Families’ “Values Voter Guide,” but it rated the candidates with letter grades and indicated which candidates it considered “Family Advocates” or “Pro-Family” and which candidates it considered “Hostile” or “Anti-Family.” The Delaware

Family Policy Council's 2012 "Values Scorecard," which was supplied to me by counsel for the Defendants, is attached hereto as Exhibit A.

39. Disclosure would not be effective in Delaware if it did not extend to non-broadcast media.

40. Television advertising is not a realistic option for most Delaware campaigns. Some statewide campaigns and political advertisers use radio, but direct mail and phone messaging are the most common media for election-related advertisements.

41. Direct mail is the most common advertising medium for Delaware political campaigns.

42. During my time as an elected official, direct mail was the primary method by which my campaigns communicated with voters.

43. Because Delaware campaigns purchase so little television advertising, the cost of Delaware campaigns is low relative to the cost in other states in the region.

44. Costs are also low because districts are quite small. My Senate district contained fewer than 50,000 residents; a comparable district in New Jersey contains hundreds of thousands of residents.

45. This means that even a relatively small expenditure can have a significant impact on a Delaware campaign.

46. For that reason, the legislature had a sound basis for setting the threshold for disclosure at $500 of third-party advertising expenditures.

47. A higher threshold would have risked omitting many expenditures that are large enough to affect Delaware campaigns.

48. It is also important that disclosure occur within a short period after an expenditure.

49. Political advertisers are aware of filing deadlines and will time their advertisements to avoid having to submit campaign-finance reports until after the election.

50. I have often seen political advertisers pour money into a race just after the date that would trigger the final campaign-finance report.

51. Without timely disclosure, voters may have no opportunity to evaluate these last-minute electioneering efforts in light of the interests of those funding them.

52. The Disclosure Act's quick filing turnarounds will address this problem by providing disclosure right up until Election Day.

53. During my two decades in elective office, my campaigns filed many campaign-finance reports.

54. Based on that experience, I do not believe that the Act will impose a significant administrative burden on groups subject to its filing and recordkeeping requirements.

55. It is easier than ever to keep the basic records required by the Disclosure Act. Simple software, like Quicken or Excel, can be used to track expenses and contributions. In my experience, most groups that engage in election-related communications use software of this kind to keep records of these sorts.

56. I became familiar with the Commissioner of Elections' electronic-filing system during my last Senate campaign.

57. Electronic filing eliminates the inconvenience of photocopying and trips to the Post Office.

58. I received no compensation for the preparation of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 5, 2014

/s/ Liane Sorenson
Liane Sorenson

# EXHIBIT A

2012 General Election

# Values Scorecard

*A Service of Delaware Family Policy Council*

Delaware Family Policy Council (DFPC) is pleased to present the 2012 Values Scorecard. DFPC is a 501c4 member-driven organization committed to standing for values that strengthen Delaware families.

All candidates were provided a questionnaire and given an equal opportunity to respond and to provide explanations or comments concerning each question. Any additional explanations or comments that were made by candidates are noted with an asterisk (*) next to the answer and can be found our website.

For your convenience, the Voter Scorecard includes phone numbers for all candidates if you wish to call those who failed to respond. Positions for non-responding candidates are based on voting records, public statements, and/or campaign literature.

A printable version of the Voter Scorecard is available on our website **www.delawarefamilies.org**. Please Facebook and share the Voter Scorecard and encourage your friends and family to vote on November 6th.

*Remember, this Voter Scorecard does not address a candidate's character, only their position on issues. It should not take the place of your effort to personally evaluate a candidate.*

The stakes couldn't be higher this election. Our hope is that on November 6th, this Voter Scorecard will help you choose candidates who best represent your values.

*Nicole Theis*

President

Delaware Family Policy Council



## FEDERAL QUESTIONS:

1. Do you oppose taxpayer funding of abortions?
2. Do you oppose giving tax dollars to Planned Parenthood?
3. Do you oppose the federal funding of embryonic stem cell research?
4. Do you support federal legislation prohibiting human cloning of all kinds, both "therapeutic" and "reproductive"?
5. Do you support repealing federal estate tax?
6. Do you support parental rights in education (educational choice)?
7. Do you support the state constitutional amendments preserving natural marriage?
8. Do you support enforcement of the Defense of Marriage Act (DOMA)?
9. Do you support a marriage protection amendment to the U.S. Constitution that defines marriage as the union of one man and one woman?
10. Do you oppose the Federal Employment Non-Discrimination Act?
11. Do you support strict constructionist judges?
12. Do you oppose open homosexuality in the military?
13. Do you support repealing the healthcare law known as "Obamacare"?
14. Do you support protection for institutions, organizations, and individuals from having the government force them to violate their moral or religious beliefs?

| Federal Candidates | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Senate | (202) 905-6706 | Alexander Pires (I) **X** | - | - | - | - | - | - | N | N | N | - | - | N | - | - | D |
| Senate | (202) 224-2441 | Thomas Carper (D) **X** | N | N | N | - | - | - | - | N | N | - | N | N | N | N | F |
| Senate | (302) 339-1763 | Kevin Wade (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| US Congress | (302) 536-9495 | Tom Kovach (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| US Congress | (302) 654-1718 | John Carney (D) **X** | N | N | - | - | - | N | - | N | - | - | - | - | N | - | F |

**Color Key**

- Family Advocate (green)
- Needs Improvement (yellow)
- Hostile (red)

**Answer Key**

- **Y** = Yes, **Pro-Family Position**
- **N** = No, **Anti- Family Position**
- **U** = **Undecided**
- **X** = **Candidate failed to respond**, information compiled from other sources listed online at www.delawarefamilies.org
- ***** = **Additional Comments** or voting record online at www.delawerefamilies.org
- **–** = **Failed to respond/Position Unknown**

**Party Key**

- **D**= Democrat
- **R**= Republican
- **L**= Libertarian
- **I** = Independent

**Endorsements/Ranking Key**

- **L** = Delaware Liberty Fund LGBT
- **S** = Stonewall Democrats
- **V** = Gay and Lesbian Victory fund
- **P** = Scored more than 60% Pro- Choice on Planned Parenthood's Survey

**Explanation of Information**

To find your voting district and contact information on the candidates, go to www.delawarefamilies.org.
This Values Scorecard is for personal distribution. For a 501c3 or church-friendly Voter Guide, please go to www.delawarestrong.org.
To help you make an informed decision, we have included endorsements of organizations that have a mission and agenda opposite of the family values promoted by DFPC. The mission of those organizations can be viewed in the endnotes online.
***The A+ grade is only awarded to incumbents who are proven champions of pro-family legislation. Those who earned an A+ grade are considered Outstanding Family Advocates.***



Paid for by Delaware Family Policy Council | P.O. Box 925 | Seaford, DE 19973

## STATE QUESTIONS:

1. Do you support the right of parents to choose what services their children may receive at school-based wellness centers?
2. Do you support tax incentives to encourage natural marriage and incent married couples to stay together as a solution to reducing poverty and dependency on government services?
3. Do you oppose same-sex civil union legislation?
4. Do you support parental consent of abortion for minors under the age of 18? (HB80)
5. Do you support strengthening and maintaining marriage as the union of one man and one woman?
6. Do you oppose adding "gender identity or gender expression" to the protected classes in Delaware's anti-discrimination laws for housing, employment, and public accommodation?
7. Do you oppose legislation that includes legalizing internet gambling as a means to increase state revenue and provide jobs?
8. Do you support prohibiting coverage for abortion in the state insurance exchanges mandated by the new federal healthcare law?
9. Do you support an annual inspection of abortion clinics for unsafe and unsanitary conditions?
10. Do you oppose using taxpayer money to fund Planned Parenthood and other organizations that provide abortion services?
11. Do you support a policy that ensures parental guardian notification prior to the introduction or instructional use of classroom curriculum or materials, whether brought or introduced by school educators, administrators, and officials, or by guests invited at their request, which involve human sexual education, human sexuality issues, sexual acts, family planning, profanity, drugs, or alcohol?
12. Do you support a Delaware Marriage Protection Amendment defining marriage between a man and a woman in the state constitution? (It does not ban civil unions. SS1 for SB27 2009)

| **Statewide Races** | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Governor | 322-8800 | L,P,S | | Jack Markell (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| Governor | 521-3761 | | | Jeffrey Cragg (R) | Y | Y | U | Y | Y | Y | Y | Y | Y | Y | Y | Y | A- |
| Lt. Governor | 328-9036 | L,P,S | | Matthew Denn (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| Lt. Governor | 563-2665 | | | Cheryl Valenzuela (R) | Y | Y | U | Y | Y | Y | Y | Y | Y | Y | Y | Y | A- |
| Insurance Co. | 559-1434 | P | | Karen Stewart (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| Insurance Co. | 690-2403 | | | Benjamin Mobley (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| **Sussex County:** Clerk of the Peace | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 604-4925 | | | | Brooks Witzke (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 542-5189 | | | | John Brady (D) **X** | - | - | - | N | - | - | - | - | - | Y | - | N | C |
| **Sussex County:** State Senate | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 703-9090 | | L,S,V,P | 6 | Andrew Staton (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 703-2243 | | | | Ernesto Lopez (R) | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | N | B- |
| 422-3460 No Opponent | | | 18 | Gary Simpson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 856-6534 | | | 19 | Jane Hovington (D) | Y | Y* | U | Y | Y | Y | Y | U | Y | Y | Y | Y | B+ |
| 858-0694 | | | | Brian Pettyjohn (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 436-4633 | | | 20 | Richard Eakle (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 539-4140 | | | | Gerald Hocker (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 744-4298 | | | 21 | Robert Venables (D) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 629-9788 | | | | Bryant Richardson (R) | Y | Y | Y | Y | Y | U | Y | Y | Y | Y | Y | Y | A |
| **Sussex County:** State Representatives | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 227-6252 | | L,S,P | 14 | Peter Schwartzkopf (D)**X** | N | - | N | - | N | N | Y | - | N | - | - | N | F |
| 231-2202 | | | | Margaret Melson (L) | Y | Y | N | Y | N | Y* | N | Y | Y | Y | Y | N* | C+ |
| 684-1602 | | S,V | 20 | Marie Mayor (D) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 684-4577 | | | | Stephen Smyk (R) | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | A |
| 422-3454 | | | 35 | David Wilson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 349-5122 | | L | | Ronnie Fitzgerald (L) | Y | N | N | Y | N | N | N | U | Y | Y | Y | N | C- |
| 422-6155 No Opponent | | | 36 | Harvey Kenton (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y* | A+ |
| 947-2984 | | | 37 | Elizabeth McGinn (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 856-2772 | | | | Ruth Briggs King (R) | Y | Y | Y | Y | Y | U* | Y | Y | Y | U* | Y | Y* | A- |
| 539-6738 | | | 38 | Shirley Price (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 436-7024 | | | | Ronald Gray (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 628-5222 No Opponent | | | 39 | Daniel Short (R) | Y | Y | Y | Y | Y | Y | N* | Y | Y | Y | Y | Y | A- |
| 875-5736 | | | 40 | Benjamin Lowe (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 235-9806 | | | | Timothy Dukes (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 745-1587 | | | 41 | John Atkins (D) | Y | Y | Y* | Y* | Y | Y | Y* | Y | Y | Y | Y | Y | A |
| 381-1610 | | | | Richard Collins (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |

| New Castle: State Senate | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 656-2921 | L,P | | Harris McDowell (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 764-2309 | | 1 | Robert Clark (I) | Y | Y | U | Y | Y | U | Y | Y | Y | Y | Y | Y | B+ |
| Not Listed | P | | Brian Lintz (L) | Y | N | N | U | N | Y* | N | U* | U* | Y | - | N | D |
| 425-4148 No Opponent | L,S,P | 2 | Margaret Henry (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 656-7261 No Opponent | L | 3 | Robert Marshall (D) **X** | - | - | N | - | Y | N | Y | - | - | - | Y | Y | C+ |
| 598-3194 | L,S,P | 4 | Michael Katz (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 478-6128 | | | Gregory Lavelle (R) **X** | Y | - | Y | Y | - | - | Y | - | Y | - | - | - | B |
| 439-0992 | L,S,P | 5 | Christopher Counihan (D)**X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 478-9616 | P | | Catherine Cloutier (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 994-4843 | L,S,P | 7 | Patricia Blevins (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| Not Listed | | | James Christina (L) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 239-2193 | L,S,P | 8 | David Sokola (D) **X** | - | - | N | - | N | N | N | - | - | - | N | N | F |
| 894-4591 | | | William Stritzinger (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 999-7522 No Opponent | L,S | 9 | Karen Peterson (D) **X** | - | - | N | - | N | N | Y | - | - | - | - | N | D |
| 378-8386 No Opponent | L,P | 10 | Bethany Hall-Long (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 709-1516 | L | 11 | Bryan Townsend (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 754-1787 | | | Evan Queitsch (R) | Y | Y | Y* | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 562-2106 | L,S,P | 12 | Nicole Poore (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 328-8944 | P | | Dorinda Connor (R) **X** | - | - | Y | - | - | - | N | - | - | - | - | N | C- |
| 322-6100 No Opponent | L | 13 | David McBride (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 653-7566 | P | 14 | Bruce Ennis (D) | Y | Y | Y | U | Y | U | N | U | Y | U | Y | Y | B |
| 378-6036 | | | Scott Unruh (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |

| New Castle: State Representatives | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 762-8322 No Opponent | | 1 | Charles Potter (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 428-1269 No Opponent | L,S | 2 | Stephanie Bolden (D) **X** | N | - | N | N | - | N | N | - | Y | - | - | - | C |
| 655-7071 No Opponent | L,S,P | 3 | Helene Keeley (D) **X** | N | - | N | - | N | N | Y | - | N | - | - | N | D |
| 655-1373 No Opponent | L | 4 | Gerald Brady (D) **X** | N | - | N | Y | N | N | N | - | N | - | Y | N | C- |
| 832-1956 No Opponent | L,S | 5 | Melanie Smith (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| Not Listed | L,S,P | 6 | Debra Heffernan (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 478-4754 | | | Eric Taylor (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 475-2252 | L,S | 7 | Bryon Short (D) **X** | N | - | N | - | N | N | Y | - | N | - | - | N | D |
| 798-0960 | | | Daniel Lepre (R) | Y | N* | N | Y | N* | N | Y | Y | Y | Y | Y | U* | C |
| 378-2681 | L | 8 | Quinton Johnson (D) **X** | Y | - | N | N | N | N | N | - | N | - | - | N | D |
| 919-900-0401 | | | Matthew Brown (R) | Y* | U* | U* | Y* | Y* | Y | N* | Y | Y | Y | Y* | Y | B+ |
| 293-2356 No Opponent | L,P | 9 | Rebecca Walker (D) **X** | Y | - | N | N | N | N | N | - | N | - | - | N | D |
| 373-0115 | L,S | 10 | Dennis Williams (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 478-4763 | | | Robert Rhodunda (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 653-8247 | | 11 | Lynne Newlin (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 526-2267 | | | Jeffrey Spiegelman (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 651-9571 No Opponent | P | 12 | Deborah Hudson (R) **X** | Y | - | Y | Y | Y | N | Y | - | Y | - | Y | Y | B+ |
| 995-1803 No Opponent | L | 13 | John Mitchell (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 562-6640 | L,S,P | 15 | Valerie Longhurst (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| Not Listed | | | Amy Merlino (L) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 322-3521 | L,P | 16 | James Johnson (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 985-7025 | P | | John Machurek (L) **X** | - | - | N | - | N | - | - | - | - | - | - | N | F |
| 322-1249 | L,P | 17 | Michael Mulrooney (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 395-1998 | | | Laura Brown (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 368-7257 No Opponent | L,S,P | 18 | Michael Barbieri (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 633-1289 | L,S | 19 | Kimberly Williams (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 999-8191 | | | Dennis Cini (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 584-8601 No Opponent | L | 21 | Michael Ramone (R) **X** | Y | - | N | Y | - | - | N | - | Y | - | Y | - | C+ |
| 983-2622 | L,S,P | 22 | David Ellis (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 454-1840 | | | Joseph Miro (R) | Y | U* | Y* | Y* | Y | N* | N* | Y | Y | Y | Y* | Y | B |
| 562-4546 | L,S,P | 23 | Paul Baumbach (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 731-9766 | | | Mark Doughty (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 292-8903 No Opponent | L,S,P | 24 | Edward Osienski (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 547-9351 No Opponent | L,S,P | 25 | John Kowalko (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 832-2209 No Opponent | L,P | 26 | John Viola (D) **X** | N | - | N | - | N | N | N | - | N | - | - | N | F |
| 834-9231 No Opponent | L,S | 27 | Earl Jaques (D) **X** | Y | - | N | Y | N | N | Y | - | N | - | - | N | C |

## STATE QUESTIONS:

1. Do you support the right of parents to choose what services their children may receive at school-based wellness centers?
2. Do you support tax incentives to encourage natural marriage and incent married couples to stay together as a solution to reducing poverty and dependency on government services?
3. Do you oppose same-sex civil union legislation?
4. Do you support parental consent of abortion for minors under the age of 18? (HB80)
5. Do you support strengthening and maintaining marriage as the union of one man and one woman?
6. Do you oppose adding "gender identity or gender expression" to the protected classes in Delaware's anti-discrimination laws for housing, employment, and public accommodation?
7. Do you oppose legislation that includes legalizing internet gambling as a means to increase state revenue and provide jobs?
8. Do you oppose prohibiting coverage for abortion in the state insurance exchanges mandated by the new federal healthcare law?
9. Do you support an annual inspection of abortion clinics for unsafe and unsanitary conditions?
10. Do you oppose using taxpayer money to fund Planned Parenthood and other organizations that provide abortion services?
11. Do you support a policy that ensures parental guardian notification prior to the introduction or instructional use of classroom curriculum or materials, whether brought or introduced by school educators, administrators, and officials, or by guests invited at their request, which involve human sexual education, human sexuality issues, sexual acts, family planning, profanity, drugs, or alcohol?
12. Do you support a Delaware Marriage Protection Amendment defining marriage between a man and a woman in the state constitution? (It does not ban civil unions. SS1 for SB27 2009)

| Phone | Key | District | Candidate | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Kent County: Clerk of the Peace** | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 335-3392 | | | Loretta Wootten (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 730-0454 | | | Mary McVay (L) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| **Kent County:** State Senate | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 653-7566 | | 14 | Bruce Ennis (D) | Y | Y | Y | U | Y | U | N | U | Y | U | Y | Y | B |
| 378-6036 | | 14 | Scott Unruh (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A |
| 270-2012 | | 15 | Kathleen Cooke (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 492-1155 | | 15 | Dave Lawson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| 698-0960 | | 16 | Colin Bonini (R) | Y | Y | Y | Y | Y | Y | N* | Y | Y | Y | Y | Y | A- |
| 697-1740 | | 16 | Michael Tedesco (I) **X** | - | - | - | - | - | - | - | - | - | - | Y | Y | B- |
| 674-5442 No Opponent | L,S | 17 | Brian Bushweller (D) **X** | - | - | N | - | N | N | N | - | - | - | - | N | F |
| 422-3460 No Opponent | | 18 | Gary Simpson (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | A+ |
| **Kent County:** State Representatives | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Grade |
| 653-8247 | | 11 | Lynne Newlin (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 526-2267 | | 11 | Jeffrey Spiegelman (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 653-8642 | | 28 | William Carson (D) **X** | Y | - | Y | - | Y | - | N | - | N | - | Y | Y | B |
| 242-4253 | | 28 | Christopher Sylvester (R) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 659-5850 | L,P | 29 | Charles Paradee (D) **X** | - | - | N | - | N | N | - | - | - | - | - | N | F |
| 659-3436 | | 29 | Lincoln Willis (R) | Y | U* | Y | Y | Y | Y* | N | Y* | Y | Y | Y | Y | A- |
| Not Listed | | 30 | William Outten (R) | Y | Y | Y | Y | Y | Y* | Y | Y | Y | Y | Y | Y | A+ |
| 272-1373 | | 30 | Gordon Smith (L) | Y | Y | N | Y | Y | N | U | Y | Y | Y | Y | U | C+ |
| 735-1781 | L,S,P | 31 | Darryl Scott (D) **X** | N | - | N | N | N | N | N | - | N | - | - | N | F |
| 222-2577 | | 31 | Samuel Chick (R) | Y | U* | Y* | Y | N* | Y | Y* | Y | Y* | Y | Y* | N* | B |
| 545-0198 | | 32 | Andria Bennett (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 697-8271 | | 32 | Ellis Parrott (R) | Y | Y | Y | Y | Y | Y | Y | Y | Y* | Y | Y | Y | A |
| 335-5633 | | 33 | John Robbins (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 335-4261 | | 33 | Harold Peterman (R) | Y | Y | Y | Y | Y | Y | N | U | Y | U | U | Y | B+ |
| 697-2554 | S | 34 | Theodore Yacucci (D) **X** | - | - | - | - | - | - | - | - | - | - | - | - | N/A |
| 697-6723 | | 34 | Donald Blakey (R) | Y | Y | Y | Y | Y | N | N | U | U | Y | Y | Y | B |

**Color Key**
- Green: Family Advocate
- Yellow: Needs Improvement
- Red: Hostile

**Answer Key**
- **Y** = Yes, **Pro-Family Position**
- **N** = No, **Anti- Family Position**
- **U** = **Undecided**
- **X** = **Candidate failed to respond**, information compiled from other sources listed online at www.delawarefamilies.org
- * = **Additional Comments** or voting record online at www.delawerefamilies.org
- **–** = **Failed to respond/Position Unknown**

**Party Key**
- **D**= Democrat
- **R**= Republican
- **L**= Libertarian
- **I** = Independent

**Endorsements/Ranking Key**
- **L** = Delaware Liberty Fund LGBT
- **S** = Stonewall Democrats
- **V** = Gay and Lesbian Victory fund
- **P** = Scored more than 60% Pro- Choice on Planned Parenthood's Survey

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STRONG FAMILIES,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH R. BIDEN III, in his official capacity as Attorney General of the State of Delaware; and<br><br>ELAINE MANLOVE, in her official capacity as Commissioner of Elections for the State of Delaware,<br><br>Defendants. | Civil Action No. 1:13-cv-1746-SLR |

**DECLARATION OF ERIK RASER-SCHRAMM**

I, Erik Raser-Schramm, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration to accompany Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.

2. I am currently a principal at the Twelve Seven Group LLC, an organizing, strategy, and consulting firm in Delaware.

3. I entered Delaware politics in 2002, when I became campaign manager for State Senator Dave Sokola's re-election campaign.

4. After Senator Sokola's re-election, I joined Governor Ruth Ann Minner's 2004 re-election campaign as campaign coordinator.

5. In 2004, I also became Vice Chairman of the New Castle County Democratic Party.

6. During the 2004–2006 election cycle, I managed then-State Treasurer Jack Markell's re-election campaign. I also advised the re-election campaigns of dozens of local candidates at the legislative and county level.

7. In 2007, I was hired as Chief of Staff for the Minority Caucus in the Delaware House of Representatives.

8. In 2008, when the Democratic Party won a majority in the House, I became Chief of Staff to the Majority Caucus. I held that position until September 2011.

9. In that role, I was involved in the campaigns of dozens of Democratic candidates, including statewide candidates, State House and Senate candidates, and county-level candidates.

10. Beginning in 2009, I also served as Chairman of the New Castle County Democrats.

11. In the 2012 election cycle, I served as Chairman of the statewide Coordinated Campaign for the Democratic Party of Delaware.

12. The Coordinated Campaign had nine field offices and 22 staff members.

13. As Chairman of the Coordinated Campaign, I worked with every Democratic campaign in Delaware during the 2012 election cycle.

14. Delaware has no major-network television station of its own.

15. The major-network television stations covering northern Delaware are based in Philadelphia, Pennsylvania. The major-network stations for southern Delaware are based in Salisbury, Maryland.

16. Ads run on these Pennsylvania- and Maryland-based stations are prohibitively expensive for most Delaware campaigns and are generally a poor investment, given that they reach primarily non-Delaware voters.

17. Accordingly, television advertising does not play as big a role in most Delaware campaigns as it does in many other States.

18. Radio is used by statewide campaigns, but is typically too expensive for most legislative or local races.

19. Direct mail is by far the dominant form of political advertising. Approximately 80% of the spending in Delaware campaigns goes toward direct mail.

20. For that reason, it is essential that Delaware campaign-finance law, including the Disclosure Act, cover direct mail.

21. In my experience, by the 2008 cycle, third-party issue advertisements—that is, advertisements mentioning one or more candidates but without an express appeal to vote for or against a candidate—had become a major phenomenon in Delaware elections.

22. In a typical legislative race, outside issue advertising can double the number of direct-mail pieces, whether positive or negative, influencing voters.

23. Disclosure of contributors to groups issuing third-party ads allows voters to evaluate each message in light of the interests and credibility of those who funded it.

24. During the 2010 election cycle, many anonymous mailings targeted candidates with negative attacks, without disclosing who was behind them or who funded them.

25. For example, one set of mailings listed as the return address only "P.O. Box 1180."

26. One of these "P.O. Box 1180" ads encouraged recipients to "Call Terry Schooley . . . and tell her our working families can't afford more taxes." (Attached hereto as Exhibit A.) Another encouraged recipients to "Call Bill Stritzinger," Schooley's

opponent, "and tell him you support his plan to get Delaware working again." (Attached hereto as Exhibit B.)

27. Other "P.O. Box 1180" ads encouraged recipients to "Call Darryl Scott," a candidate for the Delaware House, "and tell him we can't afford his tax and spending habits" (attached hereto as Exhibit C); to "Call Pete Schwartzkopf & tell him to stop hitting Delaware businesses with his job-killing taxes and fees" (attached hereto as Exhibit D); and to "Call John A. Kowalko and tell him to stop the spending" (attached hereto as Exhibit E).

28. I affirm that the attached exhibits are true and correct copies of these advertisements.

29. Despite their phrasing as appeals simply to call officeholders and candidates, these ads were clearly intended to affect voters' choices at the ballot box and likely did so.

30. In my experience, these ads were phrased as appeals to "call" candidates, rather than to vote for or against them, in order to avoid disclosure, which at the time was required only for express voting appeals.

31. Having spoken with dozens of candidates about the impact of third-party issue advertising, and having participated in dozens of campaigns in which issue ads were used, on both sides, I can say that these ads influence voters' choices at the ballot box. That is the reason the groups producing them issue them.

32. In my experience, a negative ad closing with an appeal to vote against a candidate, and a negative ad closing with an appeal to *call* a candidate, may have the same practical effect on voters.

33. This is particularly true in state-legislative and local races, where name recognition is often crucial. The mere fact of having repeatedly seen a candidate's name in a

positive or negative context can, in my experience, be as important as the precise content of the message. Issue ads have proven to be very effective at increasing name recognition in this way.

34. Disclosure of the identity of contributors and sponsoring organizations, as required by the Elections Disclosure Act, enables voters to assess the value of the information conveyed in the ad.

35. The Disclosure Act's monetary thresholds make sense in light of the realities of Delaware campaigns.

36. Even a small amount of money can purchase a significant amount of advertising in a state- or local-level election in Delaware.

37. For example, for less than $500 a campaign can place enough pre-recorded "robo-calls" to reach every household in a Delaware House district. If a hyper-targeted recipient list is used, as is common in campaigns, $150 would suffice.

38. The Act's quick turnaround times for filing are important, as a recent example shows.

39. In the November 2013 Newark mayoral election, a group called the "I Like Polly's Plan PAC" sent a series of direct-mail pieces expressing support for candidate Polly Sierer's plan to approve construction of a data center and power plant at the University of Delaware. *See* K. Simmons & J. Shannon, *Polly Sierer Elected Mayor Of Newark In Tight Race*, Newark Post, Nov. 27, 2013, *available at* http://www.newarkpostonline.com/news/article_ea5fe3eb-4492-5f2d-b12c-6e51d60458be.html (attached hereto as Exhibit F.).

40. The "Polly's Plan" ads, which Sierer disavowed, did not contain an express voting appeal.

41. The PAC initially did not comply with the requirement to disclose its donors.

42. After a complaint was filed under the Elections Disclosure Act, the PAC disclosed its funders.

43. The disclosure report revealed that the PAC was funded by interests that would benefit economically from the data center project.

44. Because the PAC did not comply with the Act, disclosure did not occur until the afternoon before the election, so there was limited opportunity for the information to reach the voting public.

45. Sierer won the election by 115 votes.

46. In my experience, disclosure must occur quickly on the heels of a message if voters are to be able to use the information to evaluate the merits of that message.

47. In my experience, timely disclosure would have affected voters.

48. I received no compensation for the preparation of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 5, 2014

/s/ Erik Raser-Schramm
Erik Raser-Schramm

# EXHIBIT A


TERRY SCHOOLEY
Hit Us With Massive Tax and Fee Hikes
At a time when our families are being forced to cut back,
TERRY SCHOOLEY voted to increase government spending.
Worse, she voted for massive tax and fee hikes to pay for it.
» Terry Schooley voted to raise our taxes and fees 15 times.
» Terry Schooley voted to raise our income taxes by nearly 17%.
» Terry Schooley voted to increase state spending by over $200 million.
» We Can't Afford More Out-Of-Control Spending.
» We Can't Afford More Job-Killing Taxes.
Call TERRY SCHOOLEY at 302-744-4351 and tell her our working families can't afford more taxes.

# TERRY SCHOOLEY is Running Up Spending and Tax Increases We Can't Afford.



P.O. Box 1180
Newark, DE 19715

PRSRT STD
U.S. POSTAGE
PAID
MODERN MAIL

T1 P1

The [redacted]
Or Current Resident
[redacted]

109415017

# EXHIBIT B


Politicians in Dover Have Hit Us
With MASSIVE JOB-KILLING TAXES.
They succeeded in raising our taxes 15 times.
They increased state spending by hundreds of millions of dollars.
They raised our personal income tax nearly 17%.
Now, our families are paying the price.
BILL STRITZINGER has a plan to STOP those tax hikes and get Delaware working again.
Control the Spending. Eliminate Waste.
• Streamline government by not replacing non-essential workers that leave state service.
• Require the state's budget bills be introduced earlier - preventing wasteful spending from being passed in the middle of the night with no public scrutiny.
• Provide Incentives for Employers to Work and Hire Locally.
Call BILL STRITZINGER at 302-468-1421 and tell him you support his plan to get Delaware working again.



# Delaware Families and Employers Can't Afford Government Reaching into Their Pockets *MORE* and *MORE*.

P.O. Box 1180
Newark, DE 19715

PRESORTED
U.S. POSTAGE
PAID
MODERN MAIL

T1 P1

The [redacted]
Or Current Resident
[redacted]

109415016

# EXHIBIT C


We Can't Afford
Darryl Scott's Tax Hikes.
Darryl Scott says "he delivered by cutting wasteful spending."
(Campaign Literature, 2010)
Darryl Scott voted to:
Raise our taxes and fees 15 times
Raise our personal income tax by 16.8%
Increase spending by $214 million
Hurt working families by taking more of their hard-earned money
Call Darryl Scott
and tell him we can't afford his tax and spending habits.
(302) 744-4351



# Delaware can't afford another tax hike.

P.O. Box 1180
Newark, DE 19715

PRSRT STD
U. S. POSTAGE
PAID
MODERN MAIL

T2 P1

The [redacted]
Or Current Resident
[redacted]

904-13284

# EXHIBIT D

# DELAWARE BUSINESSES WOULD RATHER **CREATE JOBS**, BUT CAN'T BECAUSE THEY'RE PAYING **SCHWARTZKOPF'S TAXES**

## SINCE 2009 PETE SCHWARTZKOPF VOTED TO RAISE -

**GROSS RECEIPTS TAX** (HOUSE BILL 289)

**ELECTRICITY TAX** (HOUSE BILL 288)

**INCOME TAX** (HS 1 FOR HOUSE BILL 264)

**TELEPHONE TAX** (HOUSE BILL 288)

**BUSINESS FRANCHISE TAX** (HOUSE BILL HS 1 FOR HOUSE BILL 267)

**NATURAL GAS TAX** (HOUSE BILL 288)

**DEATH TAX** (HOUSE BILL 291)

**INTERNET TAX** (HOUSE BILL 288)

**ALCOHOLIC BEVERAGE LICENSE FEE** (HOUSE BILL 210)



CALL **PETE SCHWARTZKOPF** &

TELL HIM TO **STOP HITTING** DELAWARE BUSINESSES WITH **HIS JOB-KILLING TAXES AND FEES.**

**302-744-4351**

# PETE SCHWARTZKOPF'S RECORD ON BUSINESSES IS "Taxing"



P.O. Box 1180
Newark, DE 19715

PRSRT STD
U. S. POSTAGE
PAID
MODERN MAIL

T5 P1

The [redacted]
Or Current Resident
[redacted]

109515008

# EXHIBIT E



# John A. Kowalko

## Voted to Increase the Spending by $214 Million

- Delaware's budget topped $3.3 billion this year – a whopping 6.5% increase!
- Delaware is ranked 4th in the nation in per capita spending.
- The budget includes $124 million in temporary federal stimulus funding – creating a big hole that'll have to be filled next year.
- And voted to raise our personal income tax by nearly 17%.



## Call John A. Kowalko

**and Tell Him to Stop the Spending.**
**(302) 744-4351**




P.O. Box 1180
Newark, DE 19715

107814869

# EXHIBIT F

Case: 24-2469 Document: 16 Page: 169 Date Filed: 07/15/2024
Case 1:16-cv-00xxx-SLR Document 120-14 Filed 05/30/16 Page 2 of 3 PageID #: 398

# Polly Sierer elected mayor of Newark in tight race

**By Karie Simmons and Josh Shannon Newark Post | Posted: Wednesday, November 27, 2013 12:48 am**

Polly Sierer was elected mayor of Newark on Tuesday night, bringing to a close one of the city's most publicized and highly-charged races in recent memory.

Despite rainy and cold weather conditions, a record-setting 3,695 voters cast their ballots during the day at the six polling places around Newark. Looming large in many voters' minds was the controversy over the proposed data center and power plant on the University of Delaware's STAR Campus.

Sierer captured 1,506 votes (41 percent), and Amy Roe finished second with 1,391. Rounding out the field was Rebecca Powers at 487, Mark Morehead at 148, Don DelCollo at 108, Matthew Vento at 41 and Robyn Harland at 14.

Sierer is a Christianstead resident who serves as president of the Newark Area Welfare Committee and has volunteered around the city for more than two decades. She was endorsed by many in the business community and several veterans of city politics, including former mayor Vance A. Funk III and Deputy Mayor Jerry Clifton.

Sierer said Tuesday night she is excited to be Newark's mayor and is looking forward to working with council, residents, the university and even the six other candidates she ran against.

She acknowledged the divisions that exist in the city. Many cast the race as a contest between pro-business Sierer and anti-power-plant Roe, and the vote tally appeared to confirm that.

"We have a polarized community right now," Sierer said. "We need to regroup and come together and work toward the same goals to make this a great place to live, work and visit."

"We have some healing to do," she added.

She thinks it would be helpful to meet with the other candidates to share ideas and come up with a "game plan" to create a cohesive city.

"Getting the candidates together is step number one," Sierer said. "It will be healing for the community if the seven of us get together."

Sierer will be sworn into office at 6 p.m. Dec. 3 at city hall. She replaces Funk, who resigned Sept. 30.

Sierer will serve out the remainder of Funk's term, which ends in April 2016.

**Turnout at 24 percent**

Although polls closed at 8 p.m., results were not announced at city hall until about 9 p.m. due to a holdup at one of the polling places, City Secretary Renee Bensley said. Voters at the District 1 polling place at Wesleyan Church of Newark were still in line to vote when the polls closed, which Bensley said delayed the ballot-counting process.

That delay was evidence of unusually high turnout, especially considering the timing of the election – two days before Thanksgiving – and the poor weather on Election Day.

A total of 3,695 people voted, equating to an approximate turnout of 24 percent.

The total eclipsed by 128 the number of voters in 2004, when Funk unseated incumbent Hal Godwin.

"Newark really needed this," Sierer said of the turnout. "We have a lot of concerns and a lot of issues facing our city at the moment. This kind of turnout is unprecedented for a special election. It says a lot that our community and the people who live here feel this is important. Their voices are going to be heard."

**Roe falls 115 votes short**

Runner-up Roe, an avid opponent of the data center and power plant, said she was disappointed that she lost the race but remained proud of her campaign, calling it tasteful and an overall "tremendous success."

She, too, was overwhelmed by the number of people who came out to vote in the special election.

"We've energized the neighbors in a way that's never occurred in the past," Roe said.

Although she was unable to win the mayor seat, Roe said she will continue to attend council meetings as a concerned resident and speak out on city issues.

"That won't change," she said.

Townsend Road resident Stephen Toy, who voted today at the District 4 polling place, said he likes Roe in her current position as a watchdog and strong voice of the Newark people. Over the years, Roe has spoken out on a variety of issues during council meetings, often challenging council's decisions and investigating claims.

"People who are champions like Amy tend to not be very good at working with people to come to a consensus," Toy said. "Besides, we need a good watchdog. Leave her out there, leave her snarling."

Roe said she plans to keep up her efforts against The Data Centers, LLC's project and hopes council and Sierer continue to stay up on the issue. She currently spearheads the group Residents Against the Power Plant.

After Tuesday night's results were announced, Roe remained positive and said she was still heading out to celebrate the end of a long two-month campaign.

"Right now, we're going to Iron Hill and we're going to kick back a few pints," Roe said, smiling.

**Morehead blasts PAC involvement**

Morehead, the only sitting council member running in Tuesday's mayoral election, pulled no punches after the results were announced.

"Newark is not only open for business, but you can buy an election," he said.

In the days before the election, documents revealed that a political action committee, funded to the tune of $45,000 by Delawareans for Environmental and Economic Development, distributed fliers to Newark homes promoting "Polly's plan."

Sierer denied any involvement with the PAC and issued a public plea for the group to stop.

"She'll never know if she could have done it herself without special interests," Morehead said.

"This sets a bad precedent," he added.

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STRONG FAMILIES,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH R. BIDEN III, in his official capacity as Attorney General of the State of Delaware; and<br><br>ELAINE MANLOVE, in her official capacity as Commissioner of Elections for the State of Delaware,<br><br>Defendants. | Civil Action No. 1:13-cv-1746-SLR |

**DECLARATION OF ELAINE MANLOVE**

I, Elaine Manlove, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration to accompany Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.

2. I am currently the State Election Commissioner for the State of Delaware. In my official capacity, I am one of the Defendants in this case.

3. In my capacity as State Election Commissioner, I am responsible for promulgating rules, regulations, and forms necessary to implement and enforce the Delaware Elections Disclosure Act. *See* 15 Del. C. § 8041(1). I am also responsible for adopting procedures for the electronic filing of reports under the Disclosure Act. *See id.* § 8041(1)(d).

4. The Office of the State Election Commissioner operates the Delaware Campaign Finance Reporting System, the website through which campaign finance reports required by the Disclosure Act are submitted. That website is located at https://cfrs.elections.delaware.gov/.

5. That website contains an online form for submitting the third-party advertisement reports described in 15 Del. C. § 8031. The form is located at https://cfrs.elections.delaware.gov/Public/ThirdPartyAdvertisersRegistration?isInitial =true. A true and correct printout of the first page of that form is attached hereto as Exhibit A.

6. I understand that Plaintiff has asserted that it does not—and, in fact, cannot consistent with its 501(c)(3) status—support or oppose particular candidates, yet, in its view, is required to state in this form that it supports or opposes particular candidates. *See* Plaintiff's Opening Br. in Support of its Motion for Preliminary Injunction 17. That is not an accurate understanding of the form or of the Disclosure Act as interpreted and implemented by the Office of the State Election Commissioner.

7. Mandatory fields on the form are designated by a red asterisk. Mandatory fields must be completed in order to successfully submit the form.

8. Optional fields do not include a red asterisk. The user can successfully submit the form without completing the optional fields.

9. One of the fields on the third-party advertising form is labeled "Affiliated Candidate Information." The field allows the user to enter the name of a candidate, select "Support" or "Oppose," and then click "Save." By repeating this process, the user can list multiple candidates.

10. The “Affiliated Candidate Information” field is an optional field, not a mandatory field. It is not designated with a red asterisk. The user can therefore submit the form successfully without entering any information in this field. In other words, the user can successfully submit the form without listing any candidates or stating whether they “Support” or “Oppose” any candidates.

11. Designating “Affiliated Candidate Information” as an optional field is consistent with my interpretation of the Disclosure Act.

12. As I interpret the Disclosure Act, an organization that is not a “political committee” under Delaware law and is required to submit a third-party advertisement report under 15 Del. C. § 8031 need not submit the information requested in this field if it does not wish to support or oppose any candidates or parties and does not make the relevant expenditure on behalf of any candidate.

13. On multiple occasions, I have been contacted by members of the electorate expressing both dismay about campaign mailings by groups with unrevealing names and a desire for information about who was funding the mailings.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 6, 2014

/s/ Elaine Manlove
Elaine Manlove

# EXHIBIT A

State of Delaware
The Official Website of the First State

**Delaware Campaign Finance Reporting System**

MENU HOME

## 3rd Party Advertisers

STEP 1 STEP 2 STEP 3

### 3rd Party Advertisers

(•) Person ( ) Organization

Committee Name*

Prefix | First Name* | Middle Name

Last Name* | Suffix

Email* | Confirm Email* | Cell Phone* (for Internal use)

Office Phone* | Home Phone (If entered then Public can view it) | Fax

Date of Origination* | Purpose* (Maximum characters: 250)

Party Affiliation [-- Select Party --]

**Physical Address**

Address Line 1* | Address Line 2

City* | State* [Delaware] | Zip* -

***Mailing Address***

Address Line 1* | Address Line 2

City* | State* [Delaware] | Zip* -

### Affiliated Candidate Information

Candidate Name | Position [--Select Position--]

Save Candidate Cancel

| Candidate Committee Name | Candidate Name | Office Sought Name | PartyAffiliationName | Position | Status | Delete |
|---|---|---|---|---|---|---|
| No records to view. | | | | | | |

Name of Party if entire ticket is supported [-- Select Party --]

### Treasurer Information

[ ] Self

Prefix | First Name* | Middle Name

Last Name* | Suffix

Email* | Confirm Email* | Cell Phone* (for Internal use)

Work Phone* | Home Phone | Fax

Phone* (If entered then Public can view it)

**Physical Address**

Address Line 1* | Address Line 2
City* | State* Delaware | Zip* -

**Mailing Address**

Address Line 1* | Address Line 2
City* | State* Delaware | Zip* -

**Additional Contacts (Optional)**

Contact Role* --Select Role--

Prefix | First Name* | Middle Name
Last Name* | Suffix
Email | Confirm Email

Cell Phone* (for Internal use) | Work Phone | Home Phone (If entered then Public can view it)

Fax | Receive Notices | For Public

**Residence Address**

Address Line 1* | Address Line 2
City* | State* Delaware | Zip* -

**Mailing Address** Same as Residence Address

Address Line 1* | Address Line 2
City* | State* Delaware | Zip* -

Save Contact Cancel

| Role | Name | Mailing Address | Work Phone | Cell Phone | Email | Start Date | End Date | Receive Notices | For Public | Actions |
|---|---|---|---|---|---|---|---|---|---|---|

No records to view.

Continue Clear Cancel

Office of the State Election Commissioner

Home | Contact | FAQs

Delaware.gov | Privacy | Translate | Contact | Phone Directory

JA-195

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 6

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STRONG FAMILIES,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH R. BIDEN III, in his official capacity as Attorney General of the State of Delaware; and<br><br>ELAINE MANLOVE, in her official capacity as Commissioner of Elections for the State of Delaware,<br><br>Defendants. | Civil Action No. 1:13-cv-1746-SLR |

**DECLARATION OF JONATHAN D. MOLL, CPA**

I, Jonathan D. Moll, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration to accompany Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.
2. I am a Director and Shareholder at Belfint, Lyons, & Shuman, PA (Belfint), a Certified Public Accounting (CPA) firm with offices in Delaware and Pennsylvania.
3. I joined Belfint in 2000 immediately after receiving a Bachelor of Science degree in Accounting from the University of Delaware.
4. I received my Delaware CPA certification and CPA permit to practice in 2004. The status of both my permit to practice and certificate is "active."

5. I am a member of the American Institute of Certified Public Accountants and the Delaware Society of Certified Public Accountants, and I am actively involved with the Delaware Alliance for Nonprofit Advancement (DANA).

6. I also serve as the Treasurer of the Board of Trustees of a nonprofit private school in Middletown, Delaware, and am a member of the Board of Directors of the Delaware Society of Certified Public Accountants, a nonprofit membership organization.

7. I currently have primary responsibility for Belfint's nonprofit practice. In that capacity, I provide tax-compliance, financial-statement, and consulting services for nonprofit clients.

8. I personally work with approximately fifty 501(c)(3) organization clients on an annual basis.

9. Most of these clients are Delaware organizations.

10. Over the course of my career, I conservatively estimate to have spent in excess of 10,000 hours providing accounting and tax services to nonprofit organizations.

11. My services for nonprofit clients include preparing IRS Form 990 and Form 990-EZ, the federal tax return for most tax-exempt organizations.

12. I also assist nonprofit clients with preparing financial statements and developing appropriate bookkeeping practices.

13. I am aware that the Delaware Elections Disclosure Act requires third-party advertisers to report certain information about their incoming contributions and outgoing expenditures.

14. Based on my experience providing services to nonprofit organizations, I do not believe that compiling this information should impose a significant administrative burden on nonprofit organizations that already file Form 990 or Form 990-EZ.

15. According to the tax returns provided in this case by Plaintiff Delaware Strong Families (DSF), DSF files IRS Form 990-EZ.

16. Organizations that annually file Form 990 or Form 990-EZ must report their aggregate contributions received. On Form 990-EZ, this information is reported on line 1.

17. Publicly Supported 501(c)(3) organizations that are required to file Form 990 or Form 990-EZ and received, during the year, $5,000 or more (or 2% of total contributions if greater than $5,000) from any one contributor are required to complete Schedule B to accompany their Form 990 or Form 990-EZ.

18. Schedule B of Form 990 or Form 990-EZ requires the filing organization to report the identities of contributors whose aggregate contributions exceed the $5,000 *or* 2% of the gross contributions thresholds.

19. The IRS instructions for Schedule B state that in determining total contributions by donor, all separate and independent gifts of $1,000 and greater must be identified and considered.

20. In my experience, however, nonprofits, particularly ones obligated to file a Form 990 or Form 990-EZ, generally keep records of contributions from *all donors*, not just large ones, for several reasons.

21. First, comprehensive contribution data is extremely valuable to most nonprofits in carrying out their mission. In the short-term, nonprofits *should* make it a priority to

thank donors for their contributions. Many groups also recognize their donors in annual reports or other publications. In the longer-term, nonprofits should know who their contributors are so they can reach out to them in the future. Repeat donors are the lifeblood of any nonprofit organization.

22. Second, written acknowledgement of each contribution is expected by donors and, in some cases, required by tax law. In order for a contribution to a 501(c)(3) to be tax-deductible, IRS Publication 1771 requires that the donor receive a written acknowledgment of any donation over $250. Every 501(c)(3) should issue such written acknowledgments when required. If an organization did not do so, it would risk losing many donors.

23. A 501(c)(3) must also issue written disclosure to a donor who receives goods or services in exchange for a single payment in excess of $75, such that only part of the contribution is tax-deductible. (For example, a group might provide a donor with a $75 lobster dinner in exchange for a $250 ticket to a benefit gala. The group would have to issue a written confirmation explaining that only $175 is tax-deductible.)

24. In practice, it is considered efficient and effective for nonprofits to send written acknowledgement for every contribution. Donors have come to expect an acknowledgement letter or email when they make a charitable contribution. Written acknowledgement of all contributions is considered a standard practice in the nonprofit sector.

25. The operational reasons to acknowledge in writing and record every contribution are so compelling that well-managed 501(c)(3) organizations do so as a best practice, even where federal tax law would not strictly require it.

26. Form 990 and Form 990-EZ also require the filing organization to provide a detailed account of its expenditures. A Form 990 filer must tabulate its expenditures by "natural classification" (e.g., compensation, office supplies) and "functional classification" (e.g., program services, administration, fundraising).

27. Moreover, many vendors need to receive a Form 1099 at the end of the year.

28. For an organization to comply with these tax-reporting obligations, it needs an accounting system in place that tracks payments to each vendor.

29. Such an accounting system is also essential for basic financial management. An organization needs to know how much money it has spent, how much it owes, and to whom.

30. IRS guidance documents reinforce the importance of keeping detailed records of both contributions and expenditures.

31. The IRS instructs nonprofits to retain "supporting documents" verifying "the amounts and sources of your gross receipts," "purchases," and "business expenses." *See* IRS, *What Kind of Records Should I Keep*, *at* http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/What-kind-of-records-should-I-keep (last visited Feb. 27, 2014) (attached hereto as Exhibit A).

32. The IRS's "Stay Exempt" training presentation for nonprofits further explains that 501(c)(3) organizations should retain for three years records of all "money coming in" and "money going out" of the organization. *See* IRS, *Maintaining 501(c)(3) Tax-Exempt Status Course* 4–5, *at* http://www.stayexempt.irs.gov/Portals/0/MaintainingTES-Print.pdf (last visited Feb. 27, 2014) (attached hereto as Exhibit B).

33. Part VI of IRS Form 990 asks whether an organization has a record-retention policy. The IRS has identified record retention as a best practice for nonprofit management and has acknowledged a correlation between record retention and tax compliance.

34. Basic bookkeeping software, such as QuickBooks, costs less than $200 and allows even small organizations to easily track every receipt and expenditure, cross-referenced by donor and vendor, respectively.

35. In this way, an organization can easily aggregate contributions received from a given donor and expenditures made to a given vendor.

36. All but one of my existing nonprofit clients utilize accounting software packages that have the capability to generate information about receipts and disbursements with a level of detail comparable to that of QuickBooks.

37. Basic bookkeeping software is essential for sound financial management. Even a small nonprofit should not be operating without it.

38. If one of my nonprofit clients were not using basic bookkeeping software, my first priority would be to implement such a system. If needed, we generally accomplish this within a few weeks of the Firm’s acceptance of the client.

39. If the software has been adequately set up, with a few keystrokes, this type of software can generate a report listing contributions arranged by donor or expenditures arranged by vendor.

40. Similarly, basic bookkeeping software can automatically tabulate an organization’s gross receipts.

41. I would estimate that, using any one of the many accounting software packages widely available to nonprofit organizations of all sizes, an organization could

calculate its gross receipts and generate a listing of contributor and expenditure data in less than 30 minutes.

42. My compensation for preparing this declaration is $535 and, if I give testimony, my compensation will not exceed an additional $535.

43. In the past four years, I testified as an expert at deposition in two cases: *Cars vs. Copart*, Delaware Superior Court, C.A. No. 07C-11-163 MJB, and *In re Catholic Diocese of Wilmington, Inc.*, Bankr. D. Del., Case No. 09-13560; *Official Committee of Unsecured Creditors v. Catholic Diocese of Wilmington et al.*, Bankr. D. Del., Adv. Proc. No.: 09-52866CSS.

44. As far as I am aware, my only publications in the last ten years have been blog posts on my firm's nonprofits blog, available at http://nonprofit.belfint.com/.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: March 7, 2014

/s/Jonathan D. Moll, CPA______
Jonathan D. Moll, CPA

# EXHIBIT A

IRS

**Small Business/Self-Employed**

- Industries/Professions
- International Taxpayers
- Self-Employed
- **Small Business/Self-Employed Home**

**Small Business/Self-Employed Topics**

- A-Z Index for Business
- Forms & Pubs
- Starting a Business
- Deducting Expenses
- Businesses with Employees
- Filing/Paying Taxes
- Post-Filing Issues
- Closing Your Business

# What kind of records should I keep?

You may choose any recordkeeping system suited to your business that clearly shows your income and expenses. Except in a few cases, the law does not require any special kind of records. However, the business you are in affects the type of records you need to keep for federal tax purposes. Your recordkeeping system should also include a summary of your business transactions. This summary is ordinarily made in your business books (for example, accounting journals and ledgers). Your books must show your gross income, as well as your deductions and credits. For most small businesses, the business checkbook is the main source for entries in the business books.

Some businesses choose to use electronic accounting software programs to capture and organize their records. In some situations, you will still need to keep original documentation for certain items. The software program you choose should meet the same basic recordkeeping principals mentioned above.

## Supporting Business Documents

Purchases, sales, payroll, and other transactions you have in your business will generate supporting documents such as invoices and receipts. Supporting documents include sales slips, paid bills, invoices, receipts, deposit slips, and canceled checks. These documents contain the information you need to record in your books. It is important to keep these documents because they support the entries in your books and on your tax return. You should keep them in an orderly fashion and in a safe place. For instance, organize them by year and type of income or expense. For more detailed information refer to Publication 583, Starting a Business and Keeping Records.

*The following are some of the types of records you should keep:*

- **Gross receipts** are the income you receive from your business. You should keep supporting documents that show the amounts and sources of your gross receipts. Documents for gross receipts include the following:
  - Cash register tapes
  - Bank deposit slips
  - Receipt books
  - Invoices
  - Credit card charge slips
  - Forms 1099-MISC
- **Purchases** are the items you buy and resell to customers. If you are a manufacturer or producer, this includes the cost of all raw materials or parts purchased for manufacture into finished products. Your supporting documents should show the amount paid and that the amount was for purchases. Documents for purchases include the following:
  - Canceled checks
  - Cash register tape receipts
  - Credit card sales slips
  - Invoices
- **Expenses** are the costs you incur (other than purchases) to carry on your business. Your supporting documents should show the amount paid and that the amount was for a business expense. Documents for expenses include the following:
  - Canceled checks
  - Cash register tapes
  - Account statements
  - Credit card sales slips
  - Invoices
  - Petty cash slips for small cash payments
- **Travel, Transportation, Entertainment, and Gift Expenses**
  If you deduct travel, entertainment, gift or transportation expenses, you must be able to prove (substantiate) certain elements of expenses. For additional information on how to prove certain business expenses, refer to Publication 463, Travel, Entertainment, Gift, and Car Expenses.
-
  **Assets** are the property, such as machinery and furniture, that you own and use in your business. You must keep records to verify certain information about your business assets. You need records to compute the annual depreciation and the gain or loss when you sell the assets. Documents for assets include the following:
  - When and how you acquired the assets.
  - Purchase price
  - Cost of any improvements.
  - Section 179 deduction taken.
  - Deductions taken for depreciation.
  - Deductions taken for casualty losses, such as losses resulting from fires or storms.
  - How you used the asset.
    When and how you disposed of the asset.

Case: 24-2469 Page: 189 Date Filed: 07/15/2024

- Selling price.
- Expenses of sale.

The following documents may show this information.

- Purchase and sales invoices.
- Real estate closing statements.
- Canceled checks.

- **Employment taxes**
  There are specific employment tax records you must keep. Keep all records of employment for at least four years. For additional information, refer to Recordkeeping for Employers and Publication 15, Circular E Employers Tax Guide.

*Page Last Reviewed or Updated: 03-Feb-2014*

# EXHIBIT B

# Maintaining 501(c)(3) Tax-Exempt Status Course

## Print Version

| Slide # | Page Content | Audio Script |
|---|---|---|
| 1 | Welcome to the Maintaining 501(c)(3) Tax-Exempt Status Course. | **Leagle** – Welcome to the Maintaining 501(c)(3) Tax-Exempt Status Course.<br>This course is presented by the Exempt Organizations office of the IRS. |
| 2 | ***Introduction***<br>Before you begin, you may want to:<br>• Print out the course for note taking purposes (link to printable version)<br>• Learn to navigate the course (link to navigation mini course)<br>• Get ready for knowledge checks and other activities throughout the course<br>• Know that scores are for reference purposes only | **Leagle:** Hi. I'm Leagle and I'll guide you through the courses here at StayExempt.<br>Before you start, there are a few things you should know. First, if you like to take written notes, you might want to print this course first. The print out may make it easier to follow along, especially if you haven't taken many online courses.<br>Next, take a look at our navigation tutorial. It will provide you with helpful tips on how to navigate these courses.<br>Also, this course includes questions and activities to test your knowledge. You'll need to click on the screen to answer the questions and participate in the activities.<br>Finally, the scores given at the end of the course are for your reference only. They're designed to help you understand the material better.<br>When you're ready learn about tax-exempt status, select the "Objectives" button. |
| 3 | ***Objectives***<br>• Demonstrate how to appropriately operate a 501(c)(3) organization once tax-exempt status is achieved.<br>• Describe the responsibilities of a tax-exempt organization after achieving tax-exempt status.<br>• List the activities that could jeopardize the tax-exempt status of an organization.<br>• Learn about state charitable solicitation rules<br>• Describe good governance practices. | **Leagle** – In this course, we'll talk about running an organization properly, once 501(c)(3) tax-exempt status is achieved. To do that, you'll need to know what responsibilities you have and what activities can jeopardize your organization's 501(c)(3) status. You'll also find it helpful to familiarize yourself with the charitable solicitation rules of your state - and learn a bit about "good governance" practices.<br>First, let's start by meeting someone who just got their tax-exempt status. Select the *Meet Richard* button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 4 | ***Lifecycle Review***<br><br>Link: [http://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Life-Cycle-of-a-Public-Charity](http://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Life-Cycle-of-a-Public-Charity)<br><br>**Page Text:**<br><br>• Starting out:<br>  o Create your organization<br>  o Organizing documents<br>  o Acquire an EIN<br>  o Identify the appropriate federal tax classification<br><br>• Applying for Exemption<br>  o Apply to the IRS for tax-exempt status<br>  o Form 1023<br><br>• Required Filings<br>  o Annual exempt organization returns<br>  o Unrelated business income tax filings<br>  o Other returns and reports<br><br>• Ongoing Compliance<br>  o Jeopardizing exemption<br>  o Employment taxes<br>  o Public disclosure requirements<br>  o Other ongoing compliance issues.<br><br>• Significant Events<br>  o Audits<br>  o Private letter rulings<br>  o Termination proceedings | **Richard** – Hi, I'm Richard! I just received my determination letter from the IRS. It says my animal rescue organization, *Cute and Curly Animal Rescue*, has been recognized under Section 501(c)(3) of the Internal Revenue Code as exempt from federal income tax. I've always loved taking care of animals, so managing this animal rescue correctly is really important to me. Starting my organization and applying for tax-exempt status were big steps - and I want to make sure I do everything I can to comply with the law. Leagle, can you offer any advice?<br><br>**Leagle** – Sure I can, Richard. Maintaining your federal tax-exempt status isn't difficult, but it sure helps if you're aware of your organization's required interactions with the IRS. Here's the five-stage "life cycle of a public charity" tool the IRS uses to illustrate those interactions and when they occur. You've already completed the first two stages of the process: starting out and applying for exemption – as you may remember during our "Applying for 501(c)(3) Status Overview course. Here's a link if you'd like to review.<br><br>Now, you have general responsibilities described in the three remaining stages: required filings, ongoing compliance and significant events. Click on each stage in the process to find out more about it.<br><br>Although these topics were briefly covered in the Applying for Section 501(c)(3) Status Overview course, these three stages are most important to the daily operation of your organization. We'll cover them in more detail now.<br><br>Let's start out with Required Filings. Select the *Required Filings* button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 4 | ***Required Filings – Recordkeeping***<br><br>**Page Text:**<br>• Financial records documenting entries in your organization's books<br>• Permanent Records<br>  o Organizing Document<br>  o Copy of the exempt application form (Form 1023) and<br>  o Determination letter from the IRS<br>• Annual filings - Returns and Attachments(Include list below in a pop-up)<br>  o Form 990<br>  o Form 990-EZ<br>  o Form 990-N<br>  o Form 990-T<br>• Descriptions of your organization's programs;<br>• Minutes of meetings of the governing board and any standing committees (include as popup)<br>  o executive committees<br>  o compensation committees | **Richard** –Thanks for helping me keep up with the requirements of a tax-exempt organization! So, what should I focus on first?<br><br>**Leagle –**Well Richard, it's a good idea to take a look at the IRS's Life Cycle tool. Here's a link.<br><br>A very important stage of the Life Cycle is "Required Filings," which helps you understand just what to file with the IRS. But, before you learn what forms to use and when to file them, let's talk about something that will help you prepare – and that's Recordkeeping! If you don't keep accurate and detailed records of your organization's activities, you won't have the information you need to complete the filing requirements.<br><br>**Richard** – But I'm still not sure what records I really need to keep.<br><br>**Leagle:** I think my friend Vernon can help you with that. He's the treasurer of the Highland Middle School Parent Teacher Organization.<br><br>**Vernon** – Hi Richard! I've managed a lot of records for our organization, which is classified as a public charity, just like yours. Your organization's going to have all kinds of financial records. You need to keep any accounting information you have, whether you do it using paper files, like I do, or fancy computer software.<br><br>**Leagle** – That's right. You should also maintain a set of Permanent Records, which includes your organizing document (which is sometimes called your Articles of Incorporation or your Charter), a copy of your Form 1023 (the exemption application you submitted), and the determination letter from the IRS you just mentioned.<br><br>**Vernon** – Have you filed any returns with the IRS yet?<br><br>**Richard** – No, not yet.<br><br>**Vernon** – Be sure to keep copies of any returns and attachments you send to the IRS. And keep the records you used to prepare the returns handy, too! This includes your financial records and other things, like information about your organization's programs, meeting minutes for the governing board, and minutes for any standing committees - like an executive or compensation committee. The IRS suggests keeping copies of returns and any supporting information for at least three years **after** you file the return.<br><br>**Leagle:** Next, let's talk more about the financial records you need to keep. Select the Financial Records button to move on. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 5 | ***Required Filings – Financial Records***<br><br>**Page Text:**<br>• Money coming in<br>• Money Going out<br>• Employment tax records<br>• Asset records | **Richard** – So what kind of financial records **do** I need to keep?<br><br>**Vernon** – There are four basic types of financial records you should keep. They can be categorized as<br><br>Money coming in, money going out, employment tax records and asset records.<br><br>**Leagle:** Let's discuss each type of record. Select the Money Coming In button to learn more. |
| 6 | ***Financial Records – Money Coming In***<br><br>**Page Text:**<br>Examples:<br>• Cash register tapes<br>• Bank deposit slips<br>• Receipt books<br>• Invoices<br>• Credit card slips<br>• Form 1099-MISC, *Miscellaneous Income* - http://www.irs.gov/pub/irs-pdf/f1099msc.pdf<br>• Keep these records for 3 years after the return is due or filed, whichever is later. | **Leagle**: First, I recommend that you keep records of all the money that comes into your organization. This includes cash register receipts, bank deposit slips, receipt books, invoices, credit card slips and any Form 1099-MISC documents you send to the IRS.<br><br>Save these records for three years **after** the date the return is due or filed, whichever is later, because during that time, you can amend a return to claim a credit or refund. Generally, this is also the period when the IRS can assess penalties or additional tax. In either case, you'll need those records.<br><br>And remember that some interested parties, such as a grantor, insurance company, creditor, or state agency, may require you to keep certain records for a longer time. You should check with them for their requirements.<br><br>Next, let's talk about money going out. Select the Money Going Out button to learn more. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 7 | ***Financial Records – Money Going Out***<br>**Page Text:**<br>Examples<br>• Account statements<br>• Canceled checks<br>• Cash register tapes<br>• Credit card sales slips<br>• Invoices<br>• Petty cash slips for small payments<br>• Include documents for items purchased to produce items sold by your organization<br>• Save these for 3 years after the date the return is due or filed, whichever is later.<br>Publication 538, *Accounting Periods and Methods* - http://www.irs.gov/pub/irs-pdf/p538.pdf | **Leagle**: You should save any documents that show expenses you incurred while running your organization and its programs, including account statements, canceled checks, cash register receipts, credit card sales slips, invoices and petty cash slips.<br>If your organization produces and sells items, save documents on the materials you purchased to **produce** those items. These records will also help you determine the value of your inventory at the end of the year.<br>As I mentioned earlier, you should save these documents for three years after the date the return is due or filed, whichever is later.<br>For more information, see Publication 538, *Accounting Periods and Methods.*<br>Next, let's talk about Employment Tax Records. Select the Employment Tax Records button to continue. |
| 8 | ***Financial Records – Employment Tax Records***<br>**Page Text:**<br>Keep any documents showing:<br>• Salaries<br>• Wages<br>• Benefits paid<br>• Taxes withheld<br>You should save these records for at least 4 years.<br>Publication 15 (Circular E), Employer's Tax Guide - http://www.irs.gov/pub/irs-pdf/p15.pdf | **Leagle**: You should save all employment tax records, including any documents that show salaries, wages, benefits paid and taxes withheld. You may think employment tax records sound like "money going out," but these documents are really a separate category. Employment records should be kept for at least 4 years.<br>There are other employment-related items that deserve special attention. For those, take a look at Publication 15 (Circular E), *Employer's Tax Guide*, for more information.<br>Finally, let's talk about the Asset Records. Select the Asset Records button to learn more. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 9 | ***Financial Records – Asset Records***<br>**Page Text:**<br>Asset Records: documents showing assets that your organization owns and uses in its activities, such as investments, buildings and furniture.<br>Asset records should show:<br>• When and how the asset was acquired<br>• Whether any debt was used to acquire it<br>• Purchase price<br>• Selling price and expense of sale<br>• Cost of any improvements<br>• Deductions taken for depreciation or for casualty losses, such as fires or storms<br>• How the asset is or was used<br>• When and how the asset was disposed of<br>Example documents:<br>• Purchase and sales invoices<br>• Real estate closing statements<br>• Cancelled checks or certain financial account statements<br>• Financing documents<br>Keep documents for as long as you own the asset, plus three years after you dispose of the item. | **Leagle** - Asset records are documents showing the items your organization owns and uses in its activities, such as investments, buildings and furniture. Select this "Asset Records" link to find out more about what kinds of asset records you need to keep.<br>Some example documents include purchase and sales invoices, real estate closing statements, cancelled checks or certain financial account statements as well as financing documents.<br>Finally, you should keep these documents for as long as you own the asset, plus three years **after** you dispose of the item.<br>Now that you understand the types of financial records you need to keep, let's try an activity. Select the Knowledge Check button to try it out. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 10 | ***Recordkeeping Skills Challenge***<br>There are four record categories that the IRS suggests you retain: Money coming in, Money going out, Employment tax records, and Asset records. Put the four items below in that order.<br>1) Bank deposit slip (**money coming In**)<br>2) Cancelled check for office supplies (**money going out**)<br>3) Salary document (**Employment tax records**)<br>4) Credit card receipt for a desk (**Asset records**) | **Leagle** – Let's try an exercise. Richard is still unsure of what documents fall into each category. Help him place the documents in the appropriate categories by dragging them to the correct answer – or by selecting the appropriate letter in each dropdown menu.<br>**Incorrect Feedback:** Sorry, that's not correct. Here is the correct order for the documents:<br>• Bank deposit slip – money coming in<br>• Cancelled checks for office supplies – money going out.<br>• Salary document – employment tax records<br>• Credit card receipt for a desk – asset records<br>**Correct feedback**. Great job! Here are the correct matches. (see above) |
| 11 | ***Required Filings – Record Keeping System***<br>**Page Text:**<br>• Choose any record keeping system that works for you & your organization<br>• Organizations with multiple programs need to track income and expenses for each program separately.<br>• Records should include a summary of transactions. | **Richard** – So, what record-keeping system should I use?<br>**Leagle** – Generally, the IRS doesn't require a specific recordkeeping system, so you can choose one that makes sense for your organization. But remember:<br>If your organization has more than one program, your recordkeeping system should allow you to track the income and expenses for **each** program separately.<br>Also, your records should include a summary of transactions. This summary can be listed in your books (including journals and ledgers). Or, many small organizations use checkbooks as the main source for entries into the books, and that is fine, too.<br>Next, we'll learn about the accounting periods and methods your organization should use in its reporting. Select the *Accounting Periods and Methods* button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 12 | ***Required Filings – Accounting Periods and Methods***<br><br>**Page Text:**<br>• Does my organization use a calendar or fiscal accounting period?<br>(Link to Definitions in Glossary: Calendar accounting and Fiscal accounting)<br>• Every organization should use a consistent accounting method<br>o Cash method<br>o Accrual accounting method<br>o Hybrid method<br>(Link to Definitions in Glossary: Cash Accounting, Accrual Accounting, Hybrid.)<br><br>Link: Publication 538, *Accounting Periods and Methods* http://www.irs.gov/pub/irs-pdf/p538.pdf<br><br>Link: Publication 583, *Starting a Business and Keeping Records*, http://www.irs.gov/pub/irs-pdf/p583.pdf | **Leagle** –So Richard, it's important for you to know if your organization will report to the IRS using a **calendar** year or a **fiscal** year? And, does your organization use a **cash** or **accrual** accounting method - or some sort of combination of the two? Select the links on the page to see the definitions of these items.<br><br>**Vernon** – Every organization must use a consistent accounting method, which is a set of rules for determining when to report income and expenses. Under the cash method, generally, you report income in the tax year you received it; and you deduct expenses in the tax year you paid them.<br><br>Generally, under an accrual method, you report income in the tax year you earn it, regardless of when payment is received. You deduct expenses in the tax year you incur them, regardless of when payment is made.<br><br>My organization, for example, uses the cash method and the calendar year as its reporting (or "tax") year.<br><br>**Leagle** – An organization typically makes these decisions when it begins operating and before it files its first annual tax return. When you applied for exemption, you used your application to tell the IRS what tax year and accounting method you planned to use. Make sure you know what your organization told the IRS, so you report the right items at the right time - using the right method.<br><br>Now that we know about the records you should keep and a little bit about how you'll report - and for what period - let's talk about what you have to **send** to the IRS. Select the *Form 990 Options* button to move ahead. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 13 | ***Required Filings – Form 990 Options***<br><br>**Page Text:**<br>• No annual filing requirement for Churches and certain church-affiliated organizations don't have an annual filing requirement<br>• May have other filing requirements such as employment tax returns<br>(Fade off when going onto consequences.<br>• Serious consequences for non-compliance<br>• Three consecutive years without filing and tax-exempt status is automatically revoked.<br>• To reinstate, you have to re-apply<br>o To have it retroactive, you must present a reasonable cause for not filing.<br><br>**Page Links**<br>LifeCycle - http://www.irs.gov/Charities-&-Non-Profits/Life-Cycle-of-an-Exempt-Organization<br><br>www.irs.gov/990filing for Form 990 series thresholds<br><br>Link: Publication 4221-PC, *Compliance Guide for 501(c)(3) Public Charities* http://www.irs.gov/pub/irs-pdf/p4221pc.pdf<br><br>Link to course Form 990 | **Richard** – Ok, so what am I required to file with the IRS?<br><br>**Vernon** – Well, there are details on annual filing requirements on the Required Filings page of the Lifecycle at IRS.gov. You'll probably need to file one of the Form 990-series returns – which is the annual information return required for most tax-exempt organizations. Which one you'll file will depend on the **type** of your organization, the amount of your annual gross receipts and the total of your organization's assets at the end of the tax year. www.irs.gov/990filing shows the dollar thresholds for different forms. You'll also see them in the Form 990 course here on StayExempt.<br><br>**Richard** – Do all tax-exempt organizations have to file a Form 990-series return?<br><br>**Leagle** – Churches and certain church-affiliated organizations don't have an annual filing requirement, but they may have other filing requirements, such as employment tax records.<br><br>It's important to note that there are serious consequences for not filing a required annual information return. If your organization doesn't file for three years in a row, its tax-exempt status will be automatically revoked on the due date of the third return. If your tax-exempt status is revoked for not filing - and you want to get your status back - you'll have to redo the application process, including filing Form 1023 and paying the appropriate user fees. Once revoked, If you want your reinstatement to be retroactive (which means "dated back to the day it was revoked"), you'll have to show you had reasonable cause for not filing. So, my best advice is to file annually.<br><br>Remember that in addition to submitting an annual return, you may need to submit filings for your unrelated business income, or UBI. Select the *UBI Basics* button to move forward. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 14 | ***Required Filings – UBI Basics***<br><br>**Page Links**<br><br>Link: Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities<br>http://www.irs.gov/pub/irs-pdf/p4221pc.pdf<br><br>Link to UBI course<br><br>**Page Text:**<br><br>Unrelated Business Income –<br><br>Any income you generate from business activities that occur on a regular basis and are **not** substantially related to the exempt purpose of your organization<br><br>Examples of UBI (link to a pop up with information below)<br><br>• Commercial advertising in publications<br>• Selling goods or services to the public<br>• Link to publication with list of other potentially UBI activities.<br><br>UBI can be taxable income for tax-exempt organizations<br><br>Too much UBI can jeopardize tax exemption.<br><br>Other activities may require separate filings. | **Richard** – Ok, so what's UBI?<br><br>**Vernon** – Generally, Unrelated Business Income is any income from trade or business activity that your organization conducts on a regular basis - that's **not** substantially related to your organization's exempt purpose. There are lots of activities that can generate UBI, such as commercial advertising in publications created by your organization - or selling goods or services to the public. Income from unrelated activities like these might be taxable. Calculating and reporting UBI is a requirement for maintaining your tax-exempt status. Keep in mind that too much unrelated business can jeopardize your tax exemption.<br><br>**Richard** – Hey, that sounds pretty easy.<br><br>**Leagle** – Not entirely. He's just given you a VERY simple explanation, but don't worry. There's a whole course dedicated to UBI here on StayExempt. The course teaches you which activities generate UBI. Once you understand UBI, filing the form to report the income and pay any tax due is relatively straightforward.<br><br>**Richard** – Alright, I'll remember to look into that. Is there anything else?<br><br>**Leagle** – You might need to file other returns depending on your organization's activities. You can find out about those on the IRS website as well, but Form 990 is the biggest and most important.<br><br>The next stage in the lifecycle is ongoing compliance. Select the *Ongoing Compliance* button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 15 | ***Ongoing Compliance***<br>**Page Links:**<br>Employment Issues course.<br>**Page Text:**<br>Avoid activities outside of Exempt Purpose<br>Jeopardizing Exemption<br>• Political Activity<br>• Lobbying<br>• Private Benefit/Inurement<br>• Employment Taxes | **Richard** – Alright, I understand that most organizations have an annual filing requirement. What's next?<br>**Vernon** – Do you know the particulars about what your organization must do – or must not do – to safeguard its exempt status?<br>**Richard** – I think so. I can't do too many activities that don't directly promote my organization's exempt purpose, which is to prevent animal cruelty.<br>**Leagle** – Well that's certainly true. But there are other do's and don'ts associated with tax-exempt status, which is what this next stage covers. For example, many activities can jeopardize your tax-exempt status, such as political activity, lobbying, or permitting private benefit or inurement. We'll be covering those later in this course.<br>**Vernon** - Another challenge facing exempt organizations is accurately classifying and reporting on any paid workers they have. If your organization compensates anyone for services – either employees or independent contractors – there are rules you need to follow. The *Employment Issues* course here at StayExempt will help you sort all of that out.<br>**Leagle** - There are two more ongoing compliance issues you need to be aware of, and we'll go over those next. Select the *Public Inspection* button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 16 | ***Ongoing Compliance – Public Inspection***<br><br>**Page Links:**<br><br>Link: http://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Life-Cycle-of-a-Public-Charity---Ongoing-Compliance<br><br>Links to Required Disclosures courses.<br><br>**Page Text:**<br><br>• Exemption application (Form 1023)<br>• Determination Letter<br>• Three most recent annual returns<br>• Three most recently filed Form 990-T<br>• Forms, any attachments and correspondence<br>• Schedule B is does not need to be disclosed | **Richard** – So what do I have to share with the public?<br><br>**Leagle** – Tax-exempt organizations must make their exemption application, determination letter and the three most recently-filed annual information returns available to the public, upon request and without charge (except for a reasonable charge for copying). If your organization is a 501(c)(3) and files Form 990-T, *Exempt Organization Business Income Tax Return*, your three most recent 990-Ts must be made available as well. **Richard** – What about other records I'm keeping?<br>**Leagle** – You only have to disclose the forms themselves, any attachments or separate items you sent in with the forms, and any correspondence you may have had with the IRS about the forms. There is an exception, though. If you had to file Schedule B of Form 990, that schedule is NOT required to be open for public inspection.<br><br>For your Form 1023, for example, you would also make your organizing document available for public inspection because you sent that document to the IRS when you submitted Form 1023. Same for the determination letter you received back from the IRS at the end of the application process – that has to be made available. On the other hand, the internal books and records you use to prepare your Form 990 aren't subject to the inspection requirements, because you didn't send them in as part of your Form 990 filing – you just used them to prepare it.<br><br>**Richard** – Where should I keep the items subject to public inspection?<br><br>**Leagle** – You have to make the documents available at the organization's principal office during regular business hours - as requests can be made in person or in writing. There are more specifics about how and when to meet the public inspection requirements in the Required Disclosures course here at StayExempt.<br><br>Finally, there is one last stage: Significant Events. Select the *Significant Events* button for more information. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 17 | ***Significant Events:***<br>**Page Links:**<br>Link: http://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Life-Cycle-of-a-Public-Charity---Significant-Events<br>**Page Text:**<br>• Audits<br>• Private letter rulings<br>• Termination proceedings | **Richard** – So, the last stage is significant events. What kinds of significant events are there?<br>**Leagle** – The significant events all have to do with your tax-exempt status. The events include, but aren't limited to: audits, private letter rulings, and termination proceedings. More information on this stage can be found using this link.<br>Before we test your knowledge, let's go over what we've covered so far. Select the Recap button to continue. |
| 18 | ***Recap***<br>**Page Text:**<br>• Tax-Exempt Status Lifecycle<br>• Required Filings<br>o Record keeping<br>o Annual exempt returns<br>o UBI<br>• Ongoing Compliance<br>o Jeopardizing exemption<br>o Employment taxes<br>o Public disclosure requirements<br>• Significant Events | **Leagle** –We talked about the tax-exempt status lifecycle as it applies to organizations maintaining their tax-exempt status. This includes issues such as record keeping, annual returns and unrelated business income.<br>We also mentioned jeopardizing tax-exempt status (which we'll cover later in this course), employment tax issues, public inspection requirements and we talked other significant events for tax-exempt organizations. Now that you've learned about the stages of the lifecycle, let's try an exercise. Select the *Activity* button to continue. |
| 19 | ***Knowledge Check***<br>**Page Text:** Which of the following includes required responsibilities of Section 501(c)(3) organizations? Select the best answer and then use the submit button to check your answer.<br>**A) Annual Filings, Public Inspection**<br>B) Letter Writing, Annual Gala Events<br>C) House Cleaning, Power-washing<br>D) Political Organizing, Lobbying | **Leagle** – Let's test your knowledge. Which of the following are responsibilities that will keep Richard's organization from losing its tax-exempt status? Select the best answer. When you're done, select the "submit" button to check your answer.<br>**Correct Feedback:** Great job! Annual Filings and Public Inspection are responsibilities of 501(c)(3) public charities. Remember – good recordkeeping is key to good reporting!<br>**Incorrect feedback:** Sorry, that's not right. Recordkeeping, Annual Filings and Public Inspection are responsibilities of 501(c)(3) public charities. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 20 | ***Knowledge Check***<br>**Page Text:**<br>What will happen to Richard's organization is he fails to file Form 990, Form 990-EZ or Form 990-N for three years in a row? Select the best answer, then use the submit button to check your answer.<br>a) Tax-exempt status revoked for three years<br>**b) Tax-exempt status revoked and loss of eligibility to receive tax-deductible donations**<br>c) Tax-exempt status revoked and a lifetime ban from 501(c)(3) status<br>d) Tax-exempt status revoked, and bread and water for 3 years | **Leagle** –What will happen to Richard's organization is he fails to file Form 990, Form 990-EZ or Form 990-N for three years in a row? Select the best answer. When you're done, select the "submit" button to check your answer.<br>**Correct Feedback:** That's right! Failure to meet the annual filing requirements for a 501(c)(3) public charity can lead to your tax-exempt status being revoked, as well as a loss of eligibility to receive tax-deductible donations.<br>**Incorrect Feedback:** Sorry, that's not correct. Failure to meet the annual filing requirements for a 501(c)(3) public charity can lead to your tax-exempt status being revoked, as well as a loss of eligibility to receive tax-deductible donations. |
| 21 | ***Progress Check***<br>**Page Text:**<br>You have learned how to:<br>• Describe the responsibilities of a tax-exempt organization after achieving tax-exempt status. | **Leagle** – Congratulations! You've completed the responsibilities and lifecycle section of this course. Next, you'll learn more about activities that can jeopardize the tax-exempt status of your organization.<br>Select the continue button to move forward. |
| 22 2 | ***Jeopardizing Your Tax Exempt Status***<br>**Page Text:**<br>• Lobbying<br>• Political campaign intervention<br>• Unrelated business income<br>• Private benefit/Inurement | **Richard** – So, I know about the things I'm supposed to do to keep my tax-exempt status. What about the things I'm **not** supposed to do?<br>**Vernon** – Well, Richard, there are four major categories of activities that can jeopardize your tax-exempt status. Lobbying, political campaign intervention, activities generating excessive unrelated business income, and private benefit/inurement.<br>**Leagle** - Some of these activities are absolutely prohibited, while others are restricted. Let's take a quick look at the first three - and an in-depth look at the fourth. Select the Prohibited Political Activities button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 23 | ***Prohibited Political Activities***<br>**Page Link:**<br>Link to Political Campaigns Course<br>**Page Text:**<br>Lobbying:<br>Any activity designed to influence **legislation**<br>Political Campaign Intervention<br>Participating in any political campaign on behalf of or in opposition to any candidate for public office<br>Three L's – **Lobbying** is about **Legislation** – and a 501(c)(3) can do a **Limited** amount of it.<br>Three P's – **Political** Activity is about **People** running for office and 501(c)(3)s are **PROHIBITED** from getting involved, either for or against a candidate. | **Richard** – Isn't lobbying a form of political campaign intervention?<br>**Leagle** – Actually, lobbying and political campaign intervention are two different things; Lobbying is any activity designed to influence legislation, while political campaign intervention is participating in a political campaign on behalf of, or in opposition to, a candidate for public office. Though they are both related to politics, the activities are different - as are the rules for exempt organizations participating in them.<br>501(c)(3) organizations can conduct a little lobbying without jeopardizing exemption; it just can't be a principal activity of the organization. The "Three L's" help me remember the rule here: **L**obbying is about **L**egislation - and a 501(c)(3) can do a **L**imited amount of it.<br>The rule for 501(c)(3)s and political activity is very different: A 501(c)(3) can't conduct **any** political activity. I use the "Three P's" to keep this rule straight: **P**olitical activity is about **P**eople running for office and 501(c)(3)s are **P**rohibited from getting involved, either **for** or **against**. Doing so jeopardizes their exemption.<br>You'll find lots more about prohibited political intervention in a course called "Political Campaigns and Charities: The Ban On Political Campaign Intervention." Here's the link to the course as StayExempt. (include link)<br>Let's talk a little bit more about unrelated business income next. Select the Unrelated Business Income button to move forward. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 24 | ***Unrelated Business Income***<br>**Page Link:** UBI course.<br>**Page Text:**<br>• Business activity that generates income<br>• Conducted on a regular basis<br>• Not substantially related to exempt purpose<br>Important facts:<br>• UBI can be subject to taxes<br>• Too many UBI-generating activities can jeopardize your status | **Richard** – What else can you tell me about UBI?<br>**Vernon** – Like I said before, Unrelated Business Income is any income you generate from business activities that occur on a regular basis and are not substantially related to the exempt purpose of your organization. The tests and criteria for determining if a fundraising activity generates UBI are covered in the UBI course here at StayExempt.<br>**Leagle** – And let me add two things about UBI:<br>First, funds generated through unrelated business activities can be subject to taxes. But, what's more important is that if too many of your activities are **not** related to your exempt purpose, you're jeopardizing your exempt status. Remember, your organization received tax-exempt status because you told the IRS it would pursue an exempt purpose. If it's not doing that, the reason for tax-exempt status isn't there either.<br>Next, let's talk about Private Benefits and Inurement. Select the *Continue* button to move forward. |
| 25 | ***Private Benefit and Inurement***<br>**Page Text:**<br>Private Benefit:<br>Activities that substantially benefit the private interest of an individual or organization.<br>**Public** charities must serve **public** interest.<br>Employee salaries and services provided to the public are not private benefit.<br>Income and assets cannot be used so that an individual receives substantial private benefit beyond reasonable compensation for work. | **Richard** – So, what are private benefit and inurement?<br>**Leagle** – Private benefit and inurement are two separate, but closely related concepts. Let's look at private benefit first.<br>**Vernon** - Private Benefit is any activity that substantially benefits the private interest of an individual or organization, right?<br>**Leagle** – Exactly, Vernon. A 501(c)(3)s must avoid all activities that provide primarily **private** benefit. The 501(c)(3)'s activities must serve a **public** interest.<br>**Richard**: What if I have employees? Isn't the salary some kind of private interest?<br>**Leagle** – No, this doesn't mean a 501(c)(3) can't pay reasonable salaries to its employees, or provide services to its constituents. Rather, it means the organization can't be operated - or its income or assets used in such a way - that someone receives a **substantial** private benefit well beyond what would be considered reasonable compensation for work.<br>Let's talk about inurement next. Select the Inurement button to continue. |

| Slide # | Page Content | Audio Script |
| --- | --- | --- |
| 26 | ***Inurement***<br><br>**Page Text:**<br><br>Inurement: Allow income or assets to accrue for the benefit of insiders. Examples<br>• Paying dividends<br>• Unreasonable compensation<br>• Transferring property for less than fair market value<br><br>Insider: A person who has a personal and private interest in the activities of the organization. Examples:<br>• Officers<br>• Directors<br>• Key employees | **Richard** – So, what's inurement?<br><br>**Vernon** – The concept of inurement takes the notion of private benefit a bit further. You can't conduct activities that will provide anyone with a substantial private benefit. When it comes to "**insiders**" of the organization, absolutely **none** of the income or assets can accrue to their benefit.<br><br>**Leagle** – In case you haven't heard that term before, Richard, an "insider" is a person who has a personal and private interest in the activities of the organization.<br><br>**Richard** – I'm still not sure who would qualify as an insider.<br><br>**Leagle** –Examples of typical insiders are officers, directors and key employees—like you.<br><br>**Richard** – Can you give me some examples of inurement?<br><br>**Leagle** – Sure. Some examples include paying dividends or unreasonable compensation to insiders, as well as transferring property to insiders for less than fair market value.<br><br>Select the *Continue* button to learn about the repercussions of providing inurement. |
| 27 | ***Inurement is Forbidden***<br><br>**Page Text:**<br><br>• Inurement is absolutely prohibited:<br>    o Grounds for loss of tax-exempt status<br>    o Insider may incur excise tax<br>• Private benefit (non-insider) must be substantial to jeopardize status<br>• Not considered Inurement and Private Benefit :<br>    o Reasonable payment for services<br>    o Payments to further tax-exempt purpose<br>    o Payments for fair market value of real property. | **Richard** – Are there any cases where inurement is allowed?<br><br>**Leagle** – No. **Any** amount of inurement is grounds for loss of tax-exempt status - and the insider involved may be subject to excise tax. But, if the activities of an organization privately benefit someone who is **not** an insider, that benefit must be substantial in order to jeopardize the organization's tax-exempt status. But as I said earlier, prohibited inurement or private benefit doesn't include reasonable payments for services, other payments that further tax-exempt purposes, or payments for the fair market value of real or personal property.<br><br>Select the Charitable Solicitation button to move forward. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 28 | ***Charitable Solicitation***<br>**Page Link:**<br>Governance Section in Form 990 Course<br>**Page Text:**<br>Each state has laws regulating fundraising and soliciting donations requiring<br>• Registration before soliciting for contributions<br>• Adherence to special rules for when fundraising activities involve paid solicitors and fundraising counsel<br>• Specific procedures for filing financial documents<br>Check with each state where you may be soliciting funds for its requirements | **Richard** – I'm eager to start collecting funds, but I'm worried I may be breaking some rules in that area.<br>What should I know first?<br>**Leagle** – First of all, each state has laws regulating fundraising - as well as how you go about soliciting donations. These include: requiring that you register your organization, special rules when fundraising activities involve paid solicitors and fundraisers counsel, and specific procedures for filing financial reports.<br>Each state is different, so be sure to check with each state you'll be fundraising in to confirm their requirements.<br>When you're ready, we should talk about governance next. Select the Governance button to learn more. |
| 29 | ***Tips for Governance***<br>**Page Text:**<br>General tips for operating consistently with tax law requirements:<br>• Clearly articulate organization's purpose<br>• Select a knowledgeable and committed government body and management team<br>• Adopt sound management practices | **Richard** – So, what are your governance tips for my<br>organization?<br>**Leagle** – Well, we've found that an organization is more likely to operate effectively and consistently with tax law requirements if it can clearly articulate its purpose, selects a knowledgeable and committed governing body and management team, and adopts sound management practices.<br>The IRS requests information about an organization's governance on the application for tax exemption - and again annually on the information return most organizations must file.<br>Before we do an exercise, let's go over what we've covered in this section. Select the *Recap* button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 30 | ***Recap***<br><br>**Page Text:**<br><br>Jeopardizing Tax Exempt status.<br>• Political Campaign Activity<br>• Lobbying<br>• UBI<br>• Private Benefit/Inurement<br>• Charitable Solicitation Rules<br>• Tips for Good Governance | **Leagle** – In this section, we discussed how to avoid jeopardizing your tax-exempt status. First, we talked about political campaign intervention and lobbying. There's a separate course on political campaign intervention, but you should have a basic understanding of what those things are. Then we talked about Unrelated Business Income and how that might jeopardize your tax-exempt status. We covered private benefit and inurement. Your organization shouldn't engage in activities that substantially benefit the private interest of any individual or organization, nor allow any income or assets to accrue for the benefit of insiders. And, we just discussed how to find out more about charitable solicitation rules for your state and implementing good governance practices.<br><br>Next, let's try an exercise to see if you are ready to move on. Select the *Activity* button to continue. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 31 | ***Case Study***<br><br>**Page Text:**<br><br>Read the scenario, then choose the best answer. Select the submit button to check your answer.<br><br>Richard is the President of Cute and Curly Animal Rescue. His by-laws require that he has a seven member Board of Directors - and he's a voting member.<br><br>Richard is also owns 49% of the for-profit Precious Pets pet store. His sister, Deborah, owns 51% of the business and runs the pet store. Cute and Curly Animal Rescue contracted with Precious Pets for $200,000 worth of animal food and supplies. Richard signed the contract without consulting his Board of Directors for action. Richard's sister knows there won't be a competitive bid for the contract, so she decided to bill for 120% of the fair market value for the products. She called the contract the "Precious Pets Deluxe" package, but in reality, they are the same products she provides to her other customers.<br><br>True or False: Does this scenario show private benefit or inurement? (**True**) | **Script: Leagle** - Let's test your knowledge. Read Richard's scenario, then choose the best answer. Select the submit button to check your answer.<br><br>**Correct Feedback:** Good Job! That's right!<br><br>**Incorrect Feedback:** Sorry, that's not correct. This is an example of inurement.<br><br>1. Richard is an insider because he has a personal financial interest in Cute and Curly Rescue taking the contract with Precious Pets as a part owner.<br>2. Richard used his position with Cute and Curly Animal Rescue to steer the contract towards Precious Pets.<br>3. The fact that Richard, as president of Cute and Curley, signs a contract to do business with Precious Pets without competitive bidding, or a search for alternative providers, is probably enough to show inurement.<br>4. Deborah's decision to overcharge for the supplies creates a situation where there's clearly impermissible inurement to Richard.<br><br>If this kind of a scenario was discovered in an audit, the examining agent would likely propose "intermediate sanctions" on the insider, such as repaying the excessive amount. Depending upon the facts and circumstances, the agent might propose additional sanctions on the organization and/or revocation of its exemption. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 32 | **Page Title:** Knowledge Check<br>**Page Text:**<br>Paying dividends or unreasonable compensation to insiders and transferring property to insiders for less than fair market value are considered which 501(c)(3) prohibited activity?<br>a) Annulment<br>b) Annihilation<br>c) Appropriate<br>**d) Inurement** | **Leagle** – Here's another test. Paying dividends or unreasonable compensation to insiders and transferring property to insiders for less than fair market value are considered which 501(c)(3) prohibited activity? Select the best answer. When you're done, select the "submit" button to check your answer.<br>**Correct Feedback:** That's right! Paying dividends or unreasonable compensation to insiders and transferring property to insiders for less than fair market value are considered inurement.<br>**Incorrect Feedback:** Sorry, that's not right. Paying dividends or unreasonable compensation to insiders and transferring property to insiders for less than fair market value are considered inurement. |
| 33 | ***Knowledge Check***<br>**Page Text:**<br>Which activity is a public charity allowed to do that won't jeopardize its tax-exempt status?<br>a) Contribute to a political candidate<br>b) Pay its executives excessive amounts of compensation<br>c) Make public statements in favor of a particular candidate<br>**d) Paint its office walls orange with green polka dots** | **Script: Leagle** – Let's try one more. Which activity is a public charity allowed to do that won't jeopardize its tax-exempt status?<br>Select the best answer. When you're done, select the "submit" button to check your answer.<br>**Correct Feedback:** That's right! Other than painting the office, each activity on the list will jeopardize an organization's tax-exempt status.<br>**Incorrect Feedback:** Sorry, that's not quite right. Other than painting the office, each activity on the list will jeopardize an organization's tax-exempt status. |
| 34 | ***Progress Check***<br>**Page Text:**<br>You have learned how to:<br>• Describe the responsibilities of a tax-exempt organization after achieving tax-exempt status.<br>• List the activities that could jeopardize the tax-exempt status of an organization | **Leagle** – Nice job! You've learned about jeopardizing the tax-exempt status of an organization. Select the continue button to move forward. |

| Slide # | Page Content | Audio Script |
|---|---|---|
| 35 | ***Resources***<br><br>**Page Text:**<br><br>Resources:<br><br>• IRS Lifecycle page - http://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Life-Cycle-of-a-Public-Charity<br><br>• Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities http://www.irs.gov/pub/irs-pdf/p4221pc.pdf<br><br>• Publication 557, Tax-Exempt Status for Your Organization http://www.irs.gov/file_source/pub/irs-pdf/p557.pdf | **Leagle** – As we near the end of this course, I know I've shared a lot of exempt organization resources with you. I've put them together here, so feel free to go review them. |
| **37** | ***Conclusion***<br><br>**Page Layout: Leagle** with IRS logo.<br><br>**Page Text:**<br><br>Thank you for taking the Maintaining 501(c)(3) Tax-Exempt Status course.<br><br>Before you leave, please take a couple of minutes to complete this course's evaluation. It doesn't ask for any personal information. The information you provide will ensure that this and other courses at StayExempt provide a valuable learning experience for future participants. Also, if you have other feedback for the Exempt Organizations team, feel free to use this button to send us an email.<br><br>After you complete the survey, print out your own Certificate of Completion as recognition for attending this course. | **Leagle** – On behalf of everyone in the IRS Exempt Organizations division, thank you for taking the Maintaining 501(c)(3) Tax-Exempt Status course.<br><br>Before you leave, please take a couple of minutes to complete this course's evaluation. It doesn't ask for any personal information. The information you provide will ensure that this and other courses at StayExempt provide a valuable learning experience for future participants. Also, if you have other feedback for the Exempt Organizations team, feel free to use this button to send us an email.<br><br>After you complete the survey, print out your own Certificate of Completion as recognition for attending this course. |

Case: 26-2469 Document: 16 Page: 213 Date Filed: 07/15/2026

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 7

SELECT YOUR LANGUAGE English ▼

GOVERNMENT

# Longtime court critic quietly funds PAC controlled by House Speaker

by Karl Baker
March 5, 2026




Contributions to a political action committee controlled by Delaware House Speaker Melissa Minor-Brown allow her to control a war chest for what could become a contentious legislative campaign season ahead of the 2026 primary and general elections. | SPOTLIGHT DELAWARE GRAPHIC BY ELSA KEGELMAN

**Why should Delaware care?**
As the 2026 campaign season launches, a newly revealed political contribution could bolster House Speaker Melissa Minor-Brown's political power. It also cements the status of Phil Shawe within the Delaware political establishment — a position that comes in contrast to his outsider activism of the past.

Phil Shawe, the polarizing New York executive whose financial largesse helped propel Gov. Matt Meyer to victory in 2024, is now throwing his weight behind a new political action committee controlled by Delaware House Speaker Melissa Minor-Brown.

Amended campaign finance reports filed last month show that a political organization funded by Shawe is the sole contributor, so far, to Minor-Brown's Back on Track PAC.

The contribution follows a decade of well-funded assaults on Delaware's brand by Shawe through a campaign he launched immediately after the state's Court of Chancery ordered a forced sale of his company, TransPerfect. In recent years, his activism has shifted from the courts to politics.

While the roughly $50,000 donation to Minor-Brown's PAC is not an immense amount – even for little Delaware – it now signals a completion of Shawe's transformation from a outside agitator to an individual with deep ties to Delaware political establishment.

## Building a party war chest

For Minor-Brown, the contributions allow her to control a war chest for what could become a contentious legislative campaign season ahead of primary and general elections this fall.

Though she might not face a challenge to her own New Castle-area seat, Minor-Brown's fortunes as House speaker could depend on the outcome of her legislative allies' races – some of whom already face primary challengers. Following the November election, the new members of the Delaware House of Representatives will vote for their next speaker.

In an interview with Spotlight Delaware, Minor-Brown acknowledged that the Back on Track PAC is hers, saying she launched it to "support Democratic candidates up and down this state." Her party, she said, needs another financial stream for the upcoming election.

Asked if she has established an alliance with Shawe, Minor-Brown pushed back against the characterization. She said she intends to raise money from other donors as well.

Minor-Brown also asserted that anyone donating to the PAC will be supporting the Democratic Party broadly, and not her individually.

"They're supporting the mission of the party," she said. "It doesn't mean they're supporting my mission solely, and it doesn't mean that I'm for sale, or bought and sold."



Rep. Rae Moore alleged that House Speaker Melissa Minor-Brown has retaliated against her for not supporting Senate Bill 21. | SPOTLIGHT DELAWARE PHOTO BY ETHAN GRANDIN

Nevertheless, news of the donation has sparked alarm with some progressive members of the legislature, particularly Rep. Sherae'a Moore (D-Middletown). Last year, Moore's **public sparring with Minor-Brown** included her sending a cease-and-desist letter to House speaker. Moore also claimed then that she suffered from retaliation for not supporting a **controversial bill to reform** Delaware's corporate law.

In an interview with Spotlight Delaware on Wednesday, Moore said she learned recently that Minor-Brown is actively searching for candidates to run against her in the primary election later this year.

And Moore suspects that the Back on Track PAC's resources could be deployed against her.

"From what I'm being told, I'm her priority to get rid of," Moore said.

Asked about the claim, Minor-Brown said she is too busy to focus on Moore, with policy challenges, such as addressing the high costs of energy and health care, taking up her time.

Still, the House speaker made it clear that bad blood remains between the two lawmakers.

"I don't have time for childish nonsense," she said.

Back-on-Trac... 1 / 11 44%



Delaware elections
Campaign Finance Section
Financial Report

AMENDED

Financial Reports are required to be submitted to the Campaign Finance Section of the Office of the State Election Commissioner by all Candidates, Committees, and Organizations. Late or incomplete reports are subject to fines levied by the Commissioner's Office, so please be sure to check all applicable deadlines and file on time. Add extra sheets if necessary.

FULL ORGANIZATION NAME: Back on Track PAC
ACCOUNT NUMBER : [illegible]  DATE OF THIS REPORT : 02/10/2026
REPORTING PERIOD START : 05/15/2025  REPORTING PERIOD END : 12/31/2025
OFFICE SOUGHT :

CHECK THE BOX THAT APPLIES TO THIS REPORT :
PRIMARY ELECTION ☐ 8-DAY ☐ 30-DAY  OTHER ELECTION ☐ 8-DAY ☐ 30-DAY
GENERAL ELECTION ☐ 8-DAY ☐ 30-DAY  SPECIAL ELECTION ☐ 8-DAY ☐ 30-DAY
☑ YEAR END
THIRD-PARTY ADVERTISERS ☐
FINAL ORGANIZATION CLOSING : ☐ YES ☑ NO
AMENDMENT : ☑ YES ☐ NO  CLOSING DATE :

I authorize that all information included in this Financial Report package is accurate and correct. I agree to abide by all rules and regulations regarding Campaign Finance and the election process in the State of Delaware. I understand that representatives from the Office of the State Election Commissioner will perform an audit of all information provided on this report.

April Lyons-Alls
TREASURER SIGNATURE  DATE

■ Current ■ Amended ■ Deleted ■ Amended New
Campaign Finance  Page 1 of 11  CFFM011 V1.0 2014/02/11
Printed on 02/10/2026 03:11:01 PM  Document: 14904 Version: 2

Delaware elections
STATEMENT OF ACCOUNT BALANCE

ACCOUNT NUMBER : [illegible]  REPORTING PERIOD : 05/15/2025 FROM  12/31/2025 TO

1. BEGINNING BALANCE (Ending Balance from last reporting period)  $0.00
2. RECEIPTS :
   A. SCHEDULE A - TOTAL RECEIPTS  $49,500.00
   B. SCHEDULE C-1 - TOTAL IN-KIND RECEIPTS  $0.00
   C. SCHEDULE D-1 - TOTAL LOANS RECEIVED AND DEBTS INCURRED  $0.00
   D. SCHEDULE E - TOTAL EXPENSE REIMBURSEMENTS RECEIVED  $0.00

Back on Track finance report

**Download**

## To improve or malign the courts?

Beyond impacts on upcoming political campaigns, Shawe's contributions to the Back on Track PAC suggest that he has solidified a bond with Delaware's new political establishment.

It is a bond that first emerged in 2024 when his advocacy group spent more than $1 million in Delaware's gubernatorial race — mostly on campaign ads to attack Meyer's chief opponent in the primary election, then-Lt. Gov. Bethany Hall-Long.

While the campaign spending was significant, **Forbes reported last year** that TransPerfect has nearly doubled its revenues since 2018 — growth that made Shawe a billionaire.

His new relationship in Delaware as financier of leading politicians contrasts sharply with political and legal activism from previous years when Shawe's groups assailed Delaware institutions, particularly its courts, with the help of high-profile individuals like the Rev. Al Sharpton and celebrity attorney Alan Dershowitz.

The aggressive campaign began in 2015 after a Delaware judge ordered TransPerfect – a financially successful company Shawe co-founded with his then-fiancée Liz Elting – to be auctioned off. In the order, the judge said that infighting between the co-founders had caused "irreparable harm" to the company's employees and clients, concluding that a forced sale was the only solution.

In response to the order, Shawe employed the high-profile New York public relations company, Tusk Strategies, to carry out what became a yearslong campaign against Delaware's judiciary.

It began with well-organized and well-choreographed protests outside of Delaware courts. Then there were full-page attack ads published in the print editions of The News Journal. One in particular depicted a Delaware judge standing with four other white men in front of a row of largely empty wine bottles. A portion of a caption stated that Delaware was one of 18 states at the time that had never had an African-American person serve on its Supreme Court.

The activism continued even after Elting sold her half of TransPerfect to Shawe — a decision that averted the forced auction of the company.




A portion of a full-page ad published in the News Journal in 2019 by Citizens for a Pro-Business Delaware shows a Delaware judge standing with other men in front of several wine bottles.

During the Iowa caucuses that preceded the 2020 presidential election, Shawe's mother launched a $500,000 ad campaign in that Midwestern state, claiming that then-candidate Joe Biden supported a Delaware judicial system that "cuts out thousands of people who end up hurt by the court's decisions."

In more recent years, Shawe's advocacy groups — whose names include Citizens for a Pro-Business Delaware, Citizens for Judicial Fairness, and Citizens for a New Delaware Way — have periodically paid a mobile billboard truck company to circle downtown Wilmington with signs criticizing a lack of diversity among judges on the state's courts.

To Delaware's political establishment of past years, the aggressive activism was broadly seen as spiteful – or even bad faith. In 2019, Delaware's Legislative Black Caucus characterized it as "external distractions from outside groups."

That same year, the president of the Delaware State Bar Association claimed that Shawe's **advocacy was not meant to improve the judiciary,** but to malign it.

But now, following the million-dollar spend in support of Meyer, as well as the recent contributions to Minor-Brown's PAC, Shawe has gained a foothold among Delaware's leadership. And his team seems to recognize it.

## New focus on legislature

**Chris Coffey**, an executive at Tusk Strategies who has served as Shawe's spokesman for several years, said their policy goals in Delaware are "judicial transparency and good government reforms."

"We look forward to working with members of the state legislature to build a more equitable and transparent justice system for both individual Delawareans and companies domiciled there," he said.

Because Delaware is the legal home to more than 2 million companies, its laws set the corporate governance rules for many of the biggest companies in the world.

Coffey's statement comes about six months after Shawe's advocacy group, Citizens for Judicial Fairness, published a press release celebrating a new Delaware court policy that changed how judges are assigned to cases involving businesses litigating in the state.

Rather than a single judge presiding over potentially multiple cases involving the same company, the new policy made that selection random – a process known as "wheel spin."

It was a policy change for which Shawe had advocated over several years. The old policy was also one that Elon Musk, the widely influential Tesla CEO, had criticized to his many followers.

**Within a press release** celebrating the new court rule was a quote from Minor-Brown, which stated in part that "fairness and justice are the guiding principles of our judicial system, but we can't fully uphold them by standing still."

The appearance of the quote became the first public indication that some type of collaboration existed between Minor-Brown and Shawe's advocacy team.

Four months earlier, Shawe's team first announced that he would contribute financially to Delaware's 2026 legislative races, in a press release published thought the group, Citizens for a New Delaware Way. In the statement, the group revealed he would spend at least $200,000 during the campaign.



Governor Matt Meyer and Delaware House Speaker Melissa Minor-Brown interact on the House floor. | PHOTO COURTESY OF THE HOUSE DEMOCRATS

"Following our successful effort in the 2024 governor's race, we've long said that we'd turn our attention to the state legislature – especially the speaker and her allies," Coffey later told Spotlight Delaware.

© 2026 Spotlight Delaware
Powered by Newspack

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 8

SELECT YOUR LANGUAGE English ▼

GOVERNMENT

# Millions fueling Delaware governor's race make it one of most expensive in history

by Karl Baker and Amanda Fries
August 20, 2024

---



This year's election cycle has seen millions pour in to candidate coffers and outside influence groups. | SPOTLIGHT DELAWARE PHOTOS BY JACOB OWENS

**Why Should Delaware Care?**

Gubernatorial candidates today need well more than $1 million to run a successful campaign in Delaware. And, the individuals and organizations who contribute to campaigns can reveal how the

winning candidate will ultimately manage the state's bureaucracy and how he or she will set the tone for how the state government spends money each year.

This story was produced and reported together with Delaware Online/The News Journal as part of a partnership with Spotlight Delaware.

The race to become Delaware's Democratic nominee for governor has grown increasingly bitter, fueled in large part by outside political groups that have raised millions of dollars from developers, unions, and a single New York company with **a longtime grudge against Delaware**.

Campaign finance reports filed last week with the state show those donors have supplied most of the $3 million that was collectively raised by third-party political action committees.

In recent weeks, those PACs have purchased a bevy of TV ads and political mailers that directly or **indirectly** supported their chosen Democratic candidates for governor.

The ads followed an audacious piece of politicking earlier this summer when a PAC affiliated with a building trades union hired a small airplane to circle the Delaware beaches with a political banner in tow.

In all, the hefty sums spent on political advertising are giving powerful people with narrow interests outsized influence in Delaware's race for governor.

"In the context of where the candidates are choosing to put their funds, that's obviously having an impact on the total amount spent," said Delaware State University political science professor Samuel Hoff. "It's never cheap for these TV commercials and getting folks to produce them, let alone the cost of running them."

The outside PAC money also piles on top of nearly $4 million raised by the campaigns of the three Democratic candidates for governor themselves, setting the stage for this year's contest to rival the 2008 governor's race as the most expensive in Delaware history.

Lt. Gov. Bethany Hall-Long, New Castle County Executive Matt Meyer and former state environmental secretary Collin O'Mara are vying for the Democratic ticket next month.

State House Rep. Mike Ramone, Lewes resident Jerrold Price and Bridgeville resident Bobby Williamson seek the GOP line in the gubernatorial race.

The recently filed campaign finance reports further indicate that outside messaging from the PACs is likely to escalate in the final weeks before Delaware's Sept. 10 primary. Two groups that have run ads attacking Hall-Long reported that they still hold hundreds of thousands of dollars in reserve.

Meanwhile, one PAC supporting Hall-Long and others supporting O'Mara are funded by large nationwide organizations with relatively deep pockets that could be employed as the race draws nearer to the primary election date.

Between crowded primary races and the rise of more "one issue PACs," this year's gubernatorial race certainly has had "more money pumped into the primary than is usual," which will likely rival the 2008 governor's race, Hoff said.

"I really think what happens over the next couple of weeks is certainly going to be important," he said. "From everything we have in front of us now, it's close in both areas, but particularly (among the Democrats), and we'll have to see how it shakes out."



Lt. Gov. Bethany Hall-Long is both the target and beneficiary of some of the most vehement advertising in this year's primary election cycle. | SPOTLIGHT DELAWARE PHOTO BY JACOB OWENS

## $1 million outside influence

Leading all donors to Delaware PACs is Phil Shawe, the CEO of a New York translations company called TransPerfect, who in recent months gave $1 million to a PAC that has been attacking Hall-Long with TV ads and political mailers.

The spending is the latest in **nearly a decade of Shawe's high-dollar critiques** of Delaware institutions that followed a decision in 2015 by the state's Chancery Court to order his company be auctioned off.

Those affiliated with the PAC, called Citizens for a New Delaware Way, say it is opposing Hall-Long because she failed to respond to their outreach sent to all the Democratic candidates.

Chris Coffey, campaign manager for the PAC, said while **O'Mara and Meyer responded and engaged with the group**, Hall-Long did not.

"She made it really easy for us by blowing us off, by not believing in transparency, by not participating in our process, by not being willing to speak with us," Coffey said.

Coffey said the group's focus is on transparency and advocating for good government, mostly through the courts, but also with police, like calling for police-worn body cameras. It also is pushing for cameras in Delaware courts and for judges to be selected at random.

Coffey has led similar efforts in Delaware in past years, also funded by Shawe.

In a statement, Hall-Long's campaign did not speak to the claims made by Coffey, instead asserting that Shawe's company actually seeks to "dismantle Delaware's corporate franchise" – the state's lucrative system that serves as the legal domicile of well over a million companies.

Such a dismantling would lead to higher taxes "on middle class families either by raising personal income taxes or instituting a sales tax in Delaware," the campaign claimed.

Though it indirectly benefits Meyer and O'Mara's candidacies, Shawe's PAC has not said outright that it supports either campaign.

While each Democratic candidate has benefited from third-party spending, Meyer has enjoyed the biggest boost because of the indirect support of this PAC and one other that doesn't explicitly endorse his campaign.

Another PAC, called Change Can't Wait, also has significant financial backing in Delaware's governor's race, recently running a TV ad that lauds Meyer's health care plan and sent political mailers claiming Hall-Long is "wrong on public safety."

The Change Can't Wait PAC raised more than $1.1 million in recent years with the help of sizable contributions from out-of-state and local developers, some of whom have, or have had business before New Castle County.

The group's two biggest contributions – totaling $100,000 each – came from Philip Reese, a Wilmington-area retired banker who a decade ago chaired Delaware's public employee pension system, and from an entity called 847 Cranbrook, LLC.

Among other activities, 847 Cranbrook, LLC is associated with a downstate proposal to build houses, commercial space and a hotel, called the Bridgeville Town Center.

The leading PAC supporting Hall-Long represents the political arm of the Democratic Lieutenant Governors Association – an organization that Hall-Long previously co-chaired. It has **pledged to spend $1 million in support of Hall-Long's** pursuit of the governor seat.

Some of the ad spending the association has done was helped by a $475,000 contribution from the People for a Healthy Delaware PAC, which supports candidates "committed to a healthy Delaware" and raised $447,000 this year through sizable donations from labor unions.

Three labor groups donated $100,000 each to the PAC: Growing Economic Opportunities, New Jersey's State Laborers PAC, and Laborers Political League of DE.

Early on, Hall-Long earned the support of Delaware's largest labor unions. Since early in the summer, the Delaware Building Trades has been flying banners over the state's beaches this year in support of the lieutenant governor's run.

James Maravelias
about 2 years ago




Up up in the sky.

32 1 13

Organizing the spending is James Maravelias, the powerful president of the Delaware AFL-CIO, who said he has hired planes to fly over the beaches during most weekend days when the skies are not restricted by President Joe Biden's presence.

He said his advocacy for Hall-Long's campaign originates from his antipathy for Meyer, arguing that New Castle County took several steps under Meyer's leadership that he said hurt union workers, including altering the government's "responsible contracting" standards, weakening union apprenticeship mandates, and carrying out fewer inspections of developments sites

Maravelias said he asked Meyer last year to rescind those changes. And, in response, Meyer said "I have no appetite to reverse that," Maravelias recounted.

In an emailed response, Meyer's campaign asserted that Maravelias has engaged in "irrational behavior towards Matt instead of helping hard-working Delawareans."

The statement also claimed that Maravelias in past meetings with Meyer was disrespectful and went on "expletive-laced tirades."

"Matt has been an ally of labor during his time as County Executive," the campaign's statement said.



Former chief environmental secretary Collin O'Mara has the backing of some influential national environmental advocacy groups. | SPOTLIGHT DELAWARE PHOTO BY JACOB OWENS

## Environmental groups throw support to O'Mara

Two environmental PACs have also pledged financial support in Delaware's gubernatorial race, throwing their support behind O'Mara, the CEO of the National Wildlife Federation and past Delaware Department of Natural Resources and Environmental Control secretary.

"Collin is a proven progressive," said Jocelyn Steinberg, director of the Natural Resources Defense Council Action Votes and independent expenditure director of the NRDC Action Fund. "It's not a secret agenda. We want clean energy jobs in Delaware. We want to move forward in protecting our air and water."

Steinberg said O'Mara is already pursuing clean jobs for Delaware in his recent position as chief advocate for the Mid-Atlantic Clean Hydrogen Hub, a consortium of politically powerful companies in the region that seek to remake Delaware into a hub of hydrogen production.

The regional hydrogen initiative, which won a $750 million federal award last year, has also drawn criticism from local environmentalists who have argued that using wind and solar power to produce hydrogen fuel is an inefficient use of those renewable energies. O'Mara contends that a small portion of renewable energy should be reserved to produce hydrogen fuels in order to make heavy industries that can only operate on liquid fuels more green.

The NRDC Action Votes group launched an ad in support of O'Mara as Delaware governor, and additional spending is in the works, Steinberg said.

The federal PAC donated $100,000 on Aug. 1 for the first ad buy, and another $100,000 will be committed for additional advertising and campaign material supporting O'Mara, she said.

The group is part of a coalition of environmental advocacy groups supporting O'Mara's run for governor, and joins another federal PAC, the League of Conservation Voters, in boosting the former environmental secretary's campaign.

O'Mara also earned the **Working Families Party endorsement** in Delaware back in April.



New Castle County Executive Matt Meyer has outraised his opponents by a significant margin ahead of the stretch run to the primary election. | SPOTLIGHT DELAWARE PHOTO BY JACOB OWENS

## Big money in Democratic candidates' campaigns

The money being thrown around within third-party groups nearly overshadows the contributions raised and spent among the candidates, if it wasn't for Meyer's campaign coffers dwarfing his opponents.

According to the latest campaign finance reports filed with the Delaware Department of Elections, Meyer's war chest surpasses both Democratic candidates, as well as the Republican challengers, with nearly $1.6 million on hand.

While all three Democrats loaned significant money to their campaigns, Meyer raised the most this reporting cycle with $825,721 in donations. Meyer spent $925,229 during the same period, campaign finance reports show.

While Hall-Long raised $531,500 since Jan. 1, building on a $687,348 campaign balance from the end of 2023, just over $1 million was spent this cycle, leaving the lieutenant governor's war chest at $218,511.

Hall-Long's campaign has grappled with finance issues since the longtime politician announced her run for Delaware governor last year. Those issues have only mounted in recent weeks after **a scathing audit said the reporting of her campaign finances** was "incomplete, inconsistent, and often inaccurate."

O'Mara raised the least among the Democratic candidates during this period, collecting $101,687 in donations. But his spending was far less than his opponents at $54,370, leaving O'Mara's campaign with $917,528 cash on hand.

The money raised among Democratic candidates far surpasses that of the three Republican candidates.

Ramone was the only GOP candidate to raise money this year, collecting $76,276 in donations from when he officially announced his run for governor in early May to Aug. 12.

By comparison, Price – a former New York City police officer who announced his run for governor in December – did not collect any donations this year but loaned his campaign $7,706 to cover campaign-related expenses. This is on top of a $5,000 loan he gave his campaign to start in December.

Williamson, who was the last to file his candidacy in early July, raised just shy of $900 through 12 contributions to his campaign during the latest reporting period. Williamson reported receiving $1,335 in in-kind contributions, while also loaning $8,602 to his campaign to cover expenses.

© 2026 Spotlight Delaware

Powered by Newspack

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 9

Cape Gazette
The Price of Liberty is Eternal Vigilance.

May 26, 2026

Subscribe Advertise

THE CURRENT




# Influence of PACs increasing in Delaware

Out-of-state money plays outsized role

Share:






Share:

ADOBE STOCK PHOTO/David Carillet

By Melissa Steele •
September 5, 2024

**RELATED STORIES**

PAC money continues to flow into Cape Region...
Friday, October 25, 2024

It may not be the millions of dollars pouring into this year's presidential campaigns, but Delaware has its own, albeit smaller-scale, political action committee influence.

Of the 132 active committees that had filed a 30-day report with the Delaware Department of Elections for state office as of Aug. 28, the coffers range from zero upwards to over $1 million.

Citizens for a New Delaware Way is on the high end of PAC money with more than $1 million coming in so far from a New York billionaire, active in Delaware elections ever since the Chancery Court ordered the break up of his translation company. Outgoing money has mostly gone to Park Avenue-based Tusk Strategies, which so far lists Delaware LIVE out of Milford as its only Delaware expense with $8,100. The website currently shows a Say No To Bethany Hall-Long ad marked as paid for by Citizens for a New Delaware Way.

“PACs are offshoots of an organization officially set up to contribute to campaigns, and we're definitely seeing more of them participate in the Delaware landscape,” Hoff said, adding several trends have been developing as a result of PAC influence.

The role of out-of-state money is significant, he said.

That door was opened after a 2010 U.S. Supreme Court decision placed PAC contributions under the First Amendment’s freedom of speech and expression, allowing for unlimited PAC contributions. Hoff said a billionaire with a seemingly unending supply of cash can make a difference, especially in a small state like Delaware.

“When we talk about money … we can have very few people controlling what goes on in American politics, and that’s not a good thing,” Hoff said.

Then there is the tone of a group’s messaging. PACs claim to be altruistic or cosmopolitan in their messaging, Hoff said, but they tend to focus on one issue, and the messaging often turns negative.

That negativity is evident in a string of recent commercials airing on television paid for with PAC money.

“I would say those types of commercials chip away at the trust and legitimacy of the American political system when you get them back-to-back-to-back,” he said. “It seems to be prevalent in these commercials.”

University of Delaware professor Paul Brewer says negative campaigning is definitely up.

"I've seen high levels of PAC activity in Delaware campaigns this year – and much of that activity has revolved around negative campaigning. The negativity does fit with historical patterns in PAC campaigning. PACs often go negative because they're relatively anonymous, while candidates' own campaigns tend to be more positive because they're associated with the candidate's own name," Brewer said.

Ultimately, Hoff said, the fear is that negativity will erode trust in the country’s institutions.

“When it goes negative, I think there is a detrimental effect on the American political system,” he said. “It may not be immediate, but can you recoup the trust in a system? Or will that be a generation lost because they have been bombarded with those types of commercials?”

### Busy PACs

On the county level, Preserve Sussex has been active with mailings and endorsements. With a reported balance of about $75,000, contributors in 2024 include Rob Tunnell III with $2,500 and developer Stonemark Ventures with $15,000. In 2023, contributors included Alex Pires with $2,000; Elmer Fanin, Stonemark Ventures and Stafford Street Capital with $10,000 each; and $25,000 contributed by Robert Hudson, for a total of $68,000.

This election season, the PAC has generated flyers sent across the county.

Another PAC generating flyers is Change Can’t Wait, which lists about $510,000 in receipts with contributions from Sussex County businessmen Chris Schell donating $20,000 aggregate, Aug. 16; CJ Hudson Ventures, $10,000, Aug. 20; Joe Schell, $10,000, Aug. 20; and Wilmington developer Louis Capano, $45,000 aggregate, also Aug. 20. Hundreds of thousands of dollars are posted for going to the PAC’s Wilmington address for a third-party advertiser.

Other Sussex County-oriented PACs include Shore Democrats, which has generated more than $14,000, giving out up to $1,000 for candidates. About $9,000 has gone to Bear Trap Dunes in Ocean View.

Share:

On the low end so far are Plan for Sussex with $608, and Sussex County Chairmen’s Club with $54.65.

### Long history of PACs

PACs have been part of the U.S. election process since 1944, when President Franklin D. Roosevelt’s re-election campaign established the first one.

In 1971, the Federal Election Campaign Act attempted more transparency by setting rules on contributions and disclosures. McCain/Feingold legislation had set limits to PAC contributions until a 2010 Supreme Court decision allowed for the creation of so-called super PACs, which can raise and spend unlimited amounts of money for a campaign.

Delaware code, under Title 15, Section 8020, allows PACs to pay for campaign staff wages, travel and associated expenses, advertising, election watchers and other expenses.

While contribution limits are spelled out for individuals and political parties, there are none specifically for PACs. Law states any contribution by a political action committee shall be by a check which discloses the full name and address of said political action committee. Delaware code also states that no political party shall make any contribution to any political action committee.

PAC information can be found at the Delaware Department of Elections website under campaign finance.

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 10

Delaware elections

# Campaign Finance Section
# Financial Report

FINAL REPORT

Financial Reports are required to be submitted to the Campaign Finance Section of the Office of the State Election Commissioner by all Candidates, Committees, and Organizations. Late or incomplete reports are subject to fines levied by the Commissioner's Office, so please be sure to check all applicable deadlines and file on time. Add extra sheets if necessary.

FULL ORGANIZATION NAME: **Rony Baltazar-Lopez for Delaware**

ACCOUNT NUMBER : **01006133**

DATE OF THIS REPORT : **08/06/2025**

REPORTING PERIOD START : **01/01/2025**

REPORTING PERIOD END : **12/31/2025**

OFFICE SOUGHT : **State Office - State Representative - District 36**

CHECK THE BOX THAT APPLIES TO THIS REPORT :

| | | | | | |
|---|---|---|---|---|---|
| PRIMARY ELECTION | ☐ 8-DAY | ☐ 30-DAY | OTHER ELECTION | ☐ 8-DAY | ☐ 30-DAY |
| GENERAL ELECTION | ☐ 8-DAY | ☐ 30-DAY | SPECIAL ELECTION | ☐ 8-DAY | ☐ 30-DAY |
| | ☑ YEAR END | | | | |
| THIRD-PARTY ADVERTISERS | ☐ | | | | |
| FINAL ORGANIZATION CLOSING : | ☑ YES | ☐ NO | | | |
| AMENDMENT : | ☐ YES | ☑ NO | CLOSING DATE : | **08/06/2025** | |

I authorize that all information included in this Financial Report package is accurate and correct. I agree to abide by all rules and regulations regarding Campaign Finance and the election process in the State of Delaware. I understand that representatives from the Office of the State Election Commissioner will perform an audit of all information provided on this report.

TREASURER SIGNATURE DATE

CANDIDATE SIGNATURE DATE

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## STATEMENT OF ACCOUNT BALANCE

ACCOUNT NUMBER : **01006133**

REPORTING PERIOD : **01/01/2025** (FROM) **12/31/2025** (TO)

| | |
|---|---|
| 1. BEGINNING BALANCE (Ending Balance from last reporting period) | **$1,942.38** |
| 2. RECEIPTS : | |
| A. SCHEDULE A - TOTAL RECEIPTS | **$2,070.62** |
| B. SCHEDULE C-1 - TOTAL IN-KIND RECEIPTS | **$0.00** |
| C. SCHEDULE D-1 - TOTAL LOANS RECEIVED AND DEBTS INCURRED | **$0.00** |
| D. SCHEDULE E - TOTAL EXPENSE REIMBURSEMENTS RECEIVED | **$0.00** |
| E. SUBTOTAL (Total of A,B,C,D) | **$2,070.62** |
| 3. EXPENDITURES : | |
| F. SCHEDULE B - TOTAL EXPENDITURES | **$0.00** |
| G. SCHEDULE C-2 - TOTAL IN-KIND EXPENDITURES | **$0.00** |
| H. SCHEDULE D-2 - LOAN AND DEBT PAYMENTS | **$4,013.00** |
| I. SCHEDULE E - INTER COMMITTEE (SHARED) EXPENSES | **$0.00** |
| J. SUBTOTAL (Total of F,G,H,I) | **$4,013.00** |
| 4. ENDING BALANCE (Beginning Balance plus 2E minus 3J) | **$0.00** |
| 5. VALUE OF NON-CASH ASSETS (From Schedule F) | **$0.00** |
| 6. VALUE OF DISPOSED/TRANSFERRED ASSETS (From Schedule G) | **$0.00** |
| 7. VALUE OF LOANS AT END OF PERIOD (Loan Balance From Schedule D-2) | **$0.00** |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE A - TOTAL RECEIPTS

ACCOUNT NUMBER : **01006133**

REPORTING PERIOD : **01/01/2025** (FROM) **12/31/2025** (TO)

Itemize all receipts over $100 for the reporting period. Receipts from sales of items must be itemized if they are over $50. NOTE: If you receive funds from the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**RECEIPTS :**

| Date Received | Contributor Name | Contributor Mailing Address | Aggregate Amount | Amount Received |
|---|---|---|---|---|
| 07/28/2025 | Rony Jonathan Baltazar-Lopez | 17148 Windward Blvd Unit 303, Milford, Delaware, 19963 | $2,070.62 | $2,070.62 |
| **TOTAL ITEMIZED RECEIPTS** | | | | $2,070.62 |
| **TOTAL OF CONTRIBUTIONS NOT EXCEEDING $100** | | | | $0.00 |
| **GRAND TOTAL RECEIPTS (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2A)** | | | | $2,070.62 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE B - TOTAL EXPENDITURES

ACCOUNT NUMBER : **01006133**

REPORTING PERIOD : **01/01/2025** (FROM) **12/31/2025** (TO)

Itemize all expenditures over $100 for the reporting period. All expenditures to Political Committees must be itemized, regardless of the amount. NOTE: IF you expend funds to the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**EXPENDITURES :**

| Date Expended | Payee Name | Payee Mailing Address | Vendor | Aggregate Amount | Amount Expended |
|---|---|---|---|---|---|
| **TOTAL ITEMIZED EXPENDITURES** | | | | | $0.00 |
| **TOTAL OF EXPENDITURES NOT EXCEEDING $100** | | | | | $0.00 |
| **GRAND TOTAL EXPENDITURES (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3F)** | | | | | $0.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

Case: 26-2469 Document: 26 Page: 243 Date Filed: 07/15/2026

Delaware elections

## SCHEDULE C-1 - TOTAL IN-KIND RECEIPTS

ACCOUNT NUMBER : **01006133** REPORTING PERIOD : **01/01/2025** FROM **12/31/2025** TO

Itemize all goods and services contributed at no charge or less than fair market value in excess of $100 for the reporting period. NOTE: If you receive in-kind contributions from the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**IN-KIND CONTRIBUTIONS :**

(NOTE: ESTIMATED VALUE RECEIVED IS FAIR MARKET VALUE LESS ANY PAYMENTS YOU MADE FOR THE GOODS OR SERVICES)

| Date Received | Contributor Name | Contributor Mailing Address | Description of Contribution | Est. Amount Received |
|---|---|---|---|---|
| **TOTAL ITEMIZED IN-KIND CONTRIBUTIONS** | | | | $0.00 |
| **TOTAL OF IN-KIND CONTRIBUTIONS NOT EXCEEDING $100** | | | | $0.00 |
| **GRAND TOTAL RECEIPTS<br>(TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2B)** | | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE C-2 - TOTAL IN-KIND EXPENDITURES

ACCOUNT NUMBER : **01006133**

REPORTING PERIOD : **01/01/2025** FROM **12/31/2025** TO

Itemize all goods and services expended at no charge or less than fair market value in excess of $100 for the reporting period. NOTE: If you pay in-kind expenditures to the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**IN-KIND EXPENDITURES :**

(NOTE: ESTIMATED VALUE EXPENDED IS FAIR MARKET VALUE LESS ANY PAYMENTS YOU RECEIVED FOR THE GOODS OR SERVICES)

| Date Expended | Person or Activity Name | Person or Activity Location or Mailing Address | Vendor | Description of Expenditure | Est. Amount Expended |
|---|---|---|---|---|---|
| **TOTAL ITEMIZED IN-KIND EXPENDITURES** | | | | | $0.00 |
| **TOTAL OF IN-KIND EXPENDITURES NOT EXCEEDING $100** | | | | | $0.00 |
| **GRAND TOTAL EXPENDITURES (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3G)** | | | | | $0.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE D-1 - TOTAL LOANS RECEIVED AND DEBTS INCURRED

ACCOUNT NUMBER : **01006133**

REPORTING PERIOD : **01/01/2025** (FROM) **12/31/2025** (TO)

All loans in excess of $50 RECEIVED DURING THIS REPORTING PERIOD should be itemized on this schedule. NOTE: These loans must also be listed on Schedule D-2.

**LOANS RECEIVED IN EXCESS OF $50 :**

| Transaction Id | Date Received | Lender | Endorser | Description of Security | Int. Rate | Amount Received |
|---|---|---|---|---|---|---|
| **TOTAL LOANS RECEIVED (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2C)** | | | | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE D-2 - TOTAL LOANS AND DEBTS OUTSTANDING

ACCOUNT NUMBER : **01006133** REPORTING PERIOD : **01/01/2025** FROM **12/31/2025** TO

All outstanding loans in excess of $50 must be listed. This includes loans from Lending Institutions, Candidates Personal Funds and Other Contributors.

**LOANS IN EXCESS OF $50 :**

| Transaction Id | Date Received | Lender | Endorser | Description | Int Rate | Previous Loan Balance | Payments Made | Balance |
|---|---|---|---|---|---|---|---|---|
| 708799 | 07/05/2024 | Rony Jonathan Baltazar-Lopez<br>17148 Windward Blvd Unit 303, Milford, Delaware, 19963 | | To pay for the 2024 Candidate Filing Fee | | $1,013.00 | $1,013.00 | $0.00 |
| 713410 | 07/25/2024 | Rony Jonathan Baltazar-Lopez<br>17148 Windward Blvd Unit 303, Milford, Delaware, 19963 | | -- Forgiven | | $3,000.00 | $3,000.00 | $0.00 |
| **TOTAL LOANS (TOTAL PAYMENTS MADE SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCT BALANCE, ITEM 3H. TOTAL LOAN BALANCE SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCT BALANCE, ITEM 7.)** | | | | | | $4,013.00 | $4,013.00 | $0.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE E - INTER COMMITTEE (SHARED) EXPENSES

ACCOUNT NUMBER : **01006133**

REPORTING PERIOD : **01/01/2025** FROM **12/31/2025** TO

All expense reimbursements received by you and paid by you must be itemized.

**REIMBURSEMENTS RECEIVED (Monies paid to you as reimbursements for expenses you incurred.)**

| Date Received | Reimburser | Description of Activity | Activity Date | Total Expense | Reimbursement |
|---|---|---|---|---|---|
| **TOTAL REIMBURSEMENTS RECEIVED (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2D.)** | | | | $0.00 | $0.00 |

**REIMBURSEMENTS PAID (Monies paid by you to reimburse others for expenses they incurred.)**

| Date Paid | Payee | Description of Activity | Activity Date | Total Expense | Reimbursement |
|---|---|---|---|---|---|
| **TOTAL REIMBURSEMENTS PAID (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3I.)** | | | | $0.00 | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE F - NON-CASH ASSETS

ACCOUNT NUMBER : **01006133** REPORTING PERIOD : **01/01/25** FROM **12/31/2025** TO

Itemize all non-cash assets owned by the organization including those paid for by the organization, lent to the organization and contributed to the organization.

**LIST ALL NON-CASH ASSETS**

| Date Received | Description of Asset | Location of Asset (Physical Address) | Value of Asset |
|---|---|---|---|
| **TOTAL ASSET VALUE<br>(TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 5.)** | | | $0.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

## SCHEDULE G - ELIMINATION OF ASSETS

ACCOUNT NUMBER : **01006133**

REPORTING PERIOD : **01/01/2025** (FROM) **12/31/2025** (TO)

Itemize all non-cash assets disposed of, transferred or sold by the organization during the reporting period.

**LIST ALL ELIMINATED ASSETS**

| Date Eliminated | Description of Asset | Disposition of Asset | Value of Asset |
|---|---|---|---|
| **TOTAL ASSETS ELIMINATED (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 6.)** | | | $0.00 |

Current Amended Deleted Amended New

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 11

State of Delaware
The Official Website of the First State

**Delaware Campaign Finance Reporting System**

MENU | REMINDERS | LOGOUT

- Committee
- Change Committee Status
- View / Edit Committee Information
- Login as Committee
- View Filed Reports
- View Contributions / Loans
- View Expenditures / Debts Incurred
- Delete Committees
- Primary Winners
- Candidate Filing Form
- Maintenance
- Messaging
- Audit
- Audit Trail
- Correspondence
- View DE Voters
- Email Track
- Historical Filings
- Change Username / Password
- Loans Maintenance

## VIEW / EDIT 3rd Party Advertisers Entity Registration

(Patrick Jackson)

### 3rd Party Advertisers

Person Organization

Committee Name*

Prefix | First Name* | Middle Name

Last Name* | Suffix

Email* | Confirm Email* | Cell Phone* (for Internal use)

Office Phone* | Home Phone (If entered then Public can view it) | Fax

Date of Origination* | Purpose* (Maximum characters: 250)

Party Affiliation: -- Select Party --

**Physical Address**

Address Line 1* | Address Line 2

City* | State* Delaware | Zip* -

***Mailing Address*** Same as Physical Address

Address Line 1* | Address Line 2

City* | State* Delaware | Zip* -

### Affiliated Candidate Information

Candidate Name | Position --Select Position--

Save Candidate Cancel

| Candidate Committee Name | Candidate Name | Office Sought Name | PartyAffiliationName | Position | Status | Delete |
|---|---|---|---|---|---|---|
| No records to view. | | | | | | |

Name of Party if entire ticket is supported: -- Select Party --

### Treasurer Information

Self

Add New Treasurer

| Name | Email | Mailing Address | Office Phone | Start Date | End Date | Actions |
|---|---|---|---|---|---|---|
| No records to view. | | | | | | |

### Additional Contacts (Optional)

Add New Contact

| Role | Name | Mailing Address | Work Phone | Cell Phone | Email | Start Date | End Date | Receive Notices | For Public | Actions |
|---|---|---|---|---|---|---|---|---|---|---|
| No records to view. | | | | | | | | | | |

### Documents / Correspondence

Add Document

| Document Date | Document Type | Document Description | Added By | Actions |
|---|---|---|---|---|
| 01/25/2018 | Statement of Organization (Original) (Revision 1) | | | |
| 01/25/2018 | Statement of Organization | Signed Original | Kenneth Albert McDowell | |
| 03/13/2018 | Filing Form | | Robin Greenhow | |
| 08/04/2018 | Statement of Organization (Revision 2) | | Kendra Johnson | |
| 10/28/2019 | Filing Form | | Robin Greenhow | |
| 05/02/2022 | Filing Form | | Patrick N Jackson | |
| 06/06/2024 | Filing Form | | Patrick N Jackson | |
| 05/26/2026 | Filing Form | | Patrick N Jackson | |

Displaying page 1 of 1, records 1 to 8 of 8

Filing Information

| Filing Period Name | Filing Method | Report Due Date | Original Filed Date | Amendment Filed Date | UploadedBy |
|---|---|---|---|---|---|
| 2025 Annual | Original Financial Report | 01/20/2026 | 01/20/2026 | | Kendra Johnson |
| 2024 Annual | Original Financial Report | 01/21/2025 | 01/21/2025 | | Kendra Johnson |
| 2024 8 Day 2024 General Election 11/05/2024 | Original Financial Report | 10/30/2024 | 10/30/2024 | | Kendra Johnson |
| 2024 30 Day 2024 General Election 11/05/2024 | Original Financial Report | 10/09/2024 | 10/10/2024 | | Kendra Johnson |
| 2023 Annual | Original Financial Report | 01/22/2024 | 01/21/2024 | | Kendra Johnson |
| 2022 Annual | Original Financial Report | 01/20/2023 | 01/20/2023 | | Kendra Johnson |
| 2022 8 Day 2022 General Election 11/08/22 | Original Financial Report | 11/03/2022 | 11/02/2022 | | Kendra Johnson |
| 2022 30 Day 2022 General Election 11/08/22 | Original Financial Report | 10/11/2022 | 10/11/2022 | | Kendra Johnson |
| 2021 Annual | Original Financial Report | 01/20/2022 | 01/20/2022 | | Kendra Johnson |
| 2020 Annual | Original Financial Report | 01/20/2021 | 01/20/2021 | | Kendra Johnson |
| 2020 8 Day 2020 General Election 11/03/2020 | Original Financial Report | 10/28/2020 | 10/28/2020 | | Kendra Johnson |
| 2020 30 Day 2020 General Election 11/03/2020 | Original Financial Report | 10/06/2020 | 10/06/2020 | | Kendra Johnson |
| 2019 Annual | Original Financial Report | 01/21/2020 | 01/20/2020 | | Kendra Johnson |
| 2018 Annual | Original Financial Report | 01/22/2019 | 01/22/2019 | | Kendra Johnson |
| 2018 8 Day 2018 General 11/06/2018 | Original Financial Report | 10/31/2018 | 10/31/2018 | | Kendra Johnson |

< Previous ... 1 2 ... Next > Displaying page 1 of 2, records 1 to 15 of 18 Go to Page

Violations

| Filing Period Name | Report Due Date | Filed Date | Violation Status | Violation Date | Violation Amount | Outstanding Balance | Violation |
|---|---|---|---|---|---|---|---|
| 2024 30 Day 2024 General Election 11/05/2024 | 10/09/2024 | 10/10/2024 | Closed | 10/10/2024 | $50.00 | $0.00 | Failure to file |
| 2018 30 Day 2018 General 11/06/2018 | 10/09/2018 | 10/14/2018 | Closed | 10/10/2018 | $250.00 | $0.00 | Failure to file |

Displaying page 1 of 1, records 1 to 2 of 2

Transaction level Violations

| Committee Name | Phone | FilingPeriod | Email |
|---|---|---|---|

No records to view.

Submit MaintainFlags Enter Comments / Problem Tracking Cancel

Office of the State Election Commissioner
Home | Contact | FAQs

Delaware.gov | Privacy | Translate | Contact | Phone Directory

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 12

State of Delaware
The Official Website of the First State

**Delaware Campaign Finance Reporting System**

MENU HOME

## Register a Political Action Committee(PAC)

STEP 1 STEP 2 STEP 3

### Political Action Committee Information

Are you filing reports with an Out-of-State Agency or the Federal Election Commission ? Yes ○ No ◉

Committee Name* ______ Other Name ______

Date of Origination* ______ Purpose* ______
(Maximum characters: 250)

Party Affiliation [-- Select Party --]

**Contact Information**

Office Phone* ______ (for Internal use) Web Address ______

Email* ______ Confirm Email* ______ Fax ______

**Physical Address**

Address Line 1* ______ Address Line 2 ______

City* ______ State* [Delaware] Zip* ______ - ______

**Mailing Address** ☐ Same as Physical Address

Address Line 1* ______ Address Line 2 ______

City* ______ State* [Delaware] Zip* ______ - ______

### Affiliated Candidate Information

Candidate Name ______ Position [--Select Position--]

Add Candidate Cancel

| Candidate Committee Name | Candidate Name | Office Sought Name | PartyAffiliationName | Position | Status | Delete |
|---|---|---|---|---|---|---|
| No records to view. | | | | | | |

Name of Party if entire ticket is supported [-- Select Party --]

### Treasurer Information

Prefix ______ First Name* ______ Middle Name ______

Last Name* ______ Suffix ______

Email* ______ Confirm Email* ______ Cell Phone* ______ (for Internal use)

Work Phone* ______ Home Phone ______ (If entered then Public can view it) Fax ______

**Physical Address**

Address Line 1* ______ Address Line 2 ______

City* ______ State* [Delaware] Zip* ______ - ______

**Mailing Address** ☐ Same as Physical Address

Address Line 1* ______ Address Line 2 ______

City* ______ State* [Delaware] Zip* ______ - ______

### Additional Contacts (Optional)

Contact Role* [--Select Role--]

JA-271

Prefix [ ] First Name* [ ] Middle Name [ ]

Last Name* [ ] Suffix [ ]

Email [ ] Confirm Email [ ]

Cell Phone* [ ] (for Internal use) Work Phone [ ] Home Phone [ ] (If entered then Public can view it)

Fax [ ] Receive Notices [ ] For Public [ ]

**Residence Address**

Address Line 1* [ ] Address Line 2 [ ]

City* [ ] State* Delaware Zip* [ ] - [ ]

**Mailing Address** [ ] Same as Residence Address

Address Line 1* [ ] Address Line 2 [ ]

City* [ ] State* Delaware Zip* [ ] - [ ]

Save Contact Cancel

| Role | Name | Mailing Address | Work Phone | Cell Phone | Email | Start Date | End Date | Receive Notices | For Public | Actions |
|---|---|---|---|---|---|---|---|---|---|---|

No records to view.

Continue Clear Cancel

Office of the State Election Commissioner

Home | Contact | FAQs

Delaware.gov | Privacy | Translate | Contact | Phone Directory

JA-272

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 13


State of Delaware
The Official Website of the First State
Delaware Campaign Finance Reporting System
MENU
REMINDERS
LOGOUT
View / Edit Registration Information
Create Sub-Committee
Enter Contributions/Transfers/In-kind Contributions
Enter Expenditures and Debts Incurred
Enter Non-Candidate Loans
Enter Loan Payments
Enter Return Contributions
Enter Debts Incurred Paid
Edit / File Pending Transactions
Amend Transactions
Upload Transactions
Maintain Users
Maintain Fixed Assets
Change Username / Password
Reminders
Bo McDowell (Campaign Finance Training - Bo McDowell)
Message from Administrator
Upcoming Filing Period Due Dates
2015 Annual
01/20/2016
Tasks
Count
My Verifications
0
Committee Name
Verification Request
Created Date
Reviewed
No records to view.
Pending Verifications for this Committee
0
Violations
Filing Period Name
Report Due Date
Filed Date
Violation Status
Violation Date
Violation Amount
Outstanding Balance
Violation
No records to view.
Office of the State Election Commissioner
Home | Contact | FAQs
Delaware.gov | Privacy | Translate | Contact | Phone Directory



State of Delaware
The Official Website of the First State

Delaware Campaign Finance Reporting System

MENU | REMINDERS | LOGOUT

Enter Contributions/Transfers/In-Kind Contributions

Bo McDowell (Campaign Finance Training - Bo McDowell)

Contribution General Information

Filing Period* 2015 Annual

Contribution Type* --Select Contribution Type--

--Select Contribution Type--
Candidate Loan
Cash
Check
Coordinated In-Kind
Credit Card
Data Conversion
Electronic Fund Transfer
Expense Reimbursement
In-Kind
Other Income
Payroll Deductions
Refund/Rebate
Ticket Purchases Cash
Ticket Purchases Check
Ticket Purchases Credit Card
Total of Contributions not exceeding $100
Transfer

Contributor Type* --Select Contributor Type--

--Select Contributor Type--
Business/Group/Organization
Candidate Committee
Dem or Rep National Sub-Committees
Individual
Labor Union
Non-Profit Organization
Out-of-State or Federal Committee
Political Action Committee
Political Committee
Self (Candidate)
Total of Contributions not exceeding $100

Contributor Information

Search Existing Contributors

Search Contributor Na

-or- Enter Contributor Information

Pre

First Name*

Last Nam

Suffix

Mailing Address

Address Line

Address Line 2

C

State* Delaware

Zip* -

Contribution Details

Contribution Date*

Contribution Amount*

Contribution Limit NA

Total Cumulative Amount

Comments

Comments will not appear on filed report

Submit | Clear | Cancel

Office of the State Election Commissioner

Home | Contact | FAQs

Delaware.gov | Privacy | Translate | Contact | Phone Directory


State of Delaware
The Official Website of the First State
Delaware Campaign Finance Reporting System
MENU
REMINDERS
LOGOUT
Edit / File Pending Transactions
Bo McDowell (Campaign Finance Training - Bo McDowell)
Filing Period Name* 2015 Annual
Transaction Type --Select Transaction Type--
Transaction Category --Select Contribution Type--
Transaction Date Range
Amount Range
Contributor / Payee Name
Receipt Not Generated
Non-Compliant Transactions
Search
Cancel
Clear
Transaction Date
Contributor / Payee Name
Transaction Type
Transaction Category
Amount
Address
Compliance
Edit
Select
05/15/2015 John Burgundy Contribution Check $50.00 202 Maroon Ave, Wilmington, Delaware 19801
10/27/2015 John Burgundy Contribution Check $350.00 202 Maroon Ave, Wilmington, Delaware 19801
Displaying page 1 of 1, records 1 to 2 of 2
Generate Receipt
Preview Filing
Delete
Delete All
File All to State
File Closeout Report
Office of the State Election Commissioner
Home | Contact | FAQs


State of Delaware
The Official Website of the First State
Delaware Campaign Finance Reporting System
MENU
REMINDERS
LOGOUT
View / Edit Registration Information
Create Sub-Committee
Enter Contributions/Transfers/In-kind Contributions
Enter Expenditures and Debts Incurred
Enter Non-Candidate Loans
Enter Loan Payments
Enter Return Contributions
Enter Debts Incurred Paid
Edit / File Pending Transactions
Amend Transactions
Upload Transactions
Maintain Users
Maintain Fixed Assets
Change Username / Password
Reminders
Bo McDowell (Campaign Finance Training - Bo McDowell)
Message from Administrator
Upcoming Filing Period Due Dates
2015 Annual
01/20/2016
Tasks
Count
My Verifications
0
Committee Name
Verification Request
Created Date
Reviewed
No records to view.
Pending Verifications for this Committee
0
Violations
Filing Period Name
Report Due Date
Filed Date
Violation Status
Violation Date
Violation Amount
Outstanding Balance
Violation
No records to view.
Office of the State Election Commissioner
Home | Contact | FAQs
Delaware.gov | Privacy | Translate | Contact | Phone Directory


State of Delaware
The Official Website of the First State
Delaware Campaign Finance Reporting System
MENU
REMINDERS
LOGOUT
Enter Expenditures and Debts Incurred
Bo McDowell (Campaign Finance Training - Bo McDowell)
Expenditure General Information
Filing Period* 2015 Annual
Payee Type* Business/Group/Organization
Payee Information
Search Existing Payee
Search Payee Name
-or- Enter Payee Information
Business/Organization Name* Staples
Mailing Address
Address Line 1* 1041 N DuPont Hwy
Address Line 2
City* Dover
State* Delaware
Zip* 19901
Expenditure Details
Expense Date* 10/29/2015
Expense Category* --Select Expense Category--
Expense Purpose* --Select Expense Purpose--
Expense Amount* $50.00
Debts Incurred
Payment Method* Credit Card
Expenditure Limit
Total Cumulative Amount
Fixed Assets
Description of Asset*
Fixed Asset Value*
Location of Asset
Address Line 1*
Address Line 2
City*
State*
Zip*
Vendor Details (If Payee is not the Vendor)
Vendor Name
Address Line 1
Address Line 2
City
State
Zip
--Select Expense Category--
Contributions
Data Conversion
Direct Mailing by Mail House (R)
Field Expenses
Fund Raiser
In-Kind
Independent Expenditures
Media
Other Expenses
Postage
Printing and Campaign Materials
Purchase of Equipment
Reimburse
Rent and Other Office expenses
Salaries and Other compensation
Total of Expenditures not exceeding $100
Transfer
Comments
Update Expenses
Cancel


State of Delaware
The Official Website of the First State
Delaware Campaign Finance Reporting System
MENU | REMINDERS | LOGOUT
Enter Expenditures and Debts Incurred
Bo McDowell (Campaign Finance Training - Bo McDowell)

Expenditure General Information
Filing Period* 2015 Annual
Payee Type* ---Select Payee Type---
---Select Payee Type---
Business/Group/Organization
Candidate Committee
Data Conversion
Dem or Rep National Sub-Committees
Individual
Labor Union
Non-Profit Organization
Out-of-State or Federal Committee
Political Action Committee
Political Committee
Total of Expenditures not exceeding $100

Payee Information
Search Existing Payee
Search Payee Name
-or- Enter Payee Information
Prefix | First Name* | Middle Name
Last Name* | Suffix
Mailing Address
Address Line 1* | Address Line 2
City* | State* Delaware | Zip* -

Expenditure Details
Expense Date* | Expense Category* --Select Expense Category-- | Expense Purpose* --Select Expense Purpose--
Expense Amount* | Debts Incurred | Fixed Assets | Payment Method* --Select Payment Method--
Expenditure Limit | Total Cumulative Amount
Fixed Assets
Description of Asset* | Fixed Asset Value*
Location of Asset
Address Line 1* | Address Line 2
City* | State* Delaware | Zip* -
Vendor Details (If Payee is not the Vendor)
Vendor Name
Address Line 1 | Address Line 2
City | State Delaware | Zip -

Comments

Save Expense | Clear | Cancel



State of Delaware
The Official Website of the First State

elaware Campaign Finance Reporting System

MENU | REMINDERS | LOGOUT

Enter Expenditures and Debts Incurred

Bo McDowell (Campaign Finance Training - Bo McDowell)

Expenditure General Information

Filing Period* 2015 Annual

Payee Type* Business/Group/Organization

Payee Information

Search Existing Payee

Search Payee Name Staples, 1041 N DuPont Hwy, Dover, Delaware

-or- Enter Payee Information

Business/Organization Name* Staples

Mailing Address

Address Line 1* 1041 N DuPont Hwy

Address Line 2

City* Dover

State* Delaware

Zip* 19901 -

Expenditure Details

Expense Date* 10/29/2015

Expense Category* Rent and Other Office expenses

Expense Purpose* Office Supplies

Expense Amount* $50.00

Debts Incurred

Fixed Assets

Payment Method* Credit Card

Expenditure Limit

Total Cumulative Amount $0.00

Fixed Assets

Description of Asset*

Fixed Asset Value*

Location of Asset

Address Line 1*

Address Line 2

City*

State* Delaware

Zip* -

Vendor Details (If Payee is not the Vendor)

Vendor Name

Address Line 1

Address Line 2

City

State Delaware

Zip -

Comments

Save Expense | Clear | Cancel

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 14

Delaware elections

**Campaign Finance Section**
**Financial Report**

ORIGINAL

Financial Reports are required to be submitted to the Campaign Finance Section of the Office of the State Election Commissioner by all Candidates, Committees, and Organizations. Late or incomplete reports are subject to fines levied by the Commissioner's Office, so please be sure to check all applicable deadlines and file on time. Add extra sheets if necessary.

FULL ORGANIZATION NAME: **American Civil Liberties Union of Delaware Action Fund**

ACCOUNT NUMBER : **04005042** DATE OF THIS REPORT : **10/06/2020**

REPORTING PERIOD START : **08/21/2020** REPORTING PERIOD END : **10/06/2020**

OFFICE SOUGHT :

CHECK THE BOX THAT APPLIES TO THIS REPORT :

| | | | | | |
|---|---|---|---|---|---|
| PRIMARY ELECTION | ☐ 8-DAY | ☐ 30-DAY | OTHER ELECTION | ☐ 8-DAY | ☐ 30-DAY |
| GENERAL ELECTION | ☐ 8-DAY | ☐ 30-DAY | SPECIAL ELECTION | ☐ 8-DAY | ☐ 30-DAY |
| | ☐ YEAR END | | | | |
| THIRD-PARTY ADVERTISERS | ☑ | | | | |
| FINAL ORGANIZATION CLOSING : | ☐ YES | ☑ NO | | | |
| AMENDMENT : | ☐ YES | ☑ NO | CLOSING DATE : | | |

I authorize that all information included in this Financial Report package is accurate and correct. I agree to abide by all rules and regulations regarding Campaign Finance and the election process in the State of Delaware. I understand that representatives from the Office of the State Election Commissioner will perform an audit of all information provided on this report.

**Jennifer Ying**

TREASURER SIGNATURE DATE

Current Amended Deleted Amended New

Delaware elections

## STATEMENT OF ACCOUNT BALANCE

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : FROM **08/21/2020** TO **10/06/2020**

| | |
|---|---|
| 1. BEGINNING BALANCE (Ending Balance from last reporting period) | **$0.00** |
| 2. RECEIPTS : | |
| A. SCHEDULE A - TOTAL RECEIPTS | **$70,000.00** |
| B. SCHEDULE C-1 - TOTAL IN-KIND RECEIPTS | **N/A** |
| C. SCHEDULE D-1 - TOTAL LOANS RECEIVED AND DEBTS INCURRED | **N/A** |
| D. SCHEDULE E - TOTAL EXPENSE REIMBURSEMENTS RECEIVED | **N/A** |
| E. SUBTOTAL (Total of A,B,C,D) | **$70,000.00** |
| 3. EXPENDITURES : | |
| F. SCHEDULE B - TOTAL EXPENDITURES | **$53,051.02** |
| G. SCHEDULE C-2 - TOTAL IN-KIND EXPENDITURES | **N/A** |
| H. SCHEDULE D-2 - LOAN AND DEBT PAYMENTS | **N/A** |
| I. SCHEDULE E - INTER COMMITTEE (SHARED) EXPENSES | **N/A** |
| J. SUBTOTAL (Total of F,G,H,I) | **$53,051.02** |
| 4. ENDING BALANCE (Beginning Balance plus 2E minus 3J) | **$16,948.98** |
| 5. VALUE OF NON-CASH ASSETS (From Schedule F) | **N/A** |
| 6. VALUE OF DISPOSED/TRANSFERRED ASSETS (From Schedule G) | **N/A** |
| 7. VALUE OF LOANS AT END OF PERIOD (Loan Balance From Schedule D-2) | **N/A** |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE A - TOTAL RECEIPTS

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : **08/21/2020** FROM **10/06/2020** TO

Itemize all receipts over $100 for the reporting period. Receipts from sales of items must be itemized if they are over $50. NOTE: If you receive funds from the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**RECEIPTS :**

| Date Received | Contributor Name | Contributor Mailing Address | Aggregate Amount | Amount Received |
|---|---|---|---|---|
| 09/25/2020 | American Civil Liberties Union | 125 Broad Street, 18th Floor, New York, New York, 10004 | $70,000.00 | $70,000.00 |
| **TOTAL ITEMIZED RECEIPTS** | | | | $70,000.00 |
| **TOTAL OF CONTRIBUTIONS NOT EXCEEDING $100** | | | | $0.00 |
| **GRAND TOTAL RECEIPTS (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2A)** | | | | $70,000.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE B - TOTAL EXPENDITURES

ACCOUNT NUMBER : **04005042** REPORTING PERIOD : **08/21/2020** FROM **10/06/2020** TO

Itemize all expenditures over $100 for the reporting period. All expenditures to Political Committees must be itemized, regardless of the amount. NOTE: IF you expend funds to the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**EXPENDITURES :**

| Date Expended | Payee Name | Payee Mailing Address | Vendor | Aggregate Amount | Amount Expended |
|---|---|---|---|---|---|
| 10/02/2020 | 4Imprint Inc. | P.O. Box 320, Oshkosh, Wisconsin, 54901 | | $649.52 | $649.52 |
| 10/02/2020 | Benjaminia Johnson | 739 Townsend Place, Wilming, Delaware, 19801 | | $460.00 | $460.00 |
| 10/02/2020 | Charly Bass | 6 E. Third Street, Apt 502, Wilmington, Delaware, 19801 | | $2,000.00 | $2,000.00 |
| 10/02/2020 | Cherelle Shaw | 357 John F Kennedy Way, Willingboro, New Jersey, 08046 | | $270.00 | $270.00 |
| 10/02/2020 | Daroun Jamison | 400 Kenper Drive, Newark, Delaware, 19702 | | $1,000.00 | $1,000.00 |
| 10/02/2020 | Dashynque Morrow | 409 South Clayment Street, Wilmington, Delaware, 19801 | | $270.00 | $270.00 |
| 10/02/2020 | Deoddrick Purnell | 6 E. Third Street, Wilmington, Delaware, 19801 | | $270.00 | $270.00 |
| 10/02/2020 | Deshawn Gardner | 100 W 10th Street, Suite 706, Wilmington, Delaware, 19801 | | $270.00 | $270.00 |
| 10/02/2020 | Diana Dixon | 1222 Pearl Street, Wilmington, Delaware, 19801 | | $460.00 | $460.00 |
| 10/02/2020 | Elosha Anderson | 101 W 30th Street, Wilmington, Delaware, 19802 | | $330.00 | $330.00 |

Current Amended Deleted Amended New

Delaware elections

| | | | | | |
|---|---|---|---|---|---|
| 10/02/2020 | Facebook Inc. | 1 Facebook Way, Menlo Park, California, 94025 | | $11,331.96 | $11,331.96 |
| 10/02/2020 | Fahtyma Lee | 630 N. Walnut Street, Wilmington, Delaware, 19801 | | $880.00 | $880.00 |
| 10/02/2020 | Hakeem Coates | 107 W. 41st Street, Wilmington, Delaware, 19802 | | $1,000.00 | $1,000.00 |
| 10/02/2020 | Haneef Salaam | 3009 Stoddard Place, Wilmington, Delaware, 19802 | | $2,000.00 | $2,000.00 |
| 10/02/2020 | I Heart Media Inc. | P.O. Box 419499, Boston, Massachusetts, 02241 | | $9,755.00 | $9,755.00 |
| 10/02/2020 | J.D.'s Cafe | 6 E Third Street, #502, WIlmington, Delaware, 19801 | | $450.00 | $450.00 |
| 10/02/2020 | Jereka McGriff | 1915 Prospect Road, Wilmington, Delaware, 19805 | | $760.00 | $760.00 |
| 10/02/2020 | Jonda Brown | 803 W. 34th Street, Wilmington, Delaware, 19802 | | $820.00 | $820.00 |
| 10/02/2020 | Joyce Dixon | 226 Birch Ave., Wilmington, Delaware, 19805 | | $860.00 | $860.00 |
| 10/02/2020 | Kamil Bass | 215 N Market Street, Apt. 335, Wilmington, Delaware, 19801 | | $800.00 | $800.00 |
| 10/02/2020 | Keenan Black | 5 Prince Alley, New Castle, Delaware, 19702 | | $400.00 | $400.00 |
| 10/02/2020 | Latresha Alston | 203-3 Terrace Drive, Newark, Delaware, 19871 | | $780.00 | $780.00 |
| 10/02/2020 | Mercantile Press Inc. | 3007 Bellevue Ave., Wilmington, Delaware, 19802 | | $688.00 | $688.00 |
| 10/02/2020 | Miesha Perkins | 2602 N Jefferson St., Apt. B30, Wilmington, Delaware, 19802 | | $1,000.00 | $1,000.00 |
| 10/02/2020 | Mike Bartley | 1329 Prospect Drive, Wilmington, Delaware, 19809 | | $2,000.00 | $2,000.00 |
| 10/02/2020 | Nadine Vickers | 2301 N. Jefferson Street, Wilmington, Delaware, 19802 | | $1,000.00 | $1,000.00 |
| 10/02/2020 | Nikarray Middlebrook | 1720 N Washington Street, Apt. 3, Wilmington, Delaware, 19802 | | $880.00 | $880.00 |

Current Amended Deleted Amended New

Delaware elections

| | | | | | |
|---|---|---|---|---|---|
| 10/02/2020 | Savvy Communications LLC | 41-750 Rancho Las Palmas Drive, Suite E-3, Rancho Mirage, California, 92270 | | $5,563.40 | $5,563.40 |
| 10/02/2020 | Starr Cooper | 407 W. 24th Street, Wilmington, Delaware, 19802 | | $270.00 | $270.00 |
| 10/02/2020 | Stones' Phones | 41-750 Rancho Las Palmas Drive, Suite E-3, Rancho Mirage, California, 92270 | | $4,546.28 | $4,546.28 |
| 10/02/2020 | Tappitchar Bass | 6 E. Third Street, Wilmington, Delaware, 19801 | | $270.00 | $270.00 |
| 10/02/2020 | The Spoken Hub LLC | 20 West 22nd Street, Suite 706, New York, New York, 10010 | | $260.00 | $260.00 |
| 10/02/2020 | Thoroughthreads Screenprinting Inc | 700 Cornell Drive, E15, Wilmington, Delaware, 19801 | | $650.00 | $650.00 |
| 10/02/2020 | Walgreens Inc. | 300 N Bradford Ave, West Chester, Pennsylvania, 19380 | | $106.86 | $106.86 |
| **TOTAL ITEMIZED EXPENDITURES** | | | | | $53,051.02 |
| **TOTAL OF EXPENDITURES NOT EXCEEDING $100** | | | | | $0.00 |
| **GRAND TOTAL EXPENDITURES (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3F)** | | | | | $53,051.02 |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE C-1 - TOTAL IN-KIND RECEIPTS

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : **08/21/2020** FROM **10/06/2020** TO

Itemize all goods and services contributed at no charge or less than fair market value in excess of $100 for the reporting period. NOTE: If you receive in-kind contributions from the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**IN-KIND CONTRIBUTIONS :**

(NOTE: ESTIMATED VALUE RECEIVED IS FAIR MARKET VALUE LESS ANY PAYMENTS YOU MADE FOR THE GOODS OR SERVICES)

| Date Received | Contributor Name | Contributor Mailing Address | Description of Contribution | Est. Amount Received |
|---|---|---|---|---|
| **TOTAL ITEMIZED IN-KIND CONTRIBUTIONS** | | | | $0.00 |
| **TOTAL OF IN-KIND CONTRIBUTIONS NOT EXCEEDING $100** | | | | $0.00 |
| **GRAND TOTAL RECEIPTS (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2B)** | | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE C-2 - TOTAL IN-KIND EXPENDITURES

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : FROM **08/21/2020** TO **10/06/2020**

Itemize all goods and services expended at no charge or less than fair market value in excess of $100 for the reporting period. NOTE: If you pay in-kind expenditures to the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**IN-KIND EXPENDITURES :**

(NOTE: ESTIMATED VALUE EXPENDED IS FAIR MARKET VALUE LESS ANY PAYMENTS YOU RECEIVED FOR THE GOODS OR SERVICES)

| Date Expended | Person or Activity Name | Person or Activity Location or Mailing Address | Vendor | Description of Expenditure | Est. Amount Expended |
|---|---|---|---|---|---|
| **TOTAL ITEMIZED IN-KIND EXPENDITURES** | | | | | $0.00 |
| **TOTAL OF IN-KIND EXPENDITURES NOT EXCEEDING $100** | | | | | $0.00 |
| **GRAND TOTAL EXPENDITURES (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3G)** | | | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE D-1 - TOTAL LOANS RECEIVED AND DEBTS INCURRED

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : **08/21/2020** (FROM) **10/06/2020** (TO)

All loans in excess of $50 RECEIVED DURING THIS REPORTING PERIOD should be itemized on this schedule. NOTE: These loans must also be listed on Schedule D-2.

**LOANS RECEIVED IN EXCESS OF $50 :**

| Transaction Id | Date Received | Lender | Endorser | Description of Security | Int. Rate | Amount Received |
|---|---|---|---|---|---|---|
| **TOTAL LOANS RECEIVED (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2C)** | | | | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE D-2 - TOTAL LOANS AND DEBTS OUTSTANDING

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : **08/21/2020** FROM **10/06/2020** TO

All outstanding loans in excess of $50 must be listed. This includes loans from Lending Institutions, Candidates Personal Funds and Other Contributors.

**LOANS IN EXCESS OF $50 :**

| Transaction Id | Date Received | Lender | Endorser | Description | Int Rate | Previous Loan Balance | Payments Made | Balance |
|---|---|---|---|---|---|---|---|---|
| **TOTAL LOANS (TOTAL PAYMENTS MADE SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCT BALANCE, ITEM 3H. TOTAL LOAN BALANCE SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCT BALANCE, ITEM 7.)** | | | | | | $0.00 | $0.00 | $0.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE E - INTER COMMITTEE (SHARED) EXPENSES

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : **08/21/2020** FROM **10/06/2020** TO

All expense reimbursements received by you and paid by you must be itemized.

**REIMBURSEMENTS RECEIVED (Monies paid to you as reimbursements for expenses you incurred.)**

| Date Received | Reimburser | Description of Activity | Activity Date | Total Expense | Reimbursement |
|---|---|---|---|---|---|
| **TOTAL REIMBURSEMENTS RECEIVED (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2D.)** | | | | $0.00 | $0.00 |

**REIMBURSEMENTS PAID (Monies paid by you to reimburse others for expenses they incurred.)**

| Date Paid | Payee | Description of Activity | Activity Date | Total Expense | Reimbursement |
|---|---|---|---|---|---|
| **TOTAL REIMBURSEMENTS PAID (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3I.)** | | | | $0.00 | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE F - NON-CASH ASSETS

ACCOUNT NUMBER : **04005042** REPORTING PERIOD : **08/21/20** FROM **10/06/2020** TO

Itemize all non-cash assets owned by the organization including those paid for by the organization, lent to the organization and contributed to the organization.

**LIST ALL NON-CASH ASSETS**

| Date Received | Description of Asset | Location of Asset (Physical Address) | Value of Asset |
|---|---|---|---|
| **TOTAL ASSET VALUE (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 5.)** | | | $0.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE G - ELIMINATION OF ASSETS

ACCOUNT NUMBER : **04005042**

REPORTING PERIOD : **08/21/2020** (FROM) **10/06/2020** (TO)

Itemize all non-cash assets disposed of, transferred or sold by the organization during the reporting period.

**LIST ALL ELIMINATED ASSETS**

| Date Eliminated | Description of Asset | Disposition of Asset | Value of Asset |
|---|---|---|---|
| **TOTAL ASSETS ELIMINATED**<br>**(TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 6.)** | | | $0.00 |

Current Amended Deleted Amended New

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 15

Delaware elections

**Campaign Finance Section**
**Financial Report**

ORIGINAL

Financial Reports are required to be submitted to the Campaign Finance Section of the Office of the State Election Commissioner by all Candidates, Committees, and Organizations. Late or incomplete reports are subject to fines levied by the Commissioner's Office, so please be sure to check all applicable deadlines and file on time. Add extra sheets if necessary.

FULL ORGANIZATION NAME: **Pike Creek Democrats - IE**

ACCOUNT NUMBER : **04005057** DATE OF THIS REPORT : **10/25/2020**

REPORTING PERIOD START : **10/17/2020** REPORTING PERIOD END : **10/18/2020**

OFFICE SOUGHT :

CHECK THE BOX THAT APPLIES TO THIS REPORT :

| | | | | | |
|---|---|---|---|---|---|
| PRIMARY ELECTION | ☐ 8-DAY | ☐ 30-DAY | OTHER ELECTION | ☐ 8-DAY | ☐ 30-DAY |
| GENERAL ELECTION | ☐ 8-DAY | ☐ 30-DAY | SPECIAL ELECTION | ☐ 8-DAY | ☐ 30-DAY |
| | ☐ YEAR END | | | | |
| THIRD-PARTY ADVERTISERS | ☑ | | | | |
| FINAL ORGANIZATION CLOSING : | ☐ YES | ☑ NO | | | |
| AMENDMENT : | ☐ YES | ☑ NO | CLOSING DATE : | | |

I authorize that all information included in this Financial Report package is accurate and correct. I agree to abide by all rules and regulations regarding Campaign Finance and the election process in the State of Delaware. I understand that representatives from the Office of the State Election Commissioner will perform an audit of all information provided on this report.

**Jonathan Rudenberg**

TREASURER SIGNATURE DATE

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

**STATEMENT OF ACCOUNT BALANCE**

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** FROM **10/18/2020** TO

| | | |
|---|---|---|
| 1. | BEGINNING BALANCE (Ending Balance from last reporting period) | **$0.00** |
| 2. | RECEIPTS : | |
| A. | SCHEDULE A - TOTAL RECEIPTS | **$175.00** |
| B. | SCHEDULE C-1 - TOTAL IN-KIND RECEIPTS | **N/A** |
| C. | SCHEDULE D-1 - TOTAL LOANS RECEIVED AND DEBTS INCURRED | **N/A** |
| D. | SCHEDULE E - TOTAL EXPENSE REIMBURSEMENTS RECEIVED | **N/A** |
| E. | SUBTOTAL (Total of A,B,C,D) | **$175.00** |
| 3. | EXPENDITURES : | |
| F. | SCHEDULE B - TOTAL EXPENDITURES | **$175.00** |
| G. | SCHEDULE C-2 - TOTAL IN-KIND EXPENDITURES | **N/A** |
| H. | SCHEDULE D-2 - LOAN AND DEBT PAYMENTS | **N/A** |
| I. | SCHEDULE E - INTER COMMITTEE (SHARED) EXPENSES | **N/A** |
| J. | SUBTOTAL (Total of F,G,H,I) | **$175.00** |
| 4. | ENDING BALANCE (Beginning Balance plus 2E minus 3J) | **$0.00** |
| 5. | VALUE OF NON-CASH ASSETS (From Schedule F) | **N/A** |
| 6. | VALUE OF DISPOSED/TRANSFERRED ASSETS (From Schedule G) | **N/A** |
| 7. | VALUE OF LOANS AT END OF PERIOD (Loan Balance From Schedule D-2) | **N/A** |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE A - TOTAL RECEIPTS

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** (FROM) **10/18/2020** (TO)

Itemize all receipts over $100 for the reporting period. Receipts from sales of items must be itemized if they are over $50. NOTE: If you receive funds from the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**RECEIPTS :**

| Date Received | Contributor Name | Contributor Mailing Address | Aggregate Amount | Amount Received |
|---|---|---|---|---|
| 10/18/2020 | Pike Creek Democrats | PO Box 571, Hockessin, Delaware, 19707 | $300.00 | $175.00 |
| **TOTAL ITEMIZED RECEIPTS** | | | | $175.00 |
| **TOTAL OF CONTRIBUTIONS NOT EXCEEDING $100** | | | | $0.00 |
| **GRAND TOTAL RECEIPTS (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2A)** | | | | $175.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE B - TOTAL EXPENDITURES

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** FROM **10/18/2020** TO

Itemize all expenditures over $100 for the reporting period. All expenditures to Political Committees must be itemized, regardless of the amount. NOTE: IF you expend funds to the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**EXPENDITURES :**

| Date Expended | Payee Name | Payee Mailing Address | Vendor | Aggregate Amount | Amount Expended |
|---|---|---|---|---|---|
| 10/18/2020 | Facebook Inc.<br>Stephanie Barry - RD21 | 1601 Willow Rd, Menlo Park, California, 94025 | | $300.00 | $175.00 |
| **TOTAL ITEMIZED EXPENDITURES** | | | | | $175.00 |
| **TOTAL OF EXPENDITURES NOT EXCEEDING $100** | | | | | $0.00 |
| **GRAND TOTAL EXPENDITURES (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3F)** | | | | | $175.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE C-1 - TOTAL IN-KIND RECEIPTS

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** FROM **10/18/2020** TO

Itemize all goods and services contributed at no charge or less than fair market value in excess of $100 for the reporting period. NOTE: If you receive in-kind contributions from the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**IN-KIND CONTRIBUTIONS :**

(NOTE: ESTIMATED VALUE RECEIVED IS FAIR MARKET VALUE LESS ANY PAYMENTS YOU MADE FOR THE GOODS OR SERVICES)

| Date Received | Contributor Name | Contributor Mailing Address | Description of Contribution | Est. Amount Received |
|---|---|---|---|---|
| **TOTAL ITEMIZED IN-KIND CONTRIBUTIONS** | | | | $0.00 |
| **TOTAL OF IN-KIND CONTRIBUTIONS NOT EXCEEDING $100** | | | | $0.00 |
| **GRAND TOTAL RECEIPTS**<br>**(TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2B)** | | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE C-2 - TOTAL IN-KIND EXPENDITURES

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** FROM **10/18/2020** TO

Itemize all goods and services expended at no charge or less than fair market value in excess of $100 for the reporting period. NOTE: If you pay in-kind expenditures to the same person or organization several times during the reporting period, each item must be listed if the aggregate amount is over $100, even if the individual amounts are not.

**IN-KIND EXPENDITURES :**

(NOTE: ESTIMATED VALUE EXPENDED IS FAIR MARKET VALUE LESS ANY PAYMENTS YOU RECEIVED FOR THE GOODS OR SERVICES)

| Date Expended | Person or Activity Name | Person or Activity Location or Mailing Address | Vendor | Description of Expenditure | Est. Amount Expended |
|---|---|---|---|---|---|
| **TOTAL ITEMIZED IN-KIND EXPENDITURES** | | | | | $0.00 |
| **TOTAL OF IN-KIND EXPENDITURES NOT EXCEEDING $100** | | | | | $0.00 |
| **GRAND TOTAL EXPENDITURES (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3G)** | | | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE D-1 - TOTAL LOANS RECEIVED AND DEBTS INCURRED

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** FROM **10/18/2020** TO

All loans in excess of $50 RECEIVED DURING THIS REPORTING PERIOD should be itemized on this schedule. NOTE: These loans must also be listed on Schedule D-2.

**LOANS RECEIVED IN EXCESS OF $50 :**

| Transaction Id | Date Received | Lender | Endorser | Description of Security | Int. Rate | Amount Received |
|---|---|---|---|---|---|---|
| **TOTAL LOANS RECEIVED (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2C)** | | | | | | $0.00 |

Current Amended Deleted Amended New

## SCHEDULE D-2 - TOTAL LOANS AND DEBTS OUTSTANDING

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** FROM **10/18/2020** TO

All outstanding loans in excess of $50 must be listed. This includes loans from Lending Institutions, Candidates Personal Funds and Other Contributors.

**LOANS IN EXCESS OF $50 :**

| Transaction Id | Date Received | Lender | Endorser | Description | Int Rate | Previous Loan Balance | Payments Made | Balance |
|---|---|---|---|---|---|---|---|---|
| **TOTAL LOANS (TOTAL PAYMENTS MADE SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCT BALANCE, ITEM 3H. TOTAL LOAN BALANCE SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCT BALANCE, ITEM 7.)** | | | | | | $0.00 | $0.00 | $0.00 |

Current Amended Deleted Amended New

Delaware elections

# SCHEDULE E - INTER COMMITTEE (SHARED) EXPENSES

ACCOUNT NUMBER : **04005057**

REPORTING PERIOD : **10/17/2020** (FROM) **10/18/2020** (TO)

All expense reimbursements received by you and paid by you must be itemized.

**REIMBURSEMENTS RECEIVED (Monies paid to you as reimbursements for expenses you incurred.)**

| Date Received | Reimburser | Description of Activity | Activity Date | Total Expense | Reimbursement |
|---|---|---|---|---|---|
| **TOTAL REIMBURSEMENTS RECEIVED**<br>**(TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 2D.)** | | | | $0.00 | $0.00 |

**REIMBURSEMENTS PAID (Monies paid by you to reimburse others for expenses they incurred.)**

| Date Paid | Payee | Description of Activity | Activity Date | Total Expense | Reimbursement |
|---|---|---|---|---|---|
| **TOTAL REIMBURSEMENTS PAID**<br>**(TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 3I.)** | | | | $0.00 | $0.00 |

■ Current ■ Amended ■ Deleted ■ Amended New

Delaware elections

## SCHEDULE F - NON-CASH ASSETS

ACCOUNT NUMBER : **04005057** REPORTING PERIOD : **10/17/20** FROM **10/18/2020** TO

Itemize all non-cash assets owned by the organization including those paid for by the organization, lent to the organization and contributed to the organization.

**LIST ALL NON-CASH ASSETS**

| Date Received | Description of Asset | Location of Asset (Physical Address) | Value of Asset |
|---|---|---|---|
| **TOTAL ASSET VALUE (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 5.)** | | | $0.00 |

Current Amended Deleted Amended New

Delaware elections

## SCHEDULE G - ELIMINATION OF ASSETS

ACCOUNT NUMBER : **04005057** REPORTING PERIOD : FROM **10/17/2020** TO **10/18/2020**

Itemize all non-cash assets disposed of, transferred or sold by the organization during the reporting period.

**LIST ALL ELIMINATED ASSETS**

| Date Eliminated | Description of Asset | Disposition of Asset | Value of Asset |
|---|---|---|---|
| **TOTAL ASSETS ELIMINATED (TOTAL SHOULD ALSO APPEAR ON PAGE 2, STATEMENT OF ACCOUNT BALANCE, ITEM 6.)** | | | $0.00 |

Current Amended Deleted Amended New

*Americans for Prosperity Foundation, et. al. v. Albence, et. al., C.A. No. 1:26-cv-00445-JLH*

# Exhibit 16

SPONSOR: Rep. K. Williams & Sen. Walsh
Reps. Bolden, K. Johnson, Michael Smith, Snyder-Hall, Wilson-Anton; Sens. Hansen, Hoffner, Sokola

HOUSE OF REPRESENTATIVES
153rd GENERAL ASSEMBLY

HOUSE SUBSTITUTE NO. 1
FOR
HOUSE BILL NO. 216

AN ACT TO AMEND TITLE 15 OF THE DELAWARE CODE RELATING TO ELECTION CAMPAIGNS AND PUBLIC DISCLOSURES.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

Section 1. Amend § 8002, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows and by redesignating accordingly:

§ 8002. Definitions.

As used in this chapter:

(1) "Affiliated controlling entity" means a person or entity that has the power to direct the decision and operations of another entity through any of the following means:

a. The governing instrument of the entity requires it to be bound by decisions of the affiliated controlling entity.

b. The governing board of the entity includes persons who are specifically designated representatives of the affiliated controlling entity or who are members of the governing board, officers, or paid executive staff members of the affiliated controlling entity, or whose service on the governing board is contingent upon the approval of the affiliated controlling entity.

c. The entity is created or sponsored by the affiliated controlling entity.

~~(5)~~ (6) "Clearly identified candidate" means that the name, ~~a photograph~~ photograph, image, or a drawing of the candidate appears or the identity of the candidate is otherwise ~~apparent by unambiguous reference.~~ clear and obvious.

~~(7)~~ (8) "Communications media" means television, radio, ~~newspaper or other~~ newspaper, social media, text message, email, periodical, sign, Internet, ~~mail~~ mail, or telephone.

(9) "Conduit" means an entity whose primary purpose is to act as an intermediary or pass-through for the transfer of funds between a donor and a third-party advertisement or political committee.

~~(8)~~ <u>(10)</u> “Contribution” means any advance, deposit, gift, expenditure or transfer, of money or any other thing of value, to or for the benefit of any candidate or political committee involved in an election, including without limitation ~~any:~~ <u>any of the following:</u>

a. Gift, subscription, advance, deposit, expenditure or transfer of any thing of ~~value;~~ <u>value.</u>

b. Discount or rebate not available to the general public (except a party’s abatement or refund of a filing fee otherwise required under § 3103 of this ~~title);~~ <u>title).</u>

c. Loan (except a loan of money by a national or state bank, building and loan ~~association~~ <u>association,</u> or licensed lender made in the ordinary course of ~~business);~~ <u>business).</u>

d. Purchase of tickets, ~~goods~~ <u>goods,</u> or services sold to raise funds for a campaign, whether or not the tickets, ~~goods~~ <u>goods,</u> or services are used by the ~~buyer;~~ <u>buyer.</u>

e. Forgiveness of indebtedness or payment of indebtedness by another ~~person;~~ <u>person.</u>

f. Service or use of property without full payment therefor (except the contribution of services by an individual, the use of an individual’s residence, the contribution of such items as invitations, ~~food~~ <u>food,</u> and beverages by an individual volunteering personal services or the individual’s residence, or the use of the ~~telephone equipment~~ <u>household facilities</u> of any ~~person); or~~ <u>person).</u>

g. Any other thing of value (except an independent expenditure).

<u>(11) “Donor” means a person who voluntarily contributes funds to a business entity, nonprofit organization, political committee, or other organization that directly or indirectly, through a conduit or otherwise, contributes to a political committee or third-party advertisement.</u>

<u>(16) “Foreign national” means any of the following:</u>

<u>a. A government of a foreign country.</u>

<u>b. A foreign political party.</u>

<u>c. A person who is not a citizen or lawful permanent resident of the United States.</u>

<u>d. An entity organized under the laws of or having its principal place of business in a foreign country.</u>

<u>(17) “Foreign-controlled entity” means any of the following:</u>

<u>a. An entity in which a foreign national owns or controls 20% or more of the equity or voting interests.</u>

<u>b. An entity in which a foreign national directs, dictates, or participates materially in decision-making regarding political contributions or expenditures.</u>

~~(15)~~ <u>(20)</u> “Membership communication” means ~~a newsletter or periodical, telephone call, or any other~~ <u>any</u> communication distributed solely to the members, shareholders, or employees of an organization or institution.

(22) "Out-of-state political action committee" means an organization or association organized under laws outside of the State, which accepts contributions from or makes expenditures to an election within the State, and is any of the following:

a. An entity registered with the Federal Elections Commission.

b. An entity registered with an out-of-state agency that requires the organization to report campaign finance expenditures and contributions to the out-of-state agency.

~~(19)~~ (25) "Political committee" means:

a. Any organization or association, whether permanent or created for the purposes of a specific political campaign, which accepts contributions from or makes expenditures to any candidate, candidate ~~committee~~ committee, or political party in an aggregate amount in excess of $500 during an election period, not including independent ~~expenditures; and~~ expenditures and is not an out-of-state political committee.

b. All political parties and candidate committees.

c. An out-of-state political committee that contributes more than $2,000 to a Delaware election, exempting contributions made to candidate committees and political parties.

~~(28)~~ (34) "Treasurer" means the individual appointed by a candidate or political committee to assist the candidate or political committee with the duties imposed by this chapter.

(35) "Underlying funding source" means the following must be disclosed:

a. For an entity that is not a political action committee or a nonprofit:

1. The name and address of the individual responsible for making and disclosing the entity's contribution.

2. The name and address of all persons who, directly or otherwise, own a legal or equitable interest of 50% or greater (whether in the form of stock ownership, percentage of partnership interest, liability for the debts of the entity, entitlement to the profits from the other entity or other indicia of interest) in the corporation, partnership, or other entity, or a statement that no such persons exist.

3. The 5 persons who made the 5 largest aggregate transfers to the entity in the last 12 months, if applicable.

4. If the entity is a conduit, then the underlying source of funds of the person who contributed the funds to the conduit.

b. For a political action committee:

1. The name of any affiliated controlling entity.

2. Unless paragraph (35)b.3. of this section applies, the name of the 5 persons who made the 5 largest aggregate transfers to the political action committee in the past 12 months. If any of the persons listed under this paragraph are not individuals, then the underlying funding source of those persons.

3. If the political action committee is acting as a conduit for earmarked funds that originate from a single donor, then the underlying source of funding of the original donor of those funds.

c. For a nonprofit organization, such as a tax-exempt entity under Section 501(c)(4) of the Internal Revenue Code:

1. Unless paragraph (35)c.2. of this section applies, the name of the top 5 persons who made the 5 largest aggregate transfers to the nonprofit in the past 12 months. If any of the persons listed under this paragraph are not individuals, then the underlying funding source of those persons.

2. If the nonprofit organization is acting as a conduit for earmarked funds that originate from a single donor, then the underlying source of funding of the original donor of those funds.

Section 2. Amend § 8005, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows:

§ 8005. Duties of a political committee.

(a) (1) A political committee ~~shall:~~ that is not an out-of-state political committee must file

~~(1) File~~ a statement of organization with the Commissioner no later than 24 hours after it receives any contribution or makes any expenditure that causes the aggregate amount of contributions by or expenditures to such committee to exceed $500 during an election period.

(2) An out-of-state political committee must file a statement of organization with the Commissioner no later than 24 hours after it receives any contribution for or makes an expenditure to an election in Delaware that causes the aggregate amount of contributions by or expenditures to an election in Delaware to exceed $2,000 during an election period, exempting contributions to candidate committees and political parties.

(b) The statement of organization required by subsection (a) of this section shall be filed under penalty of perjury, and shall include the following information:

~~a.~~ (1) The full name and mailing address of the ~~committee;~~ committee.

~~b.~~ (2) The full name and mailing address of each of the officers of the committee, 1 of whom shall be an individual named as its ~~treasurer;~~ treasurer.

~~c.~~ (3) A concise statement of the committee's purposes or ~~goals;~~ goals.

~~d.~~ (4) The name, office sought, and party affiliation of any candidate whom the committee is supporting or opposing, to the extent such information is known as of the date of filing; and, if the committee is supporting the entire ticket of any party, the name of the ~~party; and~~ party.

~~e.~~ (5) If the committee files reports with the Federal Elections Commission or any out-of-state agency, a statement to that effect including the name of the agency.

(6) The name of all affiliated controlling entities of the political committee.

(c) A political committee that files a statement of organization under this section must do the following:

~~(2)~~ (1) Report any change in its officers within 7 days after such change becomes effective.

~~(3)~~ (2) Keep complete records of all contributions received and all expenditures made by or on behalf of the political committee, and shall retain such records for 3 full years following the election in connection with which the contributions and expenditures were made.

~~(4)~~ (3) File with the Commissioner the reports required under this chapter.

(d) For purposes of determining the $2,000 threshold under paragraph (a)(2) of this section, the following applies:

(1) Contributions for and expenditures to an election in Delaware include the following:

a. Contributions for or expenditures to an in-state political action committee.

b. Contributions for or expenditures to an out-of-state political action committee earmarked to be used in a Delaware election.

c. A third-party advertisement or independent expenditure.

(2) Contributions for an election in Delaware does not include contributions to candidate committees or political parties.

Section 3. Amend § 8013, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows:

§ 8013. ~~Short title~~ Foreign contributions prohibited.

(a) No foreign national or foreign-controlled entity may, directly or indirectly, make a contribution, expenditure, independent expenditure, or electioneering communication in connection with any state or local election in this State.

(b) No candidate, candidate committee, political committee, or other person may knowingly solicit, accept, direct, receive, or expend a contribution or other thing of value from a foreign national or foreign controlled entity.

(c) A contribution or expenditure shall be considered indirect if made through a conduit, intermediary, affiliate, or any other person or entity acting on behalf of or at the direction of a foreign national or foreign-controlled entity.

(d) Each political committee and candidate committee must certify, in each report required under this chapter, that it has not knowingly received or expended funds prohibited by this section.

Section 4. Amend § 8021, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows:

§ 8021. Identification of purchaser.

(a) All campaign advertisements having a fair market value of $500 or more, except printed items with a surface of less than 9 square inches, shall include prominently the statement:

"Paid for by [name of political committee or other person paying for such advertisement]."

For purposes of this section, "campaign advertisements" shall include any communication by a candidate committee or political party that would otherwise qualify as an independent expenditure or an electioneering communication but for the fact it was made by a candidate committee or political party.

(b) All third-party advertisements having a fair market value of $500 or more, except printed items with a surface of less than 9 square inches, shall include prominently the statement:

"Paid for by [name of political committee or other person paying for such third-party ~~advertisement.~~ advertisement], [state of residence, incorporation, or registration]. Learn more about [name of person] at ~~[Commissioner of Elections' web address]."~~ [website to be determined by the Commissioner of Elections]."

(c) If the person paying for a third-party advertisement under subsection (b) of this section is not an individual, the advertisement must also disclose the following:

(1) The name of the entity's responsible party.

(2) The name of any controlling affiliated entities.

(3) All persons who, directly or otherwise, own a legal or equitable interest of 50% or greater (whether in the form of stock ownership, percentage of partnership interest, liability for the debts of the entity, entitlement to the profits from the other entity or other indicia of interest) in the corporation, partnership or other entity, if such persons exist.

(4) The 5 persons who made the 5 largest aggregate transfers to the entity in the last 12 months, if applicable.

(5) A link to a website maintained by the entity that lists all contributions to the third-party advertiser in the last 12 months that are greater than $100 and the underlying funding source of all contributions that are greater than $100 and not from an individual, if applicable. The website shall contain a white background with black 12-point font. It must state at the top of the website the following statement:

"Below is a list of all contributions greater than $100 to [the entity] as required by Title 15 of the Delaware Code."

(6) Next to the name of each person disclosed under this subsection, the third-party advertisement and linked website must also disclose the person's state of residence, incorporation, or registration.

~~(c)~~ (d) The Commissioner may adopt regulations regarding the size, ~~placement~~ placement, and duration of the foregoing statements as the same shall apply to specific forms of campaign advertisements. In connection therewith, the Commissioner may modify or amend the foregoing statements to conform to the requirements of a particular medium (i.e., television, radio, print, Internet), and may by regulation create exemptions from the requirements hereunder where compliance is not reasonably practicable due to the small size or short duration of such advertisements. In all events, however, campaign advertisements having the same medium and duration (for example, 15-second radio advertisements or Internet advertisements having less than 200 characters) ~~shall~~ must be subject to the same requirements. The Commissioner must identify, and update as necessary, a web address to be used by all third-party advertisements under subsection (b) of this section.

Section 5. Amend § 8030, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows:

§ 8030. Reports of political committees.

(a) Each candidate (except a candidate who is excused from filing a report under § 8004 of this title) and every treasurer of a political committee that must file a statement of organization with the Commissioner (except of a candidate excused from filing a report under § 8004 of this title) shall be responsible for filing with the Commissioner reports of contributions and expenditures on forms prescribed by the Commissioner for every reporting period during which a political committee is in existence. A candidate shall be jointly responsible with the treasurer for the filing of the report of a candidate committee.

(h) For each expenditure for campaign advertising reported under this section, a candidate committee or political party must disclose:

(1) The name of each vendor or platform that produced, distributed, or disseminated the advertisement.

(2) The medium used to distribute the advertisement.

(3) A brief description of the advertisement.

(4) The target audience, stated as any of the following:

a. The geographic area targeted.

b. For digital or electronic advertisements, a general description of any demographic, interest-based, or audience-selection criteria used.

(i) Each report filed under this section must include a certification that the reporting entity has not knowingly received contributions or made expenditures prohibited under section § 8013 of this title.

Section 6. Amend § 8031, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows:

§ 8031. Special reports — Third-party advertisements.

(a) Any person other than a candidate committee or political party who makes an expenditure for any third-party advertisement that causes the aggregate amount of expenditures for third-party advertisements made by such person to exceed $500 during an election period shall file a third-party advertisement report with the Commissioner. The report shall be filed under penalty of perjury and shall include all of the following:

(1) The information required under ~~§ 8005(1)~~ § 8005(b) of this title with respect to the person making ~~such expenditure;~~ the expenditure.

(2) The full name and mailing address of each person to whom any expenditure has been made by such person during the reporting period in an aggregate amount in excess of $100; the amount, date and purpose of each such expenditure; and the name of, and office sought by, each candidate on whose behalf such expenditure was ~~made;~~ made.

(3) The full name and mailing address of each person who has made contributions to such person during the election period in an aggregate amount or value in excess of $100; the total of all contributions from such person during the election period, and the amount and date of all contributions from such person during the reporting ~~period;~~ period.

(4) If a person who made a contribution under paragraph (a)(3) of this section is not an individual, the full name and mailing address ~~of:~~ of the underlying funding source for that person.

~~a. Any person who, directly or otherwise, owns a legal or equitable interest of 50 percent or greater in such entity; and~~

~~b. One responsible party, if the aggregate amount of contributions made by such entity during the election period exceeds $1,200; and~~

(5) The aggregate amount of all contributions made to the person who made the expenditure.

(b) For purposes of this section, a reporting period shall begin on the day after the previous reporting period under § 8030 of this title or this section, whichever is later. However, if the person making the expenditure hereunder was not previously required to file any reports during the election period under § 8030 of this title or this section, then the reporting period ~~shall begin~~ begins on the date the first contribution is received or expenditure made by or on behalf of such person in

the current election period. A reporting period shall end on the date of the expenditure set forth in subsection (a) of this section.

(c) Any person other than an individual that makes a contribution for which disclosure is required under paragraph (a)(3) of this section shall provide written notification in accordance with § 8012(e) of this title to the person filing the report hereunder. The person filing the report may rely on such notification, and should the notification provided by the representative of the entity be inaccurate or misleading, the person or persons responsible for the notification, and not the person filing the report, shall be liable therefor.

(d) If the expenditure is made more than 30 days before a primary or special election or 60 days before a general election, the report required under this section shall be filed within 48 hours after such expenditure is made. If the expenditure is made 30 days or less before a primary or special election or 60 days or less before an election, such report shall be filed with the Commissioner within 24 hours after such expenditure is made. For purposes of this section, an expenditure shall be deemed to be made on the date it is paid or obligated, whichever is earlier.

(e) The Commissioner ~~shall adopt regulations exempting, to the extent possible, persons from reporting duplicative information under this chapter.~~ must adopt regulations relating to the reporting of third-party advertisements under this section, with illustrative examples of how the law applies in specific cases. The regulations must include examples of how to determine the underlying funding source if the source of funds for the third-party advertisement is not from an individual. A summary of the regulations, with illustrative examples must be posted on the Election Commissioner's website.

(f) Persons required to file reports under this section shall retain complete records of all expenditures made and contributions received in connection herewith for 3 years following the election for which such report was filed.

(g) For each third-party advertisement reported under this section, the report must include all of the following:

(1) The name of each vendor or platform that produced, distributed, or disseminated the advertisement.

(2) The medium used to distribute the advertisement, including television, radio, print, mail, digital, or other electronic communication.

(3) A brief description of the advertisement, sufficient to identify its subject matter.

(4) The target audience, stated as any of the following:

a. The geographic area targeted.

b. For digital or electronic advertisements, a general description of any demographic, interest-based, or audience-selection criteria used.

Section 7. Amend Subchapter IV, Chapter 80, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows:

<u>§ 8031A. Negative balance prohibited.</u>

<u>No report submitted under § 8030 or §8031 of this title may contain a negative ending balance. "Ending balance" means the ending balance from the last reporting period and total receipts from the current reporting period minus total expenditures from the current reporting period. A report containing a negative balance is incomplete and may be considered tardy under § 8044 of this title.</u>

Section 8. Amend § 8043, Title 15 of the Delaware Code by making deletions as shown by strike through and insertions as shown by underline as follows:

§ 8043. Violations; penalties; jurisdiction in Superior Court.

(a) Except as set forth in § 8044 of this title, any person who knowingly violates any provision of § 8003, ~~§ 8004 or § 8005~~ <u>§ 8004, § 8005, or § 8031A</u> of this title ~~shall be~~ <u>is</u> guilty of a class B misdemeanor.

Section 9. This Act is effective immediately and is to be implemented on July 1, 2028.

<u>SYNOPSIS</u>

This Act expands Delaware's campaign finance disclosure requirements to provide more transparency regarding the source of funding for contributions to and expenditures made from political committees in the State. To that end this Act does the following:

1. Requires out-of-state committees that contribute more than $2,000 to a Delaware election (exempting contributions to candidates and political parties) to register with the State Election Commissioner (Commissioner).

2. Requires political committees to list any affiliated controlling entities on its statement of registration.

3. Increases the disclosure requirements to be placed on third-party advertisements by requiring the advertisement to display, if applicable, the name of a majority owner of the third-party advertiser, the responsible party, affiliated controlling entities, and the 5 persons who made the 5 largest aggregate transfers to the entity in the last 12 months.

4. Requires third-party advertisers to display a link to a website that lists all contributions to the third-party advertisement in excess of $100. Any contribution that is greater than $100 that is not from an individual must also include information on the contribution's underlying funding source.

4. Prohibits all reports filed with the Commissioner from containing a negative balance so that the source of all funds are disclosed, including any loans.

Substitute 1 to HB 216 makes the following changes:

1. Prohibits a foreign national or foreign-controlled entity from making a contribution, expenditure, independent expenditure, or electioneering communication in connection with any state or local election in the State.

2. Requires that all campaign finance reports disclose specific information about advertisements, including the name of the vendor or platform used, the medium used, a description of the advertisement, and the target audience.

3. Replaces the current link to the Election Commissioner's website on third-party advertisements with a website to be "determined" by the Election Commissioner.

4. Requires that third-party party advertisements display the state of residence, incorporation, or registration of all persons disclosed on the advertisement itself and on the linked website containing additional disclosures.

5. Updates definitions to include modern modes of communication.

6. Changes the implementation date to July 1, 2028.

7. Makes technical changes to conform existing law to the standards of the Delaware Legislative Drafting Manual.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AMERICANS FOR PROSPERITY FOUNDATION; AMERICANS FOR PROSPERITY

*Plaintiffs*,

v.

ANTHONY ALBENCE, in his official capacity as State Election Commissioner for the State of Delaware,

KATHY JENNINGS, in her official capacity as Attorney General of the State of Delaware,

*Defendants*.

Case No. 1:26-cv-00445-JLH

**SECOND DECLARATION OF ROSS CONNOLLY**

I, Ross Connolly, declare as follows:

1. I am over the age of 18 and competent to make this declaration.

2. I am the Northeast Regional Director for Americans for Prosperity ("AFP") and for Americans for Prosperity Foundation ("AFPF"). I have been in these roles for three years and with the organizations in other roles for 13 years.

3. I am authorized to speak for AFP and AFPF regarding the information set forth in this declaration.

4. The statements in this declaration are based upon knowledge I have acquired in the performance of my official duties, through information provided to me in my official capacity by AFP and AFPF personnel, and by reviewing records maintained by AFP and AFPF during the ordinary course of business.

5. As Northeast Regional Director, I am familiar with AFP and AFPF's planned future advocacy efforts in Delaware.

6. AFP and AFPF intend to engage in issue advocacy and educational work in Delaware. Because this work will be ongoing, it will necessarily occur in advance of the 2026 and subsequent primary and general elections, including within 30 days before the upcoming 2026 primary election and within 60 days of the upcoming 2026 general election. Specifically, AFP and AFPF intend to produce and distribute communications through various media forms, including but not limited to television, radio, mail, and the internet.

7. AFP and AFPF have been actively planning for and preparing communications to distribute in Delaware, including communications that AFP and AFPF believe would be subject to the electioneering communication donor disclosures in Delaware.

8. A true and correct copy of an advertisement developed by AFP that it wishes to disseminate in Delaware is attached hereto as Exhibit 1. The production and distribution of this communication would cost AFP more than $500.

9. A true and correct copy of an advertisement developed by AFPF that it wishes to disseminate in Delaware is attached hereto as Exhibit 2. The production and distribution of this communication would cost AFPF more than $500.

10. AFP and AFPF wish to disseminate these communications in Delaware now and continue doing so within 30 days before the upcoming 2026 primary election and within 60 days of the upcoming 2026 general election.

11. It is my understanding, however, that if AFP and AFPF were to distribute the communications in Exhibits 1 and 2 in Delaware, they would be required to file third-party advertisement reports that disclose the names and addresses of all their donors across the country

who have contributed more than $100 in the aggregate during the applicable "election period," which could be several years long.

12. It is my understanding that both current and potential future donors to our organizations are fearful of having their names and addresses disclosed as donors to or supporters of AFP and/or AFPF due to a pervasive history of threats, violence, and hostility against AFP and AFPF supporters.

13. I believe that if AFP and AFPF are required to disclose the names and addresses of our donors as a result of distributing the communications in Exhibits 1 and 2, and other similar communications, it is likely that potential donors will refuse to contribute, and current donors will cease to contribute, to Plaintiffs because they are too fearful of the reprisal they will face if their names and addresses are disclosed.

14. If AFP and AFPF do not file the required reports disclosing their donors after disseminating Exhibits 1 and 2, and other similar communications, it is my understanding that they will be subject to fines and other enforcement actions by Delaware state officials.

15. Therefore, because of how important donor privacy and confidentiality are to AFP and AFPF, and because of the onerous nature of these laws, AFP and AFPF will not publish the communications in Exhibits 1 and 2 or any similar communications in Delaware while the disclosure requirements are in effect.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: June 1, 2026

Ross Connolly

# EXHIBIT 1


SPEAKER MELISSA MINOR-BROWN
WANTS TO TAX YOUR WALLET
HIGHER INCOME TAX ON HARDWORKING DELAWAREANS
6.6%. → 6.95%
HOUSE BILL 13
“I AM 100% IN SUPPORT OF INCREASING BRACKETS -MELISSA MINOR-BROWN
TELL HER: NO NEW TAX
AFP DELAWARE

# EXHIBIT 2


EDUCATION FREEDOM ALERT
DELAWARE'S
CLOSED DOOR
ON SCHOOL CHOICE
AFP FOUNDATION
23
CHARTER SCHOOLS IN ALL OF DELAWARE — NO NEW ONES IN NEW CASTLE COUNTY
75%
OF DE 4TH GRADERS CANNOT READ PROFICIENTLY
27yr
LOW: DE 8TH GRADE READING SCORES, 2024
Did you know Delaware has some of the lowest-performing schools? States across the nation are expanding education options, and it is working. Speaker Melissa Minor Brown has not expanded education freedom; we know more freedom produces better results

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION, and AMERICANS FOR PROSPERITY, | ) | |
| Plaintiffs, | ) | C.A. No. 26-445-JLH |
| v. | ) | |
| ANTHONY ALBENCE and KATHY JENNINGS, | ) | |
| Defendants. | ) | |

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Monday, June 8, 2026
10:00 a.m.
Preliminary Injunction Hearing

BEFORE: THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

BAKER & HOSTETLER LLP
BY: JEREMY D. ANDERSON, ESQUIRE
BY: ALLEN J. DICKERSON, ESQUIRE

For the Plaintiffs

DELAWARE DEPARTMENT OF JUSTICE
BY: EMILY BURTON, ESQUIRE

-and-

CAMPAIGN LEGAL CENTER
BY: TARA MALLOY, ESQUIRE
BY: MEGAN McALLEN, ESQUIRE

For the Defendants

*** PROCEEDINGS ***

THE COURT: Good morning, everyone. Please be seated.

All right. We're here today for a PI hearing. This is Americans For Prosperity Foundation, et al vs. Albence, et al. Civil Action Number 26-445.

Let's go ahead and have the parties put their appearances on the record.

MR. ANDERSON: Good morning, Your Honor. Jeremy Anderson from Baker & Hostetler on behalf of the Plaintiffs, Americans For Prosperity. And with me today is my colleague, Allen Dickerson, who will be making the argument.

THE COURT: All right. Very good.

Good morning. Welcome.

MS. BURTON: Good morning, Your Honor. Emily Burton from the Delaware Department of Justice for the Defendants, Commissioner Anthony Albence and Attorney General Kathy Jennings. And with me at counsel table is Tara Malloy and Megan McAllen of the Campaign Legal Center.

THE COURT: Good morning. Welcome.

MR. BURTON: Thank you.

THE COURT: Okay. I can tell you we read the briefs ahead of time, and the attachments and some of the

cited cases. We're looking forward to hearing from you today to add anything you want to add.

We'll hear from the movants who are Plaintiffs.

MR. DICKERSON: Good morning, Your Honor. May it please the Court.

THE COURT: Good morning.

MR. DICKERSON: With the Court's permission, I'd ask for a little bit of time for rebuttal.

THE COURT: That's fine.

MR. DICKERSON: Thank you.

I thought it would be helpful to start with what we perceived as the dispute between the parties. Delaware has an interest in -- and I'm quoting from *Citizens United* -- "knowing who is speaking about a candidate shortly before an election." That's Page 369 of the opinion.

And Delaware has at least three protections for that interest that are not at issue.

The first is Delaware regulates an enormous swath of political speech, essentially any mention of a candidate on any media that is available to Delaware voters in the period before an election. That's the first.

The second is that anyone who makes one of those communications that costs $500 in the aggregate has to file a report with the State detailing all of their expenditures. And that report is then put on the website of the State for

access by the public. That's the second protection.

And then the third is on the face of every one of those communications, there's a statutory obligation for a prominent "Paid For By" statement explaining who paid for that communication. That's the third.

I think there was some confusion in the briefing on the motion, so I want to be clear. We don't challenge any of those provisions. The only thing that's at stake this morning is the additional fourth protection whereby Delaware requires anyone who takes out one of those communications to disclose not just the donors who gave for the communication, not donors who gave for activity in Delaware, not donors who gave for political purposes generally, but every donor of any description who gave more than $100 in the aggregate nationwide over a period potentially spanning four years. That is the sole basis for our request this morning.

THE COURT: Okay. I just want to make sure I understand what you just said.

There is already a requirement that someone who gave for that communication gets disclosed and you're not challenging that?

MR. DICKERSON: The requirement is that the payors. So in this case, my clients, AFP and AFPF would disclose to the State that they took out the communication,

would file a report saying how much they spent on it and who their vendors were and would put on the front of every communication, "Paid For By" either --

THE COURT: But they don't know who that money is coming from. That requirement -- the State doesn't know who the donors are for that. It's just the entities who received the donation.

MR. DICKERSON: Correct.

THE COURT: Okay. Got it.

MR. DICKERSON: Our argument is that the scope of the donor disclosure, not even its existence, the scope is not narrowly tailored and that changes in the law in the last five years have made it so that Delaware law has fallen out of compliance.

THE COURT: Changes in the case law, not changes in the Delaware law; right?

MR. DICKERSON: Correct, Your Honor. Yes.

So let me then turn to our theory of the case law and then let me address their case law, which, you know, they raise important claims that I think need to be discussed.

So Delaware did not have the benefit of *AFPF vs. Bonta* or the Supreme Court's unanimous decision five weeks ago in *First Choice*, either when it passed the statute or when it litigated to defend that statute in the *Delaware*

*Strong Families* case. Those are changes in the law at the Supreme Court level.

And what those cases stand for is that Delaware has an obligation "to demonstrate its need" -- I'm quoting -- "in light of any less restrictive alternatives, demonstrate its need under its informational interest in light of less restrictive alternatives."

And as the Tenth Circuit and other circuits have pointed out, after *AFPF vs. Bonta*, a mere balanced interest, some sort of connection between informing voters and the identities of donors, that isn't good enough. You have to look at other ways of accomplishing the interest.

Essentially our argument is that because Delaware demands a dragnet of all donors of any description that give to an entity that then takes out $500 of activity in Delaware, they can't possibly be narrowly tailored.

Now, their responses, that I understand them, are two lines of cases. The first is the *Delaware Strong Families* case from the Third Circuit, and it's our contention that that case is no longer good law and has been superseded by *AFPF vs. Bonta*.

THE COURT: Now, *Bonta* was not an election case; right?

MR. DICKERSON: It was not, although it cited extensively to the election cases and explained that it was

applying the same standard that would be applicable in an election case. But, no, that was a case involving non-profits.

I will point out this: My clients are also a non-profit organization. In fact, one of them was the Plaintiff in the *AFPF vs. Bonta* case. But, no, those were not electioneering communication cases.

I think, to kind of drill down in Your Honor's point or question there, that almost makes it worse, because the argument that California made in that case -- I mean, one, they applied the wrong standard -- I'm going to get to this -- back in the Third Circuit. But what the Ninth Circuit did in AFPF vs. Bonta was to say there's a substantial relationship between the governmental interest and the donors' disclosure. And the Supreme Court said "that is necessary, but not sufficient." That's a quote from *AFPF vs. Bonta*. Substantial relationship is not enough. And the Ninth Circuit was reversed on that premise.

And, secondly, a lot of the argument that California made and an argument that was picked up by the Ninth Circuit and then overturned was that information is just going to the State of California. We're not going to publish any of this. We're making representations that, you know, prior leaks aren't going to happen again. The Ninth Circuit specifically relied on the fact that this is not

going to become public most likely.

THE COURT: Yeah, I understand that, but I mean, let's just put this in context, right. The point that California was trying to make is the reason we need this law is so we can investigate and prosecute fraudulent charities. And so that's why it was secret.

Here, the whole point of the law is so that the public who received the communications can know who paid for them. So I don't think that distinction is particularly important.

MR. DICKERSON: Well, let me turn back to the Third Circuit, Your Honor.

THE COURT: Yeah.

MR. DICKERSON: And I would just point the Court to *Wyoming Gun Owners* in the Tenth Circuit which spends a page of the published opinion of the Court of Appeals explaining why the Third Circuit's ruling is no longer good law after *Bonta* and why it got it wrong under the new standard. And I suspect that's more persuasive authority than anything that I can say.

But the outlines of the argument are as follows: Again, *AFPF vs. Bonta* said, under exacting scrutiny, for any donor disclosure, political or otherwise, because again they're citing to *Buckley* and all these other political cases, the standard is you have to have a reason -- a

sufficiently important governmental interest, which I think we concede informing voters of people speaking shortly better an election is such an interest. We take issue with the scope of that interest, but the existence, I think, is not an issue.

Then you have to show a substantial relationship between the governmental policy requiring the disclosure of donors and that interest. And then, in addition, you have to show narrow tailoring.

THE COURT: So let me ask you: So, in your view, if the interest, which you say is a legitimate interest, the public gets to know who's paying for the ads, where is the line? Are you talking about it should only be the people that donated a certain amount of time before the election? It should only be a monetary threshold? Because you're the one raising the challenge, and I'm not understanding where you think the constitutional line is.

MR. DICKERSON: I think there are a lot of options available to the State. You know, one -- the most obvious one would be to take the federal, you know, rule, which I'm also happy to talk about because I think they badly muddled the federal law. You know, the federal rule is people that give for the purpose of electioneering communication purposes, that would be fine. You can have a rule that said people who earmarked. You could have a rule,

at least in the view of the First Circuit, that said people who opt out don't get disclosed.

THE COURT: Well, do you provide those options to your donors to opt out?

MR. DICKERSON: It wouldn't matter, Your Honor. The way the statute is written, it doesn't matter.

THE COURT: Okay.

MR. DICKERSON: Like they gave three years ago. We didn't expect to do activity in Delaware three years ago.

THE COURT: Well, but the law was on the books three years ago, so it's not like this is a new law. But I understand your point.

MR. DICKERSON: But it goes to the causality, Your Honor. Like there is just no theory in the State's arguments about how it is that any given donor -- and we put in a declaration the fact that we're talking about thousands of people. Like thousands of people that gave less than a thousand dollars to our entity over a period of years, somehow were on notice that they were going to be publicly disclosed, along with their addresses in Delaware. Like that's the heart of the problem.

Now, there are a lot of ways that they can buttress that and a lot of other states and a lot of other circuits have talked about this. In the Tenth Circuit in *the Wyoming Guns* case, they said you need earmarking. In

the First Circuit in the *Gaspee Project* case, they said you have to have an opt out. In the -- trying to -- well, there's been others, but --

THE COURT: Right.

MR. DICKERSON: -- my point is that what you can't do is have this dragnet approach where all donors that are undifferentiated come out.

THE COURT: Well, so just -- and break it down for me like I'm a kindergartener, because I'm really trying to understand. The donor that makes a donation years ago to your organization, your client's organization, he or she does or doesn't know that it might be used for an electioneering communication?

You're sort of saying the problem is that they don't know that they're going to get disclosed, but that's because you didn't tell them. I mean, the law was on the books; right? That's because -- I'm trying to understand why this is a surprise to them.

MR. DICKERSON: Well, I think it just is as a matter of fact. I mean, so there's 50 states --

THE COURT: But they're donating to something. What do they think the money is going for?

MR. DICKERSON: To advocacy on matters involving issues.

THE COURT: Right.

MR. DICKERSON: I mean, these are not political committees. These are entities that do a lot of activity around the discussion of issues.

THE COURT: And do you tell them that you're going to keep their information confidential?

MR. DICKERSON: Absolutely.

THE COURT: So that's you telling them that. So when you were telling them that, you knew that Delaware law would require you to disclose that if you wanted to make an electioneering communication. That's sort of what I'm not understanding, like what the First Amendment violation is.

So the donor that donates years ago, he's already donated, he or she. He's already gotten to exercise his association, right, by making the donation.

So do you understand what my issue is?

MR. DICKERSON: I do, Your Honor, and I think we're just seeing a clash of competing rights --

THE COURT: Right.

MR. DICKERSON: -- in some sense.

THE COURT: Right.

MR. DICKERSON: You know, there's also a right to private association.

THE COURT: Right.

MR. DICKERSON: That is a First Amendment recognized right. In fact, the *First Choice* case, I think

is important because, again, unanimously five weeks ago, the Supreme Court of the United States said, and I'll just quote here, "Any demand for donor information must overcome heightened First Amendment scrutiny given the deterrent effect on the exercise of First Amendment rights that arises as an inevitable rule of the Government's conduct."

THE COURT: Well, that was a case about standing; right?

MR. DICKERSON: It was.

THE COURT: And that case just said that there is a burden on First Amendment rights. I don't even think your opponents would disagree. There's some burden of First Amendment rights about disclosure, but the Supreme Court also says that there's another competing interest of the State and the community of understanding who made the donations in election cases.

So you don't -- you're not saying that case overruled *Citizens United*?

MR. DICKERSON: No, I'm not. But neither *Citizens United* nor *McConnell* have held this idea that every donor and organization that makes any electioneering communication is disclosed. I think that's one of the things in the law that the State gets very wrong in its brief.

I mean, for one thing, *Citizens United*, when

10:15:41 it's describing the statute says "certain contributors." I don't know see how that language -- that's at page -- that's at Page 366 of the majority opinion. They say "only certain donors are disclosed," and yet the State's taken the position all donors are disclosed. Like that's a direct conflict with the language of the Supreme Court.

10:16:01 THE COURT: So --

10:16:02 MR. DICKERSON: It's simply never blessed this dragnet approach.

10:16:06 THE COURT: Yeah. So I'm just trying to understand where you think the line is. So if you took a billion dollars from a donor and used that to run ads in all 50 states, how would it be unconstitutional for a state to have a law that that donor has to get disclosed?

10:16:21 MR. DICKERSON: It might not be. It would depend on --

10:16:23 THE COURT: Right.

10:16:24 MR. DICKERSON: -- how the funds were solicited. The fact that it's a billion dollars is probably relevant to the tailoring analysis. The First Circuit thought so in *Gaspee* where they said because it's a thousand dollars, maybe that's relevant. I think there -- again, I think the State has a lot of flexibility in trying to parse which donors are actually speaking shortly before an election.

10:16:43 THE COURT: So for your as applied challenge,

10:16:46 isn't the burden on you to have to tell me what -- like what parts of the -- what parts of the enforcement are unconstitutional or what are constitutional? So don't you need -- have I got it wrong? Don't you need to tell me what monetary threshold and temporal limitation draws the constitutional line for your as applied challenge?

10:17:06 MR. DICKERSON: I think I could do that. I disagree. And we cited these cases early on in our opening brief.

10:17:12 No. The responsibilities of evidence track the responsibilities of trial. It's the State's obligation to prove narrow tailoring, not mine.

10:17:21 THE COURT: For both the facial challenge and your as applied challenge?

10:17:25 MR. DICKERSON: I believe so. But even if I'm wrong about that, Your Honor, I think we've given a lot of off ramps here. Like we've specifically pled that we've got hundreds of people -- how many -- 590 donors under $200. We don't think those people should be disclosed. It's below the thousand dollars recognized in *Gaspee Project*. So it's another thousand plus.

10:17:48 And, again, they've given it over a period of time. And we have an affidavit that is unrebutted saying they didn't give for the purpose of anything in Delaware, and they weren't solicited for the purposes of anything in

Delaware.

THE COURT: So you didn't promise them you wouldn't use it in Delaware; right? I mean --

MR. DICKERSON: No.

THE COURT: -- they knew they were giving it to you and you were free to do what you wanted with it; right?

MR. DICKERSON: And I think that's exactly the point, Your Honor --

THE COURT: Yeah.

MR. DICKERSON: -- is that the decisionmaking on speaking in Delaware, the person actually doing the speaking in Delaware, is not that donor, because they gave in this unrestricted way. And then AFP and AFPF, in their sole discretion, without any input from these donors, decide to spend $5 in Delaware.

Now, I understand the theory that every cent that goes into that eventual, you know, communication should be disclosed under some theory of the informational interest. My response would be that can't possibly be narrow tailoring. And that's -- I think that's -- the issue is that, you know, my request in terms of like the scope of the injunction we're requesting is we should not have to disclose our donors because we've shown they didn't give for the purpose of contributing in Delaware under any of these theories. And like that really should be enough.

10:18:57 But if it isn't, again, we think this is a facial problem. We think the State should go back and redo its statute and take one of any of the off ramps that other Courts of Appeals have blessed after *AFPF vs. Bonta*, whether that's only contributors who gave for the purpose of political activity, which is the federal rule, whether it is, you know, the -- some sort of earmarking up front in terms of how you're structuring it, or whether it's some sort of opt-out provision.

Delaware doesn't give us any of those options, and I think that's --

THE COURT: Couldn't some -- I mean, even if Delaware -- so your view of what Delaware should do in terms of an earmarking situation is that you only have to -- you would only have to disclose donors who have earmarked their donation that they want it to be for an electioneering communication, but you would still be free to use money received from other donors from an electioneering communication and not have to disclose them. Is that your -- I just --

MR. DICKERSON: Yes.

THE COURT: I'm trying to understand.

MR. DICKERSON: Yes. Yes, Your Honor.

THE COURT: Okay.

MR. DICKERSON: Yes, because, you know, I think

there's some give in the joints here in terms of if I solicit you and say I'm going to do activity in Delaware. And you give and maybe you actually are on notice. We've said in our affidavit we don't do that and didn't do that with these donors. In theory, like that could be a way to show some connection between the individual donor and the eventual communication. But, again, we're talking about thousands of people giving, you know, relatively small amounts of money, that if you run the math, we're talking fractions of a penny in terms of the eventual spending in Delaware.

THE COURT: No, I know, but I just want to make sure I understand what you're saying, though. Under your view, then, you're worried about the thousands of people who have already donated some many years ago. But I'm more interested in understanding about the big donors who under -- wouldn't say they earmark it, but whose hundred percent of their contribution could be used for an electioneering communication and you wouldn't have to disclose.

MR. DICKERSON: I'm not sure how that would work in practice, Your Honor, unless it was, in fact, earmarked. In the hypothetical where my client's got -- a million dollars is a little bit excessive. Let's call it a hundred thousand. The hundred-thousand-dollar donation, which is a

lot of money -- it's a lot of money in Delaware, I understand that -- and they spent it all in Delaware. I would imagine there was some sort of communication that earmarked that money for Delaware. That's just not how large national organizations work.

THE COURT: Well, yeah, it does if you tell them, We're going to use it for this and we're not going to say -- you know, you don't have to earmark it, but we'll use it for Delaware. Or even worse, we'll use it for everywhere and the people of Delaware want to know who these out-of-state people are.

MR. DICKERSON: Then Delaware should have set its limit at a hundred thousand dollars if that's their constitutional application. Then most of the applications are unconstitutional because most of the applications in this case are people giving less than a thousand dollars. And many of them are people giving less than $200.

THE COURT: Well, let me ask you about that. You say that most of the applications are less than a thousand dollars, but what does that correspond to in terms of the percentage of money that you have? Do you understand what I'm trying to say?

You're pointing to these hundreds of donors that donated less than 200. Well, that doesn't come up to very much money compared to what I suspect is the total amount of

donations you received.

Do you understand what I'm saying?

MR. DICKERSON: I do, Your Honor. I don't have that number. I would, again, note that if that's the argument, this is dramatically overbroad.

THE COURT: Yeah.

MR. DICKERSON: And I think that's -- again, the problem is that, you know, Delaware's trying to shift the burden. It's their obligation to narrowly tailor their statute. And these theories that basically boil down to a tautology that whatever information Delaware thinks is necessary is its informational interest. And demanding that information is necessarily narrowly tailored, because that's the interest. Like I can't think of an area of constitutional rigor where we permit that kind of speculatively thinking.

THE COURT: Election law, seems like that's where we do it; right?

MR. DICKERSON: And, again, that's where I would push back. And *Delaware Strong Families* didn't apply the right standard, did not look at less restrictive means. That's what the less restrictive means in narrow tailoring are doing. It's the conversation Your Honor and I are having right now. It's like what could you have done that would have gotten at who's actually funding this speech,

who's actually speaking.

Because that's their concern, right. Their concern, if I put AFP or AFPF on the front of the communication, that's not enough information, even though everyone knows who AFP and AFPF are and could find it easily on a quick search.

THE COURT: I actually -- for what it's worth, I didn't know, but go ahead.

MR. DICKERSON: Fair enough. But I don't think it would have taken a lot of due diligence, Your Honor, to get a sense of where they were on the ideological spectrum, which is the interest that was put forth in *Buckley*.

THE COURT: Right.

MR. DICKERSON: Again, I think there are a lot of ways you can tailor, but you have to pay attention to these less restrictive means of doing that. And they can't point to a state. They can't point to a post-*AFPF vs. Bonta* statute that has been upheld that just had dragnet donation disclosure of everyone who gave to the entity that made the eventual political speech.

And that's because narrow tailoring requires you to actually do something to explain why the donor has some connection to the eventual communication other than they gave generally to a non-profit. No court has upheld that, and that's, I think, the issue, at least after *AFPF vs.*

*Bonta*.

And I know *First choice* is new, and I know it's a standing case, but again, that is a case that says whenever you demand donor disclosure, you are inevitably chilling First Amendment rights. And that's why you have to do the exacting scrutiny. And that's why you have to show narrow tailoring.

And I don't want to belabor it. You know, I'd like to say something just very briefly on the federal rule, because that, I think, is -- a lot of their argument is that *Citizens United* and *McConnell* upheld precisely this sort of disclosure. They're wrong, which is why they don't cite -- they don't actually quote those cases on that point.

As I said, *Citizens United* says certain contributors, which is inconsistent with their theory.

With *McConnell*, it had no occasion to consider it because corporate and non-profit electioneering communications were illegal at the time. So the case talks about people who give to individuals. So that wasn't in the case.

And then, finally, they have this theory that the D.C. Circuit has blessed a reading of the statute that requires all donors who give to an entity that makes electioneering communications. They're wrong. The Third Circuit has -- it's Footnote 9 in the *Delaware Strong*

*Families* case. The Third Circuit recognized that that was a -- that was a district court ruling that was on appeal. And even though the State cites to the emergency stay application in that case, they do not cite to the final opinion of the D.C. Circuit which said, No, the FEC rule -- it's an administrative law case -- but the FEC rule is saying only donors who give for the purpose of electioneering communications are disclosed is a reasonable reading of the statute. That could not have been the outcome if the Supreme Court had said otherwise.

And so I think there's just -- they're trying to incorporate their view of the statute into the Supreme Court precedent, and it just doesn't work.

Would you like to hear anything on the as applied challenge?

THE COURT: Well, I thought we were kind of talking about both, but go ahead. Let's hear the as applied challenge.

Is your argument that there's something special about your client because it received a particular number of threats?

MR. DICKERSON: So it's both, which is why I appreciate it. I think we're on the same page, Your Honor.

There are two ways to have an as applied challenge, and I think there's some confusion on this. One

is just: Are you narrowly tailored as applied to this particular Plaintiff? And that's the *Wyoming Gun Owners* case where they do precisely that analysis.

That's, I think, the conversation we've been having, which is if you look at how AFPF and AFP work and the scope of their donors and the fact that you have affidavits saying that they don't raise money for Delaware, and that they didn't -- you know, basically that there's no reason to think, contrary to the State's speculation, that any of these donors gave for Delaware purposes, like that's one form of the as applied challenge.

The other form is, yes, like AFP and AFPF, as was recognized by every justice of the Supreme Court only five years ago -- the State acts like it's ancient history, but this is a pretty recent case -- you know, were subject to threats, harassment and reprisal. Every justice recognized this. And so they, yes, have an as applied reason to worry about their donors being disclosed.

I think that's got two components. One is it is entirely reasonable for my client to assure the anonymity and privacy of its donors in light of that history, which multiple courts have recognized specifically in their case.

And, two, it's very reasonable for donors to not want to contribute if they're then disclosed. And the combination of those things is chilling our speech in

Delaware.

THE COURT: I guess I'm just having a hard time understanding, for the second point, how that is any different for you than it is for anyone else, which is that people don't want their names disclosed, connected to anything, regardless of their viewpoint. That's going to chill speech. But there's some chilling that's always appropriate, basically the Supreme Court has said in *Citizens United*, based on the State's interest in understanding who's paying for electioneering communications. So I don't understand how that's special to you.

And then the first part, you almost seem to be saying that because -- I actually don't know what your viewpoints are. It wasn't in the record, so I didn't look it up. But I think you seem to be saying that because you have a controversial or unpopular viewpoint that you, in particular, get to hide who's making the donations. But people with less controversial viewpoints that don't receive threats have to disclose, and that makes little sense to me.

MR. DICKERSON: Well, let me try to unpack that, Your Honor. I don't -- well, one, I don't agree we're trying to hide our donors. We're trying to insist that the State meet its constitutional obligation.

THE COURT: No, of course. And if it sounded

that way, that's not what meant.

But you're saying as applied -- the statute can be applied to other people, but not applied to your organization. So that's an as applied challenge; right?

MR. DICKERSON: Yes, like let me put it this way, maybe this helps. And stop me if it doesn't. When we talk about a facial challenge, we're talking about in the First Amendment context, right. We're talking about essentially a numbers game, like how many constitutional applications of the statute are there and how many unconstitutional applications of the statute are there?

And if there's too many unconstitutional applications, judged against the legitimate scope, it's facially unconstitutional.

THE COURT: Right, because it's overbroad because unconstitutional -- because it's going to chill some speech, and so you just take the whole law off the books.

MR. DICKERSON: Right.

THE COURT: Right.

MR. DICKERSON: Right. But all of those unconstitutional applications are all a good as applied challenge standing alone, right. Like the thing about a facial challenge is I could come in with a constitutional application and have standing to challenge the statute and say, But there are -- not from my client, for other clients

there's unconstitutional applications. And there's too many of those and so the whole statute has to go down.

That's what -- that's the special thing about facial challenges in the First Amendment context.

So imagine what are the constitutional applications of the statute, and I'm going to roll with Your Honor's hypothetical. It is probably true, I think -- I'm pretty comfortable with this that if someone gives a billion dollars to a non-profit entity and says, "Spend it in Delaware," that Delaware's demand to make that person public is constitutional. That's a constitutional application, right. I don't -- I don't take issue with that.

It may be true that if that person gives a billion dollars to an entity that doesn't have a billion dollars and, you know, a hundred million dollars of it ends up in Delaware, that there's a close-enough fit there for it to be constitutional. Maybe that satisfies narrow tailoring.

There are constitutional applications of the statute, but the statute isn't narrowly tailored, because there's so many unconstitutional applications of the statute. And we're one of them. We're one of them because in those cases what's happening is there's some indicia connection between the donation and the eventual speech in Delaware, whether it's the amount, or the lack of an earmark

or what have you. And, again, we've quoted all those cases to Your Honor about how other courts have looked at less restrictive means.

None of that is present here. Here, there's -- it's to the contrary, the record is. We've got a couple thousand people who would be disclosed if we made the communications we want to make. And none of them have any connection to that speech, other than their general donation. And that's the unconstitutional application one.

That's a separate theory from -- and it's also why we went facially, by the way, because there were a lot more things --

THE COURT: So the gist of your challenge is a facial challenge?

MR. DICKERSON: Well, it's that it's a facial challenge because we also went as applied. And our winning as applied, what happens so often, is it's facially constitutional essentially.

There are more applications like our application than applications like your billionaire application. And if they wanted to have a billionaire disclosure act, they should pass a billionaire disclosure act and that would be narrowly tailored.

That's -- so they work together. That's completely separate from the threats, harassment or reprisal

10:32:31 theory, which is that, yes, our entity, in particular. And now I'm getting to Your Honor's question. I'm sorry it took me a while.

THE COURT: Yeah, yeah.

MR. DICKERSON: Our entity, in particular, has been recognized as something that people dislike. And they threaten the management, and they attack the events and they require us to hire security to protect ourselves.

And, yes, that is something -- that is a record we have made. Now, how many entities could make that record? I don't know. I don't represent those entities. I would suspect it's more than the State thinks.

But it doesn't matter, because in our case, we have that record. Supreme Court, again, nine justices of the Supreme Court, as far as I can read that opinion, said specifically for my client in the Supreme Court that they had made out for a private giving of information of the State, not publication like here, for a private giving of donor information to the State that they had made out an as applied challenge based on this history of threats, harassment or reprisal.

So I think, as a matter of law, we have the benefits of that. And the fact that it's a political case versus a non-profit charitable solicitation case, I don't think matters at all, again, except insofar as it's far

worse from the perspective of the threat to the donor if it's made public on a website. That's that second as applied challenge.

But I just want to be clear that it's distinct from the lack of narrow tailoring as applied to us generally.

THE COURT: All right.

Thank you. Yeah.

MR. DICKERSON: All right.

I just want to end, Your Honor, by noting that, you know, again, my reading of the case law is that it's their burden to show narrow tailoring. I don't think they've done so. I will sit down and, of course, give them a chance to do so.

But I -- the Third Circuit law is that if you've got a reasonable probability of success on the merits, which is less than 50 percent, you win in a First Amendment challenge.

THE COURT: Is that for a new law or for -- does it matter that this is the law that's been on the books for a long time?

MR. DICKERSON: I don't see how that would matter, Your Honor, because you get standing based on your activities. You don't get standing based on --

THE COURT: Well, I'm not talking about

standing. I'm talking about the concept in preliminary injunction jurisprudence that tries to maintain the status quo until we can have a trial on the merits.

Do you know what I mean?

MR. DICKERSON: I do, Your Honor. And I think this just comes back to the special solicitation that's given to the First Amendment rights. Like everything I just said about facial challenges doesn't apply anywhere else, and I'm well aware of that. There are just special rules in this space.

THE COURT: All right. Thank you very much.

MR. DICKERSON: Thank you.

MR. BURTON: Good morning, Your Honor. I want to start in a little different place than your discussion with my friend has been.

Specifically, Your Honor, the ruling in this case is actually controlled by the Third Circuit opinion in *Delaware Strong Families vs. Biden*. I'm going to refer to this as DSF. In DSF the Third Circuit Courts of Appeals reviewed the exact same Disclosure Act that is at issue in this case. The Third Circuit applied exacting scrutiny, which is the standard that the Plaintiffs admit applies here. And the Third Circuit held that the act is "narrowly tailored and not impermissibly broad." That's a quote from the opinion at 306.

After the Disclosure Act was found constitutional in DSF, the Plaintiffs filed a writ of certiorari to ask the U.S. Supreme Court to reconsider the decision. That request was denied.

Fundamentally, this case is simply seeking to relitigate DSF right down to the fact that the counsel that argued is representing Plaintiffs in this matter. This Court -- this Court, respectfully, is bound by DSF. District Courts are bound by Circuit Court precedent unless it is "obviously in conflict with Supreme Court precedent." That's *Rubin vs. Buckman*.

Plaintiffs argue that you may disregard or reconsider DSF's holding for a variety of reasons. They say it applied an obsolete legal standard, but the Third Circuit opinion states ten different times that it applied exacting scrutiny. It's a heading in the opinion. *Bonta* said that it was extending the exacting scrutiny standard from the campaign finance context to other disclosure contexts. *Bonta* didn't say it was reversing or obviating the exacting scrutiny standard.

Plaintiffs assert that DSF applied the wrong standard because it didn't require narrow tailoring, except the Third Circuit said that the act was narrowly tailored.

Plaintiffs assert that *Bonta* tightened the exacting scrutiny standard. Now, they argue about assessing

whether less restrictive means are available, and that's probably because in *Bonta* the Plaintiffs argued that donor disclosure should be reviewed under strict scrutiny. And *Bonta* specifically rejected that, said that where exacting scrutiny applies, the challenge requirement must be narrowly tailored to the interest it promotes, even if it's not the least restrictive means of promoting that end.

*Bonta* cited *Buckley vs. Valeo* when it articulated what exacting scrutiny required. DSF explicitly followed the standard articulated in *Buckley*. *Bonta* cited *Citizens United* as an example of exacting scrutiny. DSF says that it applied *Citizens United*.

In short, the Plaintiffs are asking this Court to disregard what the Third Circuit said it did and what the U.S. Supreme Court said that Circuit Courts, lower courts should do in favor of Plaintiffs' view that the U.S. Supreme Court meant something different and the Third Circuit didn't do what it said it did.

And on this point I'll note that *McConnell* and *Citizens United* say that they require the disclosure of some certain donors because there was a dollar threshold. There is a dollar threshold in Delaware. It's not all donors. It's people who donate more than $100 here.

I think the federal threshold is not a thousand dollars. I think it's 200, but don't quote me on that. It

is closer to Delaware's threshold than any of the numbers my friend has been throwing out today.

Plaintiffs' opinions with respect to whether Delaware statute are sufficiently tailored provide no basis for this Court to reconsider what the Third Circuit has already considered. And I'm happy to address the arguments that you've been having and any questions at all that you have, but I do think that at least the facial challenge is controlled by DSF in this case.

THE COURT: I'm interested in the as applied challenge because I'm not really understanding --

MR. BURTON: Okay.

THE COURT: -- how -- well, we know that you can bring an as applied challenge to these types of laws.

MR. BURTON: Yes.

THE COURT: I don't really understand what that means. I understand the concept.

MR. BURTON: Okay. So what the Supreme Court has said is that to create -- to meet an as applied challenge, a Plaintiff must prove, and this is all a quote, "a reasonable probability that disclosed contributors' names will subject them to threats, harassment or reprisals from either Government officials or private parties. That's a quote from *Citizens United*, which was citing *McConnell*, which was quoting *Buckley*.

So that's --

THE COURT: And so just in general, what the Supreme Court has said is that you could have two organizations. One that has a popular opinion and one that has an unpopular opinion and could be subject to threats. And so the State could constitutionally apply the statute to the organization that has a popular opinion, but that the one with the unpopular opinion -- that doesn't make sense to me, but that's what it is?

MR. BURTON: Okay. So let me kind of break it down to the examples, because I think the examples are what really help here. There are three groups that I know of that have met this standard. One is the NAACP in the deep South in the '60s. People were being lynched.

One is socialists in small town middle America in the '50s.

THE COURT: And so the first one, that's *Buckley*; right? No, without some, that's the NACCP case; right?

MS. BURTON: Yes, that's the NAACP case.

THE COURT: And that was not an election case?

MR. BURTON: No.

THE COURT: That was a donation case.

MR. BURTON: That's a donation case. So this is not -- this exception is not unique to election cases if

it's applied --

THE COURT: Right, but it's helpful to understand what we're talking about here, right.

MR. BURTON: Yeah. We're talking about organizations that are really targeted. And in the NAACP and the socialists case, there was not just, you know, private people don't like it. There was specific Government reprisal against the group and its members.

THE COURT: But it wasn't just about the threats, it was that -- it was really -- in context, it was really the threats against what the Government interest was. And the Government interest there was also suspect; right?

MR. BURTON: Yeah.

THE COURT: Right. Okay.

What was the next example?

MR. BURTON: Communists --

THE COURT: Mm-hmm.

MR. BURTON: -- in the '50s.

THE COURT: And was that an election case?

MR. BURTON: I don't believe so. In each of those cases, there was evidence of injury to people for associating the donors themselves. So when we go back to the quote, it's who will be -- that disclosing contributors' names will subject them. So who gets subjected to the threats is the donors.

In this case, the Plaintiffs have not submitted any evidence that is admissible for the purpose of showing that anybody has suffered an injury, a threat or harassment. Their declarations, we're not objecting to them being admitted for the purpose of some of what they say, but none of the evidence they have is admissible for the purpose of showing that any threats, harm or harassment has occurred.

THE COURT: But even if it was, isn't it threats -- it's threats in relation to the Government interest, though; right?

MR. BURTON: It's threats to the donor.

THE COURT: Right, threats to the donor. But, again, even if the threats were -- even if they had put more evidence, if the Government interest in knowing who the donor was outweighed that, it's still not unconstitutional as applied; right?

MR. BURTON: Exactly. It needs -- you need to have such severe probability of threats, harassment and reprisal that it outweighs the Government's interest.

THE COURT: Right.

MR. BURTON: And that's why it's only coming in where we're seeing people potentially being killed. It's not coming in with respect to every big nationwide organization, which unfortunately, are seeing bomb threats and people tweeting mean things about them. And that alone

is not sufficient.

I think what is the most telling point here with respect to the as applied challenge, in addition to the fact that they don't have admissible evidence, what they do have is a PAC. Their federal PAC discloses its donors under the federal disclosure regime. They don't have a single instance in which one of their donors was threatened or harmed. And if them disclosing their donors in Delaware was going to subject their donors in Delaware to threats, harm and reprisals, surely something bad would have happened to the thousands of federal donors that they have disclosed. But it hasn't. And so for that reason, I don't think they had a facial challenge.

And now they say that the U.S. Supreme Court held that they upheld the facial challenge, and I'd invite the Court to actually read the citation for that. The Supreme Court did not hold that. The Supreme Court held that if it had found California's statute to be facially valid, it would have had to consider Plaintiff's as applied challenge. And in that case, it might find that they had met it. The Supreme Court didn't hold that they had met it.

And a lot of the quotations in their briefing to what they describe as other Courts' finding that they suffered threats, at least in one instance, it's another Court reciting what Plaintiffs contend or saying that

10:46:37 Plaintiffs submitted evidence to that effect. And the fact that they submitted evidence in a different case isn't evidence in this case, and it's not something that Your Honor can weigh against Delaware's specific interest in disclosure.

10:46:56 The other thing -- do you have anymore questions --

10:47:01 THE COURT: No.

10:47:03 MR. BURTON: -- on the facial challenge?

10:47:04 So I want to turn briefly to the question of narrow tailoring, because on the one hand, I don't think this Court should reach it. On the other hand, I think that there's a little bit of a misunderstanding.

10:47:16 THE COURT: This is narrow tailoring for the facial or the as applied?

10:47:20 MR. BURTON: For the facial.

10:47:23 Okay. So my reading of the U.S. Supreme Court and the Third Circuit opinions is that there is not a separate as applied challenge where we ask whether it is narrowly tailored for purposes of Plaintiffs. When I read the U.S. Supreme Court precedent, the only facial challenge -- the only as applied challenge that I see is the threats to donors for disclosure.

10:47:50 The Tenth Circuit sometimes has looked at an as applied challenge with respect to whether it's narrowly

tailored, but that, up to this point, has been Tenth Circuit specific. It hasn't been applied outside of the Tenth Circuit.

Delaware's Disclosure Act has a threshold based on what buys voter communications in Delaware. It has a time period that matches for third parties speaking, what Delaware requires of candidates and PACs. And it sounds like, although it went back and forth in the briefing, at this point Plaintiffs' only objection is that they have to disclose all of their donors.

Well, first off, Your Honor, I'd like to point out a few data points, which you can take judicial notice of, that show that Plaintiffs' donors were well aware that Plaintiffs may be engaging in political speech in Delaware on their behalf. Plaintiffs' website says that they engage in political speech. Plaintiffs' website includes a 50-state voter guide that covers Delaware, and Plaintiffs' website indicates that Plaintiffs have a Delaware chapter. So it is not as though what Plaintiffs conveyed to their donors suggested that this couldn't happen.

But shifting to tailoring, Plaintiffs talk about how it is inevitably all of their donors. And that is absolutely not the case under Delaware's Disclosure Act. Delaware's Disclosure Act allows political actors, including third-party advertisers, to form political action committees

and unincorporated associations for purposes of targeting the people and contributors to political speech.

The Albence declaration included a couple of examples of Campaign Finance disclosures by third-party advertisers where the third-party advertiser took the people that wanted to fund political speech in Delaware and had them donate to a specific PAC. Then that specific PAC funded the speech in Delaware. Delaware PACs -- we share a name with federal PACs, but they are much easier to create, consistent with our state's love of alternative entities.

You can form a Delaware PAC with a one-page form. A copy of that form was also attached to the Albence declaration.

If Plaintiffs wanted to engage in political speech in Delaware and could differentiate between their donors as to who's funding it and who's not, Delaware provides options for them to do that. What Plaintiffs want to do is take their undifferentiated mass of donors and then say because we, Plaintiffs, have created so much confusion as to who's funding what, we don't have to disclose anything. And that is what is not permitted by the Disclosure Act.

And the other point I'm going to make is that when the legislature approved this law, one of the things they noted specifically was that you had a lot of groups who

had a fancy sounding name, put it on the ads, but you didn't know who they were. Plaintiffs have a website. Not everybody does.

THE COURT: Can I ask you about this PAC thing?

MR. BURTON: Yes.

THE COURT: And this question may demonstrate my ignorance, but so if they've got money that they got from donors a few years ago, that can't be funneled through a PAC donation; right? That's just a go-forward possibility.

I guess your point is they could have done that back five years ago?

MR. BURTON: They could have and they can today.

So we had two examples. One of the examples was kind of the go-forward option, which showed the ACLU who has people funding political speech in Delaware donating to their PAC to fund political speech in Delaware.

THE COURT: So it could come from -- these Plaintiffs could donate to their own PAC?

MR. BURTON: Yes. The other example that we put in was these Plaintiffs donate to the PAC. The PAC does the speaking. That doesn't tell Delawareans who the underlying donors are. It's what the law allows today. And our legislature is taking up legislation to require down downstream, Tell us who the actual donor is. But that law hasn't been passed. So today they could form a PAC, give

their money to the PAC, the PAC could engage in the speech.

THE COURT: Can I ask you a question?

MR. BURTON: Absolutely.

THE COURT: If that's a loophole that they can utilize, I guess it begs the question to me how the law is narrowly tailored. Do you understand what I'm saying?

MR. BURTON: I understand what you're saying. You're talking about under -- under --

THE COURT: Like, right, right. Yeah, yeah, exactly.

MR. BURTON: So, candidly, I think that when the law was written, it was expected that people would be engaging in this process the way the ACLU has done where they have donors funding political speech giving to their PAC. But Delaware law, as a general matter, respects the corporate form and that respect for the corporate form wasn't closed off when the Disclosure Act was made. And that's why the legislature's reconsidering it.

But today that structuring is an option. And the Commissioner's affidavit notes that they haven't brought enforcement actions against anybody who has taken advantage of that option.

THE COURT: Thank you.

MR. BURTON: You're welcome.

THE COURT: Anything else?

MR. BURTON: Before I leave the podium, I would just like to ask that the Court accept the declaration we submitted and its exhibits into evidence.

THE COURT: Okay. Well, we didn't have an evidentiary hearing, so I will rely on the papers that we have. But thank you very much.

MR. BURTON: Thank you.

THE COURT: Go ahead, Counsel.

I wasn't hearing you to challenge any of the factual statements that were made in their declarations. I can accept those as true?

MR. DICKERSON: No, Your Honor. We're a little confused on the relevance, but we're happy for them to come in.

THE COURT: Could you start with the PAC?

MR. DICKERSON: I would be happy to, Your Honor. I was -- candidly, I'm not sure I really understood their argument until very recently on this point.

I think there's four problems with it. One is it's not what the act says. What the act says is any person, other than a candidate or a political party, as to a third-party report.

So I'm not really sure where this is coming from in terms of the constitutionality of the act. There's no reference to political committees on there being excluded

from the act, so I'll just leave that aside.

The second problem is that -- and this is *Citizens United*. You cannot force a corporation to create a PAC to speak through the PAC. That's the holding of *Citizens United*. The dissent's argument was, No, no. *Citizens United* can still speak through its PAC.

THE COURT: Well, when you're talking about creating a PAC, I mean what she's saying is it's not really a PAC. It's just a -- you know, call it what you want. You send in the form and that's how you can donate without disclosing your donors.

MR. DICKERSON: Well, and I think to Your Honor's point, that's the biggest problem with it is that if that is truly Delaware law, then Delaware has just told us what its informational interest is. Its informational interest is not in every undifferentiated donor to every organization. Its interest is in the person actually speaking.

If I can go on the website right now and click AFPF -- and the website is in evidence -- like -- and in either -- there's a check box for PAC, and there's a check box for third-party committee or third-party speaker. And if I check the right check box, I just say AFP paid for this. And if I check the wrong check box, all my donors become public.

That can't possibly be narrowly tailored. And it explains that the actual interest is in that first-level disclosure. That's the State's actual informational interest. They've been briefing this as though they desperately -- every Delaware voter desperately needs to know every donor, every organization, because they'll hide behind these anodyne names, you know. And apparently not --

THE COURT: Well, maybe at the end of the day what I'm hearing is that there's no irreparable harm and that you-all can tell what you want to tell to the Third Circuit. Maybe I'm just a rest stop on the way and that's totally fine. That's what I'm here for.

MR. DICKERSON: Well, Your Honor, I'd rather you a rest stop that allowed us to speak in this period, but I hear you.

THE COURT: Right.

MR. DICKERSON: I think, but there is a loss problem, and this is a pretty serious one, which is that 501(c)(3) charities can't form PACs. They're not -- they're not allowed to interfere in political activity.

THE COURT: But she's saying -- I don't know. I don't know what the federal PAC requirements are or what the Delaware ones are, but what I'm hearing is the attorney for the State, the State has just represented that you can do that in Delaware.

MR. DICKERSON: Well, she doesn't represent the IRS.

THE COURT: Okay.

MR. DICKERSON: And the IRS has said 501(c)(3) charities cannot intervene in political campaigns.

THE COURT: Okay.

MR. DICKERSON: And so we're running ads that are very carefully talking solely about issues and not telling who to vote for and staying far away from the line because of -- the IRS is the problem there. This is why the ACLU disclosed its donors, because the ACLU can't just form a PAC. The ACLU is a (c)(3).

So they've got two pre-*Bonta* reports that are their examples. And one of them is the ACLU of Delaware, a 501(c)(3) entity, I think. Again, I'm kind of -- I'm having to respond live to this argument. But 501(c)(3) entity that cannot form a PAC because it can't participate in politics. It's taking up the same sort of issue as we are and it has to disclose all of its donors.

But an honest-to-goodness PAC, like an organization that exists to elect Democrats in the State of Delaware can just say, No, we paid for this. Our donors are off the line.

I don't see how that's possibly narrow tailoring and I don't see how it's possibly anything other than their

informational interest is significantly narrower than they have claimed to the Court. If it's enough, under Delaware law, to just say the first-line contributor, the organizational contributor paid a PAC and that's enough information for the people of Delaware, then I should be able to check the other box on that form and say it's a third-party thing, not form this other entity, not take on all the expense -- I don't care how slight -- to create a separate entity that's not in front of the Court and have the exact same donor disclosure as that entity.

THE COURT: All right. Thank you very much.

Anything else you wanted to respond to?

MR. DICKERSON: I think I talked a little bit about DSF, Your Honor, and I understand this is tricky. DSF, it might -- my friend said, you know, that you should take the Court at what it said it was doing, and I agree with that. And it's prefatory language. And, again, remember DSF was a much broader challenge. Like DSF said you shouldn't be able to regulate these things at all. We're a neutral speaker.

And the Third Circuit rejected that. They said, No, you can have lecturing communications. That's all those things that I said we're not challenging. That was in that case.

So, yeah, they say they're applying narrow

tailoring in the introduction. But when you get to -- just read the section, Your Honor, where they actually look at the donor disclosure piece, and they say two things. They say we don't have to look at less restrictive means, because there's a substantial relation and that's all that's required. That is their analysis in the Third Circuit case and that's exactly the standard applied by the Ninth Circuit that was overturned in *Bonta*. And the Supreme Court said that analysis, a substantial relation analysis, is, and I quote, "necessary but not sufficient". That is exactly the direct conflict between *AFPF vs. Bonta* and *Delaware Strong Families*.

THE COURT: Do you --

MR. DICKERSON: Sorry.

THE COURT: Sorry. Do you agree with your opponents that the standard I'm supposed to apply when determining whether something's been overruled is that whether it's, obviously, in conflict? That I have to apply the Third Circuit case unless it's now, obviously, in conflict with subsequent case law?

MR. DICKERSON: Well, I think we think it is an obvious conflict.

THE COURT: Okay. But that's the standard, obvious conflict?

MR. DICKERSON: I'm not sure I have a position

on that, Your Honor.

THE COURT: Okay.

MR. DICKERSON: But I do think applying the wrong constitutional standard of scrutiny is about as basic a conflict as you're going to get.

Thank you very much for your time, Your Honor.

THE COURT: Thank you.

All right. Thank you very much, everybody.

Oh, go ahead.

MR. DICKERSON: I apologize. I haven't been in a courtroom for a while. I'm just on the record going to ask to move our exhibits as well. I assume Your Honor is going to make the same ruling as you made for Defendants.

THE COURT: Let me ask your opponents. Is there any -- I mean, I've got paper record. Nobody moved these in. Is there anything factual that you wanted to challenge in their --

MR. BURTON: Our only challenge is to the extent of hearsay. Someone can't describe what happened to somebody else and have that be admissible.

THE COURT: All right. Thank you very much.

Here's what I'll say -- well, everything is in the -- everything has been submitted to the Court. It's in the record. It will be considered by the Court. Nobody's asked me to disregard the other side's evidence because it

wasn't persuasive or that, you know --

MR. BURTON: Yeah.

THE COURT: That the declarator wasn't -- shouldn't be believed. So that's all in the record.

So have a seat. So here's what I want to tell you: So we prepared substantially before the hearing today, and I want to be able to get you an answer quickly, because I understand that this is relating to an upcoming election. And to the extent anybody wants to take up a denial or a grant of an injunction to the Third Circuit, they need to have time to do that. So what I want to do is take the motion under advisement, but get you an answer quickly.

So what I was thinking was if you-all could dial into the Court's conference line later today, then I'd be prepared to give you a ruling from the bench. But I do want to take a few hours and revise some of my notes based on the arguments that were made today. I only need to have one person on the line from each side.

Would the parties be prepared to dial in today at 4:00? We'll post the Court's number on the docket.

MR. DICKERSON: Absolutely, Your Honor.

MS. BURTON: Yes, Your Honor.

THE COURT: And if local counsel is tied up, there's no requirement for you to dial in for that.

The other thing I wanted to say was that it was

11:03:45 a great pleasure hearing from both sides today. This is the area of law that doesn't come before me frequently with any frequency, and it's always wonderful for me to get the chance to hear from experts in the field. It was very interesting and very well presented from both sides, so thank you for that. I enjoyed talking to you-all today and we'll talk to you in a few hours.

COURTROOM DEPUTY: All rise.

(Court was adjourned at 11:04 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court

## $

**$100** [2] - 4:15, 33:23
**$200** [2] - 15:18, 19:17
**$500** [2] - 3:23, 6:15

## '

**'50s** [2] - 35:16, 36:18
**'60s** [1] - 35:14

## /

**/s** [1] - 52:13

## 1

**10:00** [1] - 1:13
**11:04** [1] - 52:9

## 2

**200** [2] - 19:24, 33:25
**2026** [1] - 1:13
**26-445** [1] - 2:8
**26-445-JLH** [1] - 1:6

## 3

**306** [1] - 31:25
**366** [1] - 14:3
**369** [1] - 3:15

## 4

**4:00** [1] - 51:20

## 5

**5** [1] - 16:15
**50** [3] - 11:20, 14:13, 30:17
**50-state** [1] - 40:17
**501(c)(3** [4] - 46:19, 47:4, 47:15, 47:16
**590** [1] - 15:18

## 8

**8** [1] - 1:13
**844** [1] - 1:11

## 9

**9** [1] - 22:25

## A

**a.m** [2] - 1:13, 52:9
**able** [3] - 48:6, 48:19, 51:7
**absolutely** [4] - 12:6, 40:23, 43:3, 51:21
**accept** [2] - 44:2, 44:11
**access** [1] - 4:1
**accomplishing** [1] - 6:12
**accurate** [1] - 52:11
**ACLU** [6] - 42:14, 43:13, 47:11, 47:12, 47:14
**Act** [7] - 31:20, 32:1, 40:4, 40:23, 40:24, 41:22, 43:17
**act** [8] - 28:21, 28:22, 31:23, 32:23, 44:20, 44:24, 45:1
**Action** [1] - 2:8
**action** [1] - 40:25
**actions** [1] - 43:21
**activities** [1] - 30:24
**activity** [7] - 4:12, 6:15, 10:9, 12:2, 17:6, 18:2, 46:20
**actors** [1] - 40:24
**acts** [1] - 24:14
**actual** [3] - 42:24, 46:2, 46:3
**add** [2] - 3:2
**addition** [2] - 9:8, 38:3
**additional** [1] - 4:9
**address** [2] - 5:19, 34:6
**addresses** [1] - 10:20
**adjourned** [1] - 52:9
**administrative** [1] - 23:6
**admissible** [4] - 37:2, 37:6, 38:4, 50:20
**admit** [1] - 31:22
**admitted** [1] - 37:5
**ads** [4] - 9:12, 14:12, 42:1, 47:7
**advantage** [1] - 43:21
**advertiser** [1] - 41:5
**advertisers** [2] - 40:25, 41:5
**advisement** [1] - 51:12
**advocacy** [1] - 11:23
**affidavit** [3] - 15:23, 18:4, 43:20
**affidavits** [1] - 24:7
**AFP** [7] - 4:24, 16:13, 21:3, 21:5, 24:5, 24:12, 45:23
**AFPF** [18] - 4:24, 5:22, 6:9, 6:21, 7:6, 7:13, 7:17, 8:22, 16:13, 17:4, 21:3, 21:5, 21:17, 21:25, 24:5, 24:12, 45:20, 49:11
**aggregate** [2] - 3:23, 4:15
**ago** [11] - 5:24, 10:8, 10:9, 10:11, 11:10, 12:12, 13:1, 18:15, 24:14, 42:8, 42:11
**agree** [3] - 25:22, 48:16, 49:15
**ahead** [6] - 2:9, 2:25, 21:8, 23:17, 44:8, 50:9
**al** [2] - 2:7, 2:8
**ALBENCE** [1] - 1:8
**Albence** [4] - 2:8, 2:19, 41:3, 41:12
**ALLEN** [1] - 1:19
**Allen** [1] - 2:14
**allowed** [2] - 46:14, 46:20
**allows** [2] - 40:24, 42:22
**almost** [2] - 7:9, 25:13
**alone** [2] - 26:22, 37:25
**alternative** [1] - 41:10
**alternatives** [2] - 6:5, 6:7
**Amendment** [11] - 12:11, 12:24, 13:4, 13:5, 13:11, 13:13, 22:5, 26:8, 27:4, 30:17, 31:7
**America** [1] - 35:15
**Americans** [2] - 2:7, 2:13
**AMERICANS** [2] - 1:4, 1:4
**amount** [3] - 9:14, 19:25, 27:25
**amounts** [1] - 18:9
**analysis** [5] - 14:20, 24:3, 49:6, 49:9
**ancient** [1] - 24:14
**ANDERSON** [2] - 1:18, 2:11
**Anderson** [1] - 2:12
**anodyne** [1] - 46:7
**anonymity** [1] - 24:20
**answer** [2] - 51:7, 51:12
**Anthony** [1] - 2:19
**ANTHONY** [1] - 1:8
**apologize** [1] - 50:10
**appeal** [1] - 23:2
**Appeals** [3] - 8:16, 17:4, 31:19
**appearances** [1] - 2:10
**APPEARANCES** [1] - 1:17
**applicable** [1] - 7:1
**application** [7] - 19:14, 23:4, 26:24, 27:11, 28:9, 28:19, 28:20
**applications** [13] - 19:14, 19:15, 19:19, 26:10, 26:11, 26:13, 26:21, 27:1, 27:6, 27:19, 27:21, 28:19, 28:20
**applied** [38] - 7:11, 14:25, 15:6, 15:14, 23:15, 23:17, 23:24, 24:1, 24:11, 24:17, 26:2, 26:3, 26:4, 26:21, 28:16, 28:17, 29:20, 30:3, 30:5, 31:21, 32:14, 32:15, 32:21, 33:12, 34:10, 34:14, 34:19, 36:1, 37:16, 38:3, 38:19, 39:15, 39:19, 39:22, 39:25, 40:2, 49:7
**applies** [2] - 31:22, 33:5
**apply** [5] - 20:20, 31:8, 35:6, 49:16, 49:18
**applying** [3] - 7:1, 48:25, 50:3
**appreciate** [1] - 23:23
**approach** [2] - 11:6, 14:9
**appropriate** [1] - 25:8
**approved** [1] - 41:24
**area** [2] - 20:14, 52:2
**argue** [2] - 32:12, 32:25
**argued** [2] - 32:7, 33:2
**argument** [13] - 2:14, 5:10, 6:13, 7:10, 7:19, 7:20, 8:21, 20:5, 22:10, 23:19, 44:18, 45:5, 47:16
**arguments** [3] - 10:15, 34:6, 51:17
**arises** [1] - 13:5
**articulated** [2] - 33:9, 33:10
**aside** [1] - 45:1
**assert** [2] - 32:21, 32:24
**assessing** [1] - 32:25
**associating** [1] - 36:22
**association** [2] - 12:14, 12:22
**associations** [1] - 41:1
**assume** [1] - 50:12
**assure** [1] - 24:20
**attached** [1] - 41:12
**attachments** [1] - 2:25
**attack** [1] - 29:7
**attention** [1] - 21:15
**attorney** [1] - 46:23
**Attorney** [1] - 2:19
**authority** [1] - 8:19
**available** [3] - 3:20, 9:19, 33:1
**aware** [2] - 31:9, 40:13

## B

**bad** [1] - 38:10
**badly** [1] - 9:22
**Baker** [1] - 2:12
**BAKER** [1] - 1:18
**balanced** [1] - 6:9
**based** [6] - 25:9, 29:20, 30:23, 30:24, 40:4, 51:16
**basic** [1] - 50:4
**basis** [2] - 4:16, 34:4
**become** [2] - 8:1, 45:25
**BEFORE** [1] - 1:16
**begs** [1] - 43:5
**behalf** [2] - 2:12, 40:15
**behind** [1] - 46:7
**belabor** [1] - 22:8
**below** [1] - 15:19
**bench** [1] - 51:15
**benefit** [1] - 5:22
**benefits** [1] - 29:23
**better** [1] - 9:3
**between** [8] - 3:12, 6:10, 7:14, 9:7, 18:6, 27:24, 41:15, 49:11
**Biden** [1] - 31:18
**big** [2] - 18:16, 37:23
**biggest** [1] - 45:13
**billion** [5] - 14:12, 14:19, 27:8, 27:14
**billionaire** [3] - 28:20, 28:21, 28:22
**bit** [4] - 3:8, 18:24, 39:13, 48:13
**blessed** [3] - 14:8, 17:4, 22:22
**Boggs** [1] - 1:11
**boil** [1] - 20:10
**bomb** [1] - 37:24
**Bonta** [21] - 5:23, 6:9, 6:21, 6:22, 7:6, 7:13, 7:17, 8:18, 8:22, 17:4, 21:17, 22:1,

32:16, 32:19, 32:24, 33:2, 33:4, 33:10, 47:13, 49:8, 49:11
**bonta** [1] - 33:8
**books** [4] - 10:10, 11:17, 26:17, 30:20
**bound** [2] - 32:8, 32:9
**box** [5] - 45:21, 45:22, 45:23, 45:24, 48:6
**break** [2] - 11:8, 35:10
**brief** [2] - 13:24, 15:9
**briefing** [4] - 4:6, 38:22, 40:8, 46:4
**briefly** [2] - 22:9, 39:10
**briefs** [1] - 2:25
**bring** [1] - 34:14
**broad** [1] - 31:24
**broader** [1] - 48:18
**brought** [1] - 43:20
**Buckley** [6] - 8:24, 21:12, 33:8, 33:10, 34:25, 35:18
**Buckman** [1] - 32:11
**burden** [5] - 13:11, 13:12, 15:1, 20:9, 30:12
**BURTON** [33] - 1:21, 2:17, 2:23, 31:13, 34:12, 34:15, 34:18, 35:10, 35:20, 35:22, 35:24, 36:4, 36:13, 36:16, 36:18, 36:20, 37:11, 37:17, 37:21, 39:9, 39:16, 42:5, 42:12, 42:19, 43:3, 43:7, 43:11, 43:24, 44:1, 44:7, 50:18, 51:2, 51:22
**Burton** [1] - 2:18
**buttress** [1] - 10:23
**buys** [1] - 40:5
**BY** [5] - 1:18, 1:19, 1:21, 1:24, 1:24

## C

**c)(3)** [1] - 47:12
**C.A** [1] - 1:6
**Caleb** [1] - 1:11
**California** [4] - 7:10, 7:20, 7:22, 8:4
**California's** [1] - 38:18
**Campaign** [2] - 2:21, 41:4
**campaign** [1] - 32:18
**CAMPAIGN** [1] - 1:23
**campaigns** [1] - 47:5
**candidate** [3] - 3:14, 3:20, 44:21
**candidates** [1] - 40:7
**candidly** [2] - 43:11, 44:17
**cannot** [3] - 45:3, 47:5, 47:17
**care** [1] - 48:8
**carefully** [1] - 47:8
**case** [53] - 4:24, 5:15, 5:18, 5:19, 6:1, 6:19, 6:20, 6:22, 7:2, 7:6, 7:10, 10:25, 11:1, 12:25, 13:7, 13:10, 13:17, 19:16, 22:3, 22:18, 22:20, 23:1, 23:4, 23:6, 24:3, 24:15, 24:22, 29:13, 29:23, 29:24, 30:11, 31:17, 31:21, 32:5, 34:9, 35:18, 35:20, 35:21, 35:23, 35:24, 36:6, 36:19, 37:1, 38:20, 39:2, 39:3, 40:23, 48:24, 49:6, 49:19, 49:20
**cases** [13] - 3:1, 6:3, 6:18, 6:25, 7:7, 8:25, 13:16, 15:8, 22:13, 27:23, 28:1, 35:25, 36:21
**causality** [1] - 10:13
**cent** [1] - 16:16
**CENTER** [1] - 1:23
**Center** [1] - 2:21
**certain** [5] - 9:14, 14:1, 14:3, 22:14, 33:21
**Certified** [1] - 52:13
**certify** [1] - 52:10
**certiorari** [1] - 32:3
**challenge** [39] - 4:7, 9:16, 14:25, 15:6, 15:13, 15:14, 23:15, 23:18, 23:25, 24:11, 26:4, 26:7, 26:22, 26:23, 26:24, 28:13, 28:14, 28:16, 29:20, 30:3, 30:18, 33:5, 34:8, 34:11, 34:14, 34:20, 38:3, 38:13, 38:15, 38:20, 39:9, 39:19, 39:22, 39:25, 44:9, 48:18, 50:16, 50:18
**challenges** [2] - 27:4, 31:8
**challenging** [2] - 4:22, 48:23
**chance** [2] - 30:14, 52:4
**changes** [4] - 5:12, 5:15, 6:1
**chapter** [1] - 40:18
**charitable** [1] - 29:24
**charities** [3] - 8:5, 46:19, 47:5
**check** [7] - 45:21, 45:23, 45:24, 48:6
**chill** [2] - 25:7, 26:16
**chilling** [3] - 22:5, 24:25, 25:7
**Choice** [2] - 5:24, 12:25
**choice** [1] - 22:2
**Circuit** [39] - 6:8, 6:19, 7:12, 7:13, 7:18, 7:21, 7:25, 8:12, 8:15, 10:1, 10:24, 11:1, 14:20, 22:22, 22:25, 23:1, 23:5, 30:15, 31:17, 31:19, 31:21, 31:23, 32:9, 32:14, 32:23, 33:14, 33:15, 33:17, 34:5, 39:18, 39:24, 40:1, 40:3, 46:11, 48:21, 49:6, 49:7, 49:19, 51:10
**Circuit's** [1] - 8:17
**circuits** [2] - 6:8, 10:24
**citation** [1] - 38:16
**cite** [2] - 22:12, 23:4
**cited** [5] - 3:1, 6:24, 15:8, 33:8, 33:10
**cites** [1] - 23:3
**citing** [2] - 8:24, 34:24
**Citizens** [14] - 3:13, 13:18, 13:20, 13:25, 22:11, 22:14, 25:9, 33:11, 33:12, 33:20, 34:24, 45:3, 45:5, 45:6
**Civil** [1] - 2:8
**claimed** [1] - 48:2
**claims** [1] - 5:20
**clash** [1] - 12:17
**clear** [2] - 4:7, 30:4
**click** [1] - 45:19
**client** [4] - 23:20, 24:20, 26:25, 29:16
**client's** [2] - 11:11, 18:23
**clients** [3] - 4:24, 7:4, 26:25
**close** [1] - 27:16
**close-enough** [1] - 27:16
**closed** [1] - 43:17
**closer** [1] - 34:1
**colleague** [1] - 2:14
**combination** [1] - 24:25
**comfortable** [1] - 27:8
**coming** [4] - 5:5, 37:21, 37:23, 44:23
**Commissioner** [1] - 2:19
**Commissioner's** [1] - 43:20
**committee** [1] - 45:22
**committees** [3] - 12:2, 40:25, 44:25
**communication** [18] - 4:5, 4:12, 4:21, 4:25, 5:3, 7:7, 9:24, 11:13, 12:10, 13:22, 16:17, 17:17, 17:19, 18:7, 18:19, 19:3, 21:4, 21:23
**communications** [11] - 3:23, 4:3, 4:11, 8:8, 22:18, 22:24, 23:8, 25:11, 28:7, 40:5, 48:22
**communists** [1] - 36:16
**community** [1] - 13:15
**compared** [1] - 19:25
**competing** [2] - 12:17, 13:14
**completely** [1] - 28:25
**compliance** [1] - 5:14
**components** [1] - 24:19
**concede** [1] - 9:2
**concept** [2] - 31:1, 34:17
**concern** [2] - 21:2, 21:3
**conduct** [1] - 13:6
**conference** [1] - 51:14
**confidential** [1] - 12:5
**conflict** [8] - 14:6, 32:10, 49:11, 49:18, 49:20, 49:22, 49:24, 50:5
**confused** [1] - 44:13
**confusion** [3] - 4:6, 23:25, 41:19
**connected** [1] - 25:5
**connection** [5] - 6:10, 18:6, 21:23, 27:24, 28:8
**consider** [2] - 22:16, 38:19
**considered** [2] - 34:6, 50:24
**consistent** [1] - 41:10
**constitutional** [16] - 9:17, 15:3, 15:6, 19:14, 20:15, 25:24, 26:9, 26:23, 27:5, 27:11, 27:17, 27:19, 28:18, 32:2, 50:4
**constitutionality** [1] - 44:24
**constitutionally** [1] - 35:6
**contend** [1] - 38:25
**contention** [1] - 6:20
**context** [5] - 8:3, 26:8, 27:4, 32:18, 36:10
**contexts** [1] - 32:18
**contrary** [2] - 24:9, 28:5
**contribute** [1] - 24:24
**contributing** [1] - 16:24
**contribution** [1] - 18:18
**contributor** [2] - 48:3, 48:4
**contributors** [4] - 14:1, 17:5, 22:15, 41:2
**contributors'** [2] - 34:21, 36:23
**controlled** [2] - 31:17, 34:9
**controversial** [2] - 25:17, 25:19
**conversation** [2] - 20:23, 24:4
**conveyed** [1] - 40:19
**copy** [1] - 41:12
**corporate** [3] - 22:17, 43:16
**corporation** [1] - 45:3
**correct** [2] - 5:8, 5:17
**correspond** [1] - 19:20
**costs** [1] - 3:23
**Counsel** [1] - 44:8
**counsel** [3] - 2:20, 32:6, 51:23
**couple** [2] - 28:5, 41:3
**course** [2] - 25:25, 30:13
**Court** [44] - 3:5, 6:2, 7:15, 8:14, 8:16, 13:2, 13:13, 14:6, 23:10, 23:12, 24:13, 25:8, 29:14, 29:15, 29:16, 32:3, 32:8, 32:9, 32:10, 33:13, 33:15, 33:17, 34:5, 34:18, 35:3, 38:14, 38:16, 38:17, 38:21, 38:25, 39:12, 39:17, 39:21, 44:2, 48:2,

48:9, 48:16, 49:8, 50:23, 50:24, 52:9, 52:14
**COURT** [102] - 1:1, 2:4, 2:15, 2:22, 2:24, 3:6, 3:9, 4:18, 5:4, 5:9, 5:15, 6:22, 8:2, 8:13, 9:10, 10:3, 10:7, 10:10, 11:4, 11:8, 11:21, 11:25, 12:4, 12:7, 12:18, 12:20, 12:23, 13:7, 13:10, 14:7, 14:10, 14:17, 14:25, 15:13, 16:2, 16:5, 16:9, 17:12, 17:22, 17:24, 18:12, 19:6, 19:18, 20:6, 20:17, 21:7, 21:13, 23:16, 25:2, 25:25, 26:15, 26:19, 28:13, 29:4, 30:7, 30:19, 30:25, 31:11, 34:10, 34:13, 34:16, 35:2, 35:17, 35:21, 35:23, 36:2, 36:9, 36:14, 36:17, 36:19, 37:8, 37:12, 37:20, 39:8, 39:14, 42:4, 42:6, 42:17, 43:2, 43:4, 43:9, 43:23, 43:25, 44:4, 44:8, 44:15, 45:7, 46:8, 46:16, 46:21, 47:3, 47:6, 48:11, 49:13, 49:15, 49:23, 50:2, 50:7, 50:14, 50:21, 51:3, 51:23
**court** [2] - 21:24, 23:2
**Court's** [4] - 3:7, 5:23, 51:14, 51:20
**Courthouse** [1] - 1:11
**courtroom** [1] - 50:11
**COURTROOM** [1] - 52:8
**courts** [3] - 24:22, 28:2, 33:15
**Courts** [4] - 17:4, 31:19, 32:9, 33:15
**Courts'** [1] - 38:23
**covers** [1] - 40:17
**create** [4] - 34:19, 41:9, 45:3, 48:8
**created** [1] - 41:19
**creating** [1] - 45:8

## D

**D.C** [2] - 22:22, 23:5
**data** [1] - 40:12
**decide** [1] - 16:14
**decision** [2] - 5:23, 32:4
**decisionmaking** [1] - 16:10
**declaration** [4] - 10:16, 41:3, 41:13, 44:2
**declarations** [2] - 37:4, 44:10
**declarator** [1] - 51:3
**deep** [1] - 35:13
**defend** [1] - 5:25
**Defendants** [4] - 1:9, 1:25, 2:19, 50:13
**DELAWARE** [2] - 1:2, 1:21
**Delaware** [75] - 1:12, 2:18, 3:12, 3:16, 3:18, 3:20, 4:10, 4:13, 5:13, 5:16, 5:22, 5:25, 6:3, 6:14, 6:16, 6:18, 10:9, 10:20, 12:8, 15:24, 16:1, 16:3, 16:11, 16:12, 16:15, 16:24, 17:10, 17:13, 18:2, 18:11, 19:1, 19:2, 19:4, 19:9, 19:10, 19:12, 20:11, 20:20, 22:25, 24:7, 24:10, 25:1, 27:10, 27:16, 27:25, 31:18, 33:22, 34:4, 38:8, 38:9, 40:5, 40:7, 40:14, 40:17, 40:18, 41:6, 41:8, 41:11, 41:15, 41:16, 42:15, 42:16, 43:15, 45:14, 46:5, 46:23, 46:25, 47:14, 47:22, 48:2, 48:5, 49:11
**Delaware's** [7] - 20:8, 27:10, 34:1, 39:4, 40:4, 40:23, 40:24
**Delawareans** [1] - 42:21
**demand** [3] - 13:3, 22:4, 27:10
**demanding** [1] - 20:12
**demands** [1] - 6:14
**Democrats** [1] - 47:21
**demonstrate** [3] - 6:4, 6:6, 42:6
**denial** [1] - 51:9
**denied** [1] - 32:4
**Department** [1] - 2:18
**DEPARTMENT** [1] - 1:21
**DEPUTY** [1] - 52:8
**describe** [2] - 38:23, 50:19
**describing** [1] - 14:1
**description** [2] - 4:14, 6:14
**desperately** [2] - 46:5
**detailing** [1] - 3:24
**determining** [1] - 49:17
**deterrent** [1] - 13:4
**dial** [3] - 51:13, 51:19, 51:24
**DICKERSON** [70] - 1:19, 3:4, 3:7, 3:10, 4:23, 5:8, 5:10, 5:17, 6:24, 8:11, 8:14, 9:18, 10:5, 10:8, 10:13, 11:5, 11:19, 11:23, 12:1, 12:6, 12:16, 12:19, 12:21, 12:24, 13:9, 13:19, 14:8, 14:15, 14:18, 15:7, 15:15, 16:4, 16:7, 16:10, 17:21, 17:23, 17:25, 18:21, 19:12, 20:3, 20:7, 20:19, 21:9, 21:14, 23:22, 25:21, 26:5, 26:18, 26:20, 28:15, 29:5, 30:9, 30:22, 31:5, 31:12, 44:12, 44:16, 45:12, 46:13, 46:17, 47:1, 47:4, 47:7, 48:13, 49:14, 49:21, 49:25, 50:3, 50:10, 51:21
**Dickerson** [1] - 2:14
**different** [5] - 25:4, 31:14, 32:15, 33:17, 39:2
**differentiate** [1] - 41:15
**diligence** [1] - 21:10
**direct** [2] - 14:5, 49:11
**disagree** [2] - 13:12, 15:8
**disclose** [11] - 4:11, 4:25, 12:9, 16:23, 17:15, 17:19, 18:20, 25:20, 40:10, 41:20, 47:19
**disclosed** [18] - 4:21, 10:2, 10:20, 11:15, 13:22, 14:4, 14:5, 14:14, 15:19, 16:18, 23:8, 24:18, 24:24, 25:5, 28:6, 34:21, 38:11, 47:11
**discloses** [1] - 38:5
**disclosing** [3] - 36:23, 38:8, 45:11
**disclosure** [19] - 5:11, 7:15, 8:23, 9:7, 13:13, 21:19, 22:4, 22:12, 28:21, 28:22, 32:18, 33:3, 33:20, 38:6, 39:5, 39:23, 46:3, 48:10, 49:3
**Disclosure** [7] - 31:20, 32:1, 40:4, 40:23, 40:24, 41:22, 43:17
**disclosures** [1] - 41:4
**discretion** [1] - 16:14
**discussed** [1] - 5:21
**discussion** [2] - 12:3, 31:14
**dislike** [1] - 29:6
**dispute** [1] - 3:12
**disregard** [3] - 32:12, 33:14, 50:25
**dissent's** [1] - 45:5
**distinct** [1] - 30:4
**distinction** [1] - 8:9
**District** [1] - 52:14
**district** [2] - 23:2, 32:9
**DISTRICT** [2] - 1:1, 1:2
**docket** [1] - 51:20
**dollar** [3] - 18:25, 33:21, 33:22
**dollars** [14] - 10:18, 14:12, 14:19, 14:21, 15:20, 18:24, 19:13, 19:16, 19:20, 27:9, 27:14, 27:15, 33:25
**donate** [5] - 33:23, 41:7, 42:18, 42:20, 45:10
**donated** [4] - 9:14, 12:13, 18:15, 19:24
**donates** [1] - 12:12
**donating** [2] - 11:21, 42:15
**donation** [11] - 5:7, 11:10, 12:14, 17:16, 18:25, 21:18, 27:24, 28:9, 35:23, 35:24, 42:9
**donations** [3] - 13:16, 20:1, 25:18
**done** [4] - 20:24, 30:13, 42:10, 43:13
**donor** [25] - 4:14, 5:11, 8:23, 10:15, 11:10, 12:12, 13:3, 13:21, 14:12, 14:14, 16:12, 18:6, 21:22, 22:4, 29:19, 30:1, 33:2, 37:11, 37:12, 37:15, 42:24, 45:16, 46:6, 48:10, 49:3
**donors** [52] - 4:11, 4:12, 4:13, 5:6, 6:11, 6:14, 9:8, 10:4, 11:6, 14:4, 14:5, 14:24, 15:18, 16:14, 16:23, 17:15, 17:18, 18:5, 18:16, 19:23, 22:23, 23:7, 24:6, 24:10, 24:18, 24:21, 24:23, 25:23, 33:21, 33:22, 36:22, 36:25, 38:5, 38:7, 38:8, 38:9, 38:11, 39:23, 40:10, 40:13, 40:20, 40:22, 41:16, 41:18, 42:8, 42:22, 43:14, 45:11, 45:24, 47:11, 47:19, 47:22
**donors'** [1] - 7:15
**down** [8] - 7:8, 11:8, 20:10, 27:2, 30:13, 32:6, 35:11, 42:23
**downstream** [1] - 42:24
**dragnet** [4] - 6:14, 11:6, 14:9, 21:18
**dramatically** [1] - 20:5
**draws** [1] - 15:5
**drill** [1] - 7:8
**DSF** [13] - 31:19, 32:2, 32:6, 32:8, 32:21, 33:9, 33:11, 34:9, 48:14, 48:15, 48:18
**DSF's** [1] - 32:13
**due** [1] - 21:10

## E

**early** [1] - 15:8
**earmark** [3] - 18:17, 19:8, 27:25
**earmarked** [4] - 9:25, 17:15, 18:22, 19:4
**earmarking** [3] - 10:25, 17:7, 17:14
**easier** [1] - 41:9
**easily** [1] - 21:5
**effect** [2] - 13:5, 39:1
**either** [4] - 5:3, 5:24, 34:23, 45:21
**elect** [1] - 47:21
**election** [14] - 3:15, 3:21, 6:22, 6:25, 7:2, 9:3, 9:15, 13:16, 14:24, 20:17, 35:21, 35:25, 36:19, 51:8
**electioneering** [12] - 7:7, 9:23, 11:13, 12:10, 13:21, 17:16, 17:18, 18:19, 22:17, 22:24, 23:8, 25:10

**emergency** [1] - 23:3
**EMILY** [1] - 1:21
**Emily** [1] - 2:17
**end** [3] - 30:10, 33:7, 46:8
**ends** [1] - 27:15
**enforcement** [2] - 15:2, 43:21
**engage** [3] - 40:15, 41:14, 43:1
**engaging** [2] - 40:14, 43:13
**enjoyed** [1] - 52:6
**enormous** [1] - 3:18
**entirely** [1] - 24:20
**entities** [5] - 5:6, 12:2, 29:10, 29:11, 41:10
**entity** [13] - 6:15, 10:18, 21:19, 22:23, 27:9, 27:14, 29:1, 29:5, 47:15, 47:16, 48:7, 48:9, 48:10
**ESQUIRE** [5] - 1:18, 1:19, 1:21, 1:24, 1:24
**essentially** [4] - 3:19, 6:13, 26:9, 28:18
**et** [2] - 2:7, 2:8
**events** [1] - 29:7
**eventual** [6] - 16:17, 18:7, 18:10, 21:20, 21:23, 27:24
**everywhere** [1] - 19:9
**evidence** [12] - 15:10, 36:21, 37:2, 37:6, 37:14, 38:4, 39:1, 39:2, 39:3, 44:3, 45:20, 50:25
**evidentiary** [1] - 44:5
**exact** [2] - 31:20, 48:10
**exacting** [10] - 8:22, 22:6, 31:21, 32:15, 32:17, 32:19, 32:25, 33:4, 33:9, 33:11
**exactly** [5] - 16:7, 37:17, 43:10, 49:7, 49:10
**example** [3] - 33:11, 36:15, 42:19
**examples** [6] - 35:11, 41:4, 42:13, 47:14
**except** [2] - 29:25, 32:22
**exception** [1] - 35:25
**excessive** [1] - 18:24
**excluded** [1] - 44:25
**exercise** [2] - 12:13, 13:5
**exhibits** [2] - 44:3, 50:12
**existence** [2] - 5:11, 9:4
**exists** [1] - 47:21
**expect** [1] - 10:9
**expected** [1] - 43:12
**expenditures** [1] - 3:24
**expense** [1] - 48:8
**experts** [1] - 52:4
**explain** [1] - 21:22
**explained** [1] - 6:25
**explaining** [2] - 4:4, 8:17
**explains** [1] - 46:2
**explicitly** [1] - 33:9
**extending** [1] - 32:17
**extensively** [1] - 6:25
**extent** [2] - 50:18, 51:9

## F

**face** [1] - 4:2
**facial** [15] - 15:13, 17:2, 26:7, 26:23, 27:4, 28:14, 28:15, 31:8, 34:8, 38:13, 38:15, 39:9, 39:15, 39:16, 39:21
**facially** [4] - 26:14, 28:11, 28:17, 38:18
**fact** [12] - 7:5, 7:25, 10:16, 11:20, 12:25, 14:19, 18:22, 24:6, 29:23, 32:6, 38:3, 39:1
**factual** [2] - 44:10, 50:16
**fair** [1] - 21:9
**fallen** [1] - 5:13
**Families** [6] - 6:1, 6:19, 20:20, 23:1, 31:18, 49:12
**fancy** [1] - 42:1
**far** [3] - 29:15, 29:25, 47:9
**favor** [1] - 33:16
**FEC** [2] - 23:5, 23:6
**federal** [11] - 9:20, 9:22, 17:6, 22:9, 33:24, 38:5, 38:6, 38:11, 41:9, 46:22
**few** [4] - 40:12, 42:8, 51:16, 52:7
**field** [1] - 52:4
**file** [2] - 3:23, 5:1
**filed** [1] - 32:2
**final** [1] - 23:4
**finally** [1] - 22:21
**finance** [1] - 32:18
**Finance** [1] - 41:4
**fine** [3] - 3:9, 9:24, 46:12
**First** [17] - 5:24, 10:1, 11:1, 12:11, 12:24, 12:25, 13:4, 13:5, 13:11, 13:12, 14:20, 22:2, 22:5, 26:8, 27:4, 30:17, 31:7
**first** [8] - 3:18, 3:21, 6:18, 25:13, 35:17, 40:11, 46:2, 48:3
**first-level** [1] - 46:2
**first-line** [1] - 48:3
**fit** [1] - 27:16
**five** [5] - 5:13, 5:23, 13:1, 24:14, 42:11
**flexibility** [1] - 14:23
**followed** [1] - 33:10
**follows** [1] - 8:21
**Footnote** [1] - 22:25
**FOR** [3] - 1:2, 1:4, 1:5
**force** [1] - 45:3
**foregoing** [1] - 52:10
**form** [15] - 24:11, 24:12, 40:25, 41:11, 41:12, 42:25, 43:16, 45:10, 46:19, 47:11, 47:17, 48:6, 48:7
**forth** [2] - 21:12, 40:8
**forward** [3] - 3:1, 42:9, 42:14
**FOUNDATION** [1] - 1:4
**Foundation** [1] - 2:7
**four** [2] - 4:16, 44:19
**fourth** [1] - 4:9
**fractions** [1] - 18:10
**fraudulent** [1] - 8:5
**free** [2] - 16:6, 17:17
**frequency** [1] - 52:3
**frequently** [1] - 52:2
**friend** [3] - 31:15, 34:2, 48:15
**front** [4] - 5:2, 17:7, 21:3, 48:9
**fund** [2] - 41:6, 42:16
**fundamentally** [1] - 32:5
**funded** [1] - 41:8
**funding** [5] - 20:25, 41:16, 41:20, 42:15, 43:14
**funds** [1] - 14:18
**funneled** [1] - 42:8

## G

**game** [1] - 26:9
**Gaspee** [3] - 11:1, 14:21, 15:20
**General** [1] - 2:20
**general** [3] - 28:8, 35:2, 43:15
**generally** [3] - 4:14, 21:24, 30:6
**gist** [1] - 28:13
**given** [5] - 10:15, 13:4, 15:16, 15:22, 31:7
**go-forward** [2] - 42:9, 42:14
**goodness** [1] - 47:20
**Government** [6] - 34:23, 36:7, 36:11, 36:12, 37:9, 37:14
**Government's** [2] - 13:6, 37:19
**governmental** [3] - 7:14, 9:1, 9:7
**grant** [1] - 51:10
**great** [1] - 52:1
**group** [1] - 36:8
**groups** [2] - 35:12, 41:25
**guess** [3] - 25:2, 42:10, 43:5
**guide** [1] - 40:17
**Gun** [2] - 8:15, 24:2
**Guns** [1] - 10:25

## H

**HALL** [1] - 1:16
**hand** [2] - 39:11, 39:12
**happy** [4] - 9:21, 34:6, 44:13, 44:16
**harassment** [7] - 24:16, 28:25, 29:21, 34:22, 37:3, 37:7, 37:18
**hard** [1] - 25:2
**harm** [3] - 37:7, 38:9, 46:9
**harmed** [1] - 38:8
**heading** [1] - 32:16
**hear** [5] - 3:3, 23:14, 23:17, 46:15, 52:4
**Hearing** [1] - 1:14
**hearing** [8] - 2:6, 3:1, 44:5, 44:9, 46:9, 46:23, 51:6, 52:1
**hearsay** [1] - 50:19
**heart** [1] - 10:21
**Heather** [1] - 52:13
**heightened** [1] - 13:4
**held** [4] - 13:20, 31:23, 38:15, 38:17
**help** [1] - 35:12
**helpful** [2] - 3:11, 36:2
**helps** [1] - 26:6
**hereby** [1] - 52:10
**hide** [3] - 25:18, 25:23, 46:6
**hire** [1] - 29:8
**history** [3] - 24:14, 24:21, 29:20
**hmm** [1] - 36:17
**hold** [2] - 38:17, 38:21
**holding** [2] - 32:13, 45:4
**honest** [1] - 47:20
**honest-to-goodness** [1] - 47:20
**Honor** [35] - 2:11, 2:17, 3:4, 5:17, 8:12, 10:5, 10:14, 12:16, 15:16, 16:8, 17:23, 18:22, 20:3, 20:23, 21:10, 23:23, 25:22, 28:2, 30:10, 30:23, 31:5, 31:13, 31:16, 39:4, 40:11, 44:12, 44:16, 46:13, 48:14, 49:2, 50:1, 50:6, 50:12, 51:21, 51:22
**Honor's** [4] - 7:8, 27:7, 29:2, 45:13
**HONORABLE** [1] - 1:16
**Hostetler** [1] - 2:12
**HOSTETLER** [1] - 1:18
**hours** [2] - 51:16, 52:7
**hundred** [5] - 18:17, 18:24, 18:25, 19:13, 27:15
**hundred-thousand-dollar** [1] - 18:25
**hundreds** [2] - 15:18, 19:23
**hypothetical** [2] - 18:23, 27:7

## I

**idea** [1] - 13:20
**identities** [1] - 6:11
**ideological** [1] - 21:11
**ignorance** [1] - 42:7
**illegal** [1] - 22:18
**imagine** [2] - 19:3, 27:5
**impermissibly** [1] - 31:24
**important** [4] - 5:20, 8:10, 9:1, 13:1
**IN** [1] - 1:1
**included** [1] - 41:3

**includes** [1] - 40:16
**including** [1] - 40:24
**inconsistent** [1] - 22:15
**incorporate** [1] - 23:12
**indicates** [1] - 40:18
**indicia** [1] - 27:23
**individual** [1] - 18:6
**individuals** [1] - 22:19
**inevitable** [1] - 13:6
**inevitably** [2] - 22:4, 40:22
**information** [9] - 7:21, 12:5, 13:3, 20:11, 20:13, 21:4, 29:17, 29:19, 48:5
**informational** [7] - 6:6, 16:18, 20:12, 45:15, 46:3, 48:1
**informing** [2] - 6:10, 9:2
**Injunction** [1] - 1:14
**injunction** [3] - 16:22, 31:2, 51:10
**injury** [2] - 36:21, 37:3
**input** [1] - 16:14
**insist** [1] - 25:23
**insofar** [1] - 29:25
**instance** [2] - 38:7, 38:24
**interest** [31] - 3:13, 3:17, 6:6, 6:9, 6:12, 7:14, 9:1, 9:3, 9:4, 9:8, 9:11, 9:12, 13:14, 16:19, 20:12, 20:14, 21:12, 25:9, 33:6, 36:11, 36:12, 37:10, 37:14, 37:19, 39:4, 45:15, 45:16, 45:17, 46:2, 46:4, 48:1
**interested** [2] - 18:16, 34:10
**interesting** [1] - 52:5
**interfere** [1] - 46:20
**intervene** [1] - 47:5
**introduction** [1] - 49:1
**investigate** [1] - 8:5
**invite** [1] - 38:15
**involving** [2] - 7:2, 11:23
**irreparable** [1] - 46:9
**IRS** [3] - 47:2, 47:4, 47:10
**issue** [9] - 3:17, 9:3, 9:5, 12:15, 16:20, 21:25, 27:12, 31:20, 47:18
**issues** [3] - 11:24, 12:3, 47:8

## J

**JENNIFER** [1] - 1:16
**Jennings** [1] - 2:20
**JENNINGS** [1] - 1:8
**Jeremy** [1] - 2:11
**JEREMY** [1] - 1:18
**joints** [1] - 18:1
**judged** [1] - 26:13
**judicial** [1] - 40:12
**June** [1] - 1:13
**jurisprudence** [1] - 31:2
**justice** [2] - 24:13, 24:16
**JUSTICE** [1] - 1:21
**Justice** [1] - 2:18
**justices** [1] - 29:14

## K

**KATHY** [1] - 1:8
**Kathy** [1] - 2:20
**keep** [1] - 12:5
**killed** [1] - 37:22
**kind** [6] - 7:8, 20:15, 23:16, 35:10, 42:14, 47:15
**kindergartener** [1] - 11:9
**King** [1] - 1:11
**knowing** [2] - 3:14, 37:14
**knows** [1] - 21:5

## L

**lack** [2] - 27:25, 30:5
**language** [3] - 14:2, 14:6, 48:17
**large** [1] - 19:5
**last** [1] - 5:13
**law** [36] - 5:12, 5:13, 5:15, 5:16, 5:19, 6:1, 6:20, 8:4, 8:7, 8:18, 9:22, 10:10, 10:11, 11:16, 12:8, 13:23, 14:14, 20:17, 23:6, 26:17, 29:22, 30:11, 30:15, 30:19, 30:20, 41:24, 42:22, 42:24, 43:5, 43:12, 43:15, 45:14, 48:3, 49:20, 52:2
**laws** [1] - 34:14
**leaks** [1] - 7:24
**least** [6] - 3:16, 10:1, 21:25, 33:7, 34:8, 38:24
**leave** [2] - 44:1, 45:1
**lecturing** [1] - 48:22
**LEGAL** [1] - 1:23
**legal** [1] - 32:14
**Legal** [1] - 2:21
**legislation** [1] - 42:23
**legislature** [2] - 41:24, 42:23
**legislature's** [1] - 43:18
**legitimate** [2] - 9:11, 26:13
**less** [15] - 6:5, 6:7, 10:17, 19:16, 19:17, 19:19, 19:24, 20:21, 20:22, 21:16, 25:19, 28:2, 30:17, 33:1, 49:4
**level** [2] - 6:2, 46:2
**light** [3] - 6:5, 6:7, 24:21
**likely** [1] - 8:1
**limit** [1] - 19:13
**limitation** [1] - 15:5
**line** [9] - 9:13, 9:17, 14:11, 15:6, 47:9, 47:23, 48:3, 51:14, 51:18
**lines** [1] - 6:18
**litigated** [1] - 5:25
**live** [1] - 47:16
**LLP** [1] - 1:18
**local** [1] - 51:23
**look** [6] - 6:12, 20:21, 24:5, 25:15, 49:2, 49:4
**looked** [2] - 28:2, 39:24
**looking** [1] - 3:1
**loophole** [1] - 43:4
**loss** [1] - 46:17
**love** [1] - 41:10
**lower** [1] - 33:15
**lynched** [1] - 35:14

## M

**maintain** [1] - 31:2
**majority** [1] - 14:3
**MALLOY** [1] - 1:24
**Malloy** [1] - 2:21
**management** [1] - 29:7
**mass** [1] - 41:18
**matches** [1] - 40:6
**math** [1] - 18:9
**matter** [9] - 10:5, 10:6, 11:20, 29:13, 29:22, 30:20, 30:23, 32:7, 43:15
**matters** [2] - 11:23, 29:25
**McAllen** [2] - 1:24, 2:21
**McConnell** [5] - 13:20, 22:11, 22:16, 33:19, 34:24
**mean** [12] - 7:10, 8:2, 11:16, 11:20, 12:1, 13:25, 16:3, 17:12, 31:4, 37:25, 45:8, 50:15
**means** [8] - 20:21, 20:22, 21:16, 28:3, 33:1, 33:7, 34:17, 49:4
**meant** [2] - 26:1, 33:17
**media** [1] - 3:20
**meet** [2] - 25:24, 34:19
**MEGAN** [1] - 1:24
**Megan** [1] - 2:21
**members** [1] - 36:8
**mention** [1] - 3:19
**mere** [1] - 6:9
**Merit** [1] - 52:13
**merits** [2] - 30:16, 31:3
**met** [3] - 35:13, 38:21
**middle** [1] - 35:15
**might** [4] - 11:12, 14:15, 38:20, 48:15
**million** [2] - 18:23, 27:15
**mine** [1] - 15:12
**misunderstanding** [1] - 39:13
**Monday** [1] - 1:13
**monetary** [2] - 9:15, 15:5
**money** [12] - 5:4, 11:22, 17:17, 18:9, 19:1, 19:4, 19:21, 19:25, 24:7, 42:7, 43:1
**morning** [10] - 2:4, 2:11, 2:16, 2:17, 2:22, 3:4, 3:6, 4:9, 4:17, 31:13
**most** [6] - 8:1, 9:19, 19:14, 19:15, 19:19, 38:2
**motion** [2] - 4:7, 51:12
**movants** [1] - 3:3
**move** [1] - 50:12
**moved** [1] - 50:15
**MR** [99] - 2:11, 2:23, 3:4, 3:7, 3:10, 4:23, 5:8, 5:10, 5:17, 6:24, 8:11, 8:14, 9:18, 10:5, 10:8, 10:13, 11:5, 11:19, 11:23, 12:1, 12:6, 12:16, 12:19, 12:21, 12:24, 13:9, 13:19, 14:8, 14:15, 14:18, 15:7, 15:15, 16:4, 16:7, 16:10, 17:21, 17:23, 17:25, 18:21, 19:12, 20:3, 20:7, 20:19, 21:9, 21:14, 23:22, 25:21, 26:5, 26:18, 26:20, 28:15, 29:5, 30:9, 30:22, 31:5, 31:12, 31:13, 34:12, 34:15, 34:18, 35:10, 35:22, 35:24, 36:4, 36:13, 36:16, 36:18, 36:20, 37:11, 37:17, 37:21, 39:9, 39:16, 42:5, 42:12, 42:19, 43:3, 43:7, 43:11, 43:24, 44:1, 44:7, 44:12, 44:16, 45:12, 46:13, 46:17, 47:1, 47:4, 47:7, 48:13, 49:14, 49:21, 49:25, 50:3, 50:10, 50:18, 51:2, 51:21
**MS** [3] - 2:17, 35:20, 51:22
**muddled** [1] - 9:22
**multiple** [1] - 24:22
**must** [3] - 13:3, 33:5, 34:20

## N

**NAACP** [3] - 35:13, 35:20, 36:5
**NACCP** [1] - 35:18
**name** [2] - 41:9, 42:1
**names** [4] - 25:5, 34:21, 36:24, 46:7
**narrow** [14] - 9:9, 15:12, 16:20, 20:22, 21:21, 22:7, 27:17, 30:5, 30:12, 32:22, 39:11, 39:14, 47:24, 48:25
**narrower** [1] - 48:1
**narrowly** [14] - 5:12, 6:16, 20:9, 20:13, 24:1, 27:20, 28:23, 31:23, 32:23, 33:5, 39:20, 39:25, 43:6, 46:1
**national** [1] - 19:5
**nationwide** [2] - 4:15,

37:23
**necessarily** [1] - 20:13
**necessary** [3] - 7:16, 20:12, 49:10
**need** [10] - 5:20, 6:4, 6:6, 8:4, 10:25, 15:4, 37:17, 51:10, 51:17
**needs** [2] - 37:17, 46:5
**neutral** [1] - 48:20
**never** [1] - 14:8
**new** [4] - 8:18, 10:11, 22:2, 30:19
**next** [1] - 36:15
**nine** [1] - 29:14
**Ninth** [5] - 7:12, 7:18, 7:21, 7:24, 49:7
**nobody** [1] - 50:15
**nobody's** [1] - 50:24
**non** [6] - 7:3, 7:5, 21:24, 22:17, 27:9, 29:24
**non-profit** [5] - 7:5, 21:24, 22:17, 27:9, 29:24
**non-profits** [1] - 7:3
**none** [3] - 28:4, 28:7, 37:5
**North** [1] - 1:11
**note** [2] - 20:4, 33:19
**noted** [1] - 41:25
**notes** [3] - 43:20, 51:16, 52:11
**notice** [3] - 10:19, 18:3, 40:12
**noting** [1] - 30:10
**number** [3] - 20:4, 23:20, 51:20
**Number** [1] - 2:8
**numbers** [2] - 26:9, 34:1

## O

**objecting** [1] - 37:4
**objection** [1] - 40:9
**obligation** [5] - 4:3, 6:4, 15:11, 20:9, 25:24
**obsolete** [1] - 32:14
**obviating** [1] - 32:19
**obvious** [3] - 9:20, 49:22, 49:24
**obviously** [3] - 32:10, 49:18, 49:19
**occasion** [1] - 22:16
**occurred** [1] - 37:7
**OF** [2] - 1:2, 1:21
**officials** [1] - 34:23
**often** [1] - 28:17
**one** [34] - 3:22, 4:2, 4:10, 7:5, 7:11, 9:16, 9:19, 9:20, 13:22, 13:25, 17:3, 23:25, 24:11, 24:19, 25:22, 27:22, 28:9, 35:4, 35:8, 35:13, 35:15, 35:17, 38:7, 38:24, 39:11, 41:11, 41:24, 42:13, 44:19, 46:18, 47:14, 51:17
**one-page** [1] - 41:11
**ones** [1] - 46:23
**opening** [1] - 15:8
**opinion** [13] - 3:15, 8:16, 14:3, 23:5, 29:15, 31:17, 31:25, 32:15, 32:16, 35:4, 35:5, 35:7, 35:8
**opinions** [2] - 34:3, 39:18
**opponents** [3] - 13:12, 49:16, 50:14
**opt** [4] - 10:2, 10:4, 11:2, 17:9
**opt-out** [1] - 17:9
**option** [3] - 42:14, 43:19, 43:22
**options** [4] - 9:19, 10:3, 17:10, 41:17
**organization** [10] - 7:5, 11:11, 13:21, 26:4, 35:7, 37:24, 45:17, 46:6, 47:21
**organizational** [1] - 48:4
**organizations** [3] - 19:5, 35:4, 36:5
**otherwise** [2] - 8:23, 23:10
**ourselves** [1] - 29:8
**out-of-state** [1] - 19:11
**outcome** [1] - 23:10
**outlines** [1] - 8:21
**outside** [1] - 40:2
**outweighed** [1] - 37:15
**outweighs** [1] - 37:19
**overbroad** [2] - 20:5, 26:15
**overcome** [1] - 13:3
**overruled** [2] - 13:18, 49:17
**overturned** [2] - 7:21, 49:8
**own** [1] - 42:18
**Owners** [2] - 8:15, 24:2

## P

**PAC** [27] - 38:5, 41:7, 41:11, 42:4, 42:8, 42:16, 42:18, 42:20, 42:25, 43:1, 43:15, 44:15, 45:4, 45:6, 45:8, 45:9, 45:21, 46:22, 47:12, 47:17, 47:20, 48:4
**PACs** [4] - 40:7, 41:8, 41:9, 46:19
**page** [4] - 8:16, 14:2, 23:23, 41:11
**Page** [2] - 3:15, 14:3
**Paid** [2] - 4:4, 5:3
**paid** [5] - 4:4, 8:8, 45:23, 47:22, 48:4
**paper** [1] - 50:15
**papers** [1] - 44:5
**parse** [1] - 14:23
**part** [1] - 25:13
**participate** [1] - 47:17
**particular** [5] - 23:20, 24:2, 25:18, 29:1, 29:5
**particularly** [1] - 8:9
**parties** [5] - 2:9, 3:12, 34:23, 40:6, 51:19
**parts** [2] - 15:2
**party** [8] - 40:25, 41:4, 41:5, 44:21, 44:22, 45:22, 48:7
**pass** [1] - 28:22
**passed** [2] - 5:24, 42:25
**pay** [1] - 21:15
**paying** [2] - 9:12, 25:10
**payors** [1] - 4:24
**penny** [1] - 18:10
**people** [32] - 9:2, 9:14, 9:23, 9:25, 10:1, 10:17, 15:18, 15:19, 18:8, 18:14, 19:10, 19:11, 19:16, 19:17, 22:19, 25:5, 25:19, 26:3, 28:6, 29:6, 33:23, 35:14, 36:7, 36:21, 37:22, 37:25, 41:2, 41:5, 42:15, 43:12, 48:5
**perceived** [1] - 3:12
**percent** [2] - 18:18, 30:17
**percentage** [1] - 19:21
**period** [6] - 3:21, 4:15, 10:18, 15:22, 40:6, 46:14
**permission** [1] - 3:7
**permit** [1] - 20:15
**permitted** [1] - 41:21
**person** [6] - 16:11, 27:10, 27:13, 44:21, 45:17, 51:18
**perspective** [1] - 30:1
**persuasive** [2] - 8:19, 51:1
**PI** [1] - 2:6
**picked** [1] - 7:20
**piece** [1] - 49:3
**place** [1] - 31:14
**Plaintiff** [3] - 7:6, 24:2, 34:20
**Plaintiff's** [1] - 38:19
**Plaintiffs** [26] - 1:6, 1:20, 2:12, 3:3, 31:22, 32:2, 32:7, 32:12, 32:21, 32:24, 33:2, 33:13, 37:1, 38:25, 39:1, 39:20, 40:14, 40:18, 40:19, 40:21, 41:14, 41:17, 41:19, 42:2, 42:18, 42:20
**Plaintiffs'** [7] - 33:16, 34:3, 40:9, 40:13, 40:15, 40:16, 40:17
**pleasure** [1] - 52:1
**pled** [1] - 15:17
**plus** [1] - 15:21
**podium** [1] - 44:1
**point** [21] - 7:4, 7:9, 8:3, 8:7, 8:14, 10:12, 11:5, 16:8, 21:17, 22:13, 25:3, 33:19, 38:2, 40:1, 40:9, 40:11, 41:23, 42:10, 44:18, 45:13
**pointed** [1] - 6:9
**pointing** [1] - 19:23
**points** [1] - 40:12
**policy** [1] - 9:7
**political** [22] - 3:19, 4:13, 8:23, 8:24, 12:1, 17:6, 21:20, 29:23, 40:14, 40:16, 40:24, 40:25, 41:2, 41:6, 41:14, 42:15, 42:16, 43:14, 44:21, 44:25, 46:20, 47:5
**politics** [1] - 47:17
**popular** [2] - 35:4, 35:7
**position** [2] - 14:5, 49:25
**possibility** [1] - 42:9
**possibly** [5] - 6:16, 16:19, 46:1, 47:24, 47:25
**post** [2] - 21:17, 51:20
**post-AFPF** [1] - 21:17
**potentially** [2] - 4:16, 37:22
**practice** [1] - 18:22
**pre** [1] - 47:13
**pre-Bonta** [1] - 47:13
**precedent** [4] - 23:13, 32:9, 32:10, 39:21
**precisely** [2] - 22:11, 24:3
**prefatory** [1] - 48:17
**Preliminary** [1] - 1:14
**preliminary** [1] - 31:1
**premise** [1] - 7:18
**prepared** [3] - 51:6, 51:15, 51:19
**present** [1] - 28:4
**presented** [1] - 52:5
**pretty** [3] - 24:15, 27:8, 46:18
**privacy** [1] - 24:21
**private** [5] - 12:22, 29:17, 29:18, 34:23, 36:7
**probability** [3] - 30:16, 34:21, 37:18
**problem** [8] - 10:21, 11:14, 17:2, 20:8, 45:2, 45:13, 46:18, 47:10
**problems** [1] - 44:19
**proceeding** [1] - 52:12
**PROCEEDINGS** [1] - 2:2
**process** [1] - 43:13
**profit** [5] - 7:5, 21:24, 22:17, 27:9, 29:24
**profits** [1] - 7:3
**Project** [2] - 11:1, 15:20
**prominent** [1] - 4:4
**promise** [1] - 16:2
**promotes** [1] - 33:6
**promoting** [1] - 33:7
**prosecute** [1] - 8:5
**Prosperity** [2] - 2:7, 2:13
**PROSPERITY** [2] - 1:4, 1:5
**protect** [1] - 29:8
**protection** [2] - 4:1, 4:9
**protections** [1] - 3:16
**prove** [2] - 15:12, 34:20
**provide** [2] - 10:3, 34:4
**provides** [1] - 41:17

**provision** [1] - 17:9
**provisions** [1] - 4:8
**public** [7] - 4:1, 8:1, 8:8, 9:12, 27:10, 30:2, 45:25
**publication** [1] - 29:18
**publicly** [1] - 10:19
**publish** [1] - 7:23
**published** [1] - 8:16
**purpose** [8] - 9:23, 15:24, 16:24, 17:5, 23:7, 37:2, 37:5, 37:6
**purposes** [6] - 4:13, 9:24, 15:25, 24:10, 39:20, 41:1
**push** [1] - 20:20
**put** [11] - 2:9, 3:25, 5:2, 8:3, 10:15, 21:3, 21:12, 26:5, 37:13, 42:1, 42:19

## Q

**questions** [2] - 34:7, 39:7
**quick** [1] - 21:6
**quickly** [2] - 51:7, 51:12
**quo** [1] - 31:3
**quotations** [1] - 38:22
**quote** [9] - 7:16, 13:2, 22:13, 31:24, 33:25, 34:20, 34:24, 36:23, 49:10
**quoted** [1] - 28:1
**quoting** [3] - 3:13, 6:5, 34:25

## R

**raise** [2] - 5:20, 24:7
**raising** [1] - 9:16
**ramps** [2] - 15:17, 17:3
**rather** [1] - 46:13
**reach** [1] - 39:12
**read** [5] - 2:24, 29:15, 38:16, 39:20, 49:2
**reading** [4] - 22:22, 23:9, 30:11, 39:17
**Real** [1] - 52:13
**Real-Time** [1] - 52:13
**really** [11] - 11:9, 16:25, 34:11, 34:16, 35:12, 36:5, 36:10, 36:11, 44:17, 44:23, 45:8
**reason** [5] - 8:4, 8:25, 24:9, 24:18, 38:12
**reasonable** [5] - 23:8, 24:20, 24:23, 30:16, 34:21
**reasons** [1] - 32:13
**rebuttal** [1] - 3:8
**receive** [1] - 25:19
**received** [5] - 5:7, 8:8, 17:18, 20:1, 23:20
**recent** [1] - 24:15
**recently** [1] - 44:18
**reciting** [1] - 38:25
**recognized** [7] - 12:25, 15:20, 23:1, 24:13, 24:17, 24:22, 29:6
**reconsider** [3] - 32:3, 32:13, 34:5
**reconsidering** [1] - 43:18
**record** [10] - 2:10, 25:15, 28:5, 29:9, 29:11, 29:14, 50:11, 50:15, 50:24, 51:4
**redo** [1] - 17:2
**refer** [1] - 31:18
**reference** [1] - 44:25
**regardless** [1] - 25:6
**regime** [1] - 38:6
**regulate** [1] - 48:19
**regulates** [1] - 3:18
**rejected** [2] - 33:4, 48:21
**relating** [1] - 51:8
**relation** [3] - 37:9, 49:5, 49:9
**relationship** [3] - 7:14, 7:17, 9:6
**relatively** [1] - 18:8
**relevance** [1] - 44:13
**relevant** [2] - 14:19, 14:22
**relied** [1] - 7:25
**relitigate** [1] - 32:6
**rely** [1] - 44:5
**remember** [1] - 48:18
**report** [4] - 3:24, 3:25, 5:1, 44:22
**Reporter** [1] - 52:13
**reports** [1] - 47:13
**represent** [2] - 29:11, 47:1
**representations** [1] - 7:23
**represented** [1] - 46:24
**representing** [1] - 32:7
**reprisal** [5] - 24:16, 28:25, 29:21, 36:8, 37:19
**reprisals** [2] - 34:22, 38:10
**request** [3] - 4:17, 16:21, 32:4
**requesting** [1] - 16:22
**require** [5] - 12:9, 29:8, 32:22, 33:20, 42:23
**required** [2] - 33:9, 49:6
**requirement** [5] - 4:20, 4:23, 5:5, 33:5, 51:24
**requirements** [1] - 46:22
**requires** [4] - 4:10, 21:21, 22:23, 40:7
**requiring** [1] - 9:7
**respect** [5] - 34:3, 37:23, 38:3, 39:25, 43:16
**respectfully** [1] - 32:8
**respects** [1] - 43:15
**respond** [2] - 47:16, 48:12
**response** [1] - 16:19
**responses** [1] - 6:17
**responsibilities** [2] - 15:10, 15:11
**rest** [2] - 46:11, 46:14
**restrictive** [9] - 6:5, 6:7, 20:21, 20:22, 21:16, 28:3, 33:1, 33:7, 49:4
**reversed** [1] - 7:18
**reversing** [1] - 32:19
**reviewed** [2] - 31:20, 33:3
**revise** [1] - 51:16
**rights** [6] - 12:17, 13:5, 13:11, 13:13, 22:5, 31:7
**rigor** [1] - 20:15
**rise** [1] - 52:8
**roll** [1] - 27:6
**Rubin** [1] - 32:11
**rule** [9] - 9:20, 9:22, 9:25, 13:6, 17:6, 22:9, 23:5, 23:6
**rules** [1] - 31:9
**ruling** [5] - 8:17, 23:2, 31:16, 50:13, 51:15
**run** [2] - 14:12, 18:9
**running** [1] - 47:7

## S

**satisfies** [1] - 27:17
**scope** [6] - 5:10, 5:11, 9:4, 16:21, 24:6, 26:13
**scrutiny** [13] - 8:22, 13:4, 22:6, 31:21, 32:16, 32:17, 32:20, 32:25, 33:3, 33:5, 33:9, 33:11, 50:4
**search** [1] - 21:6
**seat** [1] - 51:5
**seated** [1] - 2:5
**second** [5] - 3:22, 4:1, 25:3, 30:2, 45:2
**secondly** [1] - 7:19
**secret** [1] - 8:6
**section** [1] - 49:2
**security** [1] - 29:8
**see** [5] - 14:2, 30:22, 39:22, 47:24, 47:25
**seeing** [3] - 12:17, 37:22, 37:24
**seeking** [1] - 32:5
**seem** [2] - 25:13, 25:16
**send** [1] - 45:10
**sense** [4] - 12:19, 21:11, 25:20, 35:8
**separate** [4] - 28:10, 28:25, 39:19, 48:9
**serious** [1] - 46:18
**set** [1] - 19:12
**severe** [1] - 37:18
**share** [1] - 41:8
**shift** [1] - 20:8
**shifting** [1] - 40:21
**short** [1] - 33:13
**shortly** [3] - 3:14, 9:2, 14:24
**show** [6] - 9:6, 9:9, 18:6, 22:6, 30:12, 40:13
**showed** [1] - 42:14
**showing** [2] - 37:2, 37:7
**shown** [1] - 16:23
**side** [1] - 51:18
**side's** [1] - 50:25
**sides** [2] - 52:1, 52:5
**significantly** [1] - 48:1
**simply** [2] - 14:8, 32:5
**single** [1] - 38:6
**sit** [1] - 30:13
**situation** [1] - 17:14
**slight** [1] - 48:8
**small** [2] - 18:8, 35:15
**socialists** [2] - 35:15, 36:6
**sole** [2] - 4:16, 16:13
**solely** [1] - 47:8
**solicit** [1] - 18:2
**solicitation** [2] - 29:24, 31:6
**solicited** [2] - 14:18, 15:25
**someone** [3] - 4:20, 27:8, 50:19
**something's** [1] - 49:17
**sometimes** [1] - 39:24
**sorry** [3] - 29:2, 49:14, 49:15
**sort** [8] - 6:10, 11:14, 12:10, 17:7, 17:9, 19:3, 22:11, 47:18
**sounded** [1] - 25:25
**sounding** [1] - 42:1
**sounds** [1] - 40:7
**South** [1] - 35:14
**space** [1] - 31:10
**spanning** [1] - 4:16
**speaker** [2] - 45:22, 48:20
**speaking** [9] - 3:14, 9:2, 14:24, 16:11, 21:1, 40:6, 42:21, 45:18
**special** [5] - 23:19, 25:11, 27:3, 31:6, 31:9
**specific** [5] - 36:7, 39:4, 40:2, 41:7
**specifically** [7] - 7:25, 15:17, 24:22, 29:16, 31:16, 33:4, 41:25
**spectrum** [1] - 21:11
**speculation** [1] - 24:9
**speculatively** [1] - 20:16
**speech** [18] - 3:19, 20:25, 21:20, 24:25, 25:7, 26:17, 27:24, 28:8, 40:14, 40:16, 41:2, 41:6, 41:8, 41:15, 42:15, 42:16, 43:1, 43:14
**spend** [1] - 16:15
**Spend** [1] - 27:9
**spending** [1] - 18:10
**spends** [1] - 8:15
**spent** [2] - 5:1, 19:2
**stake** [1] - 4:8
**stand** [1] - 6:3
**standard** [17] - 7:1, 7:11, 8:19, 8:25, 20:21, 31:22, 32:14, 32:17, 32:20, 32:22, 32:25, 33:10, 35:13, 49:7, 49:16, 49:23, 50:4
**standing** [7] - 13:8, 22:3, 26:22, 26:24,

30:23, 30:24, 31:1
**start** [3] - 3:11, 31:14, 44:15
**state** [3] - 14:13, 19:11, 21:17
**State** [20] - 3:24, 3:25, 4:25, 5:5, 7:22, 9:19, 13:15, 13:23, 14:23, 17:2, 23:3, 24:14, 25:24, 29:12, 29:18, 29:19, 35:6, 46:24, 47:21
**State's** [6] - 10:14, 14:4, 15:11, 24:9, 25:9, 46:3
**state's** [1] - 41:10
**statement** [1] - 4:4
**statements** [1] - 44:10
**States** [1] - 13:2
**states** [4] - 10:23, 11:20, 14:13, 32:15
**STATES** [1] - 1:1
**status** [1] - 31:2
**statute** [22] - 5:24, 5:25, 10:6, 14:1, 17:3, 20:10, 21:18, 22:22, 23:9, 23:12, 26:2, 26:10, 26:11, 26:24, 27:2, 27:6, 27:20, 27:22, 34:4, 35:6, 38:18
**statutory** [1] - 4:3
**stay** [1] - 23:3
**staying** [1] - 47:9
**stenographic** [1] - 52:11
**still** [3] - 17:17, 37:15, 45:6
**stop** [3] - 26:6, 46:11, 46:14
**Street** [1] - 1:11
**strict** [1] - 33:3
**Strong** [6] - 6:1, 6:18, 20:20, 22:25, 31:18, 49:11
**structuring** [2] - 17:8, 43:19
**subject** [5] - 24:15, 34:22, 35:5, 36:24, 38:9
**subjected** [1] - 36:24
**submitted** [5] - 37:1, 39:1, 39:2, 44:3, 50:23
**subsequent** [1] - 49:20
**substantial** [5] - 7:14, 7:17, 9:6, 49:5, 49:9
**substantially** [1] - 51:6
**success** [1] - 30:16
**suffered** [2] - 37:3, 38:24
**sufficient** [2] - 7:16, 38:1
**sufficient"** [1] - 49:10
**sufficiently** [2] - 9:1, 34:4
**suggested** [1] - 40:20
**superseded** [1] - 6:21
**supposed** [1] - 49:16
**Supreme** [26] - 5:23, 6:2, 7:15, 13:2, 13:13, 14:6, 23:10, 23:12, 24:13, 25:8, 29:14, 29:15, 29:16, 32:3, 32:10, 33:15, 33:16, 34:18, 35:3, 38:14, 38:17, 38:21, 39:17, 39:21, 49:8
**surely** [1] - 38:10
**surprise** [1] - 11:18
**suspect** [4] - 8:19, 19:25, 29:12, 36:12
**swath** [1] - 3:19

## T

**table** [1] - 2:20
**tailor** [2] - 20:9, 21:15
**tailored** [14] - 5:12, 6:16, 20:13, 24:1, 27:20, 28:23, 31:24, 32:23, 33:6, 34:4, 39:20, 40:1, 43:6, 46:1
**tailoring** [16] - 9:9, 14:20, 15:12, 16:20, 20:22, 21:21, 22:7, 27:18, 30:5, 30:12, 32:22, 39:11, 39:14, 40:21, 47:24, 49:1
**talks** [1] - 22:18
**Tara** [1] - 2:21
**TARA** [1] - 1:24
**targeted** [1] - 36:5
**targeting** [1] - 41:1
**tautology** [1] - 20:11
**temporal** [1] - 15:5
**ten** [1] - 32:15
**Tenth** [6] - 6:8, 8:15, 10:24, 39:24, 40:1, 40:2
**terms** [7] - 16:21, 17:8, 17:13, 18:1, 18:10, 19:20, 44:24
**THE** [104] - 1:1, 1:2, 1:16, 2:4, 2:15, 2:22, 2:24, 3:6, 3:9, 4:18, 5:4, 5:9, 5:15, 6:22, 8:2, 8:13, 9:10, 10:3, 10:7, 10:10, 11:4, 11:8, 11:21, 11:25, 12:4, 12:7, 12:18, 12:20, 12:23, 13:7, 13:10, 14:7, 14:10, 14:17, 14:25, 15:13, 16:2, 16:5, 16:9, 17:12, 17:22, 17:24, 18:12, 19:6, 19:18, 20:6, 20:17, 21:7, 21:13, 23:16, 25:2, 25:25, 26:15, 26:19, 28:13, 29:4, 30:7, 30:19, 30:25, 31:11, 34:10, 34:13, 34:16, 35:2, 35:17, 35:21, 35:23, 36:2, 36:9, 36:14, 36:17, 36:19, 37:8, 37:12, 37:20, 39:8, 39:14, 42:4, 42:6, 42:17, 43:2, 43:4, 43:9, 43:23, 43:25, 44:4, 44:8, 44:15, 45:7, 46:8, 46:16, 46:21, 47:3, 47:6, 48:11, 49:13, 49:15, 49:23, 50:2, 50:7, 50:14, 50:21, 51:3, 51:23
**themselves** [1] - 36:22
**theories** [2] - 16:25, 20:10
**theory** [9] - 5:18, 10:14, 16:16, 16:18, 18:5, 22:15, 22:21, 28:10, 29:1
**they've** [5] - 15:22, 30:13, 42:7, 46:4, 47:13
**thinking** [2] - 20:16, 51:13
**thinks** [2] - 20:11, 29:12
**Third** [22] - 6:19, 7:12, 8:12, 8:17, 22:24, 23:1, 30:15, 31:17, 31:19, 31:21, 31:23, 32:14, 32:23, 33:14, 33:17, 34:5, 39:18, 46:10, 48:21, 49:6, 49:19, 51:10
**third** [10] - 4:2, 4:5, 40:6, 40:25, 41:4, 41:5, 44:22, 45:22, 48:7
**third-party** [7] - 40:25, 41:4, 41:5, 44:22, 45:22, 48:7
**thousand** [11] - 10:18, 14:21, 15:20, 15:21, 18:25, 19:13, 19:16, 19:20, 28:6, 33:24
**thousands** [5] - 10:16, 10:17, 18:8, 18:14, 38:11
**threat** [2] - 30:1, 37:3
**threaten** [1] - 29:7
**threatened** [1] - 38:7
**threats** [21] - 23:21, 24:16, 25:20, 28:25, 29:20, 34:22, 35:5, 36:10, 36:11, 36:25, 37:7, 37:9, 37:11, 37:12, 37:13, 37:18, 37:24, 38:9, 38:24, 39:23
**three** [5] - 3:16, 10:8, 10:9, 10:11, 35:12
**threshold** [7] - 9:15, 15:5, 33:21, 33:22, 33:24, 34:1, 40:4
**throwing** [1] - 34:2
**tied** [1] - 51:23
**tightened** [1] - 32:24
**today** [14] - 2:6, 2:13, 3:2, 34:2, 42:12, 42:22, 42:25, 43:19, 51:6, 51:14, 51:17, 51:19, 52:1, 52:6
**together** [1] - 28:24
**took** [4] - 4:25, 14:11, 29:2, 41:5
**total** [1] - 19:25
**totally** [1] - 46:12
**town** [1] - 35:15
**track** [1] - 15:10
**transcript** [1] - 52:11
**trial** [2] - 15:11, 31:3
**tricky** [1] - 48:14
**tries** [1] - 31:2
**Triozzi** [1] - 52:13
**true** [4] - 27:7, 27:13, 44:11, 52:10
**truly** [1] - 45:14
**try** [1] - 25:21
**trying** [12] - 8:4, 11:2, 11:9, 11:17, 14:10, 14:23, 17:22, 19:22, 20:8, 23:11, 25:23
**turn** [3] - 5:18, 8:11, 39:10
**tweeting** [1] - 37:25
**two** [8] - 6:18, 23:24, 24:19, 24:23, 35:3, 42:13, 47:13, 49:3
**types** [1] - 34:14

## U

**U.S** [7] - 32:3, 33:15, 33:16, 38:14, 39:17, 39:21, 52:14
**U.S.D.C.J** [1] - 1:16
**unanimous** [1] - 5:23
**unanimously** [1] - 13:1
**unconstitutional** [12] - 14:13, 15:3, 19:15, 26:11, 26:12, 26:14, 26:16, 26:21, 27:1, 27:21, 28:9, 37:15
**under** [15] - 6:6, 8:18, 8:22, 15:18, 16:18, 16:24, 18:13, 18:17, 33:3, 38:5, 40:23, 43:8, 48:2, 51:12
**underlying** [1] - 42:21
**understood** [1] - 44:17
**undifferentiated** [3] - 11:7, 41:18, 45:16
**unfortunately** [1] - 37:24
**unincorporated** [1] - 41:1
**unique** [1] - 35:25
**United** [15] - 3:13, 13:2, 13:18, 13:20, 13:25, 22:11, 22:14, 25:9, 33:11, 33:12, 33:20, 34:24, 45:3, 45:5, 45:6
**UNITED** [1] - 1:1
**unless** [3] - 18:22, 32:9, 49:19
**unpack** [1] - 25:21
**unpopular** [3] - 25:17, 35:5, 35:8
**unrebutted** [1] - 15:23
**unrestricted** [1] - 16:13
**up** [10] - 7:20, 17:7, 19:24, 25:16, 27:16, 40:1, 42:23, 47:18, 51:9, 51:23
**upcoming** [1] - 51:8
**upheld** [4] - 21:18, 21:24, 22:11, 38:15
**utilize** [1] - 43:5

## V

**Valeo** [1] - 33:8
**valid** [1] - 38:19
**variety** [1] - 32:13
**vendors** [1] - 5:2
**versus** [1] - 29:24

**view** [6] - 9:11, 10:1, 17:13, 18:14, 23:12, 33:16
**viewpoint** [2] - 25:6, 25:17
**viewpoints** [2] - 25:15, 25:19
**violation** [1] - 12:11
**vote** [1] - 47:9
**voter** [3] - 40:5, 40:17, 46:5
**voters** [3] - 3:20, 6:10, 9:2
**vs** [15] - 2:7, 5:22, 6:9, 6:21, 7:6, 7:13, 7:17, 8:22, 17:4, 21:17, 21:25, 31:18, 32:11, 33:8, 49:11

**W**

**wants** [1] - 51:9
**ways** [4] - 6:12, 10:22, 21:15, 23:24
**website** [8] - 3:25, 30:2, 40:15, 40:16, 40:18, 42:2, 45:19, 45:20
**weeks** [2] - 5:23, 13:1
**weigh** [1] - 39:4
**welcome** [3] - 2:16, 2:22, 43:24
**whereby** [1] - 4:9
**whole** [3] - 8:7, 26:17, 27:2
**Wilmington** [1] - 1:12
**win** [1] - 30:17
**winning** [1] - 28:16
**wonderful** [1] - 52:3
**worried** [1] - 18:14
**worry** [1] - 24:18
**worse** [3] - 7:9, 19:9, 30:1
**worth** [1] - 21:7
**writ** [1] - 32:2
**written** [2] - 10:6, 43:12
**Wyoming** [3] - 8:15, 10:25, 24:2

**Y**

**years** [12] - 4:16, 5:13, 10:8, 10:9, 10:11, 10:18, 11:10, 12:12, 18:15, 24:14, 42:8, 42:11
**you-all** [3] - 46:10, 51:13, 52:6

**Certificate of Service**

The undersigned counsel for Appellants hereby certifies that the foregoing appendix was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 15, 2026

*/s/ Allen J. Dickerson*

ALLEN J. DICKERSON
BAKER & HOSTETLER LLP
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1711
adickerson@bakerlaw.com

*Counsel for Appellants*